UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRILEY PIPER,<br><br>Plaintiff,<br><br>vs.<br><br>THE ATTORNEY GENERAL OF THE STATE OF SOUTH DAKOTA, DAN SULLIVAN, WARDEN, SOUTH DAKOTA STATE PENITENTIARY;<br><br>Defendants. | 5:20-CV-05074-RAL<br><br><br>OPINION AND ORDER DENYING MOTION FOR NEUROPSYCHOLGICAL TESTING |

Petitioner Briley Piper (Piper), a state death row inmate, wants to expand the state court record and develop new evidence to support his claim that counsel in his state capital sentencing trial were ineffective by failing to investigate and present evidence on potential brain damage and Fetal Alcohol Spectrum Disorder (FASD). He seeks an order to allow four experts to enter the South Dakota State Penitentiary where he is being held to evaluate him for these conditions. Doc. 60. A federal statute, though, places strict limits on a federal habeas court's authority to consider new evidence the prisoner neglected to offer in state court. See 28 U.S.C. § 2254(e)(2). If the prisoner "has failed to develop the factual basis of a claim in State court proceedings," 28 U.S.C. § 2254(e)(2) bars federal courts from holding "an evidentiary hearing on the claim"—or, indeed, even considering extra-record evidence submitted to support the claim—unless the prisoner can satisfy some narrow exceptions not applicable here. 28 U.S.C. § 2254(e)(2)(A)(i), (ii).

1

Piper's motion frames the question whether he should be deemed responsible for failing to develop the record in state court. Section 2254(e)(2) only applies if the petitioner can be deemed "at fault" for failing to develop the factual basis of a claim, meaning that he "bears responsibility for the failure." Shinn v. Ramirez, 142 S. C.t 1718, 1734 (2022) (cleaned up and citation omitted). Piper argues that he is not "at fault" because his state postconviction attorney's "extreme negligence" severed the attorney-client agency relationship. Under the Supreme Court's recent decision in Shinn, however, Piper is responsible for his state postconviction attorney's alleged failures to develop the record under the circumstances of his case. This Court therefore denies Piper's motion for testing.

I.    **Facts**

A.    **Background and Procedural History**

In April 2000, Chester Allan Poage's partially clothed body was found in a remote location in Lawrence County, South Dakota. Piper v. Young, 936 N.W.2d 793, 799 (S.D. 2019); State v. Piper, 709 N.W.2d 783, 792 (S.D. 2006). Law enforcement identified Piper, Elijah Page, and Darrell Hoadley as suspects in Poage's murder and a related burglary at Poage's house. Id. The State of South Dakota (State) charged the three men with first-degree murder, kidnapping, first-degree robbery, first-degree burglary, and grand theft. Id. Attorneys Patrick Duffy and Timothy Rensch were appointed to represent Piper. Doc. 67 at ¶ 3. In early 2001, Piper pleaded guilty to all five crimes, including the first-degree felony murder of Poage. Piper, 936 N.W.2d at 799 & n.1. A state court judge sentenced Piper to death after a three-day sentencing hearing. Id. at 800. The Supreme Court of South Dakota affirmed Piper's death sentence on direct review in 2006. Id. at 801.

Piper, represented by attorneys Steve Miller and Steven Binger, then filed a habeas petition in state court. Id. at 801–02; Doc. 67 at ¶ 6. The Supreme Court of South Dakota granted Piper habeas relief in 2009, finding that Piper did not validly waive his right to have a jury decide whether to impose the death penalty because the state trial judge had not made clear that Piper would receive a life sentence if even one juror voted against the death penalty. Piper v. Weber, 771 N.W.2d 352, 358–60 (S.D. 2009). The Court remanded Piper's case for resentencing by a jury. Id. at 360.

In August 2009, a state court judge appointed attorneys Robert Van Norman and Michael Stonefield to represent Piper in the resentencing proceeding. Doc. 67 at ¶¶ 7, 50; Doc. 2 at 288. Both men were experienced criminal defense attorneys: Van Norman, the Federal Public Defender for South Dakota from 1999 to 2003, had tried seven death penalty cases; Stonefield, a long-time state public defender, had worked on two death penalty cases. Doc. 90-11 at 7–8, 92, 115. Piper moved to withdraw his guilty pleas in October 2009, arguing among other things that he was never informed that he did not have to plead guilty to receive a court sentencing. Doc. 2 at 288, 339–49, 367. He filed several supplements to the motion and deposed a law enforcement officer about whether evidence had been withheld in his earlier case. Doc. 2 at 381–88. Judge Jerome A. Eckrich III denied Piper's motion in November 2010. Doc. 2 at 388. In December 2010, Piper unsuccessfully petitioned the Supreme Court of South Dakota for permission to appeal Judge Eckrich's denial. Doc. 2 at 292, 414–29; Doc. 90-11 at 126–27.

Having failed to overturn Piper's guilty pleas, Van Norman and Stonefield turned their focus to avoiding the death penalty for Piper. They sought to hire a psychologist and mitigation specialist and collected records to support Piper's defense. Doc. 88-1 at 10, 14; Doc. 90-6 at 225. One of the records collected—and the one most relevant to Piper's current motion—was a

February 1994 report prepared by Lyn Clark, M.D., when Piper was 13. Doc. 2 at 233; Doc. 66-1 at 5. Piper's mother Linda had Dr. Clark evaluate Piper because she was concerned about his impulsive behavior and wanted a second opinion. Doc. 2 at 233; Doc. 66-5 at 80–81. The "Medical History" section of Dr. Clark's report noted that Linda recalled smoking one pack of cigarettes per day while pregnant with Piper and consuming "some alcohol."[1] Doc. 2 at 235. Dr. Clark noted that Piper was born four to six weeks prematurely, developed mild neonatal jaundice, and suffered from vomiting for the first month of his life. Doc. 2 at 235; Doc. 66-1 at 5. She gave Piper a neurodevelopmental examination called the Pediatric Examination of Educational Readiness in Middle Childhood. Doc. 2 at 237. Dr. Clark concluded that attention deficit disorder (ADD)[2] was a "primary concern" for Piper but believed that ADD was "not the total explanation for [his] behavioral difficulties." Doc. 2 at 241. In Dr. Clark's view, the "extent of" Piper's aggression and the "seriousness" of his conduct were "not necessarily typical of students with primary" ADD. Id. Dr. Clark's report did not mention prenatal alcohol exposure or FASD[3] as a possible explanation for Piper's behavior. Doc. 2 at 233–43.

In January 2011, Judge Eckrich granted Piper's motion to appoint capital mitigation specialist Jeannette Sheldon and psychologist Dewey Ertz. Doc. 88-1 at 6, 19, 29; Doc. 2 at 292,

---

[1]Dr. Clark's full statement on Linda's drinking was as follows: "Mrs. Piper reports that she was anemic throughout her pregnancy. She smoked one pack of cigarettes per day and consumed some alcohol." Doc. 2 at 235.

[2]"The term 'ADD' refers to 'attention deficit disorder,' while 'ADHD' refers to 'attention-deficit/hyperactivity disorder.' ADD is an older term used for what is now known as the inattentive type of ADHD. The term ADHD is now commonly used to describe both inattentive and hyperactive types." Munday v. Lees-McRae Coll., No. 1:20-cv-00105-MR-WCM, 2022 WL 17252598, at *2 n.2 (W.D.N.C. Nov. 28, 2022).

[3]FASD "is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy." Doc. 62-3 at 2. It "affects the ability to make decisions, communicate, and control emotions." Anderson v. Kelley, 938 F.3d 949, 963 (8th Cir. 2019) (Kobes, J., concurring in part and dissenting in part).

430. Sheldon's role would be to investigate Piper's life history, flag issues that could warrant further evaluation, and prepare a narrative for her testimony in court. Doc. 88-1 at 6–14, 16–18, 21–22. She had over 200 hours of training in mitigation work and 70 hours of one-on-one training with forensic psychologists and psychiatrists. Doc. 90-6 at 219. Stonefield explained at a motion hearing that Sheldon had said that while the average number of hours necessary to do a "complete mitigation investigation" was over a thousand, she could do a "competent" job in Piper's case in 150 to 200 hours. Doc. 88-1 at 9–10. According to Stonefield, Sheldon did not need as much time as she would in a typical case because the defense team had already done some investigation and compiled documents and because there was less history to review given Piper's young age when the murder occurred. Doc. 88-1 at 10–12. Stonefield further explained that Dr. Ertz would review Piper's records for mitigation evidence. Doc. 88-1 at 20–23. Stonefield said that, like the psychologists in the Hoadley and Page trials, Dr. Ertz would testify about the mitigating factors of youth, drug use, and the group dynamic involved in the killing. Doc. 88-1 at 21–23. Judge Eckrich initially capped Sheldon's fees at $10,000 and Dr. Ertz's fees at $4,000. Doc. 2 at 430. He later granted an additional $5,000 for Sheldon's work. Doc. 2 at 432.

Sheldon began reviewing Piper's school, psychological, and court records in February 2011. Doc. 90-6 at 225. She prepared a 57-page social history for Piper that involved nearly 200 hours of work. Doc. 90-7 at 59; Doc. 66-1. She spent 19 hours with Piper in person and interviewed other witnesses by phone. Doc. 90-7 at 19, 59, 83; Doc. 90-6 at 225, 239. The social history detailed Piper's struggles with impulsivity and ADHD, his poor academic performance, and his use of alcohol and hard drugs at a young age. Doc. 66-1 at 21–22, 24, 27–35, 37–40, 42, 49–54, 56. It discussed the violence Piper faced at home, describing how he endured beatings from his parents and older brother. Doc. 66-1 at 9, 17, 45–46. It also described instances when a

doctor, teacher, or probation officer concluded that Piper had grave problems and needed counseling or inpatient treatment, but Piper's parents either downplayed the seriousness of his issues or disregarded the recommendation. Doc. 66-1 at 33, 35–37, 39, 41, 44–48. Citing to Dr. Clark's evaluation, the social history noted that Linda "smoke[d] one pack of cigarettes a day and consume[d] alcohol" while pregnant with Piper. Doc. 66-1 at 5. Sheldon also discussed a diagnostic evaluation performed by psychologist Michael Rose on Piper in January 1994. Doc. 66-1 at 32–35; Doc. 66-6. Dr. Rose's diagnostic impression of Piper was that he had conduct disorder of an undifferentiated type. Doc. 66-1 at 34; Doc. 66-6 at 7. Dr. Rose's report did not mention anything about FASD. Doc. 66-6.

Dr. Ertz met with Piper twice before the trial for a total of about five hours and interviewed him "extensive[ly]" about his background and the murder. Doc. 90-7 at 183–85, 190. He also reviewed many documents, including Sheldon's social history, the evaluations from Dr. Clark and Dr. Rose, and evidence concerning Hoadley and Page. Doc. 90-7 at 188–89, 201. He did not evaluate Piper, perform any tests, or write a report, however. Doc. 90-8 at 26, 32, 40. He testified at trial that "[t]here didn't seem to be a lot of purpose to evaluate Briley Piper psychologically 11 years after the murder."[4] 90-8 at 26.

---

[4]Piper claims that Dr. Ertz's trial testimony established that he "was retained only to provide testimony about group dynamics and the interactions of the perpetrators." Doc. 62 at 19. That is not exactly what Dr. Ertz said, though. Instead, the testimony Piper relies on went as follows:

> Prosecutor: Wouldn't it be important when you're doing a diagnosis and you have the opportunity to speak to the subject to ask him his version of the facts?
> Dr. Ertz: I wasn't doing a diagnosis; I didn't do an evaluation.
> Prosecutor: You were - - what were you doing? Going to give information about the group dynamics of how this crime occurred?
> Dr. Ertz: Group dynamics and also information about how the three people who were involved with the murder with interacting and their involvement with each other.

Doc. 90-8 at 40–41.

In March 2011, Piper's parents gave his lawyers $10,000 to hire forensic neuropsychiatrist Hal Wortzel. Doc. 2 at 249–53; Doc. 90-8 at 76. Dr. Wortzel met with Piper for about four hours and reviewed his school and psychological records as well the social history Sheldon prepared. Doc. 90-8 at 81, 85, 104. Dr. Wortzel did not prepare a written report (Van Norman and Stonefield did not request one) or administer any test to Piper. Doc. 90-8 at 104–05, 133–36.

## B.    Resentencing Trial

Piper's trial began in early July 2011 and lasted nearly the entire month. For Piper to be eligible for the death penalty, the State needed to prove at least one of the aggravating factors listed in SDCL § 23A-27A-1. State v. Piper, 709 N.W.2d 783, 797 (S.D. 2006); Doc. 90-10 at 6. If the jury found one of these factors beyond a reasonable doubt, it would then consider any mitigating circumstances[5] and whether Piper should be sentenced to death or life without parole. Doc. 90-10 at 9, 19–20; SDCL § 23A-27A-1. The State argued that three aggravating factors existed in Piper's case: (1) the killing was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery"; (2) Piper had killed Poage for money or profit; and (3) Piper had killed Poage to avoid detection. Doc. 90 at 80–81.

The State presented extensive evidence on all three factors. The State's witnesses testified that Piper, Page, and Hoadley developed a plan to rob Poage while playing video games at his house on the evening of March 12, 2000. Doc. 90-3 at 64–65; Doc. 90-4 at 9–12; State v. Piper, 842 N.W.2d 338, 345 (S.D. 2014). The three men lured Poage away from his home to a house where they had been staying. Doc. 90-3 at 65; Doc. 90-4 at 14. Inside, Page pulled a .22 caliber

---

[5]The jury instructions in Piper's case defined a mitigating circumstance as "one which, while not constituting a justification or excuse for the crime, should in fairness and mercy be considered as reducing the degree of moral culpability or blame of the defendant, or otherwise offering a basis for not imposing the death penalty." Doc. 90-10 at 19.

pistol he had stolen from Poage's home and ordered Poage to the floor. Doc. 90-3 at 65; Doc. 90-4 at 14–15; Piper, 842 N.W.2d at 346. As Poage lay on his stomach, asking why his supposed friends were doing this, Piper kicked him in the face, knocking him unconscious. Doc. 90-3 at 26, 64–65; Doc. 90-4 at 16–17; Doc. 95 at 5–6; Piper, 842 N.W.2d at 346. Poage's hands and feet were bound, and he was propped upright in a chair. Doc. 90-3 at 65; Doc. 90-4 at 19–22; Doc. 90-6 at 16; Piper, 842 N.W.2d at 346. Poage upon regaining consciousness could overhear Piper, Page, and Hoadley discuss ways to kill him, including slitting his throat or drowning him. Doc. 90-3 at 27, 65; Doc. 90-4 at 22–23, 29–30. Piper stood on a four-way tire iron across Poage's ankles while Page and Hoadley forced Poage to drink a mixture of beer and hydrochloric acid. Doc. 90-4 at 25–28; Doc. 90-6 at 17; Doc. 90-8 at 114; Piper, 842 N.W.2d at 346, 350. The acid hurt Poage's stomach but did not kill him. Doc. 90-4 at 26.

Piper, Page, and Hoadley decided that it would be best to kill Poage elsewhere. Doc. 90-3 at 65; 90-4 at 32–33. They put Poage in his Chevrolet Blazer and drove to a remote, wooded area in the Black Hills called Higgins Gulch. Doc. 90 at 179; Doc. 90-3 at 65; Doc. 90-4 at 31. Once there, Piper and Page forced Poage out into a foot of snow, in the below-freezing night, and made him strip to nothing but a tank-top shirt and his socks and shoes. Doc. 90 at 189–91; Doc. 90-4 at 35–36. The three then tried burying Poage in the snow, Doc. 90-4 at 53; 90-8 at 55, 123; 90-6 at 19, and drowning him in a nearby creek, Doc. 90-1 at 124; Doc. 90-4 at 47; 90-6 at 22, but Poage remained alive, Piper, 842 N.W.2d at 346. Piper would later admit that he kicked Poage multiple times in the head and body with combat boots while out at Higgins Gulch. Doc. 90 at 127–34, 151–153, 167–68; Doc. 90-3 at 66; Doc. 90-8 at 55–56, 121; Doc. 95 at 32, 35–36, 52; Piper, 842 N.W.2d at 346, 350.

Poage tried to escape at one point during the attack, but according to Hoadley, Piper told Page to bring him back. Doc. 90-4 at 43; Piper, 842 N.W.2d at 346. The three then each stabbed Poage once with a buck knife. Doc. 90-4 at 46–49, 118–19; Doc. 90-7 at 194; Doc. 90-8 at 121, 125. According to Hoadley, Piper went first, stabbing Poage in the side of the head. Doc. 90-4 at 46–47, 118–19; Doc. 90-5 at 43. Poage's stab wounds were potentially lethal, but he did not die immediately. Doc. 90 at 147; Doc. 90-4 at 125. Instead, Poage asked to get in the Blazer so that he could bleed to death where it was warm. Doc. 90-1 at 127; Doc. 90-3 at 29; Doc. 90-4 at 54, 124; Piper, 842 N.W.2d at 346, 350. The three told Poage that they would grant his request if he washed the blood off his body in the creek first. Doc. 90-4 at 54–56, 124. Poage complied but was still not allowed in the vehicle. Doc. 90-1 at 127; Doc. 90-4 at 54–56, 124. Piper retreated to the Blazer after which Page and Hoadley dropped heavy rocks on Poage's head to complete the murder. Doc. 90-3 at 66–67; Doc. 94 at 57–58; Piper, 842 N.W.2d at 346. The three left Poage's body in the creek and drove back to Spearfish where they looted Poage's home. Doc. 90-4 at 57–58; Doc. 90-3 at 33, 67; Doc. 95 at 18; Piper, 842 N.W.2d at 345. They eventually pawned some of Poage's possessions and used his ATM card to steal cash from his bank account. Doc. 90-4 at 61, 68; Doc. 90-6 at 89; Doc. 95 at 24, 95–96; Piper, 842 N.W.2d at 345.

All told, the kidnapping and murder of Poage lasted about four hours. Doc. 90-4 at 44–45, 122; Doc. 95 at 49. The State presented evidence at trial that Poage had begged for his life throughout the ordeal and that Piper taunted Poage as he was brutalized. Doc. 90-1 at 126, 175; Doc. 90-3 at 26–27, 30; Doc. 90-4 at 33, 48, 51; Doc. 90-6 at 20; Doc. 95 at 40, 70; Doc. 90-8 at 122; Piper, 842 N.W.2d at 347, 350. Hoadley admitted that he and his codefendants killed Poage to eliminate him as a witness, Doc. 90-4 at 51, and the State offered other testimony that Piper had said that "things had gotten so bad that they had to" kill Poage, Doc. 90-1 at 176. At least two

9

witnesses testified that in the months leading up to the murder, Piper had said that he wanted to know what it was like to kill someone. Doc. 90-1 at 128; Doc. 90-5 at 168. Other witnesses who were housed with Piper in the Lawrence County Jail before his first trial testified that Piper had offered them money to kill two guards so that he could escape. Doc. 90-3 at 13, 15–16, 19–23; Doc. 90-6 at 12, 23–25.

The State also offered testimony from psychiatrists Ulises Pesce and Ronald Franks and counselor Robert Fredrickson. Dr. Pesce saw Piper over ten times between 2001 and 2004 while working at the South Dakota State Penitentiary in Sioux Falls. Doc. 90-2 at 57. He prescribed Piper medication and assessed him as having antisocial personality disorder. Doc. 90-2 at 65–66, 69, 83. Dr. Pesce testified that conduct disorder is basically the child version of antisocial personality disorder, and that a childhood diagnosis of the former often precedes an adult diagnosis of the later. Doc. 76, 96–98. He explained that violence, manipulation, deceitfulness, and a lack of empathy were all associated with antisocial personality disorder. Doc. 90-2 at 78. When asked about ADHD, Dr. Pesce said that the condition is linked to trouble in school and agitation, but that it does not cause violence. Doc. 90-2 at 72–73. He described Piper as feeling that his death sentence was a "terrible crime" the State committed against him. Doc. 90-2 at 61.

On cross-examination, Dr. Pesce conceded that he had only seen Piper for eight hours total and that ADHD can have very significant effects on a person's life. Doc. 90-2 at 80, 85. He also agreed that the brain's frontal lobes are not fully mature when a person is 20 years old, that development of the frontal lobes is directly related to impulse control and an appreciation for consequences, and that ADHD can exacerbate problems associated with underdeveloped frontal lobes. Doc. 90-2 at 86–87. Dr. Pesce likewise acknowledged that ADHD and antisocial

personality disorder would "directly" affect a 20-year-old's ability to make good choices. Doc. 90-2 at 99.

Dr. Franks never met with Piper but did review his social history and psychological records from the penitentiary. Doc. 90-3 at 79, 86. He testified that ADHD makes it difficult to focus but does not create a greater risk for violence than in children who do not have ADHD. Doc. 90-3 at 76–79. Dr. Franks told the jury that children with conduct disorder can still control their behavior, Doc. 90-3 at 85–86, and identified instances in Piper's social history where he had behaved well, Doc. 90-3 at 79–80. He testified that an enabling home environment—such as when a parent refuses to consistently punish misbehavior and hold a child accountable—can worsen conduct disorder, Doc. 90-3 at 84–85, 101, and that Dr. Rose had diagnosed Piper with conduct disorder when he was 13 or 14, Doc. 90-3 at 130.

According to Dr. Franks, Piper's social history and penitentiary records did not reveal any evidence that Piper had a brain disease or neurological damage. Doc. 90-3 at 87. "[I]n fact," Dr. Franks explained, "[Piper] had a very thorough neurological assessment when he was in the seventh grade and they did not find evidence of neurological deficit" or damage. Doc. 90-3 at 87; see also Doc. 90-3 at 91 (stating that Dr. Clark's evaluation did not show any evidence of neurological deficits). Dr. Franks further testified that he saw little connection between frontal lobe development and the type of violence done to Poage, Doc. 90-3 at 95, and that people with antisocial personality disorder can control their impulses but are sometimes unwilling to do so, Doc. 90-3 at 98–99. On cross, Dr. Franks acknowledged that at least two authorities had recommended that Piper receive residential treatment but that such treatment never occurred. Doc. 90-3 at 104–05, 119.

Penitentiary counselor Robert Fredrickson saw Piper regularly between June 2008 and March 2009 while doing rounds in Piper's housing area. Doc. 90-5 at 96–97, 101, 103, 111, 121. He testified that there were times Piper exhibited antisocial traits like a lack of remorse, superficial charm, and little concern for something unless it involved himself. Doc. 90-5 at 103–04. He also recalled one interaction where Piper had displayed "strong traits of narcissism," Doc. 90-5 at 106, and testified that Piper is "quite intelligent," Doc. 90-5 at 107. Fredrickson admitted on cross that Piper had never been rude or combative with him and that Piper taking college courses in prison was a positive sign. Doc. 90-5 at 110–111, 113.

Piper's defense focused largely on presenting mitigatory evidence. Linda's and Sheldon's testimony sought to humanize Piper, highlight his ADHD and learning disability, and explain his difficult upbringing. Doc. 90-6 at 129–207, 218–51; Doc. 90-7 at 2–121. Prison counselor Justin Falon testified about Piper's drive to educate himself by taking college correspondence courses and about his positive overall impression of Piper. Doc. 90-7 at 121–77. A prison chaplain and nun testified about Piper's conversion to Catholicism. Doc. 90-8 at 149–89.

Dr. Ertz testified about Piper's extensive pre-incarceration abuse of marijuana and LSD, and the negative effects these drugs have on a person's reasoning and mental health. Doc. 90-7 at 195–98. He agreed with Piper's ADHD diagnosis but questioned Dr. Rose's conclusion that Piper had conduct disorder. Doc. 90-7 at 199–203, 205. Among other things, Dr. Ertz believed that Dr. Rose erred by using an adult version of a test when evaluating the then 13-year-old Piper. Doc. 90-7 at 202. In Dr. Ertz's view, Piper's inattention and struggle to conform to societal norms was evidence of his ADHD. Doc. 90-7 at 205. He explained that impulsivity and failure to conform to societal norms are symptoms of both antisocial personality disorder and ADHD, and that Piper's

impulsivity made it more likely that he would unthinkingly engage in antisocial behavior. Doc. 90-7 at 205–08; Doc. 90-8 at 3–4.

Dr. Ertz told the jury that youth, substance abuse, group dynamics, and upbringing all affect a person's ability to exercise free will. Doc. 90-8 at 6, 8. He explained that the brain's frontal lobes—the area responsible for reasoning and executive function—are not fully developed until age 25, Doc. 90-8 at 7, and that the harsh physical punishment Piper received during his youth only worsened his ADHD and prevented him from learning prosocial behavior, Doc. 90-8 at 9–10.

Dr. Wortzel testified that youth, substance abuse, upbringing, ADHD, and group dynamics were all mitigating factors in Piper's case. Doc. 90-8 at 85, 97. He explained that 19-year-olds are more impulsive because their brains haven't finished maturing and that Piper's heavy LSD use in the months before Poage's murder would have compounded this impulsivity. Doc. 90-8 at 87–90. He said that home environment is critical to a person's development, Doc. 90-8 at 93, and that Piper's environment was "far from ideal," Doc. 90-8 at 91. In particular, Dr. Wortzel explained that the arbitrary beatings Piper received would not have taught him right from wrong and that Piper's parents erred by blaming others for his behavior and refusing to get him the help he needed. Doc. 90-8 at 91–94. Dr. Wortzel believed that Poage's murder was the result of group dynamics, with Piper, Hoadley, and Page feeding off one another and acting in ways they would not have if they had been alone. Doc. 90-8 at 99–100.

Dr. Wortzel agreed on cross-examination that the three defendants stole Poage's property and murdered him to eliminate a witness against them. Doc. 90-8 at 120, 128. The State asked Dr. Wortzel whether he had done a brain scan of Piper and whether there was any evidence that Piper had brain damage. Doc. 90-8 at 135. Dr. Wortzel replied that while Piper's ADHD and

13

antisocial tendencies had "neurological underpinnings," he was not saying that Piper had brain damage. Doc. 90-8 at 135. He also testified that he had not recommended a brain scan or similar test for Piper because they were "experimental in nature at this point in time and not intended for single subject use." Doc. 90-8 at 136.

Attorneys Van Norman and Stonefield focused on the mitigatory evidence in closing arguments, urging the jury to impose a sentence of life without parole rather than death. Doc. 90-10 at 58–94. Stonefield argued that the crime was the result of group dynamics and not something Piper would have done by himself, that Piper had cooperated with law enforcement and accepted responsibility by pleading guilty, and that Piper had been sitting in the Blazer when Hoadley and Page did the most damage to Poage. Doc. 90-10 at 66–67, 72–73. He contended that it would be wrong to sentence Piper to death when Hoadley—who played a significant role in Poage's murder, showed little remorse on the witness stand, and engaged in other concerning conduct like threatening his pregnant girlfriend's life and holding a knife to another girl's throat—only received a life sentence. Doc. 90-10 at 73–74. Van Norman's mitigation arguments focused more on Piper's upbringing and mental health. He argued that Piper "wasn't wired correctly to start with," having been born with a learning disability and ADHD. Doc. 84–85. He emphasized Linda's refusal to get Piper the therapeutic help he so clearly needed, Doc. 90-10 at 90, as well as her penchant for corporal punishment, Doc. 90-10 at 89.

The jury found all three aggravating factors alleged by the State and sentenced Piper to death. Doc. 2 at 333–34. Judge Eckrich entered judgment in early August 2011 and appointed attorney Steve Miller as appellate counsel. Doc. 2 at 304–05, 337; Doc. 67 at ¶ 7. Piper appealed to the Supreme Court of South Dakota, arguing that Judge Eckrich erred by denying his motion to withdraw his guilty pleas and that his sentence was disproportionate to the life sentence Hoadley

received.[6] Doc. 2-1 at 7–42. The Supreme Court of South Dakota affirmed in early 2014, holding that Piper's sentence was lawful and that his motions to withdraw his guilty pleas were beyond the scope of the court's limited 2009 remand. Piper, 842 N.W.2d at 344–51.

### C.     State Habeas Case

Piper filed a pro se state habeas petition in mid-March 2014. Doc. 2 at 313; Doc. 2-1 at 44–48. He claimed that the State had presented false testimony and withheld material evidence, that his 2001 guilty pleas were not knowing and intelligent, and that he received ineffective assistance of counsel. Doc. 2-1 at 44–48. Judge Randall Macy appointed attorney Matthew Kinney to represent Piper. Kinney secured an order staying Piper's execution and began work on the case. Doc. 103 at 62, 68–71, 73–74. An evidentiary hearing was set for mid-July 2015. Doc. 103 at 99. In June 2015, Kinney moved to postpone the hearing so that he could have more time to review "the voluminous amounts of documents and discovery in this matter." Doc. 103 at 102. At a hearing on the motion, Kinney explained that he planned on filing a motion to withdraw Piper's guilty plea in the criminal case so that this issue would be exhausted for any federal habeas action Piper might bring. Doc. 103 at 530–31. He further explained that he was "on schedule," that he and Kim de Hueck, an attorney at his firm, had "spent some good time on this," and that de Hueck had "seen Mr. Piper at least on two or three occasions for long periods of time in the South Dakota State Pen." Doc. 103 at 532. Judge Macy granted the continuance and moved the evidentiary hearing to October 2015. Doc. 103 at 118.

Kinney moved for another continuance in September 2015. The motion explained that Judge Eckrich had yet to rule on Piper's motion to withdraw his guilty plea and that Piper wanted

---

[6]When Piper appealed his initial sentence, two justices on the Supreme Court of South Dakota agreed that his death sentence was grossly disproportionate to Hoadley's life sentence. Piper, 709 N.W.2d at 822 (Sabers, J., dissenting).

to exhaust this issue before Judge Macy ruled on his habeas petition. Doc. 103 at 122–24. Judge Macy granted the motion and set a status conference for January 2016. Doc. 103 at 131. In the meantime, Judge Eckrich held a hearing on Piper's motion to withdraw his guilty plea and both parties submitted briefs on the issue. Doc. 103 at 557–58. Piper and the State agreed to continue the habeas hearing until Judge Eckrich ruled on Piper's motion. Doc. 103 at 558–59. Judge Eckrich denied Piper's motion in February 2016. Doc. 103 at 564–65. Piper filed an immediate appeal, but the Supreme Court of South Dakota dismissed it for a lack of jurisdiction. Piper, 936 N.W.2d at 803. With the guilty plea issue concluded, Judge Macy set the evidentiary hearing for July 2016. Doc. 103 at 134, 564. Kinney prepared a writ of habeas corpus ad testificandum directing that Piper be brought to Lawrence County before the hearing so that he could meet with his attorneys. Doc. 103 at 143–44. He also subpoenaed Van Norman and Stonefield. Doc. 103 at 138–41.

At the evidentiary hearing, Kinney presented testimony from Van Norman, Stonefield, and Steve Miller. He questioned Van Norman and Stonefield about the motion to withdraw Piper's guilty plea, voir dire and jury selection, preparation for and cross of certain witnesses, supposedly inconsistent arguments the State made about the leadership roles of Piper and Page during Poage's murder, and which issues they believed Miller should have raised on appeal. Doc. 90-11 at 7–36, 44–82, 114–60. Kinney questioned Miller on his advice to Piper that it would be premature to challenge his guilty pleas during his initial state habeas case, the motion to withdraw Piper's guilty pleas, and Miller's decision on which arguments to raise in Piper's appeal. Doc. 90-11 at 196–221. Kinney did not ask anyone about Piper possibly having brain damage or FASD and did not offer any evidence beyond the testimony of Piper's three previous lawyers.

Judge Macy ordered the parties to file proposed findings of fact and conclusions of law after they received the transcript of the habeas hearing. Doc. 90-11 at 228–29; Doc. 103 at 145. On Kinney's motion, Judge Macy extended the deadlines for filing post-hearing materials and any rebuttal submissions. Doc. 103 at 409. Kinney and the State filed their proposed findings of fact and conclusions of law in early October 2016. Doc. 103 at 410–59. Piper's proposed findings of fact and conclusions of law raised the following grounds for relief:

(1) that his 2001 guilty pleas were not knowing and intelligent;

(2) that Duffy, Rensch, and Piper's initial state habeas counsel (Miller) were ineffective in advising him about his guilty pleas and right to a jury trial;

(3) that Van Norman and Stonefield were ineffective by performing deficiently in several ways during voir dire, failing to thoroughly investigate the State's witnesses, and failing to develop the record concerning the cross-examination of a defense witness;

(4) that Miller was ineffective in his role as appellate counsel after the jury verdict by failing to appeal voir dire issues and denial of a mistrial motion.

Doc. 85-1 at 30–31; Doc. 2-1 at 183–85. Some of these grounds for relief overlapped with Piper's pro se habeas petition while others were new. Kinney did not claim that Van Norman and Stonefield were ineffective by failing to adequately investigate and present life history and cognitive functioning evidence.[7] The State filed a rebuttal brief, but Kinney did not. Doc. 103 at 460–65.

Judge Macy denied Piper's habeas petition on January 13, 2017, finding that Piper's guilty pleas were knowing and intelligent and that his attorneys had not performed ineffectively or

---

[7]This Court is not making any definitive findings on which claims Piper did or did not raise in his state habeas petition. For ruling on Piper's motion for testing, what matters is that Kinney did not raise a claim that Van Norman and Stonefield were ineffective by failing to have Piper evaluated for brain damage or FASD.

prejudiced him.  Doc. 2-1 at 180–204.  Piper wrote a letter to Judge Macy dated January 23, 2017,

saying that he understood that Kinney would be moving for a certificate of probable cause so that

he could appeal Judge Macy's order to the Supreme Court of South Dakota.[8]  Doc. 103 at 502.

Piper wrote:

> It is my intention to appeal your decision, however, I do not believe
> that I will be able to do that on my own, nor do I believe that my
> current counsel will be able to assist me as will be needed at that
> level.  Therefore, I am writing to you today to ask that I be allowed
> to have new counsel appointed to me, in order to move on to the next
> stage of the appeals process.

Doc. 103 at 502.  Kinney filed a short objection to Judge Macy's order on January 31, 2017.  Doc.

103 at 494–95.

Judge Macy entered an order on February 13, 2017, appointing Kinney to represent Piper

on appeal of his habeas case.  Doc. 103 at 504.  Piper wrote a letter to Judge Macy on March 7,

2017, stating as follows:

> I am writing to you today out of concern over your
> appointment of Matthew Kinney to continue to represent me in my
> attempt to appeal the ruling of the denial of habeas corpus relief.
> It will be my intention to challenge his effectiveness as
> counsel, and sir, there is no realistic way that Mr. Kinney can be
> objective in pursuing this line of appeal.
> Your honor, for some time now there has been a fundamental
> lack of communication between myself and Mr. Kinney; on several
> occasions I have written to him or attempted to telephone either
> himself, or at the time my other appointed counsel, Ms. Kimberly
> de Hueck, and only once or twice have I been actually able to consult
> with them.  And your honor, even when I was able to consult with
> them, they never seemed to follow through on what I, as their client,
> asked them to do.  This in and of itself should signify that Mr.
> Kinney could not be objectively open to arguing this point against
> himself on my behalf.
> And if I need to make another point, then please, allow me.
> In filing the motion to the State Supreme Court, Mr. Kinney sent me
> papers to file to the court pro se to begin the appeal process, yet the

---

[8]This letter was not filed in the state court record until February 13, 2017.  Doc. 103 at 502.

appeal had been dismissed due to the Court receiving my motion prior to receiving your order granting motion for issuance of certificate of probable cause, now this error seems to be able to be rectified, however as it has happened, my attorney still has not contacted me to even inform me as to what went wrong! I was able to find out through another prisoner's attorney whom [sic] lives in my cellblock, because Mr. Kinney felt it ok to discuss the happenings of my case with this individual's attorney, and not even his own client.

You honor, how can I be expected to entrust my life to an attorney who ignores strategies I suggest and fails to even communicate with about what is going on with this case? Therefore I am respectfully requesting that you reconsider your appointment of Mr. Kinney as my attorney to represent me on all matters concerning any further appeals at this particular stage in this case. I would further request that the appointment of counsel come from Sioux Falls, so that I may be permitted to meet with my counsel as frequently as may be needed, and given the gravity of this case, it would seem to be more than the four or five times that I was able to actually meet with my present attorney over the nearly five years he's been appointed to my case.[9]

I thank you for taking the time to read my letter and to take my request under consideration, and I hope you will grant my request and that I will be able to move forward with this process with as little disruption as possible.

Doc. 103 at 829–30. Judge Macy wrote back to Piper explaining that Kinney had already appealed his habeas case and that Piper would need to make his request to the Supreme Court of South Dakota. Doc. 103 at 831.

Piper wrote a letter to the Supreme Court of South Dakota on March 27, 2017:

Your honor, I am writing to you today to make my request to have my current counsel, Matthew Kinney, removed from my case, and to have new counsel appointed to represent me in any further matters as it regards the appeal of my habeas denial issued by the Honorable Judge Randall Macy.

For some time now I have been seeking to get new counsel, and initially Judge Macy had ordered that Mr. Kinney would proceed to represent me in appealing the denial by Judge Macy, for he had been my counsel during those proceedings. Yet, your Honor, it was, and is my intention to make the claim that Mr. Kinney was

---

[9]Kinney had actually been representing Piper for approximately three years.

not effective in his duties during his time as my duly appointed counsel. Not only do I believe this, but Mr. Kinney himself, during a recent telephone conversation made the admission that he knew that from the very first moment that he had been appointed to represent me, he knew that he "was only going to be going through the motions."

It is my belief that Mr. Kinney never had any intention of actually trying to represent me to the level in which appellate [sic] counsel, especially one that is handling a capital case, should have. He frequently refused to act on suggestions that I felt were important in investigating during my habeas proceedings, and after his recent admission of knowing that he was merely just going to be going through the motions of moving me along from the state level and into the Federal system, there can be no reasonable way to think that he even wanted to be effective in his representation of me. The fact that he was present for the actual proceedings and made filings on my behalf should not in itself prove effectiveness, and should not be enough to convince this court to allow him to remain as my duly appointed counsel.

Your Honor, certainly you would agree that every defendant, no matter the case, but especially in a capital case, deserves to have counsel that will perform his duties to the very best of his ability, and not simply go through the motions.

Now I was instructed by Judge Macy to make my request to you, for my case is now going to be heard before the court. I know that the court's time is precious, and it is not my intent to try and waste it, nor is it to try and prolong a proceeding for some other reason. I simply am trying to make my case before the court and follow this case to its conclusion, whatever that ultimately will be, I only want to have it done the right way, and how it is proceeding now, it is not the right way.

Therefore, I officially am requesting to have new counsel appointed to me, and also to have a new filing schedule for any briefs that may be submitted to the court, after there has been time for the new counsel to come up to speed on the issues involving this case, and that the current briefing schedule be postponed pending the outcome of this request.

I hope that with what I have had to say in this letter will provide the justification for my request and that new counsel will be able to come on board as quickly as possible and I will be able to proceed in a timely fashion to come to a resolution to this case.

I thank you for your time and attention to this matter and I hope that I will be able to hear back from the court as soon as it is convenient.

Doc. 103 at 835–36.

Kinney filed the following response to Piper's letter:

> Mr. Piper states he has been attempting to obtain substitute
> legal counsel in order to prepare for ineffective assistance of counsel
> claims with regard to my representation of Mr. Piper in his habeas
> corpus action at the trial level.  Mr. Piper further represents that I
> am only representing him to "go through the motions" and that I had
> no intention of representing someone on a capital case at the
> appellate level.  Mr. Piper goes on to make other claims to preview
> an additional ineffective-assistance of counsel claim.
>
> These claims are denied in full by myself.  I have spent
> considerable time representing Mr. Piper's claims diligently and
> ethically.  I believe the claims Mr. Piper present [sic] at his previous
> habeas corpus hearing are meritorious, although he was advised of
> further legal steps if his pending appeal did not result in a reversal
> or remand.  Perhaps understanding the procedural remedies that
> must be taken in his case as perceived by Mr. Piper as "going
> through the motions."  It is true that we reside on opposite ends of
> the state and I may not always be able to satisfy his every request.
>
> Upon receiving a copy of this response, it is anticipated the
> attorney-client relationship will further endure some strain, so while
> I do not object to the appointment of substitute counsel given the
> severity of the matter, his appeal will be litigated as planned until I
> am informed otherwise.

Doc. 103 at 837.

The Supreme Court of South Dakota remanded Piper's request to the trial court and Judge

Macy entered an order appointing Ryan Kolbeck as substitute counsel for Piper.  Doc. 103 at 834,

843–44, 847.  Kolbeck obtained an amended certificate of probable cause from the trial court and

appealed to the Supreme Court of South Dakota.  Doc. 103 at 953–54, 962–63.  The Supreme

Court of South Dakota affirmed the denial of Piper's habeas petition in late 2019.  Piper, 936

N.W.2d 793.

### D.    Federal Habeas Case and Motion for Testing

Piper timely filed this § 2254 petition in December 2020.  Doc. 1.  Claim I of his amended

petition alleges that Van Norman and Stonefield were ineffective by failing to adequately

investigate and present life history and cognitive functioning evidence.  Doc. 67 at ¶¶ 44–159.

21

Piper admits that he procedurally defaulted this claim by failing to bring it in state court, and that he will need to demonstrate cause and prejudice to overcome this procedural default. As relevant here, Piper asserts that his records contained "many red flags" suggesting that he may have brain damage and FASD, including Dr. Clark's report noting that Linda drank "some alcohol" while pregnant with Piper and that ADD did not explain all of his behavioral difficulties, a premature birth, neonatal jaundice, projectile vomiting shortly after birth, and recurrent severe ear infections. Doc. 62 at 3; Doc. 67 at ¶¶ 94–129; Doc. 85 at 10–11; Doc. 86 at 9. Piper alleges that Van Norman and Stonefield knew of these red flags yet failed to have their experts conduct appropriate evaluations of Piper. His motion for testing asks that four experts be allowed to visit him in prison to evaluate him for brain damage and FASD now. Doc. 60. He argues that the results of these tests will help him both to succeed on the merits of Claim I and to demonstrate cause and prejudice to excuse his procedural default of this claim. Doc. 62 at 3–4.

Piper submitted affidavits from the four experts in support of his motion for testing. Docs. 62-1–62-4. Dr. Jeffrey Lewine, a neuroscientist, explains that FASD "is often associated with compromised cognitive skills, poor decision making, anger management issues and impulsivity, executive dysfunction, and neurological compromise." Doc. 62-1 at ¶ 8. He avers that he has reviewed Piper's records and recommends that Piper undergo a quantitative electroencephalogram (qEEG) to test for evidence of brain dysfunction. Doc. 62-1 at ¶¶ 6–15.

Dr. Paul Connor, a clinical psychologist, writes that Piper's records revealed "a number of factors that raised concerns" that Piper "could have an FASD," including Linda consuming alcohol while pregnant with Piper, many ear infections in childhood, behavioral difficulties at a young age, and having ADHD and a learning disorder. Doc. 62-2 at 2. Dr. Connor recommends that Piper

22

undergo a neuropsychological evaluation to help determine whether he has FASD or some other neurodevelopmental disorder. Doc. 62-2 at 3.

Dr. Julian Davies, a pediatrician, reviewed Piper's records and arrived at the provisional opinion that he would be diagnosed with Neurobehavioral Disorder/Alcohol Exposed, an FASD also known as moderate Alcohol-Related Neurodevelopmental Disorder (ARND). Doc. 62-3 at 2. Dr. Davies based this opinion on Piper's prenatal exposure to alcohol, non-clinical photographs from Piper's childhood to young adulthood showing "an upper lip thickness that appears to be on the borderline of the FAS range," and his conclusion that Piper's records "support findings of moderate functional brain impairments." Doc. 62-3 at 4–6.

Dr. Natalie Novick Brown, a psychologist, wrote that her review of Piper's records "indicates" that Piper's "functional history is consistent with" FASD. Doc. 62-4 at 3. She pointed to Piper's prenatal alcohol exposure as well as certain "physiological indicia of possible FASD," including Piper being born prematurely, having neonatal jaundice, suffering from projectile vomiting for the first two months of life, and having recurrent ear infections. Doc. 62-4 at 4–5. According to Dr. Brown, the "substantial discrepancy between Mr. Piper's pattern of academic dysfunction and high-average IQ of 117 was a red flag indicative of FASD." Doc. 62-4 at 6. She further remarked that unlike ADHD, "FASD accounts for all of Mr. Piper's functioning and behavior throughout life." Doc. 62-4 at 20.

Piper also submitted affidavits from Linda, his older siblings Sheryl Engle and John Piper III, and various others. Doc. 62-5; Doc. 41. Linda admitted in her affidavit that the information written in Dr Clark's 1994 report "is true." Doc. 62-5 at ¶ 1. Engle said she had overheard Linda talk about drinking alcohol while pregnant with all her children, and both Engle and John described Linda drinking heavily while they were young. Doc. 41 at 3–5, 12. Affidavits from other

witnesses who knew Piper's family confirmed Linda's heavy drinking. Doc. 41 at 13; Doc. 2-2 at 171.

Respondent opposes Piper's motion for testing, arguing that 28 U.S.C. § 2254(e)(2) and the Supreme Court's decisions in Shinn and Shoop v. Twyford, 142 S. Ct. 2037 (2022), foreclose granting Piper's motion or considering the affidavits he submitted in support. Doc. 65 at 2, 18, 21. Relying on articles from medical journals, Respondent contends that Piper does not meet the basic criteria for FASD and that the type of FASD Piper allegedly has was not clinically recognized when he was resentenced in 2011. Doc. 65 at 45–53. Respondent also filed a separate motion for summary judgment on Claim I arguing that Piper's procedural default of the claim cannot be excused under the exception established in Martinez v. Ryan, 566 U.S. 1 (2012). Docs. 69, 70.

## II.   Analysis

### A. Exhaustion and Procedural Default

Some background on procedural default is helpful to understanding the Supreme Court's recent decision in Shinn as well as how the testing evidence and affidavits Piper submitted seek to avert the procedural default of Claim I. Federal courts typically cannot consider a state prisoner's habeas claims unless the prisoner has already raised those claims in state court. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). Congress codified this requirement in § 2254, making state prisoners "exhaus[t] the remedies available in the courts of the State" before they can obtain federal relief. 28 U.S.C. § 2254(b)(1)(A). "Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures." Shinn, 142 S. Ct. at 1732. The exhaustion requirement protects the state courts' role in enforcing federal law, allows state courts the first opportunity to correct possible constitutional defects in state court convictions, and prevents the potentially "unseemly"

24

disruption of state judicial proceedings through premature federal court intervention. Rose v. Lundy, 455 U.S. 509, 518 (1982) (cleaned up and citation omitted).

These interests in comity and federalism also underlie the procedural default doctrine. Shinn, 142 S. Ct. at 1732; Davila v. Davis, 582 U.S. 521, 527–28 (2017). Procedural default occurs when a prisoner does not properly exhaust his claims in state court and is now barred from doing so because of his failure to follow the state's procedural rules. Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) (en banc); Wiegers v. Weber, 37 F. App'x 218, 219–20 (8th Cir. 2002) (per curiam). If the petitioner is barred from raising his claims because "untimeliness or some other state procedural hurdle" prevents him from doing so, then he has technically exhausted his state court remedies as there are no longer any such remedies available to him. Grass v. Reitz, 643 F.3d 579, 584 (8th Cir. 2011); see also Woodford v. Ngo, 548 U.S. 81, 92–93 (2006) ("In habeas, state-court remedies are described as having been 'exhausted' when they are no longer available, regardless of the reason for their unavailability."). Exhaustion in this sense, however, "does not automatically entitle the habeas petitioner to litigate his . . . claims in federal court." Woodford, 548 U.S. at 93. Rather, the petitioner's "procedural default may constitute an independent and adequate state ground barring federal habeas relief," Grass, 643 F.3d at 584 (cleaned up and internal citation omitted), unless the petitioner can show "cause"—meaning "something *external* to the petitioner, something that cannot fairly be not attributed to him" that hindered compliance with the state procedural rule—and "actual prejudice,"[10] Coleman v. Thompson, 501 U.S. 722, 750, 753 (1991). The procedural default doctrine thus "ensures that

---

[10]A petitioner can also avoid procedural default by showing "actual innocence," but Piper makes no assertion of actual innocence here. Grass, 643 F.3d at 584.

the States' interest in correcting their own mistakes is respected in all federal habeas cases." Edwards v. Carpenter, 529 U.S. 446, 452–53 (2000) (cleaned up and citation omitted).

Here, Piper acknowledges that he never presented Claim I or his supporting evidence in state court and agrees that this claim is procedurally defaulted. Doc. 60 at 3; Doc. 62 at 3–4. He argues that this default must be excused, however, because Kinney was himself ineffective by failing to raise Claim I during state habeas proceedings. Attorney error can constitute cause to excuse a procedural default if it occurs at a stage of the case where the defendant has a constitutional right to effective assistance of counsel. Coleman, 501 U.S. at 754. The rationale for this is that a state's failure to provide effective counsel when the Constitution requires it to do so makes counsel's mistakes attributable to the state and thus external to the petitioner. Id. at 754. But the result is different when "the State has no responsibility to ensure that the petitioner was represented by competent counsel." Id. In that situation, counsel's errors are "attributed to the prisoner under well-settled principles of agency law." Davila, 137 S. Ct. 2065 (cleaned up and citation omitted); see also Link v. Wabash R.R. Co., 370 U.S. 626, 634 (1962) (stating that in "our system of representative litigation . . . each party is deemed bound by the acts of his lawyer-agent"). Because there is no constitutional right to an attorney in state postconviction proceedings, ineffective assistance of counsel during those proceedings generally does not qualify as cause to excuse a procedural default. Coleman, 501 U.S. at 752.

The Supreme Court recognized a narrow exception to this general rule in Martinez v. Ryan, 566 U.S. 1 (2012), holding that courts may find cause to excuse procedural default of a "substantial" claim of ineffective assistance of trial counsel when state law requires prisoners to raise such claims at the initial-review stage of collateral proceedings and the "cause" consists of there being no counsel or "ineffective" counsel during this collateral proceeding. Trevino v.

Thaler, 569 U.S. 413, 423 (2013).  A year later, in Trevino, the Court extended this exception to situations where the state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal."  Id. at 429.  Two aspects of Texas law convinced the Court in Trevino that Martinez applied to defendants convicted in that state.  Trevino, 569 U.S. at 423–28.  First, Texas procedure made it "virtually impossible" to develop the sort of extra-record evidence necessary to bring an ineffective assistance of counsel claim on direct appeal.  Id. at 424 (cleaned up and citation omitted).  Although Texas argued that defendants could expand the record via a motion for a new trial, Texas courts had found that this procedure was often inadequate given the time constraints Texas imposed and counsel's lack of access to trial transcripts.  Id. at 424–25.  Second, refusing to extend Martinez "would create significant unfairness" because Texas courts had "in effect . . . directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review."  Id. at 425–26.

Defendants convicted in South Dakota face the same problem as those convicted in Texas: the first chance to present a claim of ineffective assistance of trial counsel will almost always be on collateral review by filing a state habeas action.  The Supreme Court of South Dakota does not consider ineffective-assistance-of-counsel claims on direct appeal "absent exceptional circumstances."  State v. Alvarez, 982 N.W.2d 12, 20 (S.D. 2022) (cleaned up and citation omitted).  This "rule is a practical one, necessitated by the fact that the record on direct appeal typically does not afford a basis to review the performance of trial counsel."  Id. (cleaned up and citation omitted); see also State v. Craig, 850 N.W.2d 828, 838–39 (S.D. 2014) (explaining that it is "rare" for ineffective-assistance-of-counsel claims to be ripe for review on direct appeal (cleaned up and citation omitted)).  South Dakota appears to have no established procedure for developing

27

ineffective-assistance-of-trial-counsel claims for direct appeal.[11]   In fact, the Supreme Court of South Dakota has said that "it is only through habeas corpus that a sufficient record can be made to allow the appropriate review of a claim of ineffective assistance of counsel." State v. Hanneman, 823 N.W.2d 357, 360 (S.D. 2012) (cleaned up and citation omitted).  Habeas corpus proceedings allow trial counsel to explain their decisions and provide the Supreme Court of South Dakota "with a more complete picture of what occurred." Id. (cleaned up and citation omitted). The Supreme Court of South Dakota has essentially directed defendants to raise their ineffective-assistance-of-counsel claims in habeas proceedings, State v. Hauge, 932 N.W.2d 165, 171 (S.D. 2019) (explaining that such claims are "best made by filing" a habeas petition); State v. Schmidt, 825 N.W.2d 889, 899 (S.D. 2012) (stating that a habeas proceeding is the "preferred arena" for such claims (cleaned up and citation omitted)); State v. Beck, 785 N.W.2d 288, 296 (S.D. 2010) (stating that the court "has consistently held that claims of ineffective assistance of counsel generally will not be considered on direct appeal" (cleaned up and citation omitted)), and will hear such claims on direct appeal "only where counsel was so ineffective and the representation so casual that the trial record evidences a manifest usurpation of the defendant's constitutional rights," State v. Wilson, 947 N.W.2d 131, 139 n.14 (S.D. 2020) (cleaned up and citation omitted). This Court has previously found that the Martinez exception applies to South Dakota inmates, Dunkelberger v. Young, 4:20-CV-4117-RAL, 2021 WL 928139, at *2 (D.S.D. Mar. 11, 2021);

---

[11]The record before this Court contains the docket sheet for Piper's state criminal case but not all the documents filed therein.  It appears from the docket sheet that Judge Eckrich appointed Steve Miller as Piper's appellate counsel on August 8, 2011, and entered Piper's judgment the following day.  Doc. 2 at 303–04.  South Dakota law requires criminal defendants to move for a new trial within ten days "after filing of the judgment."  SDCL § 23A-29-1.  But the transcript from Piper's sentencing trial was not completed until December 2011.  Doc. 2 at 305; Doc. 90-11 at 135–36.  It would have been almost impossible for Miller, without the aid of a transcript and under such time constraints, to investigate Piper's background and develop evidence about FASD (as Piper now wishes to present) in ten days.

28

Sund v. Young, No. 5:14-CV-5070-KES, 2015 WL 4249405, at *4 (D.S.D. July 13, 2015), and Respondent agrees that the exception applies to Claim I, Doc. 65 at 17. Piper claims that the evidence he already submitted as well as the results of the testing would help him prove cause and prejudice to excuse the procedural default of Claim I as well as prove the underlying merits of this claim.

### B. Shinn, Shoop, and 28 U.S.C. § 2254(e)(2)

Respondent argues, however, that § 2254(e)(2) and the Supreme Court's decisions in Shinn and Shoop prohibit this Court from granting Piper's motion for testing or considering the extra-record evidence he already submitted. Doc. 65 at 18, 21. As stated above, § 2254(e)(2) limits a federal habeas court's authority to admit and consider new evidence the prisoner neglected to offer in state court. When a prisoner "has failed to develop the factual basis of a claim in State court proceedings," the statute prohibits federal courts from holding "an evidentiary hearing on the claim" unless the claim rests on (1) a "new" and "previously unavailable" rule of constitutional law held to apply retroactively, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." § 2254(e)(2)(A)(i), (ii). These limits apply both when the prisoner seeks an evidentiary hearing and when he seeks relief based on new evidence without an evidentiary hearing. Holland v. Jackson, 542 U.S. 649, 653 (2004) (per curiam); Mark v. Ault, 498 F.3d 775, 788 (8th Cir. 2007). In the rare event that a prisoner satisfies one of § 2254(e)(2)(A)'s exceptions, he "must also show that the desired evidence would demonstrate, by 'clear and convincing evidence,' that 'no reasonable fact finder' would have convicted him of the charged crime." Shoop, 142 S. Ct. at 2044 (quoting § 2254(e)(2)(B)).

These strict limits in § 2254(e)(2) apply only when a prisoner is "at fault" for failing to develop the factual basis of a claim, meaning that he "bears responsibility for the failure." Shinn,

142 S. Ct. at 1734 (cleaned up and citation omitted); see also Williams v. Taylor, 529 U.S. 420, 432 (2000) (explaining that "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel"). Supreme Court decisions predating Martinez held that prisoners bear responsibility under § 2254(e)(2) for state postconviction counsel's negligence. Shinn, 142 S. Ct. at 1735. The issue in Shinn was whether a prisoner who satisfies the Martinez exception is nevertheless at fault under § 2254(e)(2) for state postconviction counsel's failure to develop the record. Again, Martinez established that prisoners are not at fault for failing to raise an ineffective-assistance-of-trial-counsel claim when state law limits review of such claims to postconviction proceedings and the prisoner's postconviction counsel was ineffective. The prisoners in Shinn argued that it was illogical to find them faultless for failing to raise a claim because of deficient postconviction counsel but at fault for this same counsel's failure to develop the factual basis for the claim. 142 S. Ct. at 1736. The Supreme Court rejected this argument, finding that § 2254(e)(2) trumped the judge-made rule in Martinez. Shinn, 142 S. Ct. at 1736–37. A prisoner is thus "at fault" under § 2254(e)(2) even when state postconviction counsel negligently fails to develop the record for a claim of ineffective assistance of trial counsel. Id. at 1734–35. "In such a case," the Court explained, "a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." Id. at 1735.

Piper urges this Court to consider the newly filed evidence to show the level of state habeas counsel's dereliction under Martinez or to justify conducting an evidentiary hearing on whether state habeas counsel's negligence can be attributed to Piper. But prisoners cannot evade § 2254(e)(2) by arguing that the new evidence is merely being offered to show that they satisfy Martinez. Shinn, 142 S. Ct. 1738–39. Rather, if § 2254(e)(2) applies and a prisoner cannot meet

its requirements, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under Martinez." Shinn, 142 S. Ct. at 1739. As the Court explained, holding a Martinez hearing when the new evidence could not be used to decide the merits of the underlying ineffective-assistance-of-counsel claim would "needlessly prolong" the habeas case, which is something federal courts "may *never*" do. Shinn, 142 S. Ct. at 1739 (cleaned up and citation omitted); see also Marcyniuk v. Payne, 39 F.4th 988, 999 (8th Cir. 2022) (stating that Shinn "explicitly rejects the idea that because § 2254(e)(2) bars only an evidentiary hearing on the claim, a federal court may hold an evidentiary hearing to determine whether there is cause and prejudice" (cleaned up and citation omitted)).

Shoop reaffirmed that federal courts may not further the development of new evidence if § 2254 would bar the court from considering it. The prisoner in Shoop moved for an order requiring the state to transport him to a hospital for medical testing. 142 S. Ct. at 2042. He argued that the testing could reveal evidence that would support his habeas claims and counter arguments of procedural default and exhaustion. Id. The district court relied on the All Writs Act, 28 U.S.C. § 1651, to grant the motion but never decided whether the new evidence the prisoner hoped to develop would be admissible under § 2254(e)(2). Shoop, 142 S. Ct. at 2042. The Supreme Court reversed, explaining that facilitating the development of new evidence that did not satisfy § 2254's requirements would "needlessly prolong'" the case. Id. at 2044 (quoting Shinn, 142 S. Ct. at 1739). To avoid this, courts must determine that the new evidence could be considered under § 2254(e)(2) before allowing the prisoner to develop it. Id. "This is true," the Court explained, "even when the All Writs Act is the asserted vehicle for gathering new evidence." Id. After all, "AEDPA[12] provides the governing rules for federal habeas proceedings," and the Court's cases

---

[12]AEDPA is the acronym for the Antiterrorism and Effective Death Penalty Act of 1996.

make clear "that a district court must consider that statute's requirements before facilitating the development of new evidence." Id. at 2045.

Shinn and Shoop require this Court to deny Piper's motion for medical testing unless he can either satisfy § 2254(e)(2)'s requirements or show that he is not at fault for the record being undeveloped. Piper acknowledges that he cannot meet § 2254(e)(2)'s exceptions but offers three arguments for why he is not at fault under the statute. None of these arguments are convincing.

### C. Piper is Deemed at Fault Under § 2254(e)(2) For Failing to Develop the Record

#### 1. Kinney's Conduct did not Sever the Attorney-Client Relationship

Piper argues first that he is not at fault for the undeveloped record because Kinney's failure to investigate and present evidence on potential brain damage and FASD constitutes "extreme negligence." Piper asserts that Dr. Clark's report noting that Linda drank "some alcohol" while pregnant with him and that ADD did not explain all his behavioral difficulties was a red flag for FASD that should have prompted Kinney to investigate further and secure expert evaluations. Doc. 85 at 11. Had Kinney done so, Piper contends, he would have identified other risk factors for FASD like premature birth, neonatal jaundice, projectile vomiting, a distinctive odor, and recurrent severe ear infections. Piper's argument that he is not at fault for Kinney's failure does not challenge the general rule that, when there is no constitutional right to counsel, prisoners are responsible for the negligence of their attorney-agents. Doc. 62 at 21–22. Rather, he argues that, under Maples v. Thomas, 565 U.S. 266 (2012), Holland v. Florida, 560 U.S. 631 (2010), and Jamison v. Lockhart, 975 F.2d 1377 (8th Cir. 1992), Kinney's extreme negligence constituted a breach of the duty of loyalty and terminated the agency relationship.

Piper's argument attempts to lower the standard in Maples and Holland for when a habeas petitioner is not deemed at fault for his attorney's failure because of severance of the relationship.

32

The attorney-client agency relationship can be severed when, for instance, the lawyer abandons the prisoner, operates under a conflict of interest, or commits some other serious breach of the duty of loyalty. Maples, 565 U.S. at 281; Jamison, 975 F.2d at 1380; see also Restatement (Second) of Agency § 112 (Am. Law Inst. 1958) ("Unless otherwise agreed, the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal."); Restatement (Third) of Agency § 5.04 (2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person."). But Kinney's failure to investigate and present evidence on potential FASD or brain damage does not mean he ceased to be Piper's agent.

First, Piper has not cited any cases holding that an attorney's failure to investigate and present evidence on a particular claim of ineffective assistance of counsel constitutes a serious breach of the duty of loyalty. And those courts to have considered similar claims have found them unconvincing. In Towery v. Ryan, 673 F.3d 933 (9th Cir. 2012) (per curiam) overruled on other grounds by McKinney v. Ryan, 813 F.3d 798 (9th Cir. 2015), for example, the Ninth Circuit rejected and found no authority for the argument "that counsel's failure to raise a colorable habeas claim amounts to a serious breach of the duty of loyalty that severs the attorney-client agency relationship." Id. at 942. Similarly, the Eleventh Circuit in Cadet v. Florida Department of Corrections, 853 F.3d 1216 (11th Cir. 2017), rejected an argument that an attorney's failure to file a habeas petition on time constituted a breach of the duty of loyalty sufficient to sever the attorney-client agency relationship. Id. at 1230; see also id. at 1229 ("An agent is not deemed to have acted adversely to his principal's interests simply because he blundered and made an unwise, negligent,

or grossly negligent mistake that harmed those interests."). Piper does not claim that Kinney had a conflict of interest or acted solely for his own purposes, and nothing in the record suggests that was so.

Second, while Piper relies on Holland and Maples, these cases neither support that Kinney abandoned him nor suggest that Kinney's failure to investigate FASD severed the attorney-client agency relationship. Holland concerned whether an attorney's misconduct constituted an "extraordinary circumstance" necessary to equitably toll AEDPA's one-year deadline for filing a habeas petition. 560 U.S. at 649. The Supreme Court in Holland rejected the Eleventh Circuit's "rigid" rule that a lawyer's unprofessional conduct would not justify equitable tolling unless the petitioner offered "proof of bad faith, dishonesty, divided loyalty, mental impairment, or so forth" on the lawyer's part. 560 U.S. at 634 (cleaned up and citation omitted). Although the Court reaffirmed that "a garden variety claim of excusable neglect" like miscalculating a deadline would not equitably toll AEDPA's statue of limitations, it held that "unprofessional attorney conduct may, in certain circumstances, prove egregious and can be extraordinary." Id. at 651–52 (cleaned up and citations omitted).

The misconduct of the attorney in Holland, the Court explained, was "far more serious" than a "'garden variety claim' of attorney negligence." Id. at 652. Indeed, the attorney "failed to file Holland's federal petition on time despite Holland's many letters that repeatedly emphasized the importance of his doing so"; "did not do the research necessary to find out the proper filing date, despite Holland's letters that went so far as to identify the applicable legal rules"; "failed to inform Holland in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite Holland's many pleas for that information"; and "failed to communicate with his client over a period of years, despite various pleas from Holland that [the

34

lawyer] respond to his letters." Id. The attorney's errors "seriously prejudiced" Holland because he "lost what was likely his single opportunity" to have a federal habeas court review his death sentence. Id. at 653. The Court remanded the case to the Eleventh Circuit to determine in the first instance whether the attorney's misconduct constituted an extraordinary circumstance. Id. at 654.

Lamenting the lack of guidance in the majority opinion, Justice Alito wrote a concurrence explaining that the critical question was not whether the attorney's misconduct constituted "gross negligence," but rather whether the conduct was attributable to the client. Id. at 655–60. (Alito, J., concurring in part and concurring in the judgment). He argued that courts would struggle to draw the "highly artificial distinction between gross and ordinary negligence," and that it made little sense to hold petitioners responsible for ordinary negligence like miscalculating a deadline but not responsible for negligence that could be characterized as "gross." Id. at 657–58. Because Holland's attorney had "essentially 'abandoned'" him, however, Justice Alito concluded that neither "[c]ommon sense" nor agency principles justified holding him responsible for the attorney's misconduct. Id. at 659 ("Common sense dictates that a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of that word.").

The Supreme Court relied on Justice Alito's concurrence two years later when deciding Maples. There, the Court found cause to excuse a capital habeas petitioner's procedural default when the petitioner's state postconviction attorneys abandoned him without notice and caused him to miss the deadline to file a postconviction appeal. 565 U.S. at 289. The facts in Maples were "extraordinary": the two attorneys the petitioner believed were representing him in his state habeas case left their firm and abandoned his case "without leave of court, without informing [the petitioner] they could no longer represent him, and without securing any substitution of counsel."

Id. at 271; see also Dansby v. Hobbs, 766 F.3d 809, 828 (8th Cir. 2014) (referring to the events in Maples as a "veritable perfect storm of misfortune" (cleaned up and citation omitted)). The petitioner missed the deadline for appealing the trial court's denial of his petition because notice of the denial was sent to the attorneys but not to him. Id. at 276–77. In finding that these circumstances excused the petitioner's procedural default, the Supreme Court did not disturb the general rule that petitioners bear responsibility for state habeas counsel's mistakes "under well-settled principles of agency law." Id. at 280–81 (cleaned up and citation omitted). Instead, it pointed to Justice Alito's concurrence in Holland as having homed in on the "essential difference between a claim of attorney error, however egregious" and a situation where the attorney causes the default by "abandon[ing] his client without notice." Id. at 281–83. A petitioner is not responsible for counsel's errors in the latter situation because counsel's abandonment of the petitioner "sever[s] the principal-agent relationship" and removes any rationale for attributing counsel's acts to the petitioner. Id. at 281.

Kinney's representation of Piper is a far cry from the attorney misconduct in Holland and Maples. Unlike the attorneys in those cases, Kinney actively represented Piper from his appointment until being removed from the case. Among other things, Kinney:

- met or had an attorney from his office meet with Piper on multiple occasions. Doc. 103 at 532, 830.
- was in regular contact with the court and submitted timely and appropriate orders when directed to by Judge Macy. Doc. 103 at 91–92, 99, 114–16, 137, 142.
- filed a motion and brief in Piper's criminal case asking that Piper be allowed to withdraw his plea. Doc. 85-1 at 34; Doc. 103 at 122, 530–31, 557–58.
- moved to continue deadlines when he needed more time or thought it procedurally appropriate. Doc. 103 at 102, 122–24, 529–31; 539–51.
- subpoenaed Van Norman and Stonefield for Piper's habeas hearing. Doc. 103 at 138, 141.

- prepared a writ of habeas corpus ad testificandum directing that Piper be brought to Lawrence County before the hearing so that he could meet with his attorneys. Doc. 103 at 143–44.
- appeared at four hearings, including the habeas hearing where he questioned Van Norman, Stonefield, and Miller. Doc. 103 at 94–97, 528, 539, 571.
- filed proposed findings of fact and conclusions of law after the habeas hearing and filed objections when Judge Macy denied Piper's petition. Doc. 85-1 at 28–41; Doc. 103 at 494.

Piper does not argue that Kinney missed any deadlines, and nothing in the record suggests that he did. And while Piper's letters accused Kinney of not communicating with him, Piper had far more contact with his attorneys than did the prisoner in Holland. Compare Holland 560 U.S. at 636–37 (explaining that the prisoner's attorney only communicated with him three times by letter over a nearly three-year period), with Doc. 103 at 106–09 (compensation voucher Kinney submitted to court noting letters sent to Piper, telephone calls with him, and meetings with him at the South Dakota State Penitentiary), and Doc. 103 at 532 (Kinney stating during a July 1, 2015 motion hearing that de Hueck had visited Piper at the Penitentiary for "long periods of time" on at least two or three occasions). Indeed, Piper himself admitted that he had met with his attorneys "four or five times" during his habeas case. Doc. 103 at 830. In short, Kinney did not abandon Piper, leave him "without any functioning attorney of record," or cease "operating as his agent in any meaningful sense of the word." Maples, 565 U.S. at 282, 288 (cleaned up and citation omitted).

Nor do Holland and Maples support finding that Kinney's failure to investigate FASD—which Piper characterizes as "extreme negligence"—severed the attorney-client agency relationship. After all, the Maples decision suggests that, while attorney abandonment severs the agency relationship, attorney error—"however egregious"—does not. 565 U.S. at 282. Beyond

that, cases applying <u>Holland</u> and <u>Maples</u> show that the failure to raise or investigate a claim is not the sort of conduct that terminates the agency relationship.

In <u>Young v. Westbrooks</u>, 702 F. App'x 255 (6th Cir. 2017) (unpublished), for instance, the Sixth Circuit declined to find abandonment under <u>Maples</u> even though state habeas appellate counsel missed deadlines and filed a late brief, never communicated with the petitioner, and failed to raise what the petitioner argued were "clearly meritorious" claims on appeal. <u>Id.</u> at 258, 261–66. The Sixth Circuit reasoned that although failing to raise a "colorable claim" might constitute ineffective assistance, it "cannot sever the attorney-client relationship." <u>Id.</u> at 266; <u>see also</u> <u>id.</u> at 262 ("*[C]laim* abandonment—while perhaps ineffective assistance—is not the same as *client* abandonment."). The Ninth Circuit reached a similar conclusion in <u>Moormann v. Schriro</u>, 672 F.3d 644 (9th Cir. 2012), rejecting the argument that state postconviction counsel's failure to conduct a mitigation investigation amounted to abandonment under <u>Maples</u>. <u>Id.</u> at 647–48. According to the petitioner, the investigation would have revealed "additional evidence supporting [his] mitigation claims of a difficult childhood, mental disabilities, and a possible incestuous relationship with the victim." <u>Id.</u> The Ninth Circuit held that while this "alleged failure to investigate may be a claim of serious negligence," it was not the sort of "'abandonment'" described in <u>Maples</u>. <u>Moorman</u>, 672 F.3d at 648; <u>see also</u> <u>Henderson v. Mays</u>, Nos. 12-5028/14-5911, 2023 WL 3347496, at *18 (6th Cir. May 10, 2023) (rejecting argument that petitioner's state habeas counsel, whom petitioner alleged was suffering from a "severe mental illness," abandoned petitioner by failing to investigate evidence that petitioner suffered brain damage from a bike accident); <u>Id.</u> at *19 (White, J., concurring) (explaining that the medical records from the bike accident "described an injury sufficiently serious that competent death-penalty counsel (and investigators) would have explored the effects of the accident with an expert qualified to make an

assessment and offer an opinion"); Wilkins v. Stephens, 560 F. App'x 299, 304 (5th Cir. 2014) (per curiam) ("We have previously noted that counsel's failure to raise all issues a petitioner would like to argue does not amount to abandonment."). As in Moorman and Young, Piper's claim about Kinney is essentially one for ineffective assistance rather than abandonment or some other conduct that would sever the agency relationship.[13]

Piper argues that Shinn's use of the phrase "negligently failed to develop" implies that petitioners are not at fault when an attorney's errors constitute "extreme" or "extraordinary" negligence. That is not an accurate reading of Shinn, though. Shinn explained that "'a failure to develop the factual basis of a claim . . . is not established unless there is lack of diligence, *or some greater fault*, attributable to the prisoner *or the prisoner's counsel*.'" 142 S. Ct. at 1735 (first emphasis added) (quoting Williams, 529 U.S. at 432). Under Shinn, then, the extent of counsel's negligence does not determine whether the negligence is attributable to the prisoner.

But even if there are some attorney errors that fall outside Shinn's scope, Piper would still be deemed responsible for Kinney's failure to develop the record on FASD. Like Piper, the

---

[13]Respondent argues that the Eighth Circuit in Wooten v. Norris, 578 F.3d 767 (8th Cir. 2009), rejected the proposition "that a federal court may excuse procedural default for cause when the attorney error responsible for the default is so egregious that the attorney ceases to be an agent of the petitioner." Doc. 97 at 17 (cleaned up and citation omitted). The petitioner in Wooten hired an Arkansas attorney to represent him in his state habeas case. 578 F.3d at 771. Unbeknownst to the petitioner or the Arkansas state courts, the attorney was a convicted felon and had been disbarred in another state. Id. The attorney failed to develop the record in state court and caused the petitioner to procedurally default potentially meritorious claims of ineffective assistance of trial counsel. Id. at 773. Indeed, at one point during the proceedings it "appear[ed] that [the attorney] ceased providing even ineffective assistance to [the petitioner] and simply abandoned him altogether." Id. at 779. The petitioner argued that he was not at fault for failing to develop the record because the attorney's disbarment, felonious record, and concealment of these facts from himself and the Arkansas courts caused a "complete breakdown of the agency relationship." Id at 778–79 (cleaned up). The Eighth Circuit held that the petitioner was still at fault for the failure to develop the record, concluding that the Supreme Court in Coleman had "rejected agency breakdown as a viable theory of cause." Id. at 779. It is unlikely that the Eighth Circuit would decide Wooten the same way given the Supreme Court's later decision in Maples.

petitioner in <u>Shinn</u>—David Martinez Ramirez—claimed that his trial counsel was ineffective by failing to investigate and present mitigation evidence. 142 S. Ct. at 1728–29. Petitioner Ramirez argued that § 2254(e)(2) did not apply because his state postconviction counsel was himself ineffective for failing to develop this claim in state court. As set forth in Justice Sotomayor's dissent, state postconviction counsel's conduct was very similar to Piper's allegations about Kinney:

> Ramirez's postconviction attorney, however, did not conduct any investigation beyond the existing trial record, despite being aware of indications that Ramirez might have intellectual disabilities, including that his mother drank when she was pregnant with him and that he demonstrated developmental delays as a child. Nor did Ramirez's postconviction counsel argue that Ramirez's trial counsel provided ineffective assistance by failing to develop and present this mitigating evidence.

<u>Id.</u> at 1742 (Sotomayor, J., dissenting). Despite these circumstances, the majority in <u>Shinn</u> found "no warrant to impose any factfinding beyond § 2254(e)(2)'s narrow exceptions to AEDPA's general bar on evidentiary hearings." <u>Id.</u> at 1740 (cleaned up and citation omitted). If petitioner Ramirez in <u>Shinn</u> was at fault for failing to develop the record, then so too is Piper. <u>See also</u> <u>Williams</u>, 529 U.S. at 438–40 (holding that a petitioner was at fault for failing to develop the factual basis of his <u>Brady</u> claim where the undisclosed psychiatric report in question was found in a codefendant's state court file, a sentencing transcript contained repeated references to the report, and state postconviction counsel failed to investigate the references "in anything but a cursory manner").

Piper finally argues that this Court should at least hold an evidentiary hearing "to determine whether [Kinney's] failures constituted such gross or extreme misconduct that it severed" the attorney-client relationship. Doc. 85 at 14. Piper acknowledges <u>Shinn's</u> holding that "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause

and prejudice under <u>Martinez</u>" if § 2254(e)(2) applies and the prisoner cannot satisfy its requirements. <u>Shinn</u>, 142 S. Ct. at 1739; <u>see also id.</u> at 1738 ("[W]hen a federal habeas court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied."). He argues, however, that <u>Shinn</u> does not bar evidentiary hearings when there are "material disputes of fact" concerning whether § 2254(e)(2) applies in the first place.

Piper has not cited any cases discussing whether and under what circumstances a hearing on § 2254(e)(2)'s applicability is appropriate. Before <u>Shinn</u>, Eighth Circuit precedent was "clear that 'the strict rules regarding the availability of federal evidentiary hearings on the merits of habeas cases do not preclude [courts] from ordering evidentiary hearings on the limited issues of cause or prejudice.'" <u>Marcyniuk</u>, 39 F.4th at 1002 n.10 (quoting <u>Wooten</u>, 578 F.3d at 780). As the Eighth Circuit recognized, however, the Supreme Court in <u>Shinn</u> "expressed doubt about, but declined to address, the petitioners' argument to the same effect." <u>Marcyniuk</u>, 39 F.4th at 1002 n.10. The Eighth Circuit has yet to decide "the extent to which <u>Shinn</u> reaches requests for evidentiary hearings on cause and prejudice where the basis of the petitioner's cause argument is not ineffective assistance of post-conviction counsel." <u>Marcyniuk</u>, 39 F.4th at 1002 n.10.

Piper contends that a hearing is appropriate because there are "material disputes of fact" concerning whether § 2254(e)(2) applies. <u>See</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."); <u>Smith v. Bowersox</u>, 311 F.3d 915, 921 (8th Cir. 2002) ("[W]hen an evidentiary hearing is not prohibited by statute, the district court must hold

such a hearing if the petitioner has alleged disputed facts which, if proved, would entitle him to habeas relief."). Although Piper does not specify what these material disputes of fact are, this Court has taken as true Piper's claim that Kinney failed to conduct any mental health investigation despite there allegedly being red flags that Piper had brain damage and FASD. As Young, Moorman, and Shinn itself make clear, however, Kinney's failure, while arguably ineffective assistance, did not sever the agency relationship and render Piper not at fault under § 2254(e)(2). Because Piper's allegations fail as a matter of law to show that § 2254(e)(2) is inapplicable, this Court denies his request for an evidentiary hearing. See Young, 702 F. App'x at 269 (finding that deposing state appellate habeas counsel would be "wholly unnecessary and futile" because even if counsel "were to admit" the petitioner's allegations, there were "sufficient undisputed indicia of continuing representation to compel the conclusion that" the petitioner was not abandoned under Maples); see also Shinn, 142 S. Ct. at 1739 (explaining that a Martinez hearing is improper "if the newly developed evidence would never entitle the prisoner to federal habeas relief" (cleaned up and citation omitted)).

### 2. Piper Does Not Have a Federal Constitutional Right to Effective Postconviction Counsel

Piper's second argument for why § 2254(e)(2) does not apply is that Martinez, Douglas v. California, 372 U.S. 353 (1963), and Halbert v. Michigan, 545 U.S. 605 (2005), give him a constitutional right to effective assistance of counsel in bringing his ineffective-assistance-of-trial counsel claim on initial review. This constitutional right, the argument goes, means that Kinney's errors are attributed to the State.

Eighth Circuit precedent forecloses Piper's argument. The Supreme Court in Coleman reserved ruling on whether a petitioner has a constitutional right to effective assistance "in collateral proceedings which provide the first occasion" to raise a claim of ineffective assistance

of trial counsel. Martinez, 566 U.S. at 8. The Eighth Circuit, however, has held that "there is no right to counsel in a post-conviction proceeding that is the first available forum for a claim." Nolan v. Armontrout, 973 F.2d 615, 617 (8th Cir. 1992); see also Armstrong v. Iowa, 418 F.3d 924, 927 (8th Cir. 2005) (citing Nolan and explaining that the Eighth Circuit has "consistently construed [Coleman] as confirming that there is no Sixth Amendment right to the effective assistance of post-conviction counsel"); Barnett v. Roper, 904 F.3d 623, 629 (8th Cir. 2018) (stating that "there is no constitutional right to assistance of counsel in state postconviction proceedings"); Wooten, 578 F.3d at 778 (citing Coleman and stating that there "is no right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution in collateral, post-conviction, state-court proceedings, and as such, the failures or infirmities of counsel at this stage generally are not attributable to the state").

Decisions by the Eighth Circuit are binding on district courts within its territory "until overruled by [the] court en banc, by the Supreme Court, or by Congress." M.M. ex rel. L.R. v. Special Sch. Dist. No. 1, 512 F.3d 455, 459 (8th Cir. 2008); see also United States v. Burgee, 3:18-CR-30164-RAL, 2019 WL 1332858, at *3 ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has *unmistakably* been cast into disrepute by supervening authority." (emphasis added and citation omitted)).

Contrary to Piper's argument, Martinez did not overrule the Eighth Circuit's holding that there is no constitutional right to counsel "in a postconviction proceeding that is the first available forum for a claim." Nolan, 973 F.2d at 617. Instead, Martinez announced an "equitable"—as opposed to *constitutional*—exception to Coleman's rule that ineffective assistance of postconviction counsel cannot constitute cause to excuse a procedural default. Martinez, 566 U.S. at 15–17. Beyond that, the Supreme Court in Shinn stated that "there is no constitutional right to

43

counsel in state postconviction proceedings," and that the Court had "repeatedly reaffirmed" this holding since Coleman. Shinn, 142 S. Ct. at 1735, 1737. Given the state of the law, this Court must follow Eighth Circuit precedent and reject Piper's argument.

Piper also argues that SDCL § 21-27-4 and the Supreme Court of South Dakota's decision in Jackson v. Weber, 637 N.W.2d 19 (S.D. 2001), give rise to a protected liberty interest in effective postconviction counsel. He claims that the State's failure to provide him with effective assistance deprived him of due process and made Kinney's errors external to him. Eighth Circuit precedent forecloses this argument too. In Simpson v. Norris, 490 F.3d 1029 (8th Cir. 2007), the Eighth Circuit rejected an argument that a state rule of criminal procedure requiring counsel in postconviction proceedings created a constitutional right to effective assistance. Id. at 1033–34. Relying on Pennsylvania v. Finley, 481 U.S. 551 (1987), the Eighth Circuit found "little doubt as to [the Supreme Court's] view that a state's decision to grant a right to counsel in post-conviction proceedings does not give rise to a due process claim if counsel performs deficiently." Id. at 1034; see also Hagen v. Iowa, 141 F. App'x 496, 497–98 (8th Cir. 2005) (unpublished) (per curiam) (holding that statute statutory right to effective assistance of postconviction counsel did not create a federal constitutional right to effective assistance so as to excuse the petitioner's procedural default).

### 3. South Dakota Habeas Law Does Not Make the State Responsible for Kinney's Alleged Failures

Piper's last argument for why § 2254(e)(2) does not apply is a confusing one. He asserts that South Dakota law under Jackson, 637 N.W.2d 19 (S.D. 2001), gives him a right to effective assistance of postconviction counsel but the South Dakota Legislature's change in law in 2012 denies him a remedy or "statutory mechanism" to enforce this right. In particular, Piper notes that SDCL § 21-27-5.1 bars a successive state habeas petition for individuals like himself who pleaded

guilty but want to challenge the effectiveness of his state habeas counsel as it relates to his capital sentencing trial. Doc. 62 at 31–32. Piper does not argue that the change in state law or enactment of SDCL § 21-27-5.1 is unconstitutional. As explained above, Piper does not have a constitutional right to effective postconviction counsel. Nor does he cite any case even remotely suggesting that South Dakota's habeas statutes make the State responsible for Kinney's failure to develop the facts on FASD.

Piper is deemed "at fault" under precedent applying § 2254(e)(2) for failing to develop the factual basis of Claim I in state court. Because § 2254(e)(2) would bar this Court from considering the testing evidence on either the merits of Claim I or when assessing cause and prejudice under Martinez, this Court denies Piper's motion for testing.

## III.    Conclusion

For the reasons stated above, it is

ORDERED that Piper's Motion for Neuropsychological Testing, Administration of QEEG and Fetal Alcohol Expert Evaluation, Doc. 60, is denied.

DATED this _1st_ day of June, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE