UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRILEY PIPER,<br><br>                    Petitioner,<br><br>          vs.<br><br>THE ATTORNEY GENERAL OF THE STATE OF SOUTH DAKOTA, THERESA BITTINGER, WARDEN, SOUTH DAKOTA STATE PENITENTIARY;<br><br>                    Respondents. | 5:20-CV-05074-RAL<br><br><br>OPINION AND ORDER ON EXHAUSTION AND PROCEDURAL DEFAULT ISSUES AND GRANTING PARTIAL SUMMARY JUDGMENT TO RESPONDENTS |

Petitioner Briley Piper, a state death row inmate, challenges his conviction and death sentence on multiple grounds. Doc. 67. Federal courts generally may not consider a state petitioner's habeas claims unless the petitioner has (1) presented or "exhausted" those claims in state court; and (2) done so in accordance with state procedural rules so as to avoid a "procedural default." Shinn v. Ramirez, 596 U.S. 366, 371 (2022). This Court structured the deadlines in this case so that it could decide whether Piper's claims were exhausted or procedurally defaulted before ruling on whether Piper is entitled to any relief on his claims. Docs. 54, 84. Consistent with this Court's order, Piper filed an amended federal habeas petition setting forth all his claims and identifying whether each claim was exhausted or unexhausted. Doc. 67. Piper argued that any procedural defaults should be excused because the state court applied a rule that was not adequate and independent or because there was cause and prejudice to overcome the default. Id. Respondents, Warden Theresa Bittinger and the South Dakota Attorney General, have now filed

1

four motions for summary judgment, Docs. 69, 72, 74, 77, arguing that none of Piper's procedural defaults can be excused, that res judicata is an adequate and independent rule barring review of some of Piper's claims, and that summary judgment is appropriate on the merits of other claims. This opinion and order addresses only exhaustion and procedural default.

## I.    Facts

### A.    Background and Procedural History

In April 2000, Chester Allan Poage's partially clothed body was found in a remote location in Lawrence County, South Dakota. Piper v. Young (Piper IV), 936 N.W.2d 793, 799 (S.D. 2019); State v. Piper (Piper I), 709 N.W.2d 783, 792 (S.D. 2006). Law enforcement identified Piper, Elijah Page, and Darrell Hoadley as suspects in Poage's murder and a related burglary at Poage's house. Piper IV, 936 N.W.2d at 799. The State of South Dakota (State) charged the three men with first-degree murder, kidnapping, first-degree robbery, first-degree burglary, and grand theft. Id. Attorneys Patrick Duffy and Timothy Rensch were appointed to represent Piper. Doc. 67 ¶ 3. In early 2001, Piper pleaded guilty to all five crimes, including the first-degree felony murder of Poage. Piper IV, 936 N.W.2d at 799 & n.1. A state court judge sentenced Piper to death after a three-day sentencing hearing. Id. at 800. The Supreme Court of South Dakota affirmed Piper's death sentence on direct review in 2006. Piper I, 709 N.W.2d 783.

Piper, represented by attorneys Steve Miller and Steven Binger, then filed a habeas petition in state court. Piper IV, 936 N.W.2d at 801–02; Doc. 67 at ¶ 6. The Supreme Court of South Dakota granted Piper habeas relief in 2009, finding that Piper did not validly waive his right to have a jury decide whether to impose the death penalty because the state trial judge had not made clear that Piper would receive a life sentence if even one juror voted against the death penalty.

2

Piper v. Weber (Piper II), 771 N.W.2d 352, 358–60 (S.D. 2009).  The Court remanded Piper's case for resentencing by a jury.  Id. at 360.

In August 2009, a state court judge appointed attorneys Robert Van Norman and Michael Stonefield to represent Piper in the resentencing proceeding.  Doc. 67 at ¶¶ 7, 50; Doc. 2 at 288. Both men were experienced criminal defense attorneys: Van Norman, the Federal Public Defender for South Dakota from 1999 to 2003, had handled seven death penalty cases; Stonefield, a long-time state public defender, had worked on two death penalty cases.  Doc. 90-11 at 7–8, 92, 115. The compensation vouchers Van Norman and Stonefield submitted show that they began investigating Piper's mitigation case almost immediately, including speaking with Piper's prior attorneys, researching potential mitigation specialists, gathering records, and wading through the voluminous files from Piper's prior case and the cases of Page[1] and Hoadley.[2]  Doc. 121-4 at 458– 473.

One of the records collected—and the one most relevant to Claim I of Piper's petition— was a February 1994 report prepared by Lyn Clark, M.D., when Piper was 13.  Doc. 2 at 233–43; Doc. 66-1 at 5.  Piper's mother Linda had Dr. Clark evaluate Piper because she was concerned about his impulsive behavior and wanted a second opinion.  Doc. 2 at 233; Doc. 66-5 at 80–81. The "Medical History" section of Dr. Clark's report noted that Linda recalled smoking one pack of cigarettes per day while pregnant with Piper and consuming "some alcohol."[3]  Doc. 2 at 235. Dr. Clark noted that Piper was born four to six weeks prematurely, developed mild neonatal

---

[1]Page pleaded guilty, received a death sentence, and has been executed.  Piper IV, 936 N.W.2d at 800 n.5.

[2]Hoadley had a jury trial and received a life sentence.  Piper IV, 936 N.W.2d at 800 n.5.

[3]Dr. Clark's full statement on Linda's drinking was as follows: "Mrs. Piper reports that she was anemic throughout her pregnancy.  She smoked one pack of cigarettes per day and consumed some alcohol."  Doc. 2 at 235.

jaundice, and suffered from vomiting for the first month of his life. Doc. 2 at 235; Doc. 66-1 at 5. She gave Piper a neurodevelopmental examination called the Pediatric Examination of Educational Readiness in Middle Childhood. Doc. 2 at 237. Dr. Clark concluded that attention deficit disorder (ADD)[4] was a "primary concern" for Piper but believed that ADD was "not the total explanation for [his] behavioral difficulties." Doc. 2 at 241. In Dr. Clark's view, the "extent of" Piper's aggression and the "seriousness" of his conduct were "not necessarily typical of students with primary" ADD. Id. Dr. Clark's report did not mention prenatal alcohol exposure or fetal alcohol spectrum disorders (FASD)[5] as a possible explanation for Piper's behavior. Doc. 2 at 233–43.

The compensation vouchers reflect that by September 2009, Van Norman was already researching mental conditions Piper potentially had and communicating with mitigation witnesses. Doc. 121-4 at 463–64, 466, 468. Van Norman and Stonefield moved to withdraw Piper's guilty pleas in October 2009, arguing among other things that he was never informed that he did not have to plead guilty to receive a court sentencing. Doc. 2 at 288, 339–49, 367–79. They filed several supplements to the motion and deposed a law enforcement officer about whether evidence had been withheld in Piper's earlier case. Doc. 2 at 381–88.

Compensation vouchers from Fall 2009 to Winter 2011 show continued work on Piper's mitigation case. Van Norman and Stonefield gathered more records, tracked down and interviewed witnesses across the country, researched mitigation specialists and potential expert

---

[4]"The term 'ADD' refers to 'attention deficit disorder,' while 'ADHD' refers to 'attention-deficit/hyperactivity disorder.' ADD is an older term used for what is now known as the inattentive type of ADHD. The term ADHD is now commonly used to describe both inattentive and hyperactive types." Munday v. Lees-McRae Coll., 20-cv-00105, 2022 WL 17252598, at *2 n.2 (W.D.N.C. Nov. 28, 2022).

[5]FASD "is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy." Doc. 62-3 at 2. It "affects the ability to make decisions, communicate, and control emotions." Anderson v. Kelley, 938 F.3d 949, 963 (8th Cir. 2019) (Kobes, J., concurring in part and dissenting in part).

witnesses, met with psychologist Dewey Ertz, and investigated Piper's potential psychiatric issues. Doc. 121-4 at 470–73; Doc. 121-5 at 301–03; Doc. 121-10 at 327–29, 335–36, 342–43, 350–52, 358, 369–71, 373–74, 381–82, 385–87, 392–93, 395–98, 406, 409, 412, 417–19, 423–24, 428–32, 439, 445–47.  They had frequent contact with Piper's family and sent a health questionnaire to his mother Linda. Doc. 121-4 at 473; Doc. 121-5 at 302; Doc. 121-10 at 329, 350, 358, 369–71, 373–75, 381–82, 385, 395, 397, 408–09, 412, 417–18, 421–24, 430–32, 447.  Van Norman also hired a jury consultant using his own money.  Doc. 90-11 at 17; Doc. 121-10 at 369, 428, 495.

Judge Jerome A. Eckrich III denied Piper's motion to withdraw his guilty pleas in November 2010, over a year after it was filed.  Doc. 2 at 388.  In December 2010, Piper unsuccessfully petitioned the Supreme Court of South Dakota for permission to appeal Judge Eckrich's denial.  Doc. 2 at 292, 414–29; Doc. 90-11 at 126–27.  Judge Eckrich entered a scheduling order in early January 2011 setting Piper's sentencing trial for July 5, 2011.  Doc. 121-5 at 456.  Van Norman and Stonefield filed myriad motions in mid-January 2011, successfully moving to change the venue of the trial and to have appointed to the defense team Dr. Ertz, capital mitigation specialist Jeannette Sheldon, and an investigator.  Doc. 121-5 at 461, 509, 523, 592; Doc. 121-8 at 379–85, 389–90.

Sheldon's role would be to investigate Piper's life history, flag issues that could warrant further evaluation, and prepare a narrative for her testimony in court.  Doc. 88-1 at 6–14, 16–18, 21–22.  She had over 200 hours of training in mitigation work and 70 hours of one-on-one training with forensic psychologists and psychiatrists.  Doc. 90-6 at 219.  An affidavit Sheldon submitted to the state court noted her 12 "years['] experience in assisting counsel in capital case proceedings, in determining the scope of investigation necessary for preparation and presentation of mitigation and other mental health claims, in conducting those investigations and in providing mental health

experts the kind of materials they routinely rely upon in their professions in order to offer reliable expert opinions." Doc. 121-6 at 40. Stonefield explained at a motion hearing that Sheldon had said that while the average number of hours necessary to do a "complete mitigation investigation" was over 1,000, she could do a "competent" job in Piper's case in 150 to 200 hours. Doc. 88-1 at 9–10. According to Stonefield, Sheldon did not need as much time as she would in a typical case because the defense team had already done some investigation and compiled documents and because there was less than typical life history to review given that Piper was just 19 years old when the murder occurred. Doc. 88-1 at 10–12; Doc. 66-1 at 5; see also Doc. 121-9 at 379 (affidavit from Sheldon explaining that she would need less time than in an average death penalty case because of "the age of the defendant and the amount of documentary evidence already compiled by the defense team"). At the same motions hearing, Stonefield explained that Dr. Ertz would review Piper's records for mitigation evidence. Doc. 88-1 at 20–23. Stonefield said that, like the psychologists in the Hoadley and Page trials, Dr. Ertz would testify about the mitigating factors of youth, drug use, and the group dynamic involved in the killing. Doc. 88-1 at 21–23. Judge Eckrich initially capped Sheldon's fees at $10,000 and Dr. Ertz's fees at $4,000. Doc. 2 at 430. He later granted an additional $5,000 for Sheldon's work. Doc. 2 at 432. In March 2011, Piper's parents gave his lawyers $10,000 to hire forensic neuropsychiatrist Hal Wortzel. Doc. 2 at 249–53; Doc. 90-8 at 76.

Sheldon began reviewing Piper's school, psychological, and court records in February 2011. Doc. 90-6 at 225; Doc. 121-9 at 377; Doc. 121-10 at 471. She prepared a 57-page social history for Piper that involved nearly 200 hours of work. Doc. 90-7 at 59; Doc. 66-1. As relevant here, the social history cited to Dr. Clark's evaluation and noted that Linda "smoke[d] one pack of cigarettes a day and consume[d] alcohol" while pregnant with Piper. Doc. 66-1 at 5. Sheldon also

discussed a diagnostic evaluation performed by psychologist Michael Rose on Piper in January 1994. Doc. 66-1 at 32–35; Doc. 66-6. Dr. Rose's diagnostic impression of Piper was that he had conduct disorder of an undifferentiated type. Doc. 66-1 at 34; Doc. 66-6 at 7. Dr. Rose's report mentioned nothing about FASD. Doc. 66-6.

Compensation vouchers from early 2011 leading up to the July trial show that Van Norman and Stonefield continued to develop Piper's mitigation case. They gathered and reviewed records, worked with Sheldon on the social history, interviewed more witnesses, and consulted with and provided documents to Dr. Ertz and Dr. Wortzel. Doc. 121-10 at 286–94, 301–02, 304, 456–59, 461, 477–81, 484, 488–97.

Dr. Ertz met with Piper twice before the trial for a total of about five hours and interviewed him "extensive[ly]" about his background and the murder. Doc. 90-7 at 183–85, 190. He also reviewed many documents, including Sheldon's social history, the evaluations from Dr. Clark and Dr. Rose, and evidence about Hoadley and Page. Doc. 90-7 at 188–89, 201. He did not evaluate Piper, perform any tests, or write a report, however. Doc. 90-8 at 26, 32, 40. He testified at trial that "[t]here didn't seem to be a lot of purpose to evaluate Briley Piper psychologically 11 years after the murder." 90-8 at 26.

Dr. Wortzel met with Piper for about four hours and reviewed his school and psychological records as well the social history Sheldon prepared. Doc. 90-8 at 81, 85, 104. Dr. Wortzel did not prepare a written report (nor had Van Norman and Stonefield requested one) or administer any test to Piper. Doc. 90-8 at 104–05, 133–36.

**B.    Resentencing Trial**

    **1.    Voir Dire**

Judge Eckrich sent an eight-page questionnaire to the potential jurors in late May 2011. Doc. 121-9 at 191–204. Although the questionnaire was shorter than the one Piper had proposed, Doc. 121-8 at 506–27, it did include questions about whether the potential jurors or someone close to them had ever been the victim of a crime, what the jurors knew about Piper's case, how they would respond to certain mitigating evidence, and their thoughts on the death penalty, Doc. 121-9 at 195–201. Among other things, the questionnaire asked whether the potential jurors felt "that the death penalty is used too often or too seldom," whether they believed in an "eye for an eye," and whether they believed that the "State should impose a death penalty on everyone who, for any reason, intentionally kills another person." Id. at 200.

Voir dire began on July 5 and lasted more than seven court days. Doc. 89; Doc. 89-13. Piper had moved for 10 additional peremptory strikes beyond the 20 already guaranteed by statute, Doc. 121-5 at 535–36; SDCL § 23A-20-20, but Judge Eckrich concluded that one extra peremptory strike for both sides was sufficient, Doc. 121-8 at 448–49. Judge Eckrich split voir dire into sessions involving 15 potential jurors at a time. Doc. 88-2 at 3. Counsel for both sides would examine the jurors individually and exercise any challenges for cause while the remaining jurors were sequestered. These sessions would continue until there was a panel of 57 potential jurors, after which the parties would exercise their peremptory strikes. Doc. 89 at 34–35.

As relevant to Piper's petition, the third potential juror voir dired was Lisa Sagdalen. Doc. 89 at 73. Sagdalen had written in her juror questionnaire that her best friend was a deputy with the Pennington County Sheriff's Office, that she had read all the newspaper articles about the case, and that she had formed an opinion about the case: that Piper had chosen to plead guilty and "need[ed] to accept" the judge's decision. Doc. 2-2 at 160–62. She also indicated, however, that she did not believe the death penalty was appropriate in every case involving an intentional killing

and that she would want to hear all the circumstances surrounding a killing before deciding whether to impose a death sentence.  Doc. 2-2 at 163.

Van Norman's voir dire of Sagdalen focused first on her knowledge about the case.  Doc. 89 at 75.  Sagdalen confirmed that she knew "quite a bit" about Piper's case, that she had "read all the newspaper articles," and that she had discussed the case "a lot" with her friends in the Pennington County Sheriff's Office.  Id.  She also confirmed that she had already formed an opinion:

> **Van Norman**: I take it from what you're saying, and please correct me if I'm wrong, that you believe that the death sentence that was imposed by that Judge some years ago should stand.
> **Sagdalen**: I do.
> **Van Norman**: Okay.  And that's a firmly held belief, I take it.
> **Sagdalen**: Yes. That's how I believe, I mean.
> **Van Norman**: No, that's fine.  I take it then for me to have you sitting in that jury box, on behalf of my client from his perspective - - well, let's put it this way: if you were seated - - seated in his position with a juror with your feelings would you think it would be fair, from your perspective?
> **Sagdalen**: I don't know, I - - I know that I would try and do my best to be as fair as possible sitting there.
> **Van Norman**: Right.
> **Sagdalen**: I don't know. I don't know.
> **Van Norman**: Could you envision being a juror giving your opinions and actually imposing a life sentence on Briley as opposed to a death sentence?
> **Sagdalen**: I would do my best to take what was said in the courtroom and use that instead of what I previously read and heard and such.

Id. at 77–78.  Sagdalen was ambivalent when questioned further about whether she could put her opinion aside, saying she "d[id]n't know" whether she could do so and that she could not say that "yes, I could throw everything aside."  Id. at 78.  Van Norman challenged Sagdalen for cause after she agreed again that she already had "a pretty firm opinion as to how the case should come out."  Id. at 79.

The prosecutor, John Fitzgerald, examined Sagdalen next. Sagdalen testified that although she had formed an opinion about the case and could not guarantee she could set aside everything she had read, she "might" change her opinion if she learned something new during trial. Id. at 80. Fitzgerald said he would "defer to the Court" and did not make any argument on Piper's challenge of Sagdalen. Id. at 81.

Judge Eckrich then took a turn speaking with Sagdalen. He used the famous example of President Truman holding a newspaper wrongly declaring that Thomas Dewey had won the 1948 presidential election to illustrate why jurors must decide cases on the evidence presented in court rather than on what they read in the media. Id. Judge Eckrich then asked for an "honest answer" on whether Sagdalen could be fair to both sides and decide the case based only on the evidence presented in court. Id. at 82. Sagdalen said she believed she could, and Judge Eckrich followed up by asking "so despite what you read about what the prior Court did or any sentence, you could give Mr. Piper a fair shake and start from square one and . . . listen to the evidence, and make your decision based on the evidence as instructed and apply it to the law as given to you?" Id. at 83. Sagdalen said "Yes," and Judge Eckrich denied the challenge for cause. Id.

Van Norman resumed speaking with Sagdalen, explaining that Judge Eckrich just wanted the jurors to follow the law and that there were no right or wrong answers to the questions being posed. Id. Sagdalen confirmed that her best friend was a deputy with the Pennington County Sheriff's Office and said she relied on the deputy's opinions "[v]ery highly" because they had known each other for over 30 years. Id. at 83–84. She explained, however, that although she had probably spoken with the deputy about Piper's case in the last year or two, she could not recall a specific conversation about it. Id. at 84–85. Van Norman then asked Sagdalen about her comment in the juror questionnaire that she did not agree that "those convicted and sentenced should have

years and years of appeals to continue on 'death row' wasting taxpayer dollars." Id. at 85.

Sagdalen testified that this comment was a "general" one and not specific to Piper's case. Id. at

86–87.  Van Norman then returned to Sagdalen's comment about Piper needing to accept his

sentence:

> **Van Norman**: Okay, yeah.  And what I was doing was taking you back to your earlier answer that, "Mr. Piper needs to accept the Judge's decision as that was his choice."
> **Sagdalen**: Uh-huh.
> **Van Norman**: And isn't that really what you're saying, that Mr. Piper should just shut up and sit down and accept the death sentence?
> **Sagdalen**: I guess in a sense.  What my thought was on that was he chose to plead guilty, he knew that the Judge had the opportunity of two choices, and that when he pled guilty he accepted that - -
> **Van Norman**: Yeah.
> ....
> **Van Norman**: What concerns me about that isn't that you have an opinion, it's - - what concerns me, what worries me is whether you can set that aside.  And let me put it this way, and I talked about it earlier: I don't want to start out with an extra burden.  And correct me if I'm wrong, you really do have strong opinions about this case, don't you.
> **Sagdalen**: I have an opinion.
> **Van Norman**: Yes, and you said that you did have an opinion, I appreciate that, and it's what we just recited there, right?
> **Sagdalen**: Yes, but I guess after what the Judge had said I am - - I don't know, I guess I feel I'm intelligent enough or social enough that I can take what is given to me and what I need to do.
> **Van Norman**: Do you - - can you sit here and visualize yourself being on the jury, first of all, and visualize yourself coming back into this court and saying, "No, I want life without parole for Mr. Piper?"
> **Sagdalen**: If that's presented I can with what I hear.

Id. at 87–88.  Sagdalen then agreed that she could meaningfully consider mitigating evidence. Id.

at 89–91, 94–96.  Van Norman renewed his challenge for cause to Sagdalen, but Judge Eckrich

denied it. Id. at 97.

Dennis Anthony was the fifth potential juror voir dired.  Anthony had expressed concern in his juror questionnaire about the costs of imprisoning someone for life and had commented that the appeals process lasts too long in death penalty cases.  Doc. 2-2 at 150–51.  He also checked "Yes" when asked "Do you believe the State should impose a death penalty on everyone who, for any reason, intentionally kills another person?"  Id. at 151.  Van Norman questioned Anthony on all these topics, particularly on whether he would be an automatic vote for the death penalty.  Doc. 89 at 126–42.  Although Anthony initially seemed to affirm his response in the questionnaire that everyone who intentionally kills should get the death penalty, he went on to explain that he would want to hear the evidence before voting for a death sentence and that he could envision imposing a life sentence on someone in Piper's situation.  Id. at 133–42.  Van Norman passed Anthony for cause.  Id. at 142.

Dan Carlin, the last potential juror relevant to Piper's petition, underwent voir dire a few days later.  Carlin disclosed in his juror questionnaire that his niece had been murdered and that he was unhappy with the perpetrator's sentence.  Doc. 2-2 at 133.  He believed in an "eye for an eye" and that people who kill should be willing to forfeit their own lives.  Doc. 2-2 at 135.  Carlin initially told Stonefield that, given his experience with his niece, he would "[p]robably not" want himself on the jury were he in Piper's shoes.  Doc. 89-6 at 83.  Stonefield then challenged Carlin for cause, id. at 83, but Judge Eckrich denied the challenge after questioning by Fitzgerald, id. at 85.  Under further questioning from Stonefield, Carlin testified that he did not think the death penalty would be appropriate in every murder case.  Id. at 91.  When Carlin said that mitigatory evidence of Piper's troubled childhood would not matter to him, however, Stonefield renewed the challenge for cause.  Id. at 94–95.  Fitzgerald then questioned Carlin and objected to the challenge after Carlin agreed that he would follow the instructions and would consider both mitigating and

aggravating evidence before reaching a verdict. Id. at 96–99.  Judge Eckrich spoke with Carlin next, asking Carlin how he solves problems in his job as a mechanic and whether he could follow the instructions and consider mitigatory evidence of a troubled childhood despite his personal opinions. Id. at 99–105.  Carlin agreed that he could, and Judge Eckrich denied the challenge for cause. Id. at 104–05.  Judge Eckrich made a record once Carlin left the courtroom, reciting the standard for juror bias in capital cases and explaining that, after listening to the whole voir dire and considering the juror questionnaire, he did not believe that Carlin's views would substantially impair his duty to be impartial. Id. at 108–09.  Piper's attorneys used peremptory strikes on Sagdalen and Carlin, but Anthony ended up on the jury. Piper IV, 936 N.W.2d at 812.

### 2.    Final Pretrial Conference and Opening Statements

The trial began on July 18, 2011.  Doc. 90 at 13.  Judge Eckrich held a final pretrial hearing that morning in chambers. Id. at 18–19.  One of the issues discussed was Piper's sexual orientation. Id. at 24–25.  Piper had filed a motion in limine in January 2011 seeking to prohibit any evidence or argument that he was bisexual or had sexual relationships with other men.  Doc. 121-5 at 551–53.  He claimed that the State had presented evidence of this nature in his first trial and cited to the testimony of a man named Russell Olson in support.[6] Id.  Judge Eckrich entered a terse order in mid-June 2011 granting Piper's motion under the "[s]ame circumstances and ruling as Motion in Limine #6."[7]  Doc. 121-9 at 316.  Fitzgerald sought reconsideration of this ruling at the pretrial hearing, arguing that Piper's sexual orientation tied in with evidence that Piper had forced Poage

---

[6]Russell Olson testified in the first trial that he had sexual relations with Piper.  Doc. 121-2 at 525.
[7]Judge Eckrich's ruling on motion in limine six stated that the State had agreed to that motion during a January 28, 2011 hearing.  Doc. 121-9 at 316.  This Court read the transcript from that hearing, however, and did not see where the State agreed to Piper's motion to exclude evidence that he was bisexual or had sexual relationships with men.  See Doc. 88-1.  Rather, the transcript reflects that Judge Eckrich said he would defer ruling on Piper's motions in limine.  Doc. 88-1 at 64–65.

to strip naked and asked Poage to perform fellatio on him, Hoadley, and Page. Doc. 90 at 24. Judge Eckrich said he would "stand by [his] prior ruling excluding it." Id. at 25.

The final pretrial conference also included a discussion on whether prison privileges would be admissible. Id. at 28–29. Stonefield asked that the State be prohibited from mentioning the privileges available to inmates serving life sentences. Id. at 29. Judge Eckrich questioned the relevance of particular privileges like cable television or reading subscriptions and directed Fitzgerald to "stay away from any kind of specifics" in his opening statement. Id. at 30–34.

In opening statements, Fitzgerald said the evidence would show that Piper had told a fellow inmate at the Lawrence County Jail that he, Page, and Hoadley had made Poage strip because they wanted him to give them "blow jobs." Id. at 96–97. Van Norman objected, and the transcript reflects that the parties had an off-the-record discussion. Id. at 97. Fitzgerald resumed his opening statement, saying that Piper had told inmate Tom Curtis that the purpose of having Poage disrobe was because the trio wanted Poage to give them oral sex. Id. Piper's counsel did not object this time. Id. Fitzgerald proceeded to tell the jury that Piper had said that Poage was forced to disrobe because Page "got some sort of a pleasure from watching men strip" and that Page threatened to "'have Russell come down here and rape [Poage's] ass.'" Id. at 104. According to Fitzgerald, Piper found Page's threat amusing. Id.

### 3.    Trial

For Piper to be eligible for the death penalty, the State needed to prove at least one of the aggravating factors listed in SDCL § 23A-27A-1. Piper I, 709 N.W.2d at 797; Doc. 90-10 at 6. If the jury found one of these factors beyond a reasonable doubt, it would then consider any

mitigating circumstances[8] and whether Piper should be sentenced to death or life without parole. Doc. 90-10 at 9, 19–20; SDCL § 23A-27A-1.  The State argued that three aggravating factors existed in Piper's case: (1) the killing was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery;" (2) Piper had killed Poage for money or profit; and (3) Piper had killed Poage to avoid detection.  Doc. 90 at 80–81.

The State presented extensive evidence on all three factors.  The State's witnesses testified that Piper, Page, and Hoadley developed a plan to rob Poage while playing video games at his house on the evening of March 12, 2000.  Doc. 90-3 at 64–65; Doc. 90-4 at 9–12; State v. Piper (Piper III), 842 N.W.2d 338, 345 (S.D. 2014).  The three men lured Poage away from his home to a house where they had been staying.  Doc. 90-3 at 65; Doc. 90-4 at 14.  Inside, Page pulled a .22 caliber pistol he had stolen from Poage's home and ordered Poage to the floor.  Doc. 90-3 at 65; Doc. 90-4 at 14–15; Piper III, 842 N.W.2d at 346.  As Poage lay on his stomach, asking why his supposed friends were doing this, Piper kicked him in the face, knocking him unconscious.  Doc. 90-3 at 26, 64–65; Doc. 90-4 at 16–17; Doc. 95 at 5–6; Piper III, 842 N.W.2d at 346.  Poage's hands and feet were bound, and he was propped upright in a chair.  Doc. 90-3 at 65; Doc. 90-4 at 19–22; Doc. 90-6 at 16; Piper III, 842 N.W.2d at 346.  Poage, upon regaining consciousness, could overhear Piper, Page, and Hoadley discuss ways to kill him, including slitting his throat or drowning him.  Doc. 90-3 at 27, 65; Doc. 90-4 at 22–23, 29–30.  Piper stood on a four-way tire iron across Poage's ankles while Page and Hoadley forced Poage to drink a mixture of beer and

---

[8]The jury instructions in Piper's case defined a mitigating circumstance as "one which, while not constituting a justification or excuse for the crime, should in fairness and mercy be considered as reducing the degree of moral culpability or blame of the defendant, or otherwise offering a basis for not imposing the death penalty."  Doc. 90-10 at 19.

hydrochloric acid.   Doc. 90-4 at 25–28; Doc. 90-6 at 17; Doc. 90-8 at 114; <u>Piper III</u>, 842 N.W.2d at 346, 350.  The acid hurt Poage's stomach but did not kill him.  Doc. 90-4 at 26.

Piper, Page, and Hoadley decided that it would be best to kill Poage elsewhere.  Doc. 90-3 at 65; 90-4 at 32–33.  They put Poage in his Chevrolet Blazer and drove to a remote, wooded area in the Black Hills called Higgins Gulch.  Doc. 90 at 179; Doc. 90-3 at 65; Doc. 90-4 at 31.  Once there, Piper and Page forced Poage out into a foot of snow, in the below-freezing night, and made him strip to nothing but a tank-top shirt and his socks and shoes.  Doc. 90 at 189–91; Doc. 90-4 at 35–36.  The three then tried burying Poage in the snow, Doc. 90-4 at 53; 90-8 at 55, 123; 90-6 at 19, and drowning him in a nearby creek, Doc. 90-1 at 124; Doc. 90-4 at 47; 90-6 at 22, but Poage remained alive, <u>Piper III</u>, 842 N.W.2d at 346.  Piper would later admit that he kicked Poage multiple times in the head and body with combat boots while out at Higgins Gulch.  Doc. 90 at 127–34, 151–53, 167–68; Doc. 90-3 at 66; Doc. 90-8 at 55–56, 121; Doc. 95 at 32, 35–36, 52; <u>Piper III</u>, 842 N.W.2d at 346, 350.

Poage tried to escape sometime during the attack, but according to Hoadley, Piper told Page to bring him back.  Doc. 90-4 at 43; <u>Piper III</u>, 842 N.W.2d at 346.  The three then each stabbed Poage once with a buck knife.  Doc. 90-4 at 46–49, 118–19; Doc. 90-7 at 194; Doc. 90-8 at 121, 125.  According to Hoadley, Piper went first, stabbing Poage in the side of the head.  Doc. 90-4 at 46–47, 118–19; Doc. 90-5 at 43.  Poage's stab wounds were potentially lethal, but he did not die immediately.  Doc. 90 at 147; Doc. 90-4 at 125.  Instead, Poage asked to get in the Blazer so that he could bleed to death where it was warm.  Doc. 90-1 at 127; Doc. 90-3 at 29; Doc. 90-4 at 54, 124; <u>Piper III</u>, 842 N.W.2d at 346, 350.  The three told Poage that they would grant his request if he washed the blood off his body in the creek first.  Doc. 90-4 at 54–56, 124.  Poage complied but was still not allowed in the vehicle.  Doc. 90-1 at 127; Doc. 90-4 at 54–56, 124.

16

Piper retreated to the Blazer after which Page and Hoadley dropped heavy rocks on Poage's head to complete the murder. Doc. 90-3 at 66–67; Doc. 90-4 at 57–58; Piper III, 842 N.W.2d at 346. The three left Poage's body in the creek and drove back to Spearfish where they looted Poage's home. Doc. 90-4 at 57–59; Doc. 90-3 at 33, 67; Doc. 95 at 18; Piper III, 842 N.W.2d at 345. They eventually pawned some of Poage's possessions and used his ATM card to steal cash from his bank account. Doc. 90-4 at 61, 68; Doc. 90-6 at 89; Doc. 95 at 24, 95–96; Piper III, 842 N.W.2d at 345.

All told, the kidnapping and murder of Poage lasted about four hours. Doc. 90-4 at 44–45, 122; Doc. 95 at 49. The State presented evidence at trial that Poage had begged for his life throughout the ordeal and that Piper taunted Poage as he was brutalized. Doc. 90-1 at 126, 175; Doc. 90-3 at 26–27, 30; Doc. 90-4 at 33, 48, 51; Doc. 90-6 at 20; Doc. 95 at 40, 70; Doc. 90-8 at 122; Piper III, 842 N.W.2d at 347, 350. Hoadley admitted that he and his codefendants killed Poage to eliminate him as a witness, Doc. 90-4 at 51, and the State offered other testimony that Piper had said that "things had gotten so bad that they had to" kill Poage, Doc. 90-1 at 176. At least two witnesses testified that in the months just before the murder, Piper had said that he wanted to know what it was like to kill someone. Doc. 90-1 at 128; Doc. 90-5 at 168. Other witnesses who were housed with Piper in the Lawrence County Jail before his first trial testified that Piper had offered them money to kill two guards so that he could escape. Doc. 90-3 at 13, 15–16, 19–23; Doc. 90-6 at 12, 23–25. One of these witnesses was Tom Curtis.

Curtis met Piper at the Lawrence County Jail in 2000 and testified at Piper's first trial. Doc. 121-2 at 574, 577–78; Doc. 90-3 at 15–16. He was in custody in Utah during Piper's second trial, but the State had him returned to South Dakota via an interstate subpoena to testify. Doc. 90-3 at 15–16. A few days before Curtis took the stand, Piper made an oral motion to prohibit

17

Curtis from testifying as he did in the first trial that Piper had disclosed that "[t]hey made [Poage] strip down, said that he was going to perform oral sex on them." Doc. 121-2 at 585; Doc. 90-1 at 2–3, 111, 187–88, 192–93.   Judge Eckrich declined to exclude this testimony, finding it different from the sort of sexual orientation evidence he thought Piper had been seeking to prohibit:

> Okay. Now, that -- we had a brief discussion yesterday because it came up in the opening a little bit. I don't -- to be honest with you, I don't see that as a sexual orientation reference. It's a -- might be an aggression reference, it might be an assault reference, but it's -- I suppose it's to -- it's to sexual orientation as rape is to sex. There isn't really a connection. I don't regard it that way. "They" said "he" "perform oral sex on them." To that extent, if that's the -- if that was going to be the -- if that's the objectionable material based on sort of a constitutional sexual orientation argument I would deny it.

90-1 at 193. Judge Eckrich later reaffirmed his ruling on Curtis's testimony, saying that references to oral sex out at Higgins Gulch were admissible and "part of the res gestae." Doc. 90-3 at 8–9.

Curtis thus testified about the oral sex reference at Piper's trial. He explained that Piper had said that he and his accomplices forced Poage to disrobe out at Higgins Gulch because they planned to make him give them "blow job[s]." Id. at 27–28. Curtis said that he did not know, however, whether the three men actually made Poage fellate them. Id. at 28. Van Norman objected to Curtis's testimony, but Judge Eckrich overruled him. Id. at 27.

Although Curtis also testified about several other topics, the one most relevant here is his criminal history. Clad in jail garb, Curtis testified on direct that he was imprisoned in Utah and was awaiting sentencing on some recent felony convictions. Id. at 11–12. Van Norman revisited Curtis's criminal history on cross:

> **Van Norman**: Okay. How many felonies have you been convicted of over the years?
> **Curtis**: How many have I been convicted of?
> **Van Norman**: Yeah.

**Curtis**: Approximately two that I have been convicted of.  I have been accused of many more but I have been convicted of I think two.

**Van Norman**: Okay.

**Curtis**: A burglary and a theft.

**Van Norman**: A burglary and a theft?

**Curtis**: Yes.

**Van Norman**: Okay, and what have you been convicted of that you're incarcerated for now?

**Curtis**: For possession with intent to distribute.

**Van Norman**: What?

**Curtis**: Cocaine.

**Van Norman**: And that would be another conviction - -

**Curtis**: Yeah.

**Van Norman**: - - right? How much time are you facing?

**Curtis**: I have no idea yet and I won't know until I go to court.

**Van Norman**: I thought you said you were just awaiting sentencing.

**Curtis**: I am awaiting sentencing.

**Van Norman**: You have an attorney, don't you?

**Curtis**: But it carries - - it carries a five-to-life and I don't know what the Judge is going to do on that.

. . . .

**Van Norman**: Okay.  And [your lawyer] has explained to you what you might get, right?

**Curtis**: No, he has not yet.  I - - when you're - - when you get your papers you know what it is.  There is first, second and third degree felonies, mine was a first degree felony, which is a five-to-life.

**Van Norman**: That's the highest rated felony?

**Curtis**: Yes.

**Van Norman**: How much cocaine?

**Curtis**: I did not have any cocaine, I was accused of having cocaine.

**Van Norman**: Okay, so you're taking a false rap here, right, with regard to the cocaine?

**Curtis**: Yes, I am.

**Van Norman**: You have explained that to your attorney?

**Curtis**: My attorney is aware of that, yes.

**Van Norman**: And you have actually gone to court and pled guilty in front of a Judge even though it's a false charge.

**Curtis**: No, I did not go to court and plead guilty to it, I was found facility [sic].

**Van Norman**: Oh, you went to trial?

**Curtis**: Yes.

**Van Norman**: I'm sorry.

**Curtis**: That's okay.

**Van Norman**: Yeah. And how many charges were you found guilty of?

**Curtis**: There was eight charges.

19

> **Van Norman**: Eight?
> **Curtis**: Eight distributors.
> **Van Norman**: And you were charged - - charged with eight distributions, right?
> **Curtis**: Yeah.
> **Van Norman**: And you were found guilty of eight distributions?
> **Curtis**: Okay.
> **Van Norman**: And all eight of the incidents are false.
> **Curtis**: Yes, it is.

Doc. 90-3 at 36–39. Curtis did not testify to nor was he asked about convictions for sexual assault.

Trouble arose during the State's case in chief when Fitzgerald asked Brad Woodward, a unit manager at the Penitentiary, whether inmates were allowed to have television. Doc. 90-2 at 104, 121–22. Woodward responded "Yes," and Van Norman immediately objected. Id. at 121. Judge Eckrich sustained the objection and called a recess. Id. Van Norman then moved for a mistrial, arguing that Fitzgerald had violated Judge Eckrich's "direct order in chambers" prohibiting evidence of "television and other privileges" available to prisoners. Id. at 121–22. Judge Eckrich admonished Fitzgerald for "stepp[ing] over the line" but denied Piper's motion, finding that the brief reference to inmates having television did not justify a mistrial. Id. at 122. Judge Eckrich prohibited Fitzgerald from making any further reference to privileges in prison.[9] Id.

The State also offered testimony from psychiatrists Ulises Pesce and Ronald Franks and counselor Robert Fredrickson. Dr. Pesce saw Piper over ten times between 2001 and 2004 while working at the South Dakota State Penitentiary in Sioux Falls. Doc. 90-2 at 57. He prescribed Piper medication and assessed him as having antisocial personality disorder. Doc. 90-2 at 65–66, 69, 83. Dr. Pesce testified that conduct disorder is basically the child version of antisocial

---

[9]Neither party cites to where Judge Eckrich's order on prison privileges appears in the record. Doc. 75 at 12; Doc. 67 at 94–97. Van Norman's reference to a "direct order in chambers" appears to refer to the pretrial hearing Judge Eckrich held in chambers. Doc. 90 at 18–19.

personality disorder, and that a childhood diagnosis of the former often precedes an adult diagnosis of the latter. Id. at 76, 96–98. He explained that violence, manipulation, deceitfulness, and a lack of empathy were all associated with antisocial personality disorder. Doc. 90-2 at 78. When asked about ADHD, Dr. Pesce said that the condition is linked to trouble in school and agitation, but that it does not cause violence. Id. at 72–73. He described Piper as feeling that his death sentence was a "terrible crime" the State committed against him. Id. at 61.

On cross-examination, Dr. Pesce conceded that he had only seen Piper for eight hours total and that ADHD can have very significant effects on a person's life. Id. at 80, 85. He also agreed that the brain's frontal lobes are not fully mature when a person is 20 years old, that development of the frontal lobes is directly related to impulse control and an appreciation for consequences, and that ADHD can exacerbate problems associated with underdeveloped frontal lobes. Id. at 86–87. Dr. Pesce likewise acknowledged that ADHD and antisocial personality disorder would "directly" affect a 20-year-old's ability to make good choices. Id. at 99.

Dr. Franks never met with Piper but did review his social history and psychological records from the penitentiary. Doc. 90-3 at 79, 86. He testified that ADHD makes it difficult to focus but that children with ADHD are no more likely to be violent than children without ADHD. Id. at 76–79. Dr. Franks told the jury that children with conduct disorder can still control their behavior, id. at 85–86, and identified instances in Piper's social history where he had behaved well, id. at 79–80. He testified that an enabling home environment—such as when a parent refuses to consistently punish misbehavior and hold a child accountable—can worsen conduct disorder, id. at 84–85, 101, and that Dr. Rose had diagnosed Piper with conduct disorder when he was 13 or 14, id. at 130.

According to Dr. Franks, Piper's social history and penitentiary records did not reveal any evidence that Piper had a brain disease or neurological damage. Doc. 90-3 at 87. "[I]n fact," Dr.

Franks explained, "[Piper] had a very thorough neurological assessment when he was in the seventh grade and they did not find evidence of neurological deficit" or damage. Id. at 87; see also id. at 91 (stating that Dr. Clark's evaluation did not show any evidence of neurological deficits). Dr. Franks also testified that he saw little connection between frontal lobe development and the type of violence done to Poage, id. at 95, and that people with antisocial personality disorder can control their impulses but are sometimes unwilling to do so, id. at 98–99. On cross, Dr. Franks acknowledged that at least two authorities had recommended that Piper receive residential treatment but that such treatment never occurred. Id. at 104–05, 119.

Penitentiary counselor Robert Fredrickson saw Piper regularly between June 2008 and March 2009 while doing rounds in Piper's housing area. Doc. 90-5 at 96–97, 101, 103, 111, 121. He testified that there were times Piper exhibited antisocial traits like a lack of remorse, superficial charm, and little concern for something unless it involved himself. Id. at 103–04. He also recalled one interaction where Piper had displayed "strong traits of narcissism," id. at 106, and testified that Piper is "quite intelligent," id. at 107. Fredrickson admitted on cross-examination that Piper had never been rude or combative with him and that Piper taking college courses in prison was a positive sign. Id. at 110–11, 113.

Piper's defense focused largely on presenting mitigatory evidence. Testimony from Linda and Sheldon sought to humanize Piper, highlight his ADHD and learning disability, and explain his difficult upbringing. Doc. 90-6 at 129–207, 218–51; Doc. 90-7 at 2–121. Prison counselor Justin Falon testified about Piper's drive to educate himself by taking college correspondence courses and about his positive overall impression of Piper. Doc. 90-7 at 121–77.

A prison chaplain and a nun, Sister Gabrielle Crowley, also testified on Piper's behalf. Doc. 90-8 at 149–89. Sister Crowley testified that she met Piper about three and a half years before

trial when she started giving him Spanish lessons over the phone. Id. at 151. Piper was studying to become a Catholic, Sister Crowley explained, and she served as his godmother when he was baptized in April 2008. Id. at 152. She began regular in-person visits with Piper thereafter, during which they would discuss spiritual matters, Piper's family, his close relationship with his nieces, his studies, and his desire to please his parents with good grades. Id. at 154–57. Sister Crowley testified that she had a "very deep relationship" with Piper given their "spiritual connection," and that she felt like "family to him, like I belong to their family." Id. at 157. Fitzgerald's cross-examination of Sister Crowley focused on a letter she had written to a female inmate at Piper's request. Sister Crowley agreed with Fitzgerald that prison policy prohibited inmates from writing each other and that her letter violated this policy. Id. at 158–60. Fitzgerald closed his cross-examination by asking whether Piper had "manipulated your friendship" to get Sister Crowley to do something he could not. Id. at 160–61. Sister Crowley replied that she did not view "it that way" when she wrote the letter because she did not recall that doing so was against prison policy. Id. at 161.

Dr. Ertz testified about Piper's extensive pre-incarceration abuse of marijuana and LSD, and the negative effects these drugs have on a person's reasoning and mental health. Doc. 90-7 at 195–98. He agreed with Piper's ADHD diagnosis but questioned Dr. Rose's conclusion that Piper had conduct disorder. Id. at 199–203, 205. Among other things, Dr. Ertz believed that Dr. Rose erred by using an adult version of a test when evaluating the then 13-year-old Piper. Id. at 202. In Dr. Ertz's view, Piper's inattention and struggle to conform to societal norms was evidence of his ADHD. Id. at 205. He explained that impulsivity and failure to conform to societal norms are symptoms of both antisocial personality disorder and ADHD, and that Piper's impulsivity made it more likely that he would unthinkingly engage in antisocial behavior. Id. at 205–08; Doc. 90-8 at

3–4. Dr. Ertz told the jury that youth, substance abuse, group dynamics, and upbringing all affect a person's ability to exercise free will.  Doc. 90-8 at 6, 8.  He explained that the brain's frontal lobes—the area responsible for reasoning and executive function—are not fully developed until age 25, id. at 7, and that the harsh physical punishment Piper received during his youth only worsened his ADHD and prevented him from learning prosocial behavior, id. at 9–10.

Dr. Wortzel testified that youth, substance abuse, upbringing, ADHD, and group dynamics were all mitigating factors in Piper's case.  Id. at 85, 97.  He explained that 19-year-olds are more impulsive because their brains haven't finished maturing and that Piper's heavy LSD use in the months before Poage's murder would have compounded this impulsivity.  Id. at 87–90.  He said that home environment is critical to a person's development, id. at 93, and that Piper's environment was "far from ideal," id. at 91.  In particular, Dr. Wortzel explained that the arbitrary beatings Piper received would not have taught him right from wrong and that Piper's parents erred by blaming others for his behavior and refusing to get him the help he needed.  Id. at 91–94.  Dr. Wortzel believed that Poage's murder resulted from group dynamics, with Piper, Hoadley, and Page feeding off one another and behaving in ways they would not have if they had been alone. Id. at 99–100.

Dr. Wortzel agreed on cross-examination that the three defendants stole Poage's property and murdered him to eliminate a witness against them.  Id. at 120, 128.  The State asked Dr. Wortzel whether he had done a brain scan of Piper and whether there was any evidence that Piper had brain damage.  Id. at 135.  Dr. Wortzel replied that while Piper's ADHD and antisocial tendencies had "neurological underpinnings," he was not saying that Piper had brain damage.  Id. He also testified that he had not recommended a brain scan or similar test for Piper because they

were "experimental in nature at this point in time and not intended for single subject use." Id. at 136.

Attorneys Van Norman and Stonefield focused on the mitigatory evidence in closing arguments, urging the jury to impose a sentence of life without parole rather than death. Doc. 90-10 at 58–94. Stonefield argued that the crime resulted from group dynamics and was not something Piper would have done by himself, that Piper had cooperated with law enforcement and accepted responsibility by pleading guilty, and that Piper had been sitting in the Blazer when Hoadley and Page did the most damage to Poage. Id. at 66–67, 72–73. He contended that it would be wrong to sentence Piper to death when Hoadley—who played a significant role in Poage's murder, showed little remorse on the witness stand, and engaged in other concerning conduct like threatening his pregnant girlfriend's life and holding a knife to another girl's throat—only received a life sentence. Id. at 73–74. Van Norman's mitigation arguments focused more on Piper's upbringing and mental health. He argued that Piper "wasn't wired correctly to start with," having been born with a learning disability and ADHD. Id. at 84–85. He emphasized Linda's refusal to get Piper the therapeutic help he so clearly needed, id. at 90, as well as her penchant for corporal punishment, id. at 89.

The jury found all three aggravating factors alleged by the State and sentenced Piper to death. Doc. 2 at 333–34. Judge Eckrich entered judgment in early August 2011 and appointed attorney Steve Miller as appellate counsel. Id. at 304–05, 337; Doc. 67 ¶ 7. Piper appealed to the Supreme Court of South Dakota, arguing that Judge Eckrich erred by denying his motion to withdraw his guilty pleas and that his sentence was disproportionate to the life sentence Hoadley

received.[10]  Doc. 2-1 at 7–42.  The Supreme Court of South Dakota affirmed in early 2014, holding that Piper's sentence was lawful and that his motions to withdraw his guilty pleas were beyond the scope of the court's limited 2009 remand.  Piper III, 842 N.W.2d at 344–51.

### C.    State Habeas Case

Piper filed a pro se state habeas petition in mid-March 2014.  Doc. 2 at 313; Doc. 2-1 at 44–48.  He claimed that the State had presented false testimony and withheld material evidence, that his 2001 guilty pleas were not knowing and intelligent, and that he received ineffective assistance of counsel.  Doc. 2-1 at 44–48.  Judge Randall Macy appointed attorney Matthew Kinney to represent Piper.  Kinney secured an order staying Piper's execution and began work on the case.  Doc. 103 at 62, 68–71, 73–74.  An evidentiary hearing was set for mid-July 2015.  Id. at 99.  In June 2015, Kinney moved to postpone the hearing so that he could have more time to review "the voluminous amounts of documents and discovery in this matter."  Id. at 102.  At a hearing on the motion, Kinney explained that he planned to move to withdraw Piper's guilty pleas in the criminal case so that this issue would be exhausted for any federal habeas action Piper might bring.  Id. at 530–31.  He added that he was "on schedule," that he and Kim de Hueck, an attorney at his firm, had "spent some good time on this," and that de Hueck had "seen Mr. Piper at least on two or three occasions for long periods of time in the South Dakota State Pen."  Id. at 532.  Judge Macy granted the continuance and moved the evidentiary hearing to October 2015.  Id. at 118.

Kinney moved for another continuance in September 2015.  The motion explained that Judge Eckrich had yet to rule on Piper's motion to withdraw his guilty pleas and that Piper wanted to exhaust this issue before Judge Macy ruled on his habeas petition.  Doc. 103 at 122–24.  Judge

---

[10]When Piper appealed his initial sentence, two justices on the Supreme Court of South Dakota agreed that his death sentence was grossly disproportionate to Hoadley's life sentence.  Piper I, 709 N.W.2d at 822 (Sabers, J., dissenting).

Macy granted the motion and set a status conference for January 2016. Id. at 131. In the meantime, Judge Eckrich held a hearing on Piper's motion to withdraw his guilty pleas and both parties submitted briefs on the issue. Id. at 557–58. Piper and the State agreed to continue the habeas hearing until Judge Eckrich ruled on Piper's motion. Id. at 558–59. Judge Eckrich denied Piper's motion in February 2016. Id. at 564–65. Piper filed an immediate appeal, but the Supreme Court of South Dakota dismissed it for a lack of jurisdiction. Piper IV, 936 N.W.2d at 803. With the effort to withdraw the guilty pleas concluded, Judge Macy set the evidentiary hearing for July 2016. Doc. 103 at 134, 564. Kinney prepared a writ of habeas corpus ad testificandum directing that Piper be brought to Lawrence County before the hearing so that he could meet with his attorneys. Id. at 143–44. He also subpoenaed Van Norman and Stonefield. Id. at 138–41.

At the evidentiary hearing, Kinney presented testimony from Van Norman, Stonefield, and Steve Miller. He questioned Van Norman and Stonefield about the motion to withdraw Piper's guilty pleas, voir dire and jury selection, preparation for and cross of certain witnesses, supposedly inconsistent arguments the State made about the leadership roles of Piper and Page during Poage's murder, and which issues they believed Miller should have raised on appeal. Doc. 90-11 at 7–36, 44–82, 114–60. Kinney questioned Miller on his advice to Piper that it would be premature to challenge his guilty pleas during his initial state habeas case, the motion to withdraw Piper's guilty pleas, and Miller's decision on which arguments to raise in Piper's appeal. Id. at 196–221. Miller testified that although he could not "specifically recall" discussing with trial counsel whether he should appeal Judge Eckrich's denials of Piper's challenges for cause to potential jurors, he had read the entire record and concluded that there he had no issue that was "even arguably close" to as strong as the claim that Judge Eckrich erred by denying Piper's motion to withdraw his guilty

pleas.[11]  Id. at 218.   Kinney did not ask anyone about Piper possibly having brain damage or FASD

and did not offer any evidence beyond the testimony of Piper's three previous lawyers.

Piper himself was also allowed to question his former attorneys.   When Piper asked how

long Sheldon had requested to prepare her report, Van Norman admitted that she had been rushed:

> I remember we jammed her up, and there were two reasons
> I think that that happened.  One is that we waited quite a while for a
> couple of rulings by Judge Eckrich which were pretty important.
> One could have been dispositive of the case, and that was on the
> motion to withdraw your guilty plea.  And then there was – there
> were several other pending decisions that took until February or
> March to get decided, of the same year we went to trial.  We had
> started at that point looking for a mitigation specialist and even the
> very experienced ones we talked to, they were too expensive or
> unavailable because they wanted at least a year lead time to properly
> do their work.  And there's a national organization of mitigation
> specialists, and I understood what their standards were.
> So we ended up finding Ms. Sheldon, and then pushing her
> very hard to try to do what she could do.  There were a couple of
> things about her that were a little odd.  She wouldn't fly, she lived
> in Tuscan [sic] so she'd need to drive or take a bus or a train to get
> different places, and we were balancing schedules for her to even
> see you at the penitentiary to do very essential things.

Id. at 40–41.  Van Norman acknowledged that, if Sheldon had needed more time to complete her

work and he and Stonefield had not requested a continuance, he had not "protect[ed] that aspect

of [Piper's] case."  Id. at 42–43.

Judge Macy ordered the parties to file proposed findings of fact and conclusions of law

after they received the transcript of the habeas hearing.  Id. at 228–29; Doc. 103 at 145.  Kinney

and the State filed their proposed findings of fact and conclusions of law in early October 2016.

---

[11]Miller testified that he had only raised the disproportionate-sentence argument because the
Supreme Court of South Dakota was already going to review the issue as part of the automatic
appeal in every death penalty case in South Dakota, and Miller felt like he "had" to raise it.  Doc.
90-11 at 212–13, 218.

Doc. 103 at 410–59. Piper's proposed findings of fact and conclusions of law raised these grounds

for relief:

> (1) that his 2001 guilty pleas were not knowing and intelligent;
>
> (2) that Duffy, Rensch, and Piper's initial state habeas counsel
> (Miller) were ineffective in advising him about his guilty pleas
> and right to a jury trial;
>
> (3) that Van Norman and Stonefield were ineffective during voir
> dire in handling potential jurors Sagdalen and Carlin, failing to
> thoroughly investigate State witnesses from the Penitentiary,
> failing to adequately investigate Tom Curtis, and failing to
> respond appropriately when Sister Crowley was questioned
> about the alleged prison policy.
>
> (4) that Miller was ineffective in his role as appellate counsel after
> the jury verdict by failing to appeal Judge Eckrich's denial of the
> motions to strike Sagdalen and Carlin as well as the denial of
> Piper's motion for a mistrial after Fitzgerald asked whether
> inmates were allowed to have television.

Doc. 85-1 at 30–31; Doc. 2-1 at 183–85. Some of these grounds for relief overlapped with Piper's

pro se habeas petition while others were new. Kinney did not claim that Van Norman and

Stonefield were ineffective by failing to adequately investigate and present life history and

cognitive functioning evidence. The State filed a rebuttal brief, but Kinney did not. Doc. 103 at

460–65.

Judge Macy denied Piper's habeas petition on January 13, 2017, finding that Piper's guilty

pleas were knowing and intelligent and that his attorneys had not performed ineffectively or

prejudiced him. Doc. 2-1 at 180–204. Judge Macy entered an order on February 13, 2017,

appointing Kinney to represent Piper on appeal of his habeas case. Doc. 103 at 504. Piper wrote

to the Supreme Court of South Dakota asking that a new attorney be appointed for his appeal. Id.

at 835–36. The court remanded Piper's request to the trial court and Judge Macy entered an order

appointing Ryan Kolbeck as substitute counsel for Piper. Id. at 834, 843–44, 847. Kolbeck

obtained an amended certificate of probable cause from the trial court and appealed to the Supreme Court of South Dakota. Id. at 953–54, 962–63. Piper raised the following claims on appeal:

1. That his guilty pleas were not knowing and intelligent;

2. That the State made inconsistent arguments during the separate proceedings for Page and Piper and that the State's inconsistent arguments should have been admitted at Piper's resentencing trial;

3. That the trial judge violated his right to due process by failing to strike potential jurors Sagdalen and Carlin for cause;

4. That counsel was ineffective by (a) presenting testimony from Dr. Wortzel and Dr. Ertz essentially admitting that Piper had committed the alleged aggravating factors; (b) providing incorrect legal advice about his guilty pleas; (c) failing to object when the trial court rehabilitated potential jurors Sagdalen and Carlin; (d) failing to adequately investigate the State's witnesses from the Penitentiary; (e) failing to adequately investigate State witness Tom Curtis; (f) failing to appropriately respond to the State's assertion that Sister Crowley violated prison policy;

5. That the State violated his right to due process by failing to provide an updated criminal history report for Curtis; and

6. That Miller was ineffective as appellate counsel by failing to appeal Judge Eckrich's denial of Piper's motion for a mistrial and Judge Eckrich's refusal to strike Sagdalen and Carlin for cause.

Doc. 2-1 at 72–148. The Supreme Court of South Dakota affirmed the denial of Piper's habeas petition in late 2019, concluding that res judicata barred some claims and that others failed on the merits. Piper IV, 936 N.W.2d 793.

### D.    Federal Habeas Case

Piper filed his federal habeas petition in December 2020, Doc. 1, and his amended federal habeas petition in August 2022, Doc. 67. He raises these claims:

Claim I: Van Norman and Stonefield were ineffective by failing to adequately investigate and present life history and cognitive functioning evidence.

Claim II: Withdrawn.

Claim III: Judge Eckrich improperly denied Piper's motion to strike juror Lisa Sagdalen for cause and both trial and appellate counsel were ineffective in handling the Sagdalen issues.

Claim IV: Van Norman and Stonefield were ineffective during voir dire in handling potential juror Dan Carlin and juror Dennis Anthony.

Claim V: Van Norman and Stonefield were ineffective in preparing for and handling Sister Crowley's cross examination.

Claim VI: Miller was ineffective by failing to appeal Judge Eckrich's denial of a motion for a mistrial after the State elicited testimony about whether inmates were allowed television in prison.

Claim VII: Fitzerald violated Piper's rights by introducing evidence of lewd behavior at Higgins Gulch and Van Norman and Stonefield were ineffective in responding to Fitzgerald's actions.

Claim VIII: Van Norman and Stonefield were ineffective by failing to move for a mistrial based on Fitzgerald's cumulative prosecutorial misconduct.

Claim IX: The State violated Piper's due process rights by failing to disclose Tom Curtis's criminal history and Van Norman and Stonefield were ineffective by failing to adequately investigate Curtis's background.

Claim X: Judge Eckrich violated Piper's rights under the Due Process Clause and Eighth Amendment by refusing to admit allegedly inconsistent arguments Fitzgerald made in Poage's trial.

Claim XI: Piper's guilty pleas were not knowing, voluntary, and intelligent.

Claim XII: Piper had a statutory right to withdraw his guilty pleas under South Dakota law and the State violated due process by arbitrarily denying him this right.

> Claim XIII: Piper was prejudiced because of the cumulative effect
> of the errors in his case.

Doc. 67.  Respondent argues that some of these claims are procedurally defaulted because Piper never raised them in state court while others are procedurally defaulted because the Supreme Court of South Dakota held that they were barred by res judicata.  Piper argues that <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), allows him to avoid procedural default of the claims he failed to raise previously, that ineffective assistance of appellate counsel allows him to avoid default of others, and that res judicata is not an independent and adequate rule in South Dakota.

## II.    Governing Doctrines

Four doctrines govern the parties' arguments on procedural default.  To limit repetition, this Court first describes these doctrines and addresses some general arguments the parties raise before applying the doctrines to Piper's claims later in this opinion.

### A.    Exhaustion and Procedural Default

Federal courts typically cannot consider a state prisoner's habeas claims unless the prisoner has previously raised those claims in state court.  <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842 (1999).  Congress codified this requirement in 28 U.S.C. § 2254, making state prisoners "exhaus[t] the remedies available in the courts of the State" before they can obtain federal relief. 28 U.S.C. § 2254(b)(1)(A).  "Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state courts in accordance with state procedures."  <u>Shinn v. Ramirez</u>, 596 U.S. 366, 378 (2022).  The exhaustion requirement protects the state courts' role in enforcing federal law, allows state courts the first opportunity to correct possible constitutional defects in state court convictions, and prevents the potentially "unseemly" disruption of state judicial proceedings through premature federal court intervention.  <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982) (cleaned up and citation omitted).

32

These interests in comity and federalism also underlie the procedural default doctrine. Shinn, 596 U.S. at 378; Davila v. Davis, 582 U.S. 521, 527–28 (2017). Procedural default occurs when a prisoner does not properly exhaust his claims in state court and is now barred from doing so because of his failure to follow the state's procedural rules. Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) (en banc); Wiegers v. Weber, 37 F. App'x 218, 219–20 (8th Cir. 2002) (per curiam) (unpublished). If the petitioner is barred from raising his claims because "untimeliness or some other state procedural hurdle" prevents him from doing so, then he has technically exhausted his state court remedies as there are no longer any such remedies available. Grass v. Reitz, 643 F.3d 579, 584 (8th Cir. 2011); see also Woodford v. Ngo, 548 U.S. 81, 92–93 (2006) ("In habeas, state-court remedies are described as having been 'exhausted' when they are no longer available, regardless of the reason for their unavailability."). Exhaustion in this sense, however, "does not automatically entitle the habeas petitioner to litigate his . . . claims in federal court." Woodford, 548 U.S. at 93. Rather, the state procedural rule will bar federal review if the rule is "*independent* of the federal question and *adequate* to support the judgment." Lee v. Kemna, 534 U.S. 362, 375 (2002) (cleaned up and citation omitted). The only way to avoid an independent and adequate state procedural bar is for the petitioner to show "cause"—meaning "something *external* to the petitioner, something that cannot fairly be attributed to him" that hindered compliance with the state procedural rule—and "actual prejudice,"[12] Coleman v. Thompson, 501 U.S. 722, 750, 753 (1991). The procedural default doctrine thus "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." Edwards v. Carpenter, 529 U.S. 446, 452–53 (2000) (cleaned up and citation omitted).

---

[12]A petitioner can also avoid procedural default by showing "actual innocence," but Piper makes no assertion of actual innocence here. Grass, 643 F.3d at 584.

B.   **Martinez** Exception

Piper contends that Martinez allows him to overcome the procedural default of some claims because Kinney himself was ineffective by failing to raise these claims during state habeas proceedings.  Attorney error can constitute cause to excuse a procedural default if it occurs at a stage of the case in which the defendant has a constitutional right to effective assistance of counsel.  Coleman, 501 U.S. at 754.  The rationale for this is that a state's failure to provide effective counsel when the Constitution requires it to do so makes counsel's mistakes attributable to the state and thus external to the petitioner.  Id. at 754.  But the result is different when "the State has no responsibility to ensure that the petitioner was represented by competent counsel." Id.  In that situation, counsel's errors are "attributed to the prisoner under well-settled principles of agency law." Davila, 582 U.S. at 528–29 (cleaned up and citation omitted); see also Link v. Wabash R.R. Co., 370 U.S. 626, 634 (1962) (stating that in "our system of representative litigation . . . each party is deemed bound by the acts of his lawyer-agent").  Because there is no constitutional right to an attorney in state postconviction proceedings, ineffective assistance of counsel during those proceedings generally does not qualify as cause to excuse a procedural default.  Coleman, 501 U.S. at 752.

The Supreme Court recognized a narrow exception to this general rule in Martinez v. Ryan, 566 U.S. 1 (2012), holding that courts may find cause to excuse procedural default of a "substantial" claim of ineffective assistance of trial counsel when state law requires prisoners to raise such claims at the initial-review stage of collateral proceedings and the "cause" consists of there being no counsel or "ineffective" counsel during this collateral proceeding.  Trevino v. Thaler, 569 U.S. 413, 423 (2013).  A year later, in Trevino, the Court extended this exception to situations in which the state's "procedural framework, by reason of its design and operation,

34

makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." Id. at 429.  Two aspects of Texas law convinced the Court in Trevino that Martinez applied to defendants convicted in that state. Trevino, 569 U.S. at 423–28.  First, Texas procedure made it "virtually impossible" to develop the sort of extra-record evidence necessary to bring an ineffective assistance of counsel claim on direct appeal. Id. at 424 (cleaned up and citation omitted).  Although Texas argued that defendants could expand the record via a motion for a new trial, Texas courts had found that this procedure was often inadequate given the time constraints Texas imposed and counsel's lack of access to trial transcripts. Id. at 424–25.  Second, refusing to extend Martinez "would create significant unfairness" because Texas courts had "in effect . . . directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review." Id. at 425–26.

Defendants convicted in South Dakota face the same problem as those convicted in Texas: the first chance to present a claim of ineffective assistance of trial counsel will almost always be on collateral review by filing a state habeas action. The Supreme Court of South Dakota does not consider ineffective-assistance-of-counsel claims on direct appeal "absent exceptional circumstances." State v. Alvarez, 982 N.W.2d 12, 20 (S.D. 2022) (cleaned up and citation omitted).  This "rule is a practical one, necessitated by the fact that the record on direct appeal typically does not afford a basis to review the performance of trial counsel." Id. (cleaned up and citation omitted); see also State v. Craig, 850 N.W.2d 828, 838–39 (S.D. 2014) (explaining that it is "rare" for ineffective-assistance-of-counsel claims to be ripe for review on direct appeal (cleaned up and citation omitted)).  South Dakota appears to have no established procedure for developing ineffective-assistance-of-trial-counsel claims for direct appeal.  In fact, the Supreme Court of

South Dakota has said that "it is only through habeas corpus that a sufficient record can be made to allow the appropriate review of a claim of ineffective assistance of counsel." State v. Hanneman, 823 N.W.2d 357, 360 (S.D. 2012) (cleaned up and citation omitted).  Habeas corpus proceedings allow trial counsel to explain their decisions and provide the Supreme Court of South Dakota "with a more complete picture of what occurred."  Id. (cleaned up and citation omitted). The Supreme Court of South Dakota has essentially directed defendants to raise their ineffective-assistance-of-counsel claims in habeas proceedings, State v. Hauge, 932 N.W.2d 165, 171 (S.D. 2019) (explaining that such claims are "best made by filing" a habeas petition); State v. Schmidt, 825 N.W.2d 889, 899 (S.D. 2012) (stating that a habeas proceeding is the "preferred arena" for such claims (cleaned up and citation omitted)); State v. Beck, 785 N.W.2d 288, 296 (S.D. 2010) (stating that the court "has consistently held that claims of ineffective assistance of counsel generally will not be considered on direct appeal" (cleaned up and citation omitted)), and will hear such claims on direct appeal "only where counsel was so ineffective and the representation so casual that the trial record evidences a manifest usurpation of the defendant's constitutional rights," State v. Wilson, 947 N.W.2d 131, 139 n.14 (S.D. 2020) (cleaned up and citation omitted). This Court has previously found that the Martinez exception applies to South Dakota inmates, Dunkelberger v. Young, 20-CV-4117, 2021 WL 928139, at *2 (D.S.D. Mar. 11, 2021); Sund v. Young, 14-CV-5070, 2015 WL 4249405, at *4 (D.S.D. July 13, 2015), and Respondents agree that the exception applies in South Dakota.

### C.   Showing Required Under Martinez

Piper can avoid procedural default under Martinez by showing (1) that his ineffective assistance of trial counsel claims are "substantial"; (2) that state habeas counsel's failure to raise these claims constitutes ineffective assistance under Strickland v. Washington, 466 U.S. 668

(1984); and (3) that the procedural default prejudiced him. <u>Martinez</u>, 566 U.S. at 14; <u>Dorsey v. Vandergriff</u>, 30 F.4th 752, 755–56 (8th Cir. 2022); <u>Harris v. Wallace</u>, 984 F.3d 641, 648–49 (8th Cir. 2021).

This Court explains these elements in turn. As to the first element, a claim that trial counsel was ineffective is "substantial" if it has "some merit," meaning that trial counsel's ineffectiveness "must at least be debatable among jurists of reason." <u>Dorsey</u>, 30 F.4th at 756–57 (citation omitted). <u>Strickland</u>, of course, requires a petitioner claiming ineffective assistance to show both that counsel's performance was constitutionally deficient and that he was prejudiced by this deficiency. <u>Strickland</u>, 466 U.S. at 687. To establish that his ineffective assistance of trial counsel claims are substantial, then, Piper must "show that it is at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him." <u>Marcyniuk v. Payne</u>, 39 F.4th 988, 996 (8th Cir. 2022). Piper can establish deficient performance by showing trial counsel's representation fell "below an objective standard of reasonableness." <u>Slocum v. Kelley</u>, 854 F.3d 524, 532 (8th Cir. 2017) (cleaned up and citation omitted). To establish prejudice, Piper "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> (cleaned up and citation omitted).

The second element of the <u>Martinez</u> analysis requires applying the <u>Strickland</u> standard to Kinney's performance as state habeas counsel. Under this element, Piper must at least establish that Kinney performed deficiently by failing to raise his ineffective assistance of trial counsel claims.[13] <u>Deck v. Jennings</u>, 978 F.3d 578, 582 (8th Cir. 2020); <u>Harris</u>, 984 F.3d at 649.

---

[13]The Ninth and Fifth Circuits have held that <u>Martinez</u> requires petitioners to show that postconviction counsel performed deficiently *and* that this performance prejudiced them, "i.e., that there was a reasonable probability that, absent the deficient performance, the result of the post-

The third <u>Martinez</u> element requires Piper to show actual prejudice under <u>Coleman's</u> cause and prejudice standard.  <u>Thomas v. Payne</u>, 960 F.3d 465, 477–78 (8th Cir. 2020).

### D.    Res Judicata

As explained above, the Supreme Court of South Dakota held that res judicata barred certain claims that Piper could have brought in earlier proceedings but did not.  A state procedural rule like res judicata will not bar a habeas claim unless it is independent of federal law and "firmly established, regularly followed, and readily ascertainable."  <u>White v. Bowersox</u>, 206 F.3d 776, 780 (8th Cir. 2000); <u>see also</u> <u>Sloan v. Delo</u>, 54 F.3d 1371, 1379–80 (8th Cir. 1995) (explaining that a state law is "adequate" to bar federal habeas review if the rule is clear, does not "thwart the assertion of federal rights," and is firmly established and regularly followed (citation omitted)).

---

conviction proceedings would have been different."  <u>Runningeagle v. Ryan</u>, 825 F.3d 970, 982 (9th Cir. 2016) (cleaned up and citation omitted); <u>Wessinger v. Vannoy</u>, 864 F.3d 387, 391 (5th Cir. 2017).  Other circuits take a different approach, concluding that "when a petitioner shows that post-conviction relief counsel's performance was unreasonably deficient, the requirement that the deficient performance result in prejudice may be satisfied with a substantial claim of ineffective assistance of trial counsel that would otherwise have been deemed defaulted."  Brian R. Means, <u>Postconviction Remedies</u> § 24:17 (Oct. 2023 update); <u>see</u> <u>Workman v. Superintendent Albion SCI</u>, 915 F.3d 928, 939 (3d Cir. 2019) ("In our view, . . . when a petitioner shows that post-conviction relief counsel's performance was unreasonably deficient, the requirement that the deficient performance result in prejudice may be satisfied with a substantial claim of ineffective assistance of trial counsel that would otherwise have been deemed defaulted." (cleaned up and citation omitted)); <u>Owens v. Stirling</u>, 967 F.3d 396, 423 (4th Cir. 2020) ("Instead, they have reasoned that a state prisoner satisfies <u>Martinez</u> by showing, *first*, that initial postconviction counsel performed deficiently, under the first prong of <u>Strickland</u>, by failing to exhaust the underlying ineffective-assistance-of-trial-counsel claim, but not that said counsel's deficient performance was prejudicial, under the second prong of <u>Strickland</u>; and *second*, that the underlying claim is substantial, or has some merit, with respect to both prongs of <u>Strickland</u>."); <u>see also</u> <u>Owens</u>, 967 F.3d at 423 (adopting that approach); <u>Brown v. Brown</u>, 847 F.3d 502, 513 (7th Cir. 2017) ("To demonstrate cause under <u>Martinez-Trevino</u>, the petitioner must show deficient performance by counsel on collateral review as required under the first prong of the <u>Strickland</u> analysis.  Actual resulting prejudice can be established with a substantial claim of ineffective assistance of trial counsel that would otherwise have been deemed defaulted." (internal citations omitted)).  The Eighth Circuit appears not to have explicitly ruled on this issue, although it did address both <u>Strickland</u>'s performance and prejudice prongs when applying <u>Martinez</u> in <u>Barnett v. Roper</u>, 904 F.3d 623, 631 (8th Cir. 2018).  <u>See also</u> <u>Thomas v. Payne</u>, 960 F.3d 465, 474–75 (8th Cir. 2020).

The res judicata rule was firmly established and regularly applied before Piper procedurally defaulted some of his claims.  As the Supreme Court of South Dakota stated in <u>Piper IV</u>, the term "res judicata" encompasses both issue preclusion and claim preclusion:

> Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.  Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit.

936 N.W.2d at 804 (cleaned up and citation omitted).   Longstanding South Dakota habeas precedent makes clear that both variations of res judicata apply, meaning that a claim is barred if (1) the claim could have been raised on direct appeal but was not; or (2) the claim was raised and decided on direct appeal.  <u>Loop v. Class</u>, 554 N.W.2d 189, 193 (S.D. 1996) ("The rule is when a petitioner takes a direct appeal, he cannot thereafter, in a post-conviction proceeding, raise any matter of which he was aware at the time of the direct appeal but did not raise."); <u>Weddell v. Weber</u>, 604 N.W.2d 274, 283–84 (S.D. 2000) (stating in a habeas case that "[i]t is settled law in South Dakota that a judgment subject to res judicata constitutes an absolute bar against the prosecution, not only of every claim or demand therein in controversy, *but also of all other admissible matters that might have been offered to sustain or defeat such claims or demands*" (cleaned up and citation omitted)); <u>Moeller v. Weber</u>, 689 N.W.2d 1, 6 (S.D. 2004) (explaining that "[h]abeas review is not a substitute for a direct appeal," and that habeas petitions "are subject to the doctrine[] of res judicata"); <u>Miller v. State</u>, 338 N.W.2d 673, 675–76 (S.D. 1983) (explaining that the "general rule is that a petitioner who takes a direct appeal cannot thereafter raise in a post-conviction proceeding any matter which he knew at the time of the direct appeal, but did not raise" and applying that rule to bar the petitioner's claim); <u>Application of Thwing</u>, 182 N.W.2d 308, 310–11 (1970) (holding that res judicata prohibited petitioner from bringing jury instruction claim in

39

habeas petition because he had failed to raise the issue on direct appeal); see also Piper IV, 936 N.W.2d at 804 ("[E]ven for claims alleging the deprivation of constitutional rights, we have traditionally applied the doctrine of res judicata to determine whether a post-conviction claim is cognizable in a habeas corpus action or whether it has been defaulted because it was not made in an earlier proceeding.").

The Supreme Court of South Dakota consistently applies res judicata to bar habeas claims that were or could have been raised on direct appeal.  See Ramos v. Weber, 616 N.W.2d 88, 91–92 (S.D. 2000) (applying res judicata to bar constitutional claim that could have been raised on direct appeal but was raised for the first time in habeas proceeding); Rhines v. Weber, 608 N.W.2d 303, 316 (S.D. 2000) (applying res judicata to habeas claims that the Supreme Court of South Dakota had addressed on the petitioner's direct appeal); Miller, 338 N.W.2d at 675–76; Application of Thwing, 182 N.W.2d at 310–11.  The Eighth Circuit recognized the adequacy of South Dakota's res judicata bar in Rhines v. Young, 899 F.3d 482 (8th Cir. 2018).  The state trial court in Rhines concluded that res judicata barred the petitioner's claim of ineffective presentation of mitigation evidence because the claim had been raised and decided in a prior habeas petition. Id. at 488–90.  The Eighth Circuit held that this res judicata ruling was "an independent and adequate state ground that bars federal habeas relief on this claim."  Id. at 490–91.

Piper disagrees.  He argues that Haase v. Weber, 693 N.W.2d 668 (S.D. 2005), and Rhines show that the Supreme Court of South Dakota does not regularly apply the res judicata rule.  As the Supreme Court of South Dakota recognized, Haase was a "unique" case.  693 N.W.2d at 669. Haase had his first state habeas petition denied because his attorney wrote a letter to the judge saying Haase had no colorable habeas claims.  Id.  A state trial judge denied Haase's second habeas petition because it was filed more than five years after his judgment and because he had not shown

reasonable cause for failing to raise a particular claim in his first petition.  Id.  Haase's third habeas

petition alleged only that his second habeas counsel was ineffective by failing to appeal the state

judge's denial of his second habeas petition.  Id.  Under these "troubling" facts, a three-justice

majority of the Supreme Court of South Dakota remanded the case to the trial judge to consider

Haase's claims on the merits:

> No judge has ever made an independent review of any of Haase's
> grounds for habeas relief.  Haase has suffered this fundamental injustice
> through no fault of his own but, rather, through the mistakes of prior
> counsel and courts.  Now, as a result of various procedural barriers, it is
> unlikely that his habeas grounds could ever be reviewed by a judge on
> their merits.  Therefore, under the unique facts of this case, we believe
> it is in the best interests of justice and judicial efficiency to remand this
> case back to the trial court in order for the court to proceed directly to
> the merits of Haase's habeas claims, thereby providing Haase with a
> judicial determination of the merits of his claims and circumventing the
> procedural purgatory within which Haase now finds himself.  Cf. People
> v. Gaines, 105 Ill.2d 79, 85 Ill. Dec. 269, 473 N.E.2d 868, 875 (1984)
> ("The strict application of the doctrine of res judicata may be relaxed,
> however, where fundamental fairness so requires.").

Id. at 669–70.  Two justices dissented, arguing that the majority's holding violated South Dakota's

habeas statutes.  Id. at 670–75.

Piper also argues that Rhines actually shows that res judicata is not regularly applied

because the trial court in that case addressed some ineffective assistance of counsel claims that

could have been raised in a prior habeas petition but were not.  Like Haase, Rhines was a unique

case.  A South Dakota jury convicted Rhines of murder and sentenced him to death.  Rhines, 899

F.3d at 485.  The Supreme Court of South Dakota affirmed Rhines's conviction and sentence on

direct appeal and later affirmed the denial of Rhines's state habeas petition.  Id.  When Rhines

filed a federal habeas petition, the federal district court concluded that several claims were

unexhausted and stayed the case pending exhaustion of those claims in state court so that Rhines

could attempt to exhaust state law claims without risking the one-year limitation under the

Antiterrorism and Effective Death Penalty Act (AEDPA) elapsing. Id. at 488. The Eighth Circuit reversed, relying on pre-AEDPA case law and a strict application of Rose v. Lundy to conclude that the district court could not stay the federal case containing Rhines's exhausted claims while he exhausted his other claims in state court. The Supreme Court reversed the Eighth Circuit, holding that stay and abeyance in a mixed habeas petition is permissible under some circumstances. Rhines v. Weber, 544 U.S. 269, 277–79 (2005). On remand, the federal district court again stayed Rhines's case pending exhaustion of his claims in state court, finding among other things that ineffectiveness by Rhines's first postconviction attorneys provided good cause for his failure to exhaust the claims earlier. Rhines, 899 F.3d at 489; Rhines v. Weber, 408 F. Supp. 2d 844, 847–49 (D.S.D. 2005). Rhines returned to state court and filed a successive habeas petition. Rhines, 899 F.3d at 489. The state trial court granted the state summary judgment on the merits of some of Rhines's claims, without mentioning that Rhines had failed to include those claims in his prior state habeas petition. See Rhines v. Weber, 00-cv-5020, Doc. 204-1. The Supreme Court of South Dakota issued a one-page order denying Rhines a certificate of probable cause necessary under South Dakota law to pursue an appeal. Id. at Doc. 215-69; Rhines, 899 F.3d at 489.

The main problem with Piper's reliance on Haase and Rhines is that a procedural rule need not be applied in every case to be considered regularly followed. In Dugger v. Adams, 489 U.S. 401 (1989), for instance, the Supreme Court held that a state regularly applied a procedural rule that claims not raised on direct appeal cannot be raised in a state habeas petition even though the state supreme court had "addressed the merits in several cases raising [new] claims on postconviction review." Id. at 410 n.6. These "several cases" did not render the rule inadequate when the state supreme court "faithfully" applied the rule in the "vast majority of cases." Id. The

Supreme Court reached a similar conclusion in <u>Johnson v. Lee</u>, another case involving a challenge to a state rule barring postconviction review of claims that could have been raised on direct appeal. 578 U.S. 605 (2016) (per curiam).  The Ninth Circuit had held that the rule—referred to as the "<u>Dixon</u> bar" in California—was not regularly followed based on the petitioner's evidence that, out of 210 summary denials the California Supreme Court issued in a single day, the court had failed to cite the rule in nine cases in which it should have applied.  <u>Id.</u> at 607.  The Supreme Court reversed, concluding that the <u>Dixon</u> bar was "longstanding, oft-cited, and shared by habeas courts across the Nation."  <u>Id.</u> at 606.  Citing <u>Dugger</u>, the Court found that the nine denials lacking citations to the <u>Dixon</u> bar "hardly support[ed] an inference of inconsistency," especially because none of the denials ignored the bar to grant relief.  <u>Id.</u> at 608–09.  And it was not as though the <u>Dixon</u> bar was "unique," the Court explained.  <u>Id.</u>  Rather, "[f]ederal and state habeas courts across the country" bar petitioners from using postconviction proceedings to raise claims that could have been raised on direct appeal.  <u>Id.</u>  "For such well-established and ubiquitous rules," the Court wrote, "it takes more than a few outliers to show inadequacy."  <u>Id.</u>

Like the challenges in <u>Dugger</u> and <u>Johnson</u>, Piper's cites to <u>Haase</u> and <u>Rhines</u> fall far short of showing that the Supreme Court of South Dakota applies res judicata inconsistently.  <u>Haase</u> appears to be limited to its facts; Piper has not cited—and this Court has not found—any case from the Supreme Court of South Dakota applying <u>Haase</u> to ignore a res judicata bar and consider a defaulted claim on the merits.  <u>See generally</u> <u>Piper IV</u>, 936 N.W.2d at 806 n.13 (stating that <u>Haase</u> was decided by a "narrow majority" and that it "departs from our case law applying issue and claim preclusion in post-conviction collateral challenges").  Tellingly, the Supreme Court of South Dakota cited out-of-state precedent rather than one of its own decisions when concluding that Haase's claims should be addressed on the merits.  And the decision in <u>Rhines</u> to which Piper cites

was made by the state trial court, not the Supreme Court of South Dakota. Isolated decisions like Haase and the trial court decision in Rhines do not justify ignoring South Dakota's sovereign decision to apply res judicata to some of Piper's claims, especially given how widespread this rule is. See Johnson, 578 U.S. at 609 ("Federal habeas courts must not lightly disregard state procedural rules that are substantially similar to those to which we give full force in our own courts." (cleaned up and citation omitted)); id. at 612 ("A State's procedural rules are of vital importance to the orderly administration of its criminal courts; when a federal court permits them to be readily evaded, it undermines the criminal justice system." (cleaned up and citation omitted)).

Piper also argues that Foster v. Chatman, 578 U.S. 488 (2016), shows that South Dakota's res judicata rule is not independent of federal law. "When application of a state law bar depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law . . . ." Id. at 497. In Foster, a Georgia habeas court issued an opinion stating that res judicata barred the petitioner's Batson claim but then engaged in a four-page "Batson analysis" to determine whether the petitioner had shown "any change in the facts sufficient to overcome the res judicata bar." Foster, 578 U.S. at 498 (cleaned up and citation omitted). The court ultimately concluded that the petitioner's Batson claim was "without merit." Id. (cleaned up and citation omitted). Given these facts, the Supreme Court ruled that the habeas court's "application of res judicata to Foster's Batson claim was not independent of the merits of his federal constitutional challenge." Id.

Piper believes that South Dakota's res judicata rule is likewise dependent on federal law. He claims that Haase created a "fundamental-fairness exception to the application of res judicata" and that fundamental fairness is the "essence of due process." Doc. 104 at 4. According to Piper, Haase requires South Dakota courts to review "the facts and the law supporting the underlying

claim in order to decide whether application of a res judicata rule would be fundamentally unfair." Id. at 5. Piper is wrong for at least three reasons.

First, Haase did not analyze the facts and law underlying the petitioner's claims when deciding not to apply res judicata, and thus cannot even arguably be read as holding that South Dakota courts must engage in such an analysis to determine whether applying res judicata would be fundamentally unfair. Haase, 693 N.W.2d at 669–70. Instead, Haase turned on the petitioner, through no fault of his own, being denied any habeas review at all. Id.; see also Piper IV, 936 N.W.2d at 806 n.13 (explaining that Haase did not apply to Piper's case because he had "not been denied previous post-conviction review").

Second, Piper's case is not analogous to Foster. The res judicata bar in Foster was not independent of federal law because the state habeas court conducted a Batson analysis to determine whether the petitioner had shown a sufficient "change in the facts" to overcome the bar and ultimately concluded that the claim was "*without merit*." Foster, 578 U.S. at 498. In contrast, the Supreme Court of South Dakota applied res judicata to Piper's claims because he failed to raise them at the appropriate time, not because of any conclusion the court made about the merits of Piper's federal constitutional claims. Piper IV, 936 N.W.2d at 804–09, 812–16. The court's application of res judicata to Piper's claims is far removed from any case finding that a state rule depended on federal law. Compare Stewart v. Smith, 536 U.S. 856, 861 (2002) (per curiam) (holding that state procedural rule was independent of federal law where rule required state court to determine the particular constitutional right alleged to have been violated but the state court did not examine the merits of the claim and the rule did not require it to), and Campbell v. Burris, 515 F.3d 172, 177 (3d Cir. 2008) (holding that "plain error" exception to state procedural bar did not deprive the bar of its independence because state court could apply the exception using state law

"without resolving the merits of the federal constitutional issue"), with Ake v. Oklahoma, 470 U.S. 68, 74–75 (1985) (holding, in a direct review case, that a state procedural bar was not independent because it turned "on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed"); Roy v. Coxon, 907 F.2d 385, 391 (2d Cir. 1990) (holding that state's application of a plain-error exception to its contemporaneous objection rule was not independent of federal law where the state relied heavily on federal law when deciding there was no plain error).

Third, the Supreme Court of South Dakota's rejection of Piper's argument that preclusion principles "should yield to a broad general concept of fundamental fairness" does not deprive the res judicata bar of its independence, if that is indeed what Piper is arguing. Piper IV, 936 N.W.2d at 806. Nothing suggests that the Supreme Court of South Dakota used federal due process principles to interpret the requirements of fundamental fairness, and the court's rejection of Piper's argument did not depend on the merits of his federal constitutional claims. In short, none of Piper's arguments show that, as a general matter, South Dakota's res judicata rule depends on federal law or is inadequate to bar federal review of a defaulted claim.[14]

### E.    Ineffective Assistance of Appellate Counsel

As explained above, attorney error can constitute cause to excuse a procedural default if it occurs during a stage of the case where the defendant has a constitutional right to effective assistance of counsel. Coleman, 501 U.S. at 754. Defendants have a constitutional right to

---

[14]Piper argues that Respondents waived any arguments in Document 97 concerning procedural default, exhaustion, and res judicata by failing to raise them in earlier briefs. Doc. 104 at 2–3; Doc. 116 at 123. This Court finds no such waiver occurred. The briefing schedule here was unique, Piper had plenty of notice that Respondents were asserting procedural default and res judicata as defenses, and Piper had a chance to respond to any such arguments Respondents raised. See Docs. 100, 104.

effective assistance on direct appeal, Evitts v. Lucey, 469 U.S. 387, 396–97 (1985), and ineffective assistance of appellate counsel can serve as both a standalone claim and as cause to excuse procedural default of another claim, Reese v. Delo, 94 F.3d 1177, 1182 (8th Cir. 1996); Edwards v. Carpenter, 529 U.S. 446, 450–51 (2000). Two conditions must be met for ineffective assistance of appellate counsel to serve as cause, however. First, appellate counsel's failure to raise a claim on direct appeal must itself constitute ineffective assistance under Strickland to constitute cause to excuse procedural default of another claim. Evans v. Luebbers, 371 F.3d 438, 445 (8th Cir. 2004). Second, the prisoner must have either exhausted the ineffective-assistance-of-appellate-counsel claim in state court or be able to show cause and prejudice to excuse procedural default of the ineffective-assistance claim itself. Edwards, 529 U.S. at 450–51 ("[A] procedurally defaulted ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself."); Taylor v. Bowersox, 329 F.3d 963, 971 (8th Cir. 2003) (holding that exhaustion doctrine requires claim for ineffective assistance of direct appeal counsel be initially presented to the state court as an independent claim before it can be used to establish cause for a procedural default). Unlike with defaulted claims of ineffective assistance of trial counsel, however, prisoners cannot use the ineffective assistance of postconviction counsel to excuse the procedural default of a claim of ineffective assistance of appellate counsel. Davila, 582 U.S. at 529 (declining to "extend Martinez to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim"). In other words, the Martinez/Trevino exception provides cause for the

procedural default of trial-counsel-ineffectiveness claims but not for the default of appellate-counsel-ineffectiveness claims.  Id.

III.   **Analysis of Claims**

A.   **Claim I: Failure to Adequately Investigate and Present Life History and Cognitive Functioning Evidence**

1.   **Evidence that may be considered**

Piper acknowledges that he never presented Claim I or his supporting evidence in state court and agrees that this claim is procedurally defaulted.  Doc. 60 at 3; Doc. 62 at 3–4.  He argues that he can avoid this procedural default under Martinez, however, because Kinney himself was ineffective by not raising Claim I during state habeas proceedings.  This Court starts by deciding what evidence it can consider when analyzing Claim I.  Piper filed a motion for testing to support Claim I, asking that four experts be allowed to visit him in prison to evaluate him for brain damage and FASD now.  Doc. 60.  He argued that the results of these tests would help him both to succeed on the merits of Claim I and to demonstrate cause and prejudice to excuse his procedural default of this claim.  Doc. 62 at 3–4.

Piper submitted affidavits from the four experts in support of his motion for testing.  Docs. 62-1–62-4.  Dr. Jeffrey Lewine, a neuroscientist, explained that FASD "is often associated with compromised cognitive skills, poor decision making, anger management issues and impulsivity, executive dysfunction, and neurological compromise."  Doc. 62-1 at ¶ 8.  He asserted that he has reviewed Piper's records and recommended that Piper undergo a quantitative electroencephalogram to test for brain dysfunction.  Id. at ¶¶ 6–15.

Dr. Paul Connor, a clinical psychologist, wrote that Piper's records revealed "a number of factors that raised concerns" that Piper "could have an FASD," including Linda consuming alcohol while pregnant with Piper, many ear infections in childhood, behavioral difficulties at a young age,

and having ADHD and a learning disorder.  Doc. 62-2 at 2.  Dr. Connor recommended that Piper

undergo a neuropsychological evaluation to help determine whether he has FASD or some other

neurodevelopmental disorder.  Id. at 3.

Dr. Julian Davies, a pediatrician, reviewed Piper's records and reached the provisional

opinion that he would be diagnosed with Neurobehavioral Disorder/Alcohol Exposed, an FASD

also known as moderate Alcohol-Related Neurodevelopmental Disorder (ARND).  Doc. 62-3 at 2.

Dr. Davies based this opinion on Piper's prenatal exposure to alcohol, non-clinical photographs

from Piper's childhood to young adulthood showing "an upper lip thickness that appears to be on

the borderline of the FAS range," and his conclusion that Piper's records "support findings of

moderate functional brain impairments."  Id. at 4–6.

Dr. Natalie Novick Brown, a psychologist, wrote that her review of Piper's records

"indicates" that Piper's "functional history is consistent with" FASD.  Doc. 62-4 at 3.  She pointed

to Piper's prenatal alcohol exposure as well as certain "physiological indicia of possible FASD,"

including Piper's premature birth, having neonatal jaundice, suffering from projectile vomiting for

the first two months of life, and having recurrent ear infections.  Id. at 4–5.  According to Dr.

Brown, the "substantial discrepancy between Mr. Piper's pattern of academic dysfunction and

high-average IQ of 117 was a red flag indicative of FASD."  Id. at 6.  She also remarked that unlike

ADHD, "FASD accounts for all of Mr. Piper's functioning and behavior throughout life."  Id. at

20.

Piper also filed affidavits from Linda, his older siblings Sheryl Engle and John Piper III,

and various others.  Doc. 62-5; Doc. 41.  Linda admitted in her affidavit that the information

written in Dr. Clark's 1994 report "is true."  Doc. 62-5 at ¶ 2.  Engle said she overheard Linda talk

about drinking alcohol while pregnant with all her children, and both Engle and John detailed

Linda's heavy drinking when they and Piper were growing up, the beatings their parents dispensed, and Piper's poor social functioning. Doc. 41 at 3–12. Other witnesses confirmed Linda's heavy drinking, Piper's odd behaviors and impulsivity, and his struggle to appreciate social cues and boundaries.[15] Doc. 2-2 at 171–76; Doc. 41 at 13–18.

This Court issued a previous opinion finding that 28 U.S.C. § 2254(e)(2) and the Supreme Court's recent decision in Shinn barred Piper's motion for testing. Piper v. Att'y Gen. of S.D., 20-CV-5074, 2023 WL 3750418, at *14–22 (D.S.D. June 1, 2023). As this Court explained, § 2254(e)(2) strictly limits a federal habeas court's authority to consider new evidence the prisoner neglected to offer in state court. If the prisoner "has failed to develop the factual basis of a claim in State court proceedings," § 2254(e)(2) bars federal courts from holding "an evidentiary hearing on the claim"—or, indeed, even considering extra-record evidence submitted to support the claim—unless the prisoner can satisfy some narrow exceptions not applicable here. 28 U.S.C. § 2254(e)(2)(A)(i), (ii); Shinn, 596 U.S. at 383–90; Holland v. Jackson, 542 U.S. 649, 653 (2004) (per curiam). These strict limits in § 2254(e)(2) apply only when a prisoner is "at fault" for failing to develop the factual basis of a claim, meaning that he "bears responsibility for the failure." Shinn, 596 U.S. at 382 (cleaned up and citation omitted).

---

[15]At least one of the witnesses Piper now relies on had very different things to say during his initial sentencing hearing in 2001. Brian Webb, one of Piper's boy scout leaders, stated in a 2001 affidavit that Linda was "active in troop meetings and was always willing to volunteer," that she "did her best to get [Piper] involved in scouts and always seemed to be there for him if he needed her," that she "was always concerned about his affairs and activities and seemed to push him to participate and to follow the rules," and that Piper's family "appeared to be a good" one in "which there was love and support." Doc. 121-2 at 219–20. Webb's current affidavit repeats none of these positive observations. Instead, Webb describes Linda as having a "bad attitude" and a "negative influence on her children," frequently being drunk, and screaming loudly when she was unhappy about things. Doc. 2-2 at 171–72.

Supreme Court decisions predating <u>Martinez</u> held that prisoners bear responsibility under § 2254(e)(2) for state postconviction counsel's negligence.  <u>Shinn</u>, 596 U.S. at 383–84.  The issue in <u>Shinn</u> was whether a prisoner who satisfies the <u>Martinez</u> exception is still at fault under § 2254(e)(2) for state postconviction counsel's failure to develop the record.  The prisoners in <u>Shinn</u> argued that it was illogical to find them faultless for failing to raise a claim because of deficient postconviction counsel but at fault for this same counsel's failure to develop the factual basis for the claim.  596 U.S. at 384.  The Supreme Court rejected this argument, finding that § 2254(e)(2) trumped the judge-made rule in <u>Martinez</u>.  <u>Shinn</u>, 596 U.S. at 383–87.  A prisoner is thus "at fault" under § 2254(e)(2) even when state postconviction counsel negligently fails to develop the record for a claim of ineffective assistance of trial counsel.  <u>Id.</u> at 382–84.  "In such a case," the Court explained, "a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements."  <u>Id.</u> at 384.

This Court denied Piper's motion for testing because it had to deem Piper responsible for Kinney's alleged failure to develop the record in state court.  Unfortunately for Piper, that finding not only bars this Court from considering the affidavits from his experts and others when analyzing the merits of Claim I, but also when assessing cause and prejudice under <u>Martinez</u>.  <u>Shinn</u> held that prisoners cannot evade § 2254(e)(2) by offering new evidence during a <u>Martinez</u> hearing and then using that evidence to establish the merits of their underlying claim.  <u>Shinn</u>, 596 U.S. at 388–90.  Although recognizing that this holding would render many <u>Martinez</u> hearings "a nullity," the Court in <u>Shinn</u> found this "a reason to dispense with <u>Martinez</u> hearings altogether, not to set § 2254(e)(2) aside."  <u>Shinn</u>, 596 U.S. at 389.  Thus, if § 2254(e)(2) applies and a prisoner cannot meet its requirements, "a federal court may not hold an evidentiary hearing—or otherwise consider

new evidence—to assess cause and prejudice under Martinez." Shinn, 596 U.S. at 389.  As the Court explained, holding a Martinez hearing when the new evidence could not be used to decide the merits of the underlying ineffective-assistance-of-counsel claim would "needlessly prolong" the habeas case, which is something federal courts "may *never*" do.  Shinn, 596 U.S. at 390 (cleaned up and citation omitted); see also id. (stating that a "Martinez hearing is improper if the newly developed evidence never would entitle the prisoner to federal habeas relief" (cleaned up and citation omitted)).

The Eighth Circuit addressed Shinn for the first time in Marcyniuk, concluding that Shinn "explicitly rejects the idea that because § 2254(e)(2) bars only an evidentiary hearing on the claim, a federal court may hold an evidentiary hearing to determine whether there is cause and prejudice." Marcyniuk, 39 F.4th at 999 (cleaned up and citation omitted); see also id. at 1002 n.10 (explaining that the Eighth Circuit "need not comment on the extent to which Shinn reaches requests for evidentiary hearings on cause and prejudice *where the basis of the petitioner's cause argument is not ineffective assistance of post-conviction counsel*" but noting that the Supreme Court had expressed doubt about a similar argument in Shinn (emphasis added)).[16]  Other circuits have similarly held that Shinn and § 2254(e)(2) bar courts from considering new evidence when assessing whether a claim is substantial under Martinez. See Stokes v. Stirling, 64 F.4th 131, 136 (4th Cir. 2023) (stating that Shinn "prohibits a petitioner from introducing evidence to support either their underlying constitutional claim or a Martinez claim that PCR counsel were ineffective"); Rogers v. Mays, 69 F.4th 381, 396–98 (6th Cir. 2023) (en banc) (refusing to consider

---

[16]At least one circuit appears to disagree with Marcyniuk's reading of Shinn. The Fifth Circuit recently concluded that, under circuit precedent, "evidence outside the state record is admissible in Martinez claims for the limited purpose of establishing an excuse for procedural default, even in the wake of [Shinn] and Shoop [v. Twyford, 596 U.S. 811 (2022)]. Mullis v. Lumpkin, 70 F.4th 906, 911 (5th Cir. 2023).

new evidence not offered in state court when analyzing whether the petitioner's ineffective-assistance-of-trial-counsel claims were substantial under Martinez); see also Lacy v. Payne, 19-cv-95-DPM, 2023 WL 3182927, at *8 (E.D. Ark. May 1, 2023) (concluding that Shinn and § 2254(e)(2) barred the court from considering the petitioner's new evidence when deciding whether ineffective-assistance-of-trial-counsel claims were substantial under Martinez).   The Eighth Circuit addressed Shinn a second time very recently in Black v. Falkenrath, 93 F.4th 1107 (8th Cir. 2024), stating that "[w]hile Shinn reserved deciding whether habeas petitioners are entitled to Martinez hearings when the circumstances in 28 U.S.C. § 2254(e)(2) are not satisfied . . . a Martinez hearing is improper if the newly developed evidence would never entitle the petitioner to federal habeas relief." Black, 93 F.4th at 1109.   Considering the state court record only, the Eighth Circuit held that Black was not entitled to a Martinez hearing because he had failed to show that his trial counsel was ineffective. Id. at 1110.

Piper argued at the October 2023 hearing in this case and in a brief submitted later that the Eighth Circuit's opinion in Marcyniuk misreads Shinn and that this Court should hold a hearing on cause and prejudice under Martinez.   Doc. 116 at 32–42; Doc. 118.   No such hearing is appropriate here, even if the Eighth Circuit would permit Martinez hearings in certain case where § 2254(e)(2) applied and the petitioner could not satisfy its requirements.   As explained below, neither Claim I nor any of Piper's other procedurally defaulted ineffective-assistance-of-trial-counsel claims can succeed on the state court record alone. This Court could not consider evidence from a Martinez hearing on the merits of Piper's claims, so holding such a hearing would needlessly prolong Piper's habeas case.   See Shoop v. Twyford, 596 U.S. 811, 820 (2022) ("If § 2254(e)(2) applies and the prisoner cannot satisfy its stringent requirements, holding an evidentiary hearing or otherwise expanding the state-court record would prolong federal habeas

proceedings with no purpose." (cleaned up and citations omitted)).  This Court analyzes Claim I on the state court record alone.

### 2.      Standard Governing Claim I

This Court measures counsel's performance "against an objective standard of reasonableness under prevailing professional norms." Rompilla v. Beard, 545 U.S. 374, 380 (2005) (cleaned up and citations omitted).  The performance question under Claim I is whether counsel reasonably investigated Piper's case when preparing for his resentencing.  Strickland established that attorneys in a capital case have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. As the Supreme Court explained, the respect afforded counsel's strategic decisions depends on the extent of the investigation they conducted: "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (cleaned up and citation omitted).  Courts evaluating the reasonableness of the investigation must consider not just the evidence known to counsel, "but also whether the known evidence would lead a reasonable attorney to investigate further." Id. at 527.

The Supreme Court has looked to "[p]revailing norms of practice as reflected in American Bar Association [(ABA)] standards" as "guides to determining what is reasonable." Strickland, 466 U.S. at 688.  The ABA Guidelines published over two decades before Piper's resentencing trial provided that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" Wiggins, 539 U.S. at 524 (quoting 1989 version of ABA

Guidelines); see also Porter v. McCollum, 558 U.S. 30, 39 (2009) (per curiam) ("It is unquestioned that under the prevailing professional norms at the time of [petitioner's] trial, counsel had an obligation to conduct a thorough investigation of the defendant's background." (cleaned up and citation omitted)).  The 2003 ABA Guidelines recognize the mitigating value of neurological damage caused by fetal alcohol syndrome (FAS) and recommend that a capital defense team include someone qualified to screen for FAS and other conditions.  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 ABA Guidelines), reprinted in 31 Hofstra L. Rev. 913, 956–57, 1060–61 (2003).

Still, the ABA Guidelines are not the definitive word on what counsel must do in every case.  Indeed, they are "only guides to what reasonableness means, not its definition." Bobby v. Van Hook, 558 U.S. 4, 8 (2009) (per curiam) (cleaned up and citation omitted); see also Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000) ("Nonetheless, prevailing norms of practice as reflected in [ABA] standards and the like are only guides, and imposing specific guidelines on counsel is not appropriate." (cleaned up and citation omitted)).  Counsel need not "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins, 539 U.S. at 533.  And courts evaluating the reasonableness of an investigation cannot play Monday morning quarterback; they must instead focus on "counsel's perspective at the time investigative decisions are made" and give "a heavy measure of deference to counsel's judgments." Rompilla, 545 U.S. at 381 (cleaned up and citation omitted).

Piper's Claim I.B alleges that trial counsel failed to conduct a timely and adequate background investigation while Claim I.C alleges that they failed to investigate and present cognitive functioning evidence.  Doc. 67 ¶¶ 44–126.  This Court analyzes Claim I.C first.

### 3.      Claim I.C

Piper asserts that his records contained "many red flags" suggesting that he may have brain damage and FASD, including Dr. Clark's report noting that Linda drank "some alcohol" while pregnant with Piper and that ADD did not explain all his behavioral difficulties, a premature birth, Linda's problems during labor, neonatal jaundice, projectile vomiting shortly after birth, and recurrent severe ear infections. Doc. 62 at 3; Doc. 67 ¶¶ 94–129; Doc. 85 at 10–11, 17–18; Doc. 86 at 9. Piper alleges that Van Norman and Stonefield knew of these red flags yet failed to have their experts arrive at a diagnosis, test him for brain dysfunction, screen him for FASD, or even write a report. Doc. 86 at 16–17; Doc. 67 at 43–46. Rather, Piper claims that his attorneys directed Dr. Ertz and Dr. Wortzel to conduct a "truncated analysis" focused only on youthful age, substance abuse, and group dynamics that influenced the crime. Doc. 86 at 16; Doc. 67 ¶¶ 47, 103.

Piper faces a difficult task in showing that reasonable jurists could debate whether Van Norman and Stonefield's investigation fell below an objective standard of reasonableness. Van Norman and Stonefield knew the mitigating value of psychological evidence. They mailed Judge Eckrich the 2003 ABA Guidelines, Doc. 121-4 at 329, and, when moving to appoint Dr. Ertz, quoted the Guideline's statement that the defense team in a capital case "should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments," Doc. 121-5 at 524 (quoting 2003 ABA Guideline 4.1(A)(2)). Van Norman's compensation vouchers show that he began investigating Piper's mental condition, including the possibility that Piper had FASD, shortly after being appointed in August 2009. See, e.g., Doc. 121-4 at 463; Doc. 121-10 at 329, 343, 350–52, 374, 385, 417, 421–23, 428. Among other notations concerning Piper's psychiatric issues, the vouchers contain a September 2009 entry for "Research FASD/ADHD/sociopathy," Doc. 121-4 at 463, a November 6, 2009 entry for "FASD/other mental health research," Doc. 121-10 at 421, and a November 18,

2009 entry for "FASD (fetal alcohol) work-up," Doc. 121-10 at 423. The vouchers show multiple entries for communications with a "psych." in November 2009, indicating that Van Norman was consulting with a psychologist or psychiatrist at the same time he was investigating FASD. Id. at 421–23, 425. In Summer 2010, Van Norman had a conference with a "social worker/consultant regarding childhood/birth issues," id. at 371, and a conference with a "special education consultant" on "ADHD, birth issues," id. at 374. Van Norman spoke with the doctor who delivered Piper in September 2010, id. at 350, and he and Stonefield met with Dr. Ertz the next month, id. at 336, 343. Van Norman and Stonefield's communication with Dr. Ertz and Dr. Wortzel increased in Spring 2011 and continued until Piper's trial. Id. at 286–89, 291–92, 306, 459, 488–93, 495–97, 515, 517–18.

The record belies Piper's claim that his attorneys directed Dr. Ertz and Dr. Wortzel to focus only on age, drug use, and group dynamics. True, Stonefield said during a January 2011 hearing that Dr. Ertz would testify about these three mitigating factors. Doc. 88-1 at 21. But he went on to explain that the records review Dr. Ertz would perform could "also help develop mitigating evidence" and that they planned to have Dr. Ertz review "certain records and then discuss with us the potential mitigatory factors that are arising from those records." Id. at 21–22. Counsels' motion to appoint Dr. Ertz also recognized that Dr. Ertz's role would be broader than simply testifying about youth, drug use, and group dynamics, explaining that "[s]chool and health records from Piper's youth also may produce mitigating evidence if examined by a mental health professional." Doc. 121-5 at 525. And it is hard to believe that Van Norman and Stonefield, who cited the Guidelines' suggestion that the defense team include a person qualified to screen the defendant for mental impairments when seeking appointment of Dr. Ertz, would then limit their experts' analysis to three predetermined issues.

In short, this is not a case where counsel failed to investigate FASD altogether or somehow hampered their experts' investigation. See Williams v. Stirling, 914 F.3d 302, 308–09, 314–15 (4th Cir. 2019) (finding ineffective assistance of counsel where counsel did not investigate FAS at all despite knowing that the defendant's mother drank while pregnant with him); Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002) (finding ineffective assistance in part because counsel failed "to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health"). The issue, rather, is whether the investigation underlying counsels' decision not to further develop potential FASD evidence "*was itself reasonable*." Wiggins, 539 U.S. at 523. This Court does not know for certain how thoroughly counsel investigated the possibility that Piper had FASD or precisely what occurred during their consultations with experts. But the information obtained by Van Norman and Stonefield includes no real evidence that "would lead a reasonable attorney to investigate further" whether Piper had FASD. Wiggins, 539 U.S. at 527.

First, neither psychologist Rose nor psychiatrist Clark mentioned FASD in their reports evaluating Piper at age 13. Doc. 2 at 233–43; Doc. 66-6. Dr. Clark's failure to mention FASD could have been particularly influential, as she knew that Linda drank "some" alcohol while pregnant with Piper and performed a neurodevelopmental assessment to screen Piper for cognitive dysfunction. Doc. 2 at 235, 237–43. Second, psychiatrist Stephen Manlove evaluated Piper in 2000 and evidently never mentioned anything about FASD.[17] In September 2000, Rensch

---

[17]The record shows that Piper's current attorneys received an evaluation done by Dr. Manlove because their expert listed a "psychiatric evaluation" by Dr. Manlove as something they reviewed. Doc. 2 at 121. Dr. Manlove's psychiatric evaluation is not itself in the record. According to Piper's expert, Dr. Manlove diagnosed Piper with antisocial personality disorder but lacked access to Dr. Clark's evaluation or Piper's school records. Id. at 113. Piper's expert theorized that, had Dr. Manlove had access to these documents, he "likely" would "have ruled out antisocial personality disorder and advised counsel of the need for one or more FASD experts." Id. at 119.

successfully moved to appoint Dr. Manlove to "perform a psychiatric evaluation upon" Piper to determine whether he "is suffering from any mental illness, insanity, or any mental disease or defect." Doc. 121 at 381, 642. Rensch wrote that the facts of the case indicated "the possibility of insanity, mental illness, and/or diminished capacity." Id. at 381. At Piper's change of plea hearing in January 2001, Rensch explained that although a report had not been prepared, a psychiatrist had evaluated Piper and found no "issue" of insanity or diminished capacity.[18] Doc. 121-2 at 174. Third, Van Norman and Stonefield's experts might not have believed that further testing of Piper was necessary. Although Dr. Ertz and Dr. Wortzel both reviewed Dr. Clark's evaluation and Sheldon's social history, there is no evidence that either flagged FASD as something that should be investigated further or said that Piper needed to be tested for brain damage. In fact, Dr. Ertz testified that Dr. Clark's evaluation of Piper was "a very good pediatric workup." Doc. 90-7 at 199. And Dr. Wortzel, when asked on cross whether a brain scan or imaging test would have helped determine whether Piper had brain damage, said such tests are "really experimental in nature at this point in time and not intended for single subject use, *which is precisely why I didn't recommend that we go that route in a case like this*." Doc. 90-8 at 135–36 (emphasis added). An attorney is typically not considered ineffective for relying on an expert's advice. See Haight v. Jordan, 59 F.4th 817, 839 (6th Cir. 2023) (per curiam) ("It is not unreasonable for counsel, untrained in the field of mental health, to rely on the professional opinions of expert witnesses." (cleaned up and citation omitted)); Anderson, 938 F.3d at 956–58

---

[18]Piper faults Van Norman and Stonefield for failing to have their experts write a report, but there could have been good reasons for not requesting one. Rensch testified during Piper's first state habeas case that Dr. Manlove gave him an oral report and agreed that defense attorneys, for strategic reasons, "[s]ometimes" request that psychiatric evaluations not be put in writing. Doc. 119 at 310. Duffy, Piper's other attorney for his initial case, testified that one of the reasons he was concerned about Piper having a jury trial was his "discussion with Mr. Rensch about potential possibilities of psychiatric testimony in this case." Id. at 462.

(finding that attorneys' failure to investigate FASD was not ineffective assistance where no one told them that defendant's mother drank while pregnant and experts did not say that defendant was brain damaged); <u>Marcrum v. Luebbers</u>, 509 F.3d 489, 511 (8th Cir. 2007) ("Where counsel has obtained the assistance of a qualified expert on the issue of the defendant's sanity and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion.").

But even if Piper's counsel performed unreasonably in not further investigating possible FASD, Piper cannot show a substantial claim of prejudice.  To establish prejudice, Piper must show a reasonable probability that, but for counsels' failure to further investigate FASD, at least one juror would have voted differently.  <u>Wiggins</u>, 539 U.S. at 536–37.  Piper's argument for prejudice assumes that further investigation would have led to an FASD diagnosis and that his attorneys would have presented that diagnosis to the jury. Doc. 85 at 36–38.  As explained above, though, <u>Shinn</u> prohibits the testing Piper wanted done and precludes consideration of the affidavits from his experts.  <u>Rogers</u>, 69 F.4th at 396–97 (refusing to consider new evidence not offered in state court when analyzing whether the petitioner's ineffective-assistance-of-trial-counsel claims were substantial under <u>Martinez</u>).  That leaves this Court to speculate about whether Piper actually has FASD.  Courts routinely hold that speculation is not enough to show a reasonable probability that the results of a petitioner's trial would have been different; this Court has no choice but to reach that same conclusion here.  <u>See id.</u> at 397 (rejecting claim that trial counsel was ineffective for failing to develop mitigating evidence where none of the proposed mitigation evidence was in the state court record); <u>Carter v. Mitchell</u>, 443 F.3d 517, 528–30 (6th Cir. 2006) (declining to find prejudice from a failure to hire a neuropsychologist to uncover alleged brain damage where petitioner failed to present "actual, probative evidence" that he had brain damage); <u>Armstrong v.</u>

Kemna, 534 F.3d 857, 867 (8th Cir. 2008) ("Ordinarily, a defendant's failure to present some evidence from the uncalled witness regarding that witness's potential testimony would be fatal to an ineffective assistance of counsel claim." (cleaned up and citation omitted)); United States v. Vazquez-Garcia, 211 F. App'x 544, 546 (8th Cir. 2007) (unpublished per curiam) (declining to find that counsel's failure to interview a witness prejudiced the petitioner when the petitioner did not offer any independent evidence about what the witness would have said); Goins v. Warden, 576 F. App'x 167, 173 (4th Cir. 2014) (unpublished per curiam) (concluding that petitioner's failure to make a proffer in state court as to what an expert would have said about mental health evidence "reduces any claim of prejudice to mere speculation and is fatal to his claim"); Smith v. Adams, 506 F. App'x 561, 565 (9th Cir. 2013) (unpublished) ("Smith merely speculates as to the expert testimony that could have been produced, but speculation about what an expert could have said is not enough to establish prejudice." (cleaned up and citation omitted)).

Piper also has not shown that Kinney performed deficiently by failing to raise a claim that counsels' investigation of FASD was unreasonable. The record when Kinney started work on Piper's most recent state habeas case showed:

- that neither psychologist Rose nor pediatrician Clark mentioned FASD in their reports of evaluating Piper at age 13;
- that neither retained trial mitigation psychologist Ertz nor neuropsychiatrist Wortzel testified to any suspicion of FASD;
- that none of the psychiatrists whom the state called perceived Piper to have FASD; and
- that Van Norman and Stonefield conducted a mitigation investigation including at least some investigation of FASD.

On this record, the possibility that Van Norman and Stonefield's investigation of FASD was deficient was not so obvious that Kinney was ineffective in failing to raise such a claim.

### 4.    Claim I.B

Piper alleges that Stonefield and Van Norman's late start on his background investigation left too little time for the mitigation specialist and forced them to hire a specialist who lived in Arizona and refused to fly. Doc. 67 ¶ 46. He faults Sheldon for not traveling to Alaska to visit his acquaintances and family in person and argues that her investigation was "flimsy," Id. ¶ 58, and discovered only "rudimentary information," Id. ¶ 54. Piper claims that an adequate investigation would have revealed the "trove of mitigating evidence" contained in the affidavits from Linda, Sheryl Engle, John Piper III, and various others. Doc. 86 at 14.

Claim I.B. is not a substantial claim of deficient performance. Van Norman and Stonefield were appointed to represent Piper in August 2009. They had reams of information to review given the procedural history of Piper's case and the records generated by his codefendants' cases. Doc. 90-11 at 11, 119–20. Contrary to Piper's suggestion, Stonefield and Van Norman did not squander the first 18 months after being appointed. Rather, they moved to withdraw Piper's guilty pleas in early October 2009. Doc. 2 at 288, 339–49, 367. They filed several supplements to the motion and deposed a law enforcement officer about whether evidence had been withheld in Piper's earlier case. Id. at 381–88. Stonefield and Van Norman testified that the motion to withdraw was important because it could have been dispositive of Piper's case.[19] Doc. 90-11 at 40, 120. As Stonefield explained at the state habeas hearing, the ruling on the motion to withdraw would also "determine scheduling" and the type of proceeding they "were actually going to have." Id. at 123. In fact, it was not until January 4, 2011, after Judge Eckrich had denied the motion to withdraw and the Supreme Court of South Dakota had denied the petition to appeal this ruling, that Judge Eckrich entered a scheduling order setting the resentencing trial for July 2011. Doc. 121-5 at 456.

---

[19]Indeed, Piper's current habeas petition raises a claim challenging his guilty pleas.

And while Piper argues that Van Norman and Stonefield waited until 18 months after being appointed to begin investigating his background, this does not match the record. Stonefield and Van Norman were well aware of their duty to thoroughly investigate all mitigation evidence; they not only mailed Judge Eckrich the 2003 ABA Guidelines, Doc. 121-4 at 329, but also cited to the guidelines and Supreme Court cases addressing what a reasonable mitigation investigation entails when they moved to appoint Sheldon, Doc. 121-5 at 592–608. Stonefield testified that, while they awaited Judge Eckrich's ruling on the motion to withdraw, they continued preparing for trial and reviewing the records and discovery. Doc. 90-11 at 123. He explained during a January 28, 2011 motions hearing that the defense team had already done some things a mitigation specialist would do, such as gathering documents and speaking to "quite a few witnesses already, including the family members." Doc. 88-1 at 10; see also Doc. 88-1 at 14 (Van Norman explaining during the same hearing that the defense team had already gathered some documents).

Indeed, the compensation vouchers Van Norman and Stonefield submitted to the court showed that they started working on Piper's mitigation case in August 2009 and continued thereafter. Doc. 121-4 at 460, 463, 465–67, 471, 473. This work included hiring an investigator; requesting Piper's prison records; interviewing his prior attorneys; tracking down and interviewing witnesses in Alaska, Oregon, Nevada, Louisiana, Michigan, and South and North Dakota; frequent contact with Piper's family; genealogical research on Piper's extended family; reviewing Piper's medical and juvenile records; speaking with the doctor who delivered Piper; reviewing background checks on adult males in Piper's past; researching mental conditions Piper may have; and consultation with experts. Id. at 289, 460, 463–68, 470–71; Doc. 121-5 at 302–03, 507; Doc. 121-8 at 389–90; Doc. 121-10 at 288–90, 292, 323, 327–29, 335–36, 343, 350–52, 358, 369, 371, 374, 382, 385–87, 397–98, 417–21, 423–25, 428–32, 439, 441, 445–47, 456, 458–59, 477–78, 481,

484, 488–92, 514–15, 518, 520, 555.  Although Piper argues that counsel should have hired a mitigation specialist sooner, they filed a motion requesting that Sheldon be appointed shortly after Judge Eckrich's January 4, 2011 order setting a trial date.  Doc. 88-1 at 6, 19.  And Sheldon, who said she could do a "competent" job in Piper's case in 200 hours, had roughly five months to complete her background investigation.[20]  Doc. 88-1 at 10.  Hiring a mitigation specialist five months before trial is a far cry from cases finding that an untimely investigation constituted deficient performance.  See Rowland v. Chappell, 876 F.3d 1174, 1185 (9th Cir. 2017) (finding that counsel performed deficiently by retaining a psychiatrist "only a few days" before the penalty phase began); Jells v. Mitchell, 538 F.3d 478, 493–94 (6th Cir. 2008) (holding that counsel was deficient where they hired a mitigation phase expert two days after the defendant was convicted and only 16 days before the mitigation hearing); see also Williams v. Taylor, 529 U.S. 362, 395 (2000) (finding it significant that counsel did not begin preparing for the sentencing phase until a week before trial).

Piper's argument about Sheldon's investigation being "flimsy" also falls flat, especially when considered alongside all the work Van Norman and Stonefield did.  Sheldon reviewed Piper's school, court, psychological, and family records.  Doc. 90-6 at 225.  She spent 19 hours with Piper in person and interviewed, albeit by telephone, Linda, Piper's father, Piper's siblings John and Sheryl,[21] some of his teachers, his friends, and a few extended relatives.  Doc. 90-7 at 19, 32–33, 41, 59, 83; Doc. 90-6 at 225, 234, 239; Doc. 121-9 at 377.  She attempted contact with numerous others but was unsuccessful.  Doc. 121-9 at 377.  Sheldon gathered evidence that Piper

---

[20]Judge Eckrich, when granting Piper's motion for a mitigation specialist, observed that "there certainly can be plenty of time, as I understand it, for Ms. Sheldon to get her work done."  Doc. 88-1 at 19.
[21]Van Norman wrote to Piper's eldest sibling, Jake, asking that he speak with Sheldon, but Jake refused.  Doc. 90-6 at 235.

was born prematurely, had jaundice, threw up for the first month of his life, Doc. 90-6 at 233, had severe ear infections throughout childhood, id. at 234, suffered a head injury requiring over ten stiches at age three, id. at 235, did poorly on standardized tests, id. at 242; and had difficulty making friends, id. at 245; Doc. 90-7 at 57.  She also elicited statements from Linda, John, and Sheryl about the frequent corporal punishment used in the Piper household.  Doc. 90-6 at 235–36.

The social history Sheldon prepared detailed Piper's struggles with impulsivity and ADHD, his poor academic performance, and his use of alcohol and hard drugs at a young age. Doc. 66-1 at 21–22, 24, 27–35, 37–40, 42, 49–54, 56.  It discussed the violence Piper faced at home, describing how he endured beatings from his parents and older brother.  Id. at 9, 17, 45–46. It also described how Piper had told Sheldon that Linda "w[ould] have a beer out by herself or drink at home alone," that his parents liked to "drink and dance at the bar," and get drunk at the club on the weekends.  Id. at 16.  The social history detailed instances when a doctor, teacher, or probation officer concluded that Piper had grave problems and needed counseling or inpatient treatment, but Piper's parents either downplayed the seriousness of his issues or disregarded the recommendation.  Id. at 33, 35–37, 39, 41, 44–48.  There was nothing inherently deficient about Sheldon's background investigation, even accounting for her reliance on telephone interviews. See Sells v. Stephens, 536 F. App'x 483, 493 (5th Cir. 2013) (unpublished) (rejecting claim that "an investigator's use of a telephone to speak with potential witnesses should be considered a sign of constitutional deficiency").

Piper has not shown that the adequacy of the background investigation would be debatable among jurists of reason.  And even if he had, he cannot show a substantial claim of prejudice.  As with Piper's expert reports on FASD, Shinn bars this Court from considering the affidavits from his family members and others.  Because speculation about what the witnesses would have said is

not enough to support a finding of prejudice, Claim I.B fails. See Armstrong, 534 F.3d at 867; Vazquez-Garcia, 211 F. App'x at 546. Respondents are entitled to summary judgment on the entirety of Claim I.

### B.   Claim III: Juror Sagdalen

Claim III of Piper's petition involves potential juror Lisa Sagdalen. Doc. 67 at 67–80. Piper alleges that Judge Eckrich improperly denied his motion to strike Sagdalen for cause (Claim III.B), that this denial caused prejudice by forcing him to waste a peremptory strike on Sagdalen rather than using it on biased Juror Anthony (Claim III.C), that counsel was ineffective by not objecting to Judge Eckrich's questioning of Sagdalen (Claim III.D), and that Miller was ineffective by failing to argue on direct appeal that Judge Eckrich erred by denying the motion to strike Sagdalen for cause (Claim III.E). "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45 (1980). And "[s]o long as the jury that sits is impartial," a defendant's loss of a peremptory strike to fix a court's erroneous failure to dismiss a juror for cause does not violate the Constitution. Ross v. Oklahoma, 487 U.S. 81, 88 (1988). In other words, a prisoner complaining about the loss of a peremptory strike cannot establish a constitutional violation without showing that a juror who heard the case was biased. Ramsey v. Bowersox, 149 F.3d 749, 758 (8th Cir. 1998).

Piper did not claim on direct appeal that Judge Eckrich erred by denying his motion to strike Sagdalen or Carlin for cause. Piper IV, 936 N.W.2d at 812; Doc. 2-1 at 7–43 (Piper's brief on direct appeal). When asked about appealing denials of challenges to potential jurors, Miller testified that he had raised only the issues that he did because he had read the entire record and

concluded that he "had no issue that was even arguably close" to the strength of the claim that Judge Eckrich erred by denying Piper's motion to withdraw his guilty plea. Doc. 90-11 at 218. In his state habeas case, Piper argued at the trial court level that Van Norman and Stonefield were ineffective in handling the voir dire of Sagdalen and Carlin and that Miller performed ineffectively by failing to appeal Judge Eckrich's denial of counsels' motions to strike these potential jurors for cause. Doc. 85-1 at 31, 34–35. Piper expanded and refined his arguments in his state habeas appeal, arguing that the denial of counsel's motion to strike Sagdalen and Carlin for cause violated his right to a fair trial, that counsel was ineffective by not objecting to Judge Eckrich's questioning of Sagdalen and Carlin, and that Miller was ineffective by not appealing the denial of the motions to strike Sagdalen and Carlin for cause. Doc. 2-1 at 122–27. Although Piper argued that these alleged errors prejudiced him, he never claimed in state court that any of the jurors who ultimately heard his case were impermissibly biased. See Doc. 2-1 at 119–27; Piper's Reply Brief, 2018 WL 10152750, at *16–18 (July 10, 2018).

The Supreme Court of South Dakota held that Piper's voir dire claims failed "for a variety of reasons." Piper IV, 936 N.W.2d at 812. First, res judicata barred "any free-standing fair trial or due process claim associated with the jury selection process" because Piper failed to raise it on appeal. Id. Second, Piper did not prove either Strickland prong on his claim that trial counsel handled the Sagdalen and Carlin voir dire ineffectively. Id. The court found Piper's deficient performance argument unconvincing, noting that counsel had challenged Sagdalen and Carlin for cause and then removed them from the jury using peremptory strikes. Id. As for prejudice, the court explained that the loss of a peremptory challenge to correct a trial court error does not violate the Constitution and that any juror bias claim must turn on the jurors who actually sat. Id. at 812–13. Because Sagdalen and Carlin did not sit on Piper's jury, the court explained, Piper was "unable

to sustain his post-conviction jury selection argument . . . either on its merits or as a component of an ineffective assistance of counsel claim." Id. at 813. Third, the court rejected Piper's claim that Miller was ineffective by failing to raise the juror selection claims on direct appeal. Id. at 814 n.19. The court concluded that the jury selection claims "lack[ed] merit" and noted Miller's testimony that he did not raise the claims "because of their relative weakness." Id.

Piper argued in his petition that all the subparts within Claim III were exhausted in state court. Doc. 67 at 67 n.8. He asserted that the ineffective assistance of Miller as appellate counsel "both provides a basis for relief and constitutes cause and prejudice to overcome any [procedural] default" of his claim that Judge Eckrich erred by denying his motion to strike Sagdalen for cause. Doc. 67 at 80.

Respondents argue that Claims III.B and III.C are procedurally defaulted and barred by res judicata. Doc. 75 at 5–8. They also assert that, under AEDPA's deferential standard of review, this Court should affirm the Supreme Court of South Dakota's decision that Piper failed to show that counsel was ineffective by not objecting to Judge Eckrich's questioning of Sagdalen and that Miller was ineffective by not arguing that Judge Eckrich had erred by refusing to strike Sagdalen. Doc. 75 at 8–10. Respondents additionally note that Piper never claimed in state court that Anthony was impartial as he does now. Respondents thus argue that this Court is limited to the form of the argument made in state court when reviewing Claim III.B and that res judicata bars Claim III.D to the extent that Piper relies on the seating of Juror Anthony to establish prejudice.

### 1.     Claims III.B and III.C

Piper offers three reasons he can avoid procedural default of Claims III.B and III.C; none are persuasive. He argues first that res judicata in South Dakota is not adequate and independent because of Haase and the related arguments discussed above. This argument fails for the reasons

already explained.  Piper argues next that res judicata does not bar claim III.B because the Supreme Court of South Dakota intertwined its res judicata analysis with federal law.  That is not correct.  The Supreme Court of South Dakota held that res judicata barred any free-standing fair trial claim concerning jury selection and then, alternatively, that the claim failed "either on its merits or as a component of an ineffective assistance of counsel claim." Piper IV, 936 N.W.2d at 812–13.  When a state court clearly imposes a procedural bar like the Supreme Court of South Dakota did here, that bar does not lose its independence simply because the state court relies on federal law in reaching an alternative holding on the merits.  Coleman, 501 U.S. at 733; Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Taylor v. Norris, 401 F.3d 883, 886 (8th Cir. 2005).

Piper's last argument is that Miller's ineffectiveness in failing to argue on appeal that Judge Eckrich should have struck Sagdalen provides cause to excuse the procedural default of Claims III.B and C.  This argument raises three preliminary questions.  The first is whether this Court should rule now on whether Miller's ineffectiveness can constitute cause or defer the issue to the next round of briefing.  Piper's brief points to Miller's ineffectiveness as cause to excuse the procedural default of Claims III.B and C but then says he "defers discussion of the merits of the appellate ineffectiveness claim." Doc. 86 at 39.  This Court structured the deadlines in this case so that it could decide whether Piper's claims were exhausted or procedurally defaulted before considering whether Piper is entitled to any relief on his remaining claims.  After Piper filed an amended petition, Respondents filed four motions for summary judgment arguing, among other things, that Piper's procedural default on certain claims could not be excused under Martinez, that res judicata barred review of some of Piper's claims, and that Respondents were entitled to summary judgment on still other claims because the relevant state court decisions were not contrary to or an unreasonable application of clearly established federal law.  Piper then moved

for clarification, asking whether he needed only to address "issues of exhaustion and default at this time" or whether he should also address "all the procedural and substantive arguments made" by Respondents. Doc. 80 at 2. This Court ordered as follows:

> [Piper's response] should address Respondents' arguments that Piper's procedurally defaulted claims are not excused under <u>Martinez</u>, Respondents' arguments that res judicata constitutes an independent and adequate ground barring review of some of his claims, and any other issues Piper has with Respondents' briefing on exhaustion and procedural default. But Piper need not address Respondents' arguments that certain state court decisions were not contrary to or an unreasonable application of clearly established federal law. As noted in the scheduling order, this Court wants to decide issues of exhaustion and procedural default before ruling on whether Piper is entitled to any relief on his claims.

Doc. 84 at 2–3. This Court's order made clear that it intended to decide issues of res judicata and procedural default on this round of briefing and that Piper should draft his response accordingly. Deciding whether Miller's alleged ineffectiveness allows Piper to avoid res judicata of Claims III.B and C necessarily involves a review of Miller's performance; as explained already, Miller's failure to raise a claim on direct appeal cannot serve as cause to excuse a procedural default unless the failure itself constitutes ineffective assistance under <u>Strickland</u>. <u>Evans v. Luebbers</u>, 371 F.3d 438, 445 (8th Cir. 2004). Consistent with the prior order, this Court decides now whether Miller's alleged ineffectiveness allows Piper to avoid the res judicata bar.[22]

The second preliminary question concerns what standard should apply to Piper's claim that Miller's ineffectiveness excuses the procedural default of Claims III.B and C. The federal

---

[22]Proceeding this way will not prejudice Piper. Piper's argument that Miller was ineffective by not appealing the issues relating to voir dire of Sagdalen fails without a showing that the seated jury was biased. Piper relies on Juror Anthony to make this showing, but, as this Court explains later in this opinion, Piper does not even have a substantial claim that Juror Anthony was impermissibly biased. Moreover, this Court, for the reasons explained below, cannot consider the Juror Anthony aspect of Claim III.E when analyzing whether Miller was ineffective. In short, nothing Piper could write in further briefing would show that Miller was ineffective.

appellate courts are split on whether a claim of ineffective assistance of counsel advanced as cause

to excuse default of another claim should be reviewed *de novo* or under 2254(d)(1)'s deferential

standard. Tavarez v. Larkin, 814 F.3d 644, 650 n.3 (2d Cir. 2016) (noting circuit split and

collecting cases). As far as this Court can tell, the Eighth Circuit has never decided the issue. See

Clemons v. Luebbers, 381 F.3d 744, 752 n.4 (8th Cir. 2004) (declining to decide what standard

applies to a previously adjudicated ineffective-assistance-of-counsel claim because the result

would be the same under either analysis). Giving Piper the benefit of the doubt, this Court will

review *de novo* whether Miller's alleged ineffective assistance constitutes cause to excuse the

procedural default of Claim III.B.

The third preliminary question is whether this Court can consider Piper's argument that

Anthony's sitting on the jury prejudiced him when analyzing whether Miller performed

ineffectively. A claim of ineffective assistance of appellate counsel cannot serve as cause to excuse

a procedural default unless the prisoner either exhausted the claim in state court or can show cause

and prejudice to excuse the default of the ineffective assistance claim itself. Edwards, 529 U.S. at

452–53. A prisoner has not properly exhausted a claim unless he "fairly presented" it to the state

court. Picard v. Connor, 404 U.S. 270, 275–76 (1971). A "fair presentation," in turn, requires that

the prisoner "present the same facts and legal theories to the state court that he later presents to the

federal courts." Morris v. Norris, 83 F.3d 268, 270 (8th Cir. 1996) (cleaned up and citation

omitted). Although the federal claim "cannot contain significant additional facts[,] . . . closely

related claims containing an arguable factual commonality may be reviewed." Ward v. Norris,

577 F.3d 925, 935 (8th Cir. 2009) (cleaned up and citations omitted).

Piper did not fairly present the Juror Anthony aspect of Claim III.E to the Supreme Court

of South Dakota. Claim III.E relies on Juror Anthony's supposed bias both to show that Piper's

claim concerning the Sagdalen voir dire is meritorious and that Miller's failure to raise the Sagdalen claim prejudiced him. Doc. 67 at 78–80. But Piper never made any argument about Anthony or any of the other jurors who heard his case when arguing in state court that Miller was ineffective. See Doc. 2-1 at 119–27. Instead, Piper argued that unlike the federal rule, South Dakota law did not require him to show that a member of the jury was biased to succeed on a fair trial claim. See Piper's Reply Brief, 2018 WL 10152750, at *16–18. The Supreme Court of South Dakota disagreed, explaining that the loss of a peremptory challenge does not violate the Constitution absent a showing of juror bias. Piper IV, 936 N.W.2d at 812–13. Piper did not make this showing, so the court found that his jury selection claims failed, and that Miller was not ineffective for failing to raise these meritless claims on appeal. Id. at 812–13, 814 n.19. Claim III.E now seeks to supply the missing element of prejudice for Piper's fair trial claim and to address the very reason the Supreme Court of South Dakota rejected the claim that Miller was ineffective. Although Piper is correct that claims raised in federal habeas need not "precisely replicate" their state court counterparts, Doc. 104 at 13, the Juror Anthony aspect of Claim III.E is simply too different from the ineffective assistance claim Piper raised in state court to be considered fairly presented, see Nash v. Russell, 807 F.3d 892, 898 (8th Cir. 2015) (holding that the petitioner did not fairly present his claim where he made a facial challenge to a state evidentiary rule in state court and then an as-applied challenge in his federal habeas petition); Williams v. Norris, 576 F.3d 850, 865 (8th Cir. 2009) (holding that the petitioner did not fairly present his claims that the state had inappropriately struck two specific African American jurors where the petitioner's direct appeal challenged "the State's use of peremptory strikes generally, but not the strikes" of the two jurors specifically); Wooten v. Norris, 578 F.3d 767, 777–78 (8th Cir. 2009) (concluding that claim that trial counsel was ineffective in the penalty phase by failing to assert mental infirmities to rebut

the state's arguments about a death-qualifying aggravator was procedurally defaulted because while the petitioner had argued in state court that trial counsel was generally ineffective for failing to present additional mitigation evidence, he did not identify what the mitigation was or how it would have impacted the trial). This Court thus cannot consider the Juror Anthony aspect of Claim III.E when analyzing whether Miller performed ineffectively.

Even on *de novo* review, Piper cannot show that Miller performed ineffectively by failing to argue on direct appeal that Judge Eckrich erred by denying his challenge to Sagdalen for cause. To establish ineffectiveness, Piper must show that Miller's failure to raise the Sagdalen claim on direct appeal was constitutionally deficient and that this deficiency prejudiced him. Strickland, 466 U.S. at 687. Under the performance prong, Piper must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "Because of this presumption and the reality that effective appellate advocacy often entails screening out weaker issues, the Sixth Amendment does not require that appellate counsel raise every colorable or non-frivolous issue on appeal." Roe v. Delo, 160 F.3d 416, 418 (8th Cir. 1998). Indeed, "[d]eclining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." Davila, 582 U.S. at 533. Miller testified that he did not raise any juror challenge claims because they were not "even arguably close" to as strong as the guilty plea claim. Doc. 90-11 at 218. This conclusion seems reasonable. As explained already, Piper's Sagdalen and Carlin claims were meritless because Piper did not include any evidence or argument that the seated jury was biased. Because Miller was not constitutionally ineffective, Piper cannot rely on Claim III.E as cause to excuse his procedural default of Claims III.B and C. Respondents are thus entitled to summary judgment on claims III.B and C.

### 2.     Claim III.D

Piper did not raise the Juror Anthony aspect of Claim III.D below but he did exhaust at least a part of Claim III.D by arguing in his state habeas case that trial counsel was ineffective for failing to object to Judge Eckrich's improper questioning of Sagdalen.  The Supreme Court of South Dakota rejected that form of Claim III.D on the merits.  This Court denies Respondents' motion for summary judgment on the merits of Claim III.D without prejudice to Respondents renewing that motion in the next round of briefing.  The Juror Anthony aspect of Claim III.D is procedurally defaulted, however.

### 3.     Claim III.E

As explained already, Piper exhausted part of Claim III.E in his state habeas case and the Supreme Court of South Dakota rejected that part of Claim III.E on the merits.  This Court denies Respondents' motion for summary judgment on the merits of Claim III.E but Respondents can renew that motion in the next round of briefing.

### C.     Claim IV: Potential Juror Dan Carlin and Juror Dennis Anthony

### 1.     Claim IV.A

Claim IV.A alleges that Van Norman and Stonefield were ineffective by not objecting to Judge Eckrich's questioning of potential juror Dan Carlin.  Piper asserts that Judge Eckrich would have struck Carlin for cause if counsel had only objected to the Judge's questions, that this would have saved Piper a peremptory strike, and that he could then have used that strike on biased Juror Anthony.  Doc. 67 at 86.  Piper argued in state court that trial counsel was ineffective by failing to object to Judge Eckrich's questioning of Carlin, and the Supreme Court of South Dakota rejected this claim on the merits.  Piper IV, 936 N.W.2d at 812–13.  As noted already, though, Piper never argued that Anthony or any of the other jurors who sat were biased when raising his ineffectiveness

74

claims in state court.  See Doc. 2-1 at 119–27; Piper's Reply Brief, 2018 WL 10152750, at *16–18.

Respondents move for summary judgment on Claim IV.A, arguing that the Supreme Court of South Dakota's decision was not contrary to or an unreasonable application of federal law and that res judicata bars the Juror Anthony aspect of Claim IV.A.  Doc. 75 at 8–9; Doc. 97 at 26–27. Respondents' motion for summary judgment on the merits of Claim IV.A is denied for now but can be renewed in the next round of briefing.  The Juror Anthony aspect of Claim IV.A is procedurally defaulted, however.

## 2.    Claim IV.B: Juror Dennis Anthony

Claim IV.B alleges that trial counsel performed ineffectively by not challenging Juror Anthony for cause or not requesting an additional peremptory strike to use on him.  Doc. 67 at 87. Piper acknowledges that he did not exhaust Claim IV.B in state court but argues that he can overcome procedural default of this claim under Martinez because Kinney himself was ineffective for failing to raise this claim.

Capital defendants like Piper have a constitutional right to be sentenced by an impartial jury.  Morgan v. Illinois, 504 U.S. 719, 726–28 (1992).  Voir dire, peremptory challenges, and the opportunity to challenge biased jurors for cause are critical to protecting this right.  Id. at 729–30; Batson v. Kentucky, 476 U.S. 79, 91 (1986).  The standard for excusing jurors for cause in a capital case is whether their "views would prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath."  Morgan, 504 U.S. at 728 (cleaned up and citation omitted).  So, for example, a juror who would "automatically vote for the death penalty in every case" would fail this standard because he would not "in good faith . . . consider the evidence of aggravating and mitigating circumstances as the instructions require."  Id.

at 729.  The same is true for a juror who would never vote for the death penalty, regardless of the circumstances.  Id. at 728.  The impaneling of even one "automatic death penalty" juror requires that a death sentence be reversed.  Id. at 729.

To succeed on his claim that counsel was ineffective by failing to challenge Anthony for cause, Piper needs to show that Anthony was "impermissibly biased," that counsel was deficient in not challenging Anthony for cause, and that Anthony's presence on the jury led to an unfair trial.  Williams v. Norris, 612 F.3d 941, 955 (8th Cir. 2010).  "Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel."  Johnson v. Armontrout, 961 F.2d 748, 755 (8th Cir. 1992).  Prejudice is presumed when counsel fails to challenge a biased juror.  Sanders v. Norris, 529 F.3d 787, 791 (8th Cir. 2008).  This Court must consider Anthony's entire voir dire—not just the statements Piper says show bias—when analyzing Piper's claim.  See Murray v. Delo, 34 F.3d 1367, 1377 (8th Cir. 1994) (explaining that courts "review the entire record, not individual responses," when determining whether a juror was biased).

Piper points to three areas of Anthony's voir dire to show that Anthony was impermissibly biased.  Doc. 67 at 74–76; 87.  The first concerns Anthony's statement in the jury questionnaire about the appeals process:

> **Van Norman**: Okay.  You also indicated in your questionnaire that - - and I'll quote you here, "I think if the court system imposes a ruling on this then it shouldn't be appeals after appeals or carried on for years . . ."  Do you remember that?
> **Anthony**: Right.
> **Van Norman**: What do you mean by that?
> **Anthony**: Well, let's see.  If a decision is made then it's made so it should be carried out - -
> **Van Norman**: Okay.
> **Anthony**: - - you know, one way or another - -
> **Van Norman**: Okay.

> **Anthony**: - - instead of going - - you know, carrying it on and on and on.
> **Van Norman**: Right.
> **Anthony**: So there would be a little bit of closure, I guess, for everybody.
> **Van Norman**: All right.  Does it irritate you? Have you read in the newspaper that appeals can go on and on?
> **Anthony**: Oh, yeah, they go on for years sometimes.

Doc. 89 at 130–31.

The second area concerns Anthony's beliefs about the costs of sentencing someone to life in prison.  Anthony had included a response in the juror questionnaire asking why the "taxpayers" should "have to pay for the upkeep for life?" Id. at 131–32.  Under questioning from Van Norman, Anthony affirmed that this was "kind of - - kind of how I feel about it, yeah." Id. at 132.

The third area concerns Anthony's views on the death penalty.  Anthony's juror questionnaire stated that he believed in an "eye for an eye" and that "[t]hey should get the same as what they caused." Id. at 132.  When Anthony said he couldn't really explain what he meant by these statements, Van Norman asked whether he believed that a person who "intentionally takes a life" should "forfeit[]" his own life.  Id. at 132.  Anthony replied, "No, it depends on - - it all would depend on the circumstances . . . and, you know, what - - how the trial went." Id.  Van Norman then got more specific:

> **Van Norman**:  So the question I have got is based on part of what you answered in your questionnaire, and the question was, "Do you believe the State should impose a death penalty on everyone who, for any reason, intentionally kills another person?" that was the question, and you answered, "Yes."
> **Anthony**: Yes, I really think they should.
> **Van Norman**: Okay.  So if a person kills without excuse, and I think we're - - we're excluding no excuse like self-defense - -
> **Anthony**: Yeah.
> **Van Norman**: - - or accident or insanity, we're setting those aside, right?
> **Anthony**: Right, yeah.

77

> **Van Norman**: Okay.  Your belief then as a personal matter, as a personal belief we're talking about, is that if somebody intentionally kills, like Briley, then he should get the death penalty?
> **Anthony**: Yeah, I really think he should.

Id. at 133–34.

But the above statements, while concerning in isolation, do not capture the whole picture of Anthony's voir dire.  Indeed, Anthony's responses when Van Norman pressed him further indicate that he would not be an automatic vote for the death penalty:

> **Van Norman**: Okay.  In a trial like this what a jury has to do, and this isn't criticizing you, I'm just trying to explain the procedure here, what the jury has to do is sort through a lot of information.
> **Anthony**: Right.
> **Van Norman**: And in this instance given your state of mind, your belief there, it wouldn't matter to you to sort through that information, you already have a belief, right, and a conclusion?
> **Anthony**: Is there more evidence going to be presented?
> **Van Norman**: Sure, but my concern isn't that I have to prove anything to you, it's whether or not you already have a firm belief right now as we sit here.  And your firm belief, I understand, is that since Briley is a convicted killer, that he intentionally killed somebody - -
> **Anthony**: Uh-huh.
> **Van Norman**: - - then he should get the death penalty.
> **Anthony**: I would say yes, but it would depend on what come [sic] up during this trial, or whatever it's going to be, the sentencing part.
> **Van Norman**: Okay.  What can you envision - - again, you got a - - let's do a hypothetical situation.
> **Anthony**: Okay.
> **Van Norman**: Those can be tricky, but hypothetical situation where you got a convicted killer that you're passing judgment on, he's already convicted, you haven't to decide that, he plead guilty, okay.  And it's a horrific crime, it's a bad crime, and the State has proven to you that there is a special aggravating circumstance about that crime and that makes that defendant eligible for the death penalty, okay?
> **Anthony**: Uh-huh, okay.
> **Van Norman**: Can you envision ever voting for life without the chance of parole for a person that was convicted in that situation?
> **Anthony**: In some instances, yes, because it's going to give him an awful long time to think about what he did.

**Van Norman**: Okay. So you kind of view sitting for life as possibly - - well, not possibly, a severe punishment.

**Anthony**: Yeah, already punishment.

**Van Norman**: Okay. What about your concern that the taxpayers having to pay for somebody to sit for life, how does that figure into your estimation there?

**Anthony**: Well, I don't know what it costs to feed and house and all that medical stuff, but you wouldn't have that to contend with, so that would be - -

**Van Norman**: And if the Judge were to instruct you - - not instruct you to consider anything like that - - or, to instruct you not to consider anything like what the costs may or may not be, could you set that aside?

**Anthony**: Yeah.

**Van Norman**: Okay. Can you envision yourself under these circumstances I described coming back with a verdict of life without the possibility of parole?

**Anthony**: Yes.

**Van Norman**: Okay. I mean, that - - that's pretty firm that you could do that in your mind?

**Anthony**: You bet, you bet.

**Van Norman**: I'm take what you said here, and I'll read it again, "Do you believe the State should impose a death penalty on everyone who, for any reason, intentionally kills another person?" that was the question; you answered, "Yes." But that isn't your true feeling after we talked about it here.

**Anthony**: Well, like I say, it's got to - - you got to hear more about what went on than just a question like that - -

**Van Norman**: Okay.

**Anthony**: - - I would think.

Doc. 89 at 134–36. Anthony went on to affirm that he could consider mitigating evidence, including youth, a troubled childhood, and what Piper had done in the years since the murder. Id. at 137–40. He said that he would extend mercy to Piper if he "thought it was appropriate," and agreed that he would follow the judge's instructions. Id. at 142.

Piper has not shown a substantial claim that Anthony was impermissibly biased in favor of the death penalty. Although Anthony's questionnaire and initial statements on the death penalty suggested such a bias, his voir dire as a whole shows that he was not a juror whose views on capital punishment would have prevented him from following the law and the judge's instructions.

Anthony repeatedly and unequivocally said that he could impose a life sentence on a hypothetical defendant who had pleaded guilty to a horrific murder and was eligible for the death penalty. Id. at 135–36, 138. He confirmed his willingness to follow the judge's instructions and agreed that he would consider the very type of mitigating evidence Piper planned to offer. Id. at 137–40, 142. Overall, the voir dire shows that Anthony wanted to hear all the evidence and would consider both the death and life sentence alternatives.

Piper also has not made a substantial showing that Van Norman was ineffective by failing to challenge Anthony for cause. Van Norman made clear during voir dire that he was troubled by some of Anthony's responses in the questionnaire. Id. at 139. When Van Norman sought to pin Anthony down, though, Anthony said he would need to hear the whole case and that he would consider a life sentence for a defendant in Piper's situation. It was objectively reasonable for Van Norman to conclude that Anthony's voir dire did make not him vulnerable to a meritorious challenge for cause, especially when Judge Eckrich had just denied two challenges for cause to potential juror Sagdalen,[23] whose voir dire was more problematic than Anthony's. Piper also has not shown that Judge Eckrich would have granted a request for an additional peremptory strike to use on Anthony or that Van Norman was ineffective for failing to make such a request. See Greenlee v. Wallace, 13-CV-1922, 2016 WL 4730312, at *9 (E.D. Mo. Sept. 12, 2016) (rejecting ineffective assistance claim in part because there was "no reason to conclude that the trial court would have granted a motion to strike" the juror in question). Indeed, Judge Eckrich had already set the number of peremptory strikes the parties would receive, giving each side one additional

---

[23]Sagdalen after all had described a Pennington County sheriff's deputy as her best friend, had talked with the deputy about the case generally, had read extensively about Poage's murder, and expressed an opinion that Piper should receive the death penalty. Doc. 2-2 at 160–63; Doc. 89 at 75–97.

strike but denying Piper's pretrial motion for 10 additional strikes.  Doc. 121-5 at 535–36; Doc. 121-8 at 448–49.

Finally, Piper has not shown that Kinney was ineffective in failing to argue in the state habeas corpus case that Van Norman performed deficiently by not challenging Anthony for cause. Kinney raised other, stronger claims, and could reasonably have concluded that such a claim would not have aided in getting Piper's sentence vacated.  See Deck, 978 F.3d at 584 (explaining that "competent performance does not require counsel to recognize and raise every conceivable constitutional claim" (cleaned up and citations omitted)); id. ("[D]eclining to raise a claim is not deficient performance unless that claim was plainly stronger than those actually presented." (cleaned up and citation omitted)).  Respondent is entitled to summary judgment on Claim IV.B.

### D.    Claim V: Sister Crowley

Claim V alleges that Van Norman and Stonefield were ineffective when Fitzgerald cross-examined Sister Crowley about writing a letter to a female inmate at Piper's urging.  Piper argues that Sister Crowley's actions did not violate prison rules and that trial counsel should have objected to the cross-examination and requested a recess to research the issue for themselves.  Doc. 67 at 93.  Piper raised this claim in his state habeas case, and everyone agrees it is exhausted.  Doc. 75 at 1.  The Supreme Court of South Dakota rejected the claim on its merits, noting that it was "still unsettled" whether the letter violated prison policy and finding that Piper had not proved either Strickland prong.[24]  Piper IV, 936 N.W.2d at 816.  Respondents move for summary judgment on

---

[24]Van Norman testified at the state habeas hearing that he had asked his paralegal to speak with the warden after Piper's trial and that his paralegal had drafted an affidavit saying that the warden was "very concerned about the exchange that had taken place" between Fitzgerald and Sister Crowley.  Doc. 90-11 at 78; see also id. at 86 (Van Norman testifying on cross that the warden told his paralegal there was no policy forbidding inmates from communicating with other inmates through third parties).  Judge Macy sustained a hearsay objection to Van Norman's description of the affidavit.  Id. at 78.  Piper included the paralegal's affidavit in the appendix of his federal

the merits of Claim V, arguing that the Supreme Court of South Dakota's decision is not contrary to nor an unreasonable application of federal law.[25]   Doc. 75 at 9–12.   This Court denies Respondents' motion without prejudice to refiling it in the next round of briefing.

### E.      Claim VI: Failure to Appeal Denial of Motion for Mistrial

Claim VI alleges that Miller was ineffective by failing to appeal the denial of Piper's motion for a mistrial made after the State elicited testimony about whether inmates were allowed television.  Doc. 67 at 94–97.  Piper properly exhausted this claim by raising it in his state habeas case.  The Supreme Court of South Dakota rejected this claim, finding that Miller made a reasonable "strategic decision" not to appeal the issue based on its "relative strength" and that Piper had failed to prove prejudice.  Piper IV, 936 N.W.2d at 816.  Respondents moved for summary judgment on Claim VI in one of its opening briefs, arguing that the Supreme Court of South Dakota's decision was not contrary to or an unreasonable application of federal law.  Doc. 75 at 12–13.  In their reply brief, however, Respondents make the misguided argument that res judicata bars Claim VI and that the claim cannot be revived under Martinez.  Doc. 97 at 29.  Res judicata does not apply to Claim VI because Piper's habeas case was the first time he could raise it.  And Martinez does not apply because Claim VI concerns appellate counsel rather than trial counsel and Piper properly exhausted the claim in state court.  Respondents' motion for summary judgment on Claim VI is denied without prejudice to renewing the merits aspect of the motion in the next round of briefing.

---

habeas case, Doc. 2-2 at 177–78, but it is unclear whether he made the affidavit part of the record in his state habeas case.  Piper's appellate brief in his state habeas case stated that because the policy was never introduced at trial, it was "still unclear as to whether" Sister Crowley's letter violated any policy.  Doc. 2-1 at 140.

[25]Respondents also argue that res judicata bars the "due process component" of Claim V.  Doc. 97 at 28.  Piper confirmed at the October 25, 2023 hearing that Claim V is a straight ineffective-assistance claim with no due process component.

### F.   Claim VII: Evidence of Lewd Behavior

Claim VII addresses the State's evidence and argument that Piper and his accomplices forced Poage to undress and made sexual comments to him out at Higgins Gulch. Claims VII.A and VII.B allege that Fitzgerald engaged in prosecutorial misconduct and violated Piper's due process rights by ignoring two court orders prohibiting sexual orientation evidence and repeatedly alluding to Piper's bisexuality. Doc. 67 at 100–10. Claim VII.C alleges that trial counsel was ineffective by failing to object, request a limiting instruction, or move for a mistrial when Fitzgerald repeatedly referenced the oral sex comment Piper made at Higgins Gulch. Id. at 111–13; Doc. 86 at 43–45. Piper acknowledges that these claims were not raised in state court and are procedurally defaulted. Doc. 67 at 100; Doc. 86 at 44. He agrees that he cannot overcome the procedural default of Claims VII.A and B but argues that Martinez excuses the default of Claim VII.C. Doc. 86 at 44; Doc. 116 at 103–04. Respondent moves for summary judgment on Claim VII, arguing that Martinez does not apply because trial counsel preserved the claim by objecting to the oral sex evidence and the default did not occur until Miller failed to raise the claim on direct appeal. Doc. 73 at 7–9; Doc. 97 at 30–31.

Piper agrees that his counsel objected to some of the evidence of lewd behavior at Higgins Gulch but argues that Fitzgerald went well beyond just mentioning the evidence in opening statements and introducing it through Curtis. He points to Fitzgerald's exchanges with Dr. Donald Habbe, Hoadley, Dr. Ertz, and Dr. Wortzel for support. Fitzgerald asked Dr. Habbe, a forensic pathologist, how often he found male homicide victims missing their clothes. Doc. 90 at 164. Van Norman objected, Judge Eckrich overruled him, and Dr. Haabe responded that "[i]t happens," but not as often as female victims are found without clothes. Id. Fitzgerald's exchange with Hoadley began with asking what Piper said to Poage after he was made to strip. Doc. 90-4 at 36–37. When

Hoadley replied that Piper had asked for the pin to Poage's ATM card, Fitzgerald said he would ask a "little bit more leading question" and inquired when Piper told "the naked Mr. Poage that he was going to have to suck his dick?" Id. at 37. Piper's counsel did not object, and Hoadley replied that Piper had asked Poage what he would "say if I told you I wanted you to suck my dick?" Id. Piper also cites to Fitzgerald asking Dr. Ertz whether the American Psychiatric Association once defined homosexuality as a mental disorder, Doc. 90-8 at 67, asking Dr. Ertz and Dr. Wortzel about Piper's oral sex comment at Higgins Gulch, id. at 54–55, 122, and referring in closing argument to the oral sex comment and Page's threat to have someone "rape and sodomize" Poage,[26] Doc. 90-10 at 42–43. Trial counsel did not object to these statements.

Piper argues that Fitzgerald's conduct violated two court orders—Judge Eckrich's order granting Piper's motion in limine on sexual orientation evidence and his statement at the pretrial hearing that he would "stand by" this ruling. Piper claims that this violation constituted prosecutorial misconduct and that trial counsel was ineffective by failing to request a mistrial or a cautionary instruction to remedy the misconduct. Doc. 86 at 43–45.

This is not a substantial claim of ineffective assistance and Kinney was not deficient for failing to raise it in state court. Piper has not pointed to any evidence or argument offered by Fitzgerald that Piper was bisexual in general or suggesting that he had or wanted to have sex with men on occasions unrelated to Poage's kidnapping and murder. Rather, Piper's claim relies on the

---

[26]Piper claims in his petition that the State never presented evidence to support Fitzgerald's statement on Page's conduct at Higgins Gulch. Doc. 67 at 102. Not so. In a police interview played for the jury, Piper said that Page "likes naked guys" and "was getting into it" when Poage disrobed. Doc. 95 at 38–39; Doc. 90-2 at 150–52. He also disclosed that Page had told Poage that he "could have Russell come down here and just rape your ass." Doc. 95 at 40. Piper admitted to laughing at this. Id. at 40–41. Piper also told police he was bisexual. Doc. 90-1 at 191. Consistent with Judge Eckrich's order on the motion in limine, however, that portion of the interview was not shown to the jury. Doc. 95 at 38–39; Doc. 90-1 at 190–91.

flawed premise that Judge Eckrich's pretrial orders prohibited Fitzgerald from offering evidence or argument about the lewd behavior that occurred at Higgins Gulch. But Piper's motion in limine focused only on his sexual orientation, seeking to prohibit evidence or argument that he was bisexual or "had sexual relationships with other males." Doc. 121-5 at 551. The motion cited to testimony by Russell Olson in Piper's first trial that he and Piper had engaged in sexual relations, and did not make any reference to Poage being made to strip naked, Piper making an oral sex comment at Higgins Gulch, or Page suggesting to get "Russell" to rape Poage. Id. at 551–53. When Stonefield brought up Judge Eckrich's order at the pretrial hearing, he said that the court had "granted a motion in limine on Mr. Piper's supposed bisexuality or sexual relationship with Russ Olson"; Stonefield did not argue for all the lewd behavior at Higgins Gulch to be excluded. Doc. 90 at 24. Nor did Judge Eckrich's order on the motion in limine or his ruling at the pretrial hearing extend to lewd behavior at Higgins Gulch. More importantly still, Judge Eckrich's decision that Curtis could testify about Piper's oral sex comment shows that Judge Eckrich did not view the lewd behavior at Higgins Gulch as "a sexual orientation reference," Doc. 90-1 at 193, but rather as "part of the res gestae," Doc. 90-3 at 8–9.

This distinction between Piper's sexual orientation in general and the lewd behavior at Higgins Gulch is hardly surprising. The lewd behavior at Higgins Gulch was part of Poage's kidnapping and murder and probative of whether the State had proved the aggravating circumstance that Piper's crime was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery." See Doc. 90-10 at 42–43 (Fitzgerald arguing in closing that sexual behavior at Higgins Gulch and Piper laughing at Page's rape threat was evidence of torture and depravity of mind); Doc. 121-10 at 177 (final instructions explaining that "torture includes serious psychological abuse of a victim resulting in severe mental

anguish to the victim in anticipation of serious physical harm"); id. at 212 (verdict form asking jury to select whether Poage's murder involved torture, depravity of mind, or an aggravated battery). Evidence directly relating to the elements and immediate context of a crime does not become inadmissible just because it might shed light on a defendant's sexual orientation. See United States v. Forrest, 429 F.3d 73, 79–80 (4th Cir. 2005) (holding that pornographic photos of adult males, which defendant argued portrayed him as homosexual, were not unfairly prejudicial in sexual exploitation of a minor case where photos were "highly relevant" to rebut the defendant's theories); United States v. Isley, 369 F. App'x 80, 91–93 (11th Cir. 2010) (per curiam) (unpublished) (upholding district court's decision to admit evidence in fraud prosecution that defendant used her employer's money to make a charitable donation to a lesbian advocacy organization where donation was "part and parcel" of evidence that defendant was misappropriating her employer's funds and the nature of the donation was relevant to show that it was not related to her employer's business); United States v. Yazzie, 59 F.3d 807, 811–12 (9th Cir. 1995) (holding that pornographic magazines showing naked men were not unfairly prejudicial where defendant used the magazines to perpetrate the sexual abuse of a minor and the magazines corroborated the victim's description of the abuse).

Fitzgerald did not violate Judge Eckrich's orders by introducing evidence of the lewd behavior at Higgins Gulch, and a motion for a mistrial based on this evidence would not have succeeded. No reasonable jurist would say that trial counsel was ineffective for failing to move for a mistrial based on a violation of a pretrial ruling when the evidence submitted did not in fact violate the ruling. Piper also asserts that trial counsel should have requested a limiting instruction that the jury could not consider his sexual orientation. But reasonable counsel rationally could fear and make a proper strategic decision that such an instruction would have just drawn attention

to the issue Piper sought to prohibit with his motion in limine.   Respondents are entitled to summary judgment on Claim VII.[27]

### G.   Claim VIII

Claim VIII alleges that trial counsel was ineffective by failing to move for a mistrial based on Fitzgerald's "cumulative" prosecutorial misconduct.  Doc. 67 at 113–28.  In Piper's view, this misconduct consists of Fitzgerald: (1) eliciting testimony about prison privileges despite a court order excluding such evidence; (2) suggesting during Hoadley's testimony that the jury was too weak to impose a death sentence; (3) violating Judge Eckrich's rulings by eliciting testimony about lewd behavior at Higgins Gulch and "falsely insinuating" that Poage was sexually assaulted; and (4) surprising trial counsel with two undisclosed experts, Dr. Pesce and Dr. Franks.  Piper acknowledges that Claim VIII is procedurally defaulted but argues that he can show cause under Martinez.[28]  Doc. 86 at 46; Doc. 67 at 114.

Piper cannot satisfy Martinez unless he establishes a substantial claim that trial counsel was ineffective by failing to move for a mistrial based on Fitzgerald's cumulative prosecutorial misconduct and that Kinney was himself ineffective for failing to raise this claim in the state habeas case.   A prisoner alleging prosecutorial misconduct must prove (1) the prosecutor's conduct was improper and (2) that the improper conduct was so prejudicial that the prisoner was denied a fair

---

[27]Piper argued in his petition that trial counsel was ineffective by failing to object when Fitzgerald asked Hoadley a leading question about Piper's oral sex comment at Higgins Gulch.  Doc. 67 at 112.  He did not mention this argument in his briefs, and such an objection would not have been successful in any event.  Doc. 86 at 43–45; Doc. 104 at 16.  Stonefield had objected to what he believed was a leading question earlier in Hoadley's direct.  Doc. 90-4 at 18.  Judge Eckrich overruled the objection, agreeing with Fitzgerald that Hoadley was a hostile witness.  Id.; see State v. Rodriguez, 952 N.W.2d 244, 255–56 (S.D. 2020) (stating that leading questions are appropriate when a party calls a hostile witness).

[28]Parts of Claim VIII read as though Piper is also raising a standalone prosecutorial misconduct claim.  Piper agrees that such a claim is procedurally defaulted, however, and that this default cannot be excused.  Doc. 116 at 112.

trial. State v. Hankins, 982 N.W.2d 21, 33 (S.D. 2022); see also United States v. Kopecky, 891 F.3d 340, 343 (8th Cir. 2018). "Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods." Hankins, 982 N.W.2d at 33 (cleaned up and citation omitted); see also United States v. Crawford, 523 F.3d 858, 861 (8th Cir. 2008) ("A prosecutor's comments are improper if they are likely to inflame bias in the jury and to result in a verdict based on something other than the evidence." (cleaned up and citation omitted)). A prosecutor's misconduct results in prejudice when it "so infects the trial with unfairness as to make the resulting convictions a denial of due process." Hankins, 982 N.W.2d at 33 (cleaned up and citation omitted); see also Kopecky, 891 F.3d at 343 ("The ultimate question is whether the prosecutor's comments, if improper, so infected the trial with unfairness as to make the resulting conviction a denial of due process." (cleaned up and citation omitted)). Courts in South Dakota will not grant a mistrial based on prosecutorial misconduct unless the conduct "in all probability . . . produced some effect upon the jury's verdict and is harmful to the [defendant's] substantial rights." State v. Mitchell, 491 N.W.2d 438, 441 (S.D. 1992) (cleaned up and citation omitted); State v. Hofman, 562 N.W.2d 898, 902 (S.D. 1997) (same). This Court reviews each instance of alleged prosecutorial misconduct and then considers whether trial counsel was ineffective by not moving for a mistrial based on the cumulative effect of the misconduct.

### 1.    Prison Privileges

Piper's prison privileges argument focuses on four questions Fitzgerald asked Penitentiary employee Brad Woodward. Doc. 67 at 116. The first such question was whether the prison restricted communications by inmates in Piper's unit, and Woodward replied that the inmates "can communicate with the guys in their section" but could not pass notes. Doc. 90-2 at 119. The

second was Fitzgerald returning to this issue after asking about inmates using a "fishing line"[29] to

pass messages:

> **Fitzgerald**: But they can talk amongst themselves in the same unit?
> **Woodward**: Right.
> **Fitzgerald**: All right.  Do you know if inmate Elijah Page and the defendant were housed in close proximity to each other for a period of time?
> **Woodward**: I believe they were for a period of time.
> **Fitzgerald**: Do you know how long?
> **Woodward**: I don't.

Id. at 119–20.  The third question was whether Piper had been allowed to attend college and

Woodward responding that Piper had taken some college courses.  Id. at 120.  The fourth was

whether inmates are allowed television and Woodward replying "Yes" before Van Norman could

object.  Id. at 121.  Piper claims that Fitzgerald violated Judge Eckrich's order by asking these

questions and that evidence of prison privileges was irrelevant and prejudicial.

Piper's position has several problems, the first being his argument that all four areas of

Fitzgerald's questions violated a court order.  That argument appears to be based on Judge

Eckrich's oral ruling during the July 18, 2011 pretrial hearing in chambers.  Stonefield argued

during the hearing that the State should not be allowed to mention the privileges available to

inmates serving life without parole.  Doc. 90 at 28–29.  He relied on a South Carolina case, State

v. Burkhart, 640 S.E.2d 450, 487–89 (S.C. 2007), holding that evidence of prison privileges in a

death penalty case was not relevant under state law.  Doc. 90 at 29.  Fitzgerald replied that some

discussion of prison life was necessary to show that Piper was not a model prisoner, having

received 75 disciplinary write ups while in the Penitentiary.  Id. at 30.  He gave the example of

Piper communicating with other inmates despite being in solitary confinement for much of the

---

[29]Woodward testified that a "fishing line" is a string of clothing or bedding inmates use to move notes or contraband through the unit.  Doc. 90-2 at 119.

day. Id. Judge Eckrich agreed that certain evidence about Piper's conditions of confinement could be admissible but doubted the relevance of particular privileges like cable television or reading subscriptions. Id. at 30–31. He said that he would read Burkhart and directed Fitzgerald to "stay away from any kind of specifics" for "the moment." Id. at 33–34. Judge Eckrich did not mention the prison privilege issue again until Fitzgerald asked about inmates having television. Doc. 90-2 at 121–22. Judge Eckrich then called a recess, told Fitzgerald he had "stepped over the line there," and ruled that prison privileges were irrelevant under Burkhart. Id. at 122. Just a few moments later, however, Judge Eckrich said that he "actually had [the prison-privilege issue] as a pending motion," although he knew he "did discuss it some, just to be clear."[30] Id. at 123.

Fitzgerald's question about Piper taking college courses did not violate any pretrial order; Piper's attorneys mentioned the college courses in opening statements, Doc. 90 at 114, and pointed to the taking of college courses as evidence that Piper had changed since the murder, Doc. 90-10 at 71, 88, 91. The questions about communication between prisoners included Fitzgerald's suggestion that Piper could speak with Page. But it is not clear that these violated Judge Eckrich's order either. After all, an inmate's ability to speak with other inmates was not mentioned during the July 18 hearing as a "privilege" Piper wanted to exclude. In fact, Fitzgerald cited Piper violating a rule about communication between inmates as an example of a disciplinary issue he wanted to present. Doc. 90 at 30–34. And Judge Eckrich said that some evidence of prison life would be admissible to show why Piper had received write ups. Id. The television question is the only instance of questioning appearing to violate Judge Eckrich's pretrial ruling expressing doubt

---

[30]Respondents concede that Fitzgerald, in asking about television privileges, "broached the limits of an order in limine." Doc. 75 at 12.

about television privileges being relevant and direction to Fitzgerald to "stay away from any kind of specifics" for the "moment." Id. at 34.

Piper however cannot show prejudice even though the television question appeared to violate Judge Eckrich's order. Any prejudicial effect from the television reference was minimal given that it occurred just once during a ten-day trial, Judge Eckrich sustained an objection to it,[31] and the jury heard a mountain of properly admitted evidence establishing the aggravating factors and horrendous circumstances of Poage's murder. See United States v. Thao, 76 F.4th 773, 779 (8th Cir. 2023) (explaining that any "misconduct must be put in context of the length of the trial" when determining the prejudicial effect of prosecutorial misconduct); id. (stating that courts should also consider the strength of the properly admitted evidence of guilt); United States v. Fenner, 600 F.3d 1014, 1022 (8th Cir. 2010) (finding no prejudice from the government's use of leading questions because the district court sustained objections to all but two of them and the government rephrased). These circumstances make it very unlikely that a brief reference to television in prison influenced the jury's verdict or caused it to reach a decision on an improper basis. Beyond that, the Supreme Court of South Dakota has suggested that the circumstances of prison life can be relevant in a death penalty case. See State v. Rhines, 548 N.W.2d 415, 453–54 (S.D. 1996). The petitioner in Rhines argued that the jury's question about whether prison conditions "might allow 'distraction from his punishment'" and whether he would be eligible for work release showed that the jury considered irrelevant or unfairly prejudicial matters. Id. The court rejected this argument, explaining that "[p]rison life was an appropriate topic for discussion when weighing the alternatives of life imprisonment and the death penalty." Id. at 454; see also State v. Holden, 488

---

[31] Judge Eckrich instructed the jurors at the beginning of trial that they must ignore any question to which he sustained an objection and should not try to guess what the answer might have been. Doc. 90 at 82.

S.E.2d 514, 528 (N.C. 1997) (approving argument that the defendant would enjoy various privileges if the jury sentenced him to life in prison rather than death). Although this Court does not read <u>Rhines</u> as allowing prosecutors to make a sentence of life in prison sound cushy, there does not appear to be any prohibition per se in South Dakota on evidence about prison conditions that apply to a person serving a life sentence. The fact that Fitzgerald mentioned television being available in prison on this record was not prejudicial, particularly given Judge Eckrich's sustaining of the objection to the question.

### 2.    Hoadley Letter

On direct examination, Fitzgerald asked Hoadley about a letter he had written to Piper a few years before the resentencing trial. Doc. 90-4 at 64. Piper claims that Fitzgerald tried to goad the jury into a death sentence in the following exchange:

> **Fitzgerald**: All right, and then in there you said - - writing this letter and you say that you believed that he was "trying to do any kind of manipulation you can to get off death row," is that right?
> ....
> **Hoadley**: I said, "Why should I believe that you aren't just realizing your own mortality and trying to do anything - - any kind of manipulation you can to get off death row?"
> **Fitzgerald**: And then what did you say?
> **Hoadley**: I said, "Honestly, if you don't ask for it they will never kill you anyway."
> **Fitzgerald**: All right. And what does the next sentence say?
> **Hoadley**: I said, "I do hope that you do get out of death row, and if you ever get a jury to do the sentencing you probably will." Actually I said, "You will."
> **Fitzgerald**: All right. So you don't believe a jury like this could impose the death sentence.

<u>Id.</u> at 69–70. Stonefield objected immediately and Judge Eckrich sustained the objection before Hoadley could respond. <u>Id.</u> at 70.

Fitzgerald's statement that Hoadley did not believe that "a jury like this could impose the death sentence" was improper. Hoadley's thoughts on the matter were irrelevant and Fitzgerald

had no legitimate reason for commenting on them. Fitzgerald's statement, however, cannot be deemed so prejudicial that it denied Piper due process. Like the television availability question, Fitzgerald's statement occurred once during a ten-day trial, Judge Eckrich sustained an objection to it, and the jury heard overwhelming evidence on the aggravating factors and the brutality of Poage's murder.

### 3.   Sexual Orientation and Alluding to Sexual Assault

Piper argues that Fitzgerald violated two court orders by eliciting testimony about the lewd behavior at Higgins Gulch. Doc. 67 at 119. This Court has already determined, however, that evidence of such behavior occurring at Higgins Gulch did not violate Judge Eckrich's orders and that Fitzgerald did not act improperly by discussing the evidence.

Piper also claims that Fitzgerald falsely insinuated that Poage was sexually assaulted through his questions of Dr. Habbe and Hoadley. Id. at 119–21. Fitzgerald asked Dr. Habbe how often he found male homicide victims missing their clothing, and Dr. Habbe responded that it occurred sometimes but was more common for female homicide victims to be found naked. Doc. 90 at 164. The Hoadley question Piper complains of occurred on redirect, after Hoadley testified on cross that no one did anything sexual to Poage:

> **Fitzgerald**: Okay. Now, if I recall, yesterday you said that when Briley Piper was forcing Chester Allan Poage to strip naked, and you were asked by the Defense whether there was any sexual act, you said, "Absolutely no." Do you remember that?
> **Hoadley**: Yep.
> **Fitzgerald**: All right. But that's exactly[32] the way you said it when the police talked to you back on April 25th of 2000, correct?
> **Hoadley**: No.
> **Fitzgerald**: Yeah. You said, "I don't know, nothing happened while I was around." That's what you told the police.
> **Hoadley**: And I was never not around, so - -

---

[32]Fitzgerald may have meant to say (or perhaps did and the court reporter missed it) "that's *not* exactly" the way Hoadley said it in 2000.

> **Fitzgerald**: Well, that's not what you told the police though, is it. Or would you like to see the transcript?
>
> **Hoadley**: You just read the transcript.
>
> **Fitzgerald**: I did; so that's what you said. "Did it happen earlier?" You said, "I don't know, nothing happened while I was around." That's what you told the police.
>
> **Hoadley**: And there wasn't a point where I wasn't around so therefore nothing happened.
>
> **Fitzgerald**: So that's how you remember it now 11 years later.
>
> **Hoadley**: And then too.
>
> **Fitzgerald**: Oh, but that's not what you said.

Doc. 90-5 at 44–45. Fitzgerald had a good-faith basis for the questions he posed to Dr. Habbe and Hoadley. There was evidence that Piper and his accomplices forced Poage to strip, after which Piper asked what Poage would say if requested to perform oral sex on the trio and Page taunted Poage by suggesting they bring Russell there to rape Poage. Judge Eckrich allowed Fitzgerald to treat Hoadley as a hostile witness, and while Fitzgerald was making too much out of a slightly different answer Hoadley gave eleven years prior, Fitzgerald probing a perceived inconsistency in Hoadley's account of one aspect of circumstances surrounding the murder was not prosecutorial misconduct and had a good-faith basis. See United States v. Mosquera, 886 F.3d 1032, 1047 (11th Cir. 2018) ("In at least some circumstances, a prosecutor must have a good-faith basis for questions asked during trial."); see also 75 Am. Jur. 2d Trial § 410 (Updated Feb. 2024) ("A lawyer must not pursue a line of questioning when there is no reasonable expectation of being able to prove the matters to which the line refers, so that a prosecutor who asks questions that imply the existence of a prejudicial fact must be prepared to prove that fact. Prosecutorial misconduct may occur when a prosecutor asks a question for which the prosecutor has no reason to believe there is a foundation of fact or law." (footnotes omitted)).

### 4.   State's Experts

Piper argues that Fitzgerald "surprised" his trial counsel by not notifying them that Dr. Pesce and Dr. Franks would be testifying as experts and not providing their curriculum vitaes. Doc. 67 at 114–16. During the January 28, 2011 hearing, Judge Eckrich had ordered the State to "identify within your witness list who your expert is going to be." Doc. 88-1 at 85. On May 26, 2011, Fitzgerald filed an amended witness list naming, among other witnesses, "Dr. Ron Franks, Psychiatrist, University of Southern Alabama," and "Dr. Ulysses Peese, [sic] S.D. Division of Mental Health." Doc. 121-9 at 208–09. Fitzgerald failed to comply with Judge Eckrich's order by not specifically identifying Dr. Franks and Dr. Pesce as expert witnesses. Piper's attorneys were not surprised that these witnesses were testifying as experts, however. They received Dr. Pesce's records for treatment of Piper in March 2011, id. at 487–500; Doc. 89 at 17–19, and filed pretrial motions discussing the possibility that Dr. Pesce would provide expert testimony, Doc. 121-9 at 307–09, 370–75. Dr. Franks, whom Fitzgerald identified as a psychiatrist in his witness list, testified as an expert for the State in Hoadley's trial. Doc. 89 at 21–22; Doc. 121-8 at 170.

Beyond the experts not being a surprise to his attorneys, Piper also cannot show any prejudice from Fitzgerald's supposed misconduct. Judge Eckrich held a preliminary hearing with Dr. Pesce because of Van Norman's complaints about a lack of notice and an inability to speak with the doctor before trial. Dr. Pesce described his credentials and proposed testimony at the hearing, and Van Norman was allowed to question him on these topics. Doc. 90-2 at 12–50. When asked what he would have done differently if he had received access to Dr. Pesce earlier, Van Norman simply said that he would have "talked to him informally the length I could" and that this discussion would have been more thorough than the discussion during the preliminary hearing.[33]

---

[33] Judge Eckrich did not impose any time or topic limits when Van Norman questioned Dr. Pesce during the preliminary hearing. Doc. 90-2 at 12–50.

Id. at 50.  Judge Eckrich denied Piper's motion to preclude Dr. Pesce from testifying but ruled that Dr. Pesce should not stray too far afield from the topics discussed in his treatment records for Piper.  Id. at 50–51.  On Judge Eckrich's order, Van Norman was also allowed to interview Dr. Franks off the record before he testified.  Doc. 90-3 at 9, 101–02.  Piper has made no attempt to explain how Fitzgerald's failure to comply with Judge Eckrich's orders on expert witnesses made the trial so unfair that his conviction amounted to a denial of due process.

**5.   Ineffective Assistance and Cumulative Effect of Alleged Prosecutorial Misconduct**

Piper argues that he was prejudiced by the cumulative effect of Fitzgerald's misconduct and that trial counsel were ineffective by failing to move for a mistrial based on the sum of Fitzgerald's misdeeds. This is not a substantial claim of ineffective assistance.  Much of the conduct Piper complains of—Fitzgerald offering evidence of lewd behavior at Higgins Gulch, questioning Woodward about college courses and communication in prison, and asking Dr. Habbe and Hoadley the questions discussed in section III.G.3 of this opinion—was not improper at all. Courts only consider "the cumulative effect of the improprieties," not the cumulative effect of *alleged* improprieties.  United States v. Milk, 447 F.3d 593, 602 (8th Cir. 2006).   And while Fitzgerald's comment on the Hoadley letter and the television question were improper, that does not mean Piper would have been successful in moving for a mistrial based on the cumulative effect of Fitzgerald's misconduct.  See Donnelly v. DeChristoforo, 416 U.S. 637, 647–48 (1974) (distinguishing between "ordinary trial error of a prosecutor" and the "sort of egregious misconduct" that amounts "to a denial of constitutional due process"); Hankins, 982 N.W.2d at 34 (explaining that due process guarantees the defendant the right to a fair trial, not an "error-free" one (cleaned up and citation omitted)).  Instead, the question is whether Fitzgerald's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

96

Donnelly, 416 U.S. at 643; Hankins, 982 N.W.2d at 33 (same); State v. Smith, 599 N.W.2d 344, 355 (S.D. 1999) (same).

No reasonable jurist would find that the cumulative effect of Fitzgerald's misconduct rose to this level. Judge Eckrich minimized any prejudice from the television question and comment on the Hoadley letter by sustaining objections to them and instructing the jury that "[o]ffered testimony . . . not received . . . should not be considered." Doc. 90-10 at 27; Doc. 90 at 82. If any prejudice remained, it was dwarfed by the properly admitted evidence. The State established the aggravating factors and presented extensive evidence of Poage's gruesome murder. After all, near the start of this brutality, a combat-boot clad Piper kicked the defenseless Poage in the face so hard that he knocked him unconscious. Piper and his accomplices then forced Poage to drink hydrochloric acid mixed with beer and discussed in Poage's presence various ways of killing him. They drove Poage to a remote location where they made him strip in the below-freezing night and tried burying him in the snow and drowning him in an icy creek. This didn't kill Poage, so Piper stabbed him in the head with a knife and kicked him with his combat boots. Piper stood by while Page and Hoadley similarly stabbed and beat Poage. Poage pleaded for mercy throughout the attack, but Piper and his accomplices ignored and taunted him. Given the "ordinary" nature of Fitzgerald's misconduct and the overwhelming evidence against Piper, trial counsel and Kinney were not ineffective in failing to argue for a mistrial based on cumulative prosecutorial misconduct. Respondents are entitled to summary judgment on Claim VIII.

### H.    Claim IX: Tom Curtis

Claim IX addresses the shortcoming in disclosure and use in cross-examination of Curtis's criminal history. Piper alleges in Claims IX.A–IX.D that the State violated his due process rights by (1) failing to disclose that Curtis was awaiting sentencing on rape convictions in Utah when he

testified at Piper's resentencing trial in July 2011, and (2) failing to correct Curtis's omission of the rape convictions when describing his criminal history to the jury. Doc. 67 at 128–35; see Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that the State violates due process when it suppresses evidence favorable to the defense and material to the defendant's guilt or punishment); Napue v. Illinois, 360 U.S. 264, 265, 269 (1959) (holding that the State violated due process when it failed to correct testimony it knew to be false). Claim IX.E alleges that trial counsel were ineffective by failing to adequately investigate Curtis's background and failing to request Curtis's updated criminal history. Doc. 67 at 135–37.

Piper raised a version of these arguments in his state habeas case. At the state habeas hearing, Van Norman testified that his paralegal had checked Curtis's record after Piper's resentencing trial and discovered that Curtis had been convicted of several rape charges concurrent with his cocaine distribution charges.[34]  Doc. 90-11 at 50, 52, 101. During Piper's resentencing trial, Curtis admitted to being convicted by a jury (wrongly, according to Curtis) on cocaine distribution charges but never mentioned the rape convictions. Doc. 90-3 at 36–39. Van Norman testified that Fitzgerald had provided a criminal history for Curtis at some point before Piper's resentencing but that this history did not include the Utah convictions. Doc. 90-11 at 49, 101. Van Norman acknowledged that he could have received the criminal history before Curtis's convictions for rape and cocaine distribution occurred and that he did not request an updated criminal history for Curtis right before trial. Id. at 49–50, 54, 94, 217. On appeal of Piper's habeas case, Kolbeck argued that the State had violated Piper's due process rights by failing to provide an updated

---

[34]A 2013 opinion from the Utah Court of Appeals, over two years after Piper's resentencing trial, shows that a jury convicted Curtis of four counts of giving a minor female victim cocaine and four counts of raping her. State v. Curtis, 317 P.3d 968, 971–72 (Utah Ct. App. 2013). At trial, Curtis testified that a jury found him guilty of eight charges, but they were all drug distribution charges. Doc. 90-3 at 37–39.

criminal history that included Curtis's rape convictions and by permitting Curtis to lie under oath about his Utah convictions.  Doc. 2-1 at 135–39.  He also asserted that trial counsel was ineffective by failing to adequately investigate Curtis's criminal background.  Id.  Although Kolbeck's appellate brief cited Van Norman's testimony about the rape convictions, it appears that Piper's state habeas attorneys never offered a judgment or other document establishing that Curtis had, in fact, been convicted of rape in Utah.  The State's appellate brief argued that Piper had not identified impeaching convictions that trial counsel had failed to discover, and that Piper was simply speculating that Curtis had convictions in Utah "beyond those that were known by his counsel and used as impeachment."  State's Appeal Brief, 2018 WL 10152749, at *67–69 (July 10, 2018).

The Supreme Court of South Dakota rejected both Piper's ineffective assistance claim and his claim that the State violated his due process rights by failing to provide an updated criminal history for Curtis.  Piper IV, 936 N.W.2d at 815.  The court declined to find prejudice on the ineffective assistance claim, concluding that Piper had failed to show that an investigation of Curtis would have "yielded meaningful impeachment information."  Id.  And it ruled that Piper had defaulted his due process claim by not raising it on direct appeal.[35]  Id. at 815 nn.21 & 22.  The

---

[35]The Supreme Court of South Dakota seemed to address Piper's due process argument twice, in footnotes 21 and 22.  Footnote 21 addressed procedural default and the issue of whether Curtis's criminal history was material:

> Piper also now alleges that the State's failure to provide Curtis'
> criminal history report is, itself, a free-standing due process claim
> that is cognizable in this habeas case despite the fact it was not raised
> on direct review.  We disagree, but even if the claim were not
> precluded, we are not convinced on this record that Piper could
> sustain his burden to demonstrate the omitted information was
> material.

Piper IV, 936 N.W.2d at 815 n.21.  Footnote 22 addressed procedural default and Piper's claim that the State should have provided his attorneys with Curtis's updated criminal history:

> Piper further argues that the State violated his due process rights
> when it failed to provide his resentencing counsel with Curtis'
> updated criminal history.  Because Piper did not raise this issue on

court referred generally to Curtis's criminal history and did not mention his rape convictions in either ruling. Id.

Respondents move for summary judgment on Claims IX.A–IX.D and IX.E, arguing that res judicata bars Piper's due process claim and that the Supreme Court of South Dakota's ruling on the ineffective assistance claim was not contrary to or an unreasonable application of federal law. Respondents assert that Piper failed to offer evidence of Curtis's rape conviction in his state habeas case and that he cannot do so now. Doc. 75 at 14–15; Doc. 97 at 31. Piper responds that the Supreme Court of South Dakota's rejection of his ineffective assistance claim involved an unreasonable determination of fact because it ignored Van Norman's testimony at the habeas hearing about Curtis's rape convictions.[36] Doc. 67 at 136. He also contends that he can show cause to excuse any procedural default of his due process claims. Id.; Doc. 86 at 47.

### 1.    Claims IX.A–IX.D

The Supreme Court of South Dakota found that Piper procedurally defaulted the due process claims he now brings in Claims IX.A–IX.D by failing to raise them on direct appeal. Piper IV, 936 N.W.2d at 815 nn.21 & 22. Piper argues that the State's failure to disclose Curtis's updated criminal history provides cause to excuse this default. Doc. 67 at 136; Doc. 86 at 47. Piper is correct that a prosecutor's suppression of evidence may sometimes constitute cause to excuse procedural default of a Brady or Napue claim like he tries to raise here. See Banks v. Dretke, 540

---

appeal in Piper III, he is foreclosed from bringing this claim now as a free-standing claim.

Id. at 815 n.22.

[36]Piper's initial federal habeas petition alleged that state habeas counsel was ineffective by failing to prove that Curtis had lied when testifying about his Utah convictions. Doc. 1-1 at 126. Piper's amended petition drops this claim, contending instead that Van Norman's testimony about the rape charge could establish that a proper investigation would have produced meaningful impeachment material. Doc. 67 at 136.

U.S. 668, 691–92 (2004); Dansby v. Payne, 47 F.4th 647, 657, 659–60 (8th Cir. 2022). This rule only applies, however, when the suppression of evidence "is the reason for the petitioner's default." Dansby, 47 F.4th at 659. "A petitioner has not shown cause if he had evidentiary support for his claim before his default, or if the evidence was reasonably available through other means." Id. (cleaned up and citations omitted).

Piper has not shown cause for defaulting this issue. He has not cited any evidence that the State knew of Curtis's rape convictions or any case suggesting that the State had a constitutional duty to discover and divulge these out-of-state convictions. See United States v. Jones, 34 F.3d 596, 599 (8th Cir. 1994) ("[T]he prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find impeaching evidence." (cleaned up and citations omitted)). Nor has Piper established that the State suppressed Curtis's convictions. Rather, Piper through trial counsel learned of Curtis's rape convictions shortly after the trial when Van Norman directed his paralegal to check Curtis's record and Van Norman's testimony suggested that the Utah convictions were quite recent.[37] Doc. 90-11 at 50, 52. The paralegal's discovery of Curtis's rape convictions suggests that when the convictions occurred, they were available to Piper's attorneys.[38]

---

[37] Van Norman testified that: "Mr. Fitzgerald's office provided a rap sheet. It didn't include, as I recall, the Utah convictions. Keep in mind, those were arrests at the time, I think, we were preparing for trial. I don't know the timeline on when he was convicted relative to when we even started jury selection, but he got convicted shortly before he testified at the sentencing trial." Doc. 90-11 at 49.

[38] Piper does not point to anything in the record about being unable to discover Curtis's criminal record. This Court's independent review of the record shows the following. In January 2011, Piper moved to have the State produce the criminal histories of all of its witnesses by a month before trial. Doc. 121-6 at 50–51. The motion said that Piper lacked the ability to find this information on his own. Id. At a January 2011 motions hearing, the State told Judge Eckrich that it could not have the FBI run the criminal histories at the defense's request, but that the defense could supply a court order to the FBI and get the criminal histories that way. Doc. 121-8 at 361–62. Judge Eckrich said that he would grant Piper's motion and the State said it would provide Piper with the appropriate address. Id. at 362. At a May 6, 2011 hearing, Fitzgerald again said that the FBI would not allow the prosecution to request criminal histories on the defense's behalf but that there

See Jones, 34 F.3d at 600 (finding that an attorney's discovery of prosecution witness's out-of-state convictions "suggests" these convictions were "also . . . accessible to" the defendant's attorneys). This is a serious problem for Piper as "[l]ack of production by state officials is not cause excusing procedural default if the information the officials failed to produce is reasonably available through other means." Zeitvogel v. Delo, 84 F.3d 276, 279–80 (8th Cir. 1996); see also Jones, 34 F.3d at 600 ("When information is readily available to the defendant, it is not Brady material, and the prosecution does not violate Brady by not discovering and disclosing the

---

was a mechanism by which the defense could request a court order and give that to the FBI. Doc. 121-9 at 104–05. Van Norman said he was aware of the State's change in procedure and that he would submit a proposed order to the Court. Id. at 105. On May 15, 2011, Van Norman emailed Judge Eckrich asking that he execute a proposed order for criminal histories, saying that the defense needed a copy to send to the FBI. Doc. 121-8 at 648. Judge Eckrich wrote back that he had no proposed order and told Van Norman to get him one. Id. Judge Eckrich filed an order on May 20, 2011, requesting that the FBI produce to the court criminal record checks for the State's witnesses, including Curtis. Doc. 121-9 at 71. On May 23, 2011, Van Norman's paralegal emailed Judge Eckrich asking whether a copy of the signed order had been sent to the FBI or whether she should send it herself. Id. at 127. Judge Eckrich said the paralegal needed to send it. Id. At a June 17, 2011 hearing, Judge Eckrich said he had not received any criminal histories yet and Van Norman said he would follow up on it. Id. at 337. On June 29, 2011, Van Norman sent a letter to Judge Eckrich saying that his efforts to secure the criminal rap sheets of the state's witnesses through the FBI had been fruitless and that the defense would be constitutionally deficient without these criminal histories. Id. at 408–09. That same day, Judge Eckrich sent an email to Fitzgerald and Van Norman saying that he could not explain why the FBI had not supplied the criminal rap sheets and directing Fitzgerald to "produce and deliver to Mr. Van Norman a Triple I for each witness you intend to call at trial." Id. at 407. On July 1, 2011, Judge Eckrich entered an order requiring Fitzgerald to produce by the end of that day the "criminal records (NCIC or Triple I reports)" for all State witnesses. Id. at 416–17. Fitzgerald responded that same day, objecting to the order and attaching a memo from the FBI supposedly saying that prosecutors are not to run criminal histories for defense counsel. Id. at 422–27. Fitzgerald said that the state would nevertheless attempt to comply with the order. Id. at 422. On July 5, 2011, the State filed a "Supplementary Discovery Response" explaining that it had provided the "Triple I/History" for Tom Curtis and other State witnesses to Van Norman. Id. at 473. The record does not appear to contain Curtis's "Triple I," so this Court does not know when the State ran Curtis's Triple I. This Court did not find any complaints about Piper's counsel lacking a criminal history for Curtis after this July 5, 2011 disclosure. Van Norman's billing records show that his paralegal contacted the clerk for Daggett County, Utah, on August 16, 2011, about Curtis. Doc. 121-10 at 282. She contacted the "Utah Court" about Curtis on August 29, 2011. Id. at 283. Daggett County is the County where Curtis was convicted of rape. Doc. 67 ¶ 352.

information."); id. at 559–600 (finding that a Missouri prosecutor did not violate Brady by failing to disclose the Illinois convictions of one of its witnesses where prosecutor had checked the witness's Missouri record and did not know of the Illinois convictions, and the Illinois convictions were accessible and part of the public record); Johns v. Bowersox, 203 F.3d 538, 545 (8th Cir. 2000) ("There is no suppression of evidence if the defendant could have learned of the information through reasonable diligence." (cleaned up and citation omitted)).

And even if Piper could show that the State suppressed the convictions, he would still need to show that this was "the reason for [his] default." Dansby, 47 F.4th at 659. Van Norman testified that he learned of the rape convictions "several weeks" after trial, Doc. 90-11 at 52, and that he told Miller about this information and urged him to raise the issue on appeal, id. at 77. The thorny question here is whether claims involving nondisclosure of Curtis's rape convictions could have been raised on direct appeal or belonged among claims in the state habeas case. Testimony of Van Norman and Miller illustrate this debate. Van Norman's principal concern upon learning of Curtis's undisclosed rape convictions was the possibility that Curtis was receiving consideration from Utah for testifying at Piper's resentencing trial. Id. at 44–57. When asked what issues he believed Miller should have raised on appeal, Van Norman mentioned Curtis, testifying that he

> urged Mr. Miller to ask for - - the Supreme Court, the State Supreme Court, to remand the case for exploration of that information similar to what had happened with the Toby Gibbens [sic][39] issue for Briley on his first appeal to the Supreme Court after Judge Johnson imposed the death penalty. It was a valid issue, especially after I received the information I did via my paralegal that he had rape convictions. He lied about it, obviously, or omitted during his testimony. That should have been done. It was not done despite our urging."

---

[39]The correct spelling is "Tobe Givens."

<u>Id.</u> at 77.  The Tobe Givens issue Van Norman referenced involved Piper's claim in his first appeal,
after Judge Johnson had sentenced Piper to death, that Fitzgerald had an undisclosed sentencing
agreement with state witness Toby Givens.  Doc. 121-3 at 261–62; <u>Piper I</u>, 709 N.W.2d at 793–
94.  The Supreme Court of South Dakota had entered a limited remand of Piper's first appeal in
2002, directing the trial judge to hold a hearing on whether there was an undisclosed agreement
with Givens and whether Piper's death sentence was grossly disproportionate to Hoadley's life
sentence.  <u>Piper I</u>, 709 N.W.2d at 793; Doc. 121-3 at 261–62.  A bit later in the habeas hearing,
Van Norman testified: "There were other issues that should have been raised, in my opinion, and
it's contingent on whether or not there would have been further information on a remand.  And so
if the remand would have been denied had the request been made, then we would not have had a
record for the two issues, the Crowley and the Curtis issues, to be developed on appeal."  Doc. 90-
11 at 81.  On cross-examination, the State asked Van Norman what evidence he had that Curtis
received undisclosed consideration for his testimony and what steps Van Norman took after trial
to follow up on this.  <u>Id.</u> at 102.  Van Norman testified "What I followed up was the convictions,
and I talked to Mr. Miller about the possibility of a remand to get this straight."  <u>Id.</u>  He said that
he "handed it off to Mr. Miller at that point with specific disclosures."  <u>Id.</u>

Miller, however, testified that the "gist" of the complaint he received from Van Norman
was that Curtis had a deal to receive a more lenient sentence in Utah for testifying at Piper's trial,
although Miller acknowledged that "there may have been other things with regards to Mr. Curtis."
<u>Id.</u> at 217.  Miller went on to explain that "the record does not reflect that there was any undisclosed
deal or promises of leniency.  And again, the record could be developed by way of a habeas
proceeding, and so it was a bad appeal issue because the record wasn't sufficient.  It was a potential
habeas issue, and so I left it alone."  <u>Id.</u> at 217–18.  Miller knew of Curtis's rape convictions and

perhaps could have sought some limited remand to the trial court to create a record for pursuit of these due process claims on direct appeal to the Supreme Court of South Dakota. Some state appellate courts may view the matter like Miller did: an issue better developed in a subsequent state habeas case. After all, South Dakota law provides that the "original pleadings, papers, offered exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases." SDCL § 15-26A-47; see also State v. Rederth, 376 N.W.2d 579, 580 (S.D. 1985) ("Appeals are decided entirely on the record received from the trial court. This court cannot take new evidence on appeal, or take judicial notice of facts subject to reasonable dispute." (cleaned up and citation omitted)); Toben v. Jeske, 718 N.W.2d 32, 35–36 (S.D. 2006) (declining to consider affidavit attached to appellate brief because it was not part of the settled record). However, the Supreme Court of South Dakota had previously dealt with a similar Brady issue—the Tobe Givens plea deal—in Piper's prior appeal through a remand to develop the record before direct appeal. Piper I, 709 N.W.2d at 793 (discussing how the court had remanded Piper's case for a determination of whether there had been an undisclosed agreement between the State and Tobe Givens); see also State v. Birdshead, 871 N.W.2d 62, 79 (S.D. 2015) (remanding case so that trial court could include alleged Brady material in the settled record where trial court said it would include material in the record but failed to do so).

The court, albeit in a footnote and with no analysis, deemed Piper foreclosed from bringing this as a freestanding claim in his state habeas case because it was not raised on direct appeal. Piper IV, 936 N.W.2d at 815 n.22. Miller's decision not to pursue these claims—rather than the State's suppression of evidence—caused what the Supreme Court of South Dakota deemed to be Piper's procedural default. See Dansby, 47 F.4th at 559–61 (holding that state's alleged suppression of information about prosecution witness did not provide cause to excuse procedural

default of Brady/Napue claims where the petitioner could have learned of information by interviewing witness before trial and could have filed a petition in state court when witness supposedly recanted his testimony several years after the trial); Sullivan v. United States, 587 F. App'x 935, 944 (6th Cir. 2014) ("Sullivan has procedurally defaulted on any Brady claims concerning these documents because his appellate counsel, who had these documents, did not raise these claims on direct appeal."); Hammonds v. Allen, 849 F. Supp. 2d 1262, 1294 (M.D. Ala. 2012) (holding that State's suppression of evidence did not provide cause to excuse procedural default of Brady claim where petitioner knew of evidence before filing appeal).  This result seems harsh because Miller's decision to await a habeas case to develop the record for such a Brady claim was not irrational.  See, e.g., Welch v. Lund, 616 F.3d 756, 758 (8th Cir. 2010) (stating that a "state prisoner is not required to pursue extraordinary remedies outside of the standard review process" (cleaned up and citation omitted)).   Respondents nonetheless are entitled to summary judgment on the due process claims Piper raises in Claim IX because of the unique South Dakota procedure for remands to develop Brady claims.

### 2.    Claim IX.E

This Court denies Respondents' motion for summary judgment on the merits of Claim IX.E—ineffective assistance of counsel by failing to investigate Curtis's criminal history—without prejudice to Respondents renewing the motion in the next round of briefing.  See Doc. 67 at 128–29.

### I.    Claim X: Inconsistent Arguments

Claim X alleges that Judge Eckrich violated Piper's rights under the due process clause and Eighth Amendment by refusing to admit supposedly inconsistent arguments Fitzgerald made in Page's trial.  Piper raised this claim in his state habeas case, but the Supreme Court of South

Dakota rejected it.  The court held that res judicata barred the claim because Piper failed to raise it on direct appeal and, alternatively, that the claim failed on the merits.  Piper IV, 936 N.W.2d at 809–10.  Respondents move for summary judgment on Claim X, arguing that res judicata bars it and that the Supreme Court of South Dakota's merits decision was not contrary to or an unreasonable application of federal law.  Doc. 75 at 16.  Piper responds that Miller was ineffective in failing to raise the inconsistent argument claim on direct appeal and that this ineffectiveness provides cause to excuse any procedural default.

Respondents are entitled to summary judgment on Claim X.  Again, ineffective assistance of appellate counsel constitutes cause only if the prisoner either *properly* exhausted the ineffective assistance of appellate counsel claim in state court or can show cause and prejudice to excuse procedural default of the claim.  Edwards, 529 U.S. at 453 (explaining that a claim of appellate counsel ineffectiveness was still procedurally defaulted where the petitioner presented the claim in state court "but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it").  Piper argues that he exhausted his claim that Miller was ineffective by raising it in his reply brief in his state habeas appeal.  Doc. 67 at 145; Doc. 86 at 47.  Not so.

The closest Piper came to raising the issue was a heading in his reply brief stating that "Appellate counsel was ineffective by not appealing and preserving all issues for appeal."  Piper's Reply Brief, 2018 WL 10152750, at *23 (July 10, 2018); Doc. 67 at 145 (citing to this statement as evidence that Piper exhausted his claim that Miller was ineffective).  The text following this heading, however, focused mainly on whether Piper's attorneys should have raised the guilty plea issue earlier; Piper did not specifically argue that Miller was ineffective by failing to raise the inconsistent argument issue on direct appeal.  See Piper's Reply Brief, 2018 WL 10152750, at *23–25.  A general heading like the one in Piper's reply brief is not nearly specific enough on its

own to show that Piper properly presented his claim that Miller was ineffective by failing to raise the inconsistent argument issue. See Kelley v. Sec'y for the Dep't of Corr., 377 F.3d 1317, 1344 (11th Cir. 2004) ("[H]abeas petitioners cannot preserve otherwise unexhausted, specific claims of ineffective assistance merely by arguing that their lawyers were ineffective in a general and unspecified way."); Ellis v. Raemisch, 872 F.3d 1064, 1091 (10th Cir. 2017) ("[I]t is not enough that a prisoner has generally presented a Strickland claim of ineffective assistance to the appropriate state court; the prisoner must have presented—and thereby exhausted—the substance of the exact ground of ineffectiveness (i.e., deficient attorney conduct) upon which the prisoner later seeks habeas relief in federal court."); Flieger v. Delo, 16 F.3d 878, 885 (8th Cir. 1994) ("A habeas petitioner who asserts only broadly in his state petition for relief that his counsel has been ineffective has not immunized his federal habeas claim's specific variations from the effects of the state's procedural requirements.  Nor has a petitioner who presents to the state courts a broad claim of ineffectiveness as well as some specific ineffectiveness claims properly presented all conceivable specific variations for purposes of federal habeas review."  (internal citations omitted)).  And even if Piper had been more specific, the Supreme Court of South Dakota does not consider arguments raised for the first time in a reply brief.  Mach v. Connors, 979 N.W.2d 161, 173 (S.D. 2022); State v. Roedder, 923 N.W.2d 537, 545 (S.D. 2019); see also Atwater v. Crosby, 451 F.3d 799, 810 (11th Cir. 2006) (holding that petitioner procedurally defaulted habeas claim he raised for the first time in a reply brief before the state supreme court where the state's rules deemed arguments raised for the first time in a reply brief waived).

### J.    Claim XI: Guilty Pleas

Claim XI alleges that Piper's guilty pleas were not knowing, voluntary, and intelligent because the state trial judge incorrectly told him that all twelve jurors would need to agree before

he could receive a life sentence and that pleading guilty would require him to be sentenced by the court rather than a jury. Doc. 67 at 146.   The Supreme Court of South Dakota rejected this claim when Piper raised it in his state habeas case, Doc. 2-1 at 90–100, finding that res judicata applied because Piper failed to raise the claim when appealing his initial death sentence and in his first habeas proceeding, and that the claim would fail on the merits "[e]ven if we were inclined to review" it, Piper IV, 936 N.W.2d at 803–07.

Respondents move for summary judgment on Claim XI, arguing that res judicata bars the claim and, alternatively, that the Supreme Court of South Dakota's decision was not contrary to or an unreasonable application of federal law. Docs. 77, 78.   Piper argues that the Supreme Court of South Dakota's res judicata ruling does not bar Claim XI because it was not adequate to support the judgment or independent of federal law.

>    1.    **Adequacy**

Some background on the guilty plea claim aids understanding both Piper's adequacy argument and the Supreme Court of South Dakota's application of res judicata.   The Supreme Court of South Dakota held that Piper first defaulted the guilty plea claim when he failed to raise it in his initial appeal of his death sentence.   Piper IV, 936 N.W.2d at 805.   As the court found, Piper's initial appeal in Piper I made no claim that his guilty plea was not knowing, voluntary, or intelligent.   Instead, he challenged the constitutionality of South Dakota's capital punishment statutes.   He argued that the statutes violated the Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), by depriving him of his right to be sentenced by a jury after pleading guilty. Piper I, 709 N.W.2d at 803;[40] Piper I Brief, 2003 WL 24309259, at *92–95 (May 22, 2003); see

---

[40]As a reminder, Piper I, decided in 2006 was Piper's initial appeal of his death sentence; Piper II, decided in 2009, was Piper's initial state habeas case; Piper III, decided in 2014, was Piper's direct

Ring, 536 U.S. at 588–89, 608–09 (holding that Arizona's death penalty scheme violated the Sixth Amendment by requiring that a judge—rather than a jury—determine the existence of aggravating factors after the defendant's conviction). Piper claimed that the only appropriate remedy for his unconstitutional sentence was to reduce it to one of life imprisonment. Piper I Brief, 2003 WL 24309259, at *97; Piper I Reply Brief, 2004 WL 3769922, at *13 (Feb. 18, 2004). The Supreme Court of South Dakota rejected Piper's challenge to the statutes, finding that South Dakota law did not prevent a defendant who pleads guilty from exercising his right to a jury at the sentencing phase and that Piper had waived his right to a jury sentence by pleading guilty and "expressly declining the circuit court's offer to empanel a jury to consider his sentence." Piper I, 709 N.W.2d at 803–10.

The Supreme Court of South Dakota held that Piper defaulted his guilty plea claim a second time by failing to raise it in Piper II, his initial state habeas case. Piper IV, 936 N.W.2d at 805. As with his initial appeal, Piper's first state habeas case did not challenge his guilty plea. See Piper II Brief, 2008 WL 6722279 (Oct. 7, 2008); Piper II Reply Brief, 2009 WL 2598204 (Jan. 22, 2009); Piper IV, 936 N.W.2d at 801. Rather, Piper focused solely on his death sentence, arguing that it should be reduced to life in prison because the trial judge's misstatement of the juror unanimity requirement rendered his waiver of the right to a jury sentencing invalid. Piper II Brief, 2008 WL 6722279; Piper IV, 936 N.W.2d at 801–02; Piper II, 771 N.W.2d at 356, 360. The Supreme Court of South Dakota agreed in part with Piper, finding that he did not validly waive his right to have a jury decide whether to impose the death penalty because the state trial judge did not make clear that he would receive a life sentence if even one juror voted against the death

---

appeal after his jury resentencing; and Piper IV, decided in 2019, was Piper's second state habeas case.

penalty.  Piper II, 771 N.W.2d at 358–60.  Rather than converting Piper's sentence to one of life imprisonment, however, the court remanded Piper's case for resentencing by a jury.  Id. at 360.

On remand, Piper, now represented by Van Norman and Stonefield, moved for the first time to withdraw his guilty plea.  Doc. 2 at 288, 339–49, 367–80.  He claimed that he should be allowed to withdraw his guilty pleas under SDCL § 23A-27-11[41] for several reasons, including that he was never informed that he did not have to plead guilty to receive a court sentencing.  Doc. 2 at 339–48.  Judge Eckrich denied Piper's motion to withdraw his guilty plea on the merits.  Id. at 381–88.  Piper appealed this denial in Piper III but the Supreme Court of South Dakota affirmed, finding that Judge Eckrich had no jurisdiction to consider the merits of Piper's motion because it was beyond the scope of the limited remand in Piper II.  Piper III, 842 N.W.2d at 343–44.

Piper raised the guilty plea claim in his second state habeas case, arguing that his plea was not knowing and voluntary because the trial court misadvised him on the unanimity requirement and suggested that the guilt and sentencing forums had to be the same.  Doc. 85-1 at 32–34.  At the state habeas hearing, Miller testified that he and Piper agreed not to challenge the guilty plea in Piper II, Piper's first habeas case.  Doc. 90-11 at 198, 203.  Miller explained that he told Piper that it would be premature to challenge his guilty plea, that he did not have the experience to accurately advise him on the pros and cons of withdrawing his guilty plea, and that South Dakota's rules of criminal procedure would give him an "absolute right" to move to withdraw his guilty plea if he succeeded in his habeas petition.  Id. at 199–202.  Miller recognized, however, that Piper could have challenged his guilty plea in his first habeas case.  Id. at 204.

---

[41] Section 23A-27-11 provides: "A motion to withdraw a plea of guilty or nolo contendere may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice a court after sentence may set aside a judgment of conviction and permit the defendant to withdraw his plea."

The Supreme Court of South Dakota applied res judicata to the guilty plea claim in <u>Piper IV</u> because Piper failed to raise the claim on direct appeal in <u>Piper I</u> or in his first habeas case in <u>Piper II</u>. <u>Piper IV</u>, 936 N.W.2d at 805. It rejected Piper's argument that § 23A-27-11 allowed him to "choose, unilaterally and for strategic reasons, when to advance his challenge to the guilty pleas." <u>Piper IV</u>, 936 N.W.2d at 806. The court found nothing in the text of the statute that "purport[s] to displace other limitations that might restrict the availability of motions to withdraw guilty pleas, such as those imposed by basic rules of claim preclusion and procedural default in post-conviction cases." <u>Id.</u>

This Court has already found that, as a general matter, South Dakota's res judicata rule is firmly established and regularly followed in state habeas cases. Piper argues, however, that the court's application of res judicata to the guilty plea claim was too novel to constitute an adequate state procedural ground barring review. Relying on <u>Cruz v. Arizona</u>, 598 U.S. 17 (2023), he argues that the res judicata ruling was unforeseeable because the Supreme Court of South Dakota had never had the occasion to apply the doctrine to a motion to withdraw a guilty plea filed after a death sentence was vacated and before a new sentence was imposed. Doc. 86 at 49; Doc. 104 at 18–19. He claims he had "every reason to believe" that § 23A-27-11 would allow him to move to withdraw his guilty plea after resentencing was granted. Doc. 104 at 18.

<u>Cruz</u> was one of the "rare[]" and "exceptional" cases in which the Supreme Court found a state's procedural rule inadequate. 598 U.S. at 26. At issue was the Arizona Supreme Court's decision that Cruz had not satisfied state Rule 32.1(g) allowing defendants to file a successive habeas petition if there has been "a significant change in the law." <u>Id.</u> at 24–25. Cruz was convicted of murder and sentenced to death in 2005. <u>Id.</u> at 22. He argued on direct appeal that

the trial judge violated <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994), by refusing to let him tell the jury that a life sentence would be without parole. <u>Cruz</u>, 598 U.S. at 21.

The Arizona Supreme Court affirmed Cruz's conviction, holding that <u>Simmons</u> did not apply to Arizona's sentencing scheme. <u>Id.</u> at 21–22. The court continued to follow that holding until 2016 when the Supreme Court in <u>Lynch v. Arizona</u> held that <u>Simmons</u> did indeed apply in Arizona. <u>Lynch</u>, 578 U.S. 613, 614–16 (2016) (per curiam). Cruz moved for postconviction relief under Rule 32.1(g), arguing that <u>Lynch</u> constituted "a significant change in the law." <u>Cruz</u>, 598 U.S. at 24. A "[s]traightforward" reading of Arizona precedent suggested that Cruz was correct; the Arizona Supreme Court had interpreted Rule 32.1(g) as requiring "a transformative event, a clear break from the past" and said that the "archetype of such a change occurs when an appellate court overrules previously binding case law." <u>Cruz</u>, 598 U.S. at 27 (cleaned up and citations omitted). Seemingly ignoring this precedent, however, the Arizona Supreme Court held that Cruz failed to satisfy Rule 32.1(g). <u>Id.</u> It reasoned that <u>Lynch</u> "was not a significant change in the law" because <u>Lynch</u> "relied on <u>Simmons</u>, and <u>Simmons</u> was clearly established at the time of Cruz's trial despite the misapplication of that law by the Arizona courts." <u>Id.</u> (cleaned up and citations omitted). Adopting an "entirely new" interpretation of Rule 32.1(g), the Arizona Supreme Court held that the rule "requires a significant change in the law[,] not a significant change in the <u>application</u> of the law." <u>Id.</u> (cleaned up and citation omitted).

The Supreme Court vacated the decision, finding the Arizona Supreme Court's application of Rule 32.1(g) to <u>Lynch</u> too "novel and unfounded" to be adequate. <u>Cruz</u>, 598 U.S. at 26–29. Rather than being firmly established and regularly followed, the Arizona Supreme Court's decision "abruptly departed from and directly conflicted with its prior interpretations" of Rule 32.1(g). <u>Id.</u> at 32. Importantly, the Court distinguished between extending earlier jurisprudence "to new

situations as they arise"—something states are "free" to do—and "foreclose[ing] federal review by adopting a novel and unforeseeable approach . . . that lacks fair or substantial support in prior state law"—something courts "cannot do." Id. at 30–31 (cleaned up and citation omitted).

The Supreme Court of South Dakota's res judicata holding is an example of a state court applying its precedent to a new situation in a foreseeable way. Before Piper I and Piper II, the court had consistently applied res judicata to bar habeas claims that could have been brought in an earlier proceeding. See, e.g., Weddell, 604 N.W.2d at 283–84 (stating in a habeas case that "[i]t is settled law in South Dakota that a judgment subject to res judicata constitutes an absolute bar against the prosecution, not only of every claim or demand therein in controversy, *but also of all other admissible matters that might have been offered to sustain or defeat such claims or demands*" (cleaned up and citation omitted)); Ramos, 616 N.W.2d at 91–92 (holding that res judicata barred the petitioner from making a due process challenge to his sentence after he made an unsuccessful Eighth Amendment challenge on direct appeal); id. ("Under the doctrine of res judicata, we will not review successive attacks on a sentence, especially when all the grounds could have been raised in the earlier proceeding."). Although the court had never applied res judicata to a factual situation like Piper's, South Dakota case law made it foreseeable that the doctrine would bar Piper's challenge to his guilty plea after he forwent two previous opportunities to raise the claim. If anything is novel about the issue, it's the idea that Piper, after eight years of litigation and two trips to the Supreme Court of South Dakota trying to have his sentence reduced to life imprisonment, could suddenly change tactics, challenge his guilty plea, and restart the entire case. Piper's argument that § 23A-27-11 justified his belief that he could move to withdraw his guilty plea after his death sentence was vacated does not change the analysis. Neither the text of § 23A-27-11 nor the case law applying it "purport to displace other limitations that might restrict the

availability of motions to withdraw guilty pleas, such as those imposed by basic rules of claim preclusion and procedural default in post-conviction cases." Piper IV, 936 N.W.2d at 806; see also id. (stating that no cases "support the view that SDCL 23A-27-11 can be viewed in isolation as an unrestricted right to challenge a guilty plea at any point in the indeterminate future").

At bottom, this is not one of the rare and exceptional cases in which a state court's procedural rule is inadequate to support the judgment below. See Cruz, 598 U.S. at 26 (explaining that the novelty aspect of inadequacy is "reserved for the rarest of situations"). Unlike Cruz and other cases Piper cites, the Supreme Court of South Dakota's res judicata holding did not lack support in prior state law, conflict with state precedent, or announce a completely new rule. See id. at 24–32; NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 455–58 (1958) (finding inadequate the Alabama Supreme Court's ruling that it could not consider the NAACP's constitutional claims because the organization sought review under a writ of certiorari rather than a writ of mandamus where this ruling was irreconcilable with the court's "past unambiguous holdings," was so novel a reading of state law that the NAACP could not "fairly be deemed to have been apprised of its existence," and the court had previously reviewed constitutional claims raised by a Ku Klux Klan member even though he had used a writ of certiorari); White, 206 F.3d at 781–82 (holding that the petitioner's procedural default was not adequate to bar review where the default was based on two limitations "newly introduced" in the petitioner's case and neither the petitioner nor his attorneys "could reasonably have anticipated any such" limitations). Nor is this a case where the Supreme Court of South Dakota required pointless compliance with a state procedural rule regardless of the rule's purpose. See Lee v. Kemna, 534 U.S. 362, 381–87 (2002) (finding that a state procedural rule was inadequate for several reasons, including that the petitioner "substantially complied" with the rule given the realities of the case and that this compliance

served the rule's purpose).  Indeed, barring the guilty plea claim undoubtedly served the purpose of claim preclusion, which is designed to encourage finality in litigation and "force a plaintiff to explore all the facts, develop all the theories, and demand all the remedies in the first suit."  Healy Ranch, Inc. v. Healy, 978 N.W.2d 786, 802 (S.D. 2022) (cleaned up and citation omitted).  Piper had a fair opportunity to raise his guilty plea claim in state court and the Supreme Court of South Dakota's res judicata holding is adequate to support the judgment below.

        **2.**        **Independence**

Piper also argues that the Supreme Court of South Dakota's res judicata ruling cannot bar review of his guilty plea claim because the ruling depended on federal law.  Doc. 67 at 158–61.  He claims that the ruling rested on a fundamental fairness rationale, that South Dakota courts equate fundamental fairness with due process, and that the Supreme Court of South Dakota's rejection of his fundamental fairness argument "was, in essence, a constitutional due process ruling."  Id. at 160–61.

Piper's arguments are unconvincing.  First, they rest on the mistaken belief that Haase created a fundamental fairness exception requiring South Dakota courts to review the facts and law of the underlying claim to determine whether it would be fundamentally unfair, under federal due process principles, to apply res judicata.  This is a vast overreading of Haase.  As explained above, Haase did not engage in any such analysis itself and no cases from the Supreme Court of South Dakota have interpreted Haase in that way.  Second, the cases Piper cites to support his argument that the res judicata ruling depends on federal law involve a state court considering the merits of the underlying federal claim when deciding whether to apply a state procedural bar.  See, e.g., Foster, 578 U.S. at 498; Ake, 470 U.S. at 75; Cooper v. Neven, 641 F.3d 322, 332–33 (9th Cir. 2011).  In contrast, the Supreme Court of South Dakota's res judicata ruling—including the

116

court's rejection of Piper's argument that "preclusion principles should yield to a broad general concept of fundamental fairness"—had nothing to do with the federal merits of Piper's guilty plea claim. Piper IV, 936 N.W.2d at 803–07.  Rather, the court found no fundamental unfairness in applying res judicata given Piper's previous opportunities to raise the guilty plea claim and his apparent strategic decision not to challenge the guilty plea until after the court affirmed his death sentence and remanded for a jury resentencing. Id. at 806.  Piper has cited no case suggesting that this decision—made without reference to the merits of his claim or federal due process principles—somehow made the res judicata ruling dependent on federal law. See generally Rocha v. Thaler, 626 F.3d 815, 824 (5th Cir. 2010) (stating, in a case where the state court did not consider the merits of the underlying federal constitutional claim, that a "state court does not undermine the independent state-law character of its procedural-default doctrine by using a federal standard to determine whether an otherwise defaulted successive habeas application should be permitted to bypass a procedural bar").

Piper also argues in his petition that the res judicata ruling became interwoven with his "underlying right to due process" when the Supreme Court of South Dakota "determined that the need for finality outweighed the constitutional requirement of knowing, intelligent, and voluntary waiver." Doc. 67 at 161.  Piper did not develop this argument at all in his briefs, and it lacks merit in any event.  The court never weighed the need for finality against the constitutional requirements of a guilty plea, let alone did so in a way that made the res judicata ruling dependent on federal law.  Instead, it explained that the need for finality exists even in death penalty cases, particularly in ones like Piper's where the petitioner was raising "untimely arguments arising from an original uncontested guilty plea and without alleging actual innocence." Piper IV, 936 N.W.2d at 807.  The

res judicata ruling is an adequate and independent rule barring federal review of Piper's guilty plea claim. Respondents are entitled to summary judgment on Claim XI.

### K.    Claim XII: Right to Withdraw Guilty Plea

Claim XII alleges that § 23A-27-11 gave Piper a statutory right to withdraw his guilty plea and that South Dakota violated due process by arbitrarily denying him this right. Piper acknowledges that he never raised this claim in state court. Respondents moved for summary judgment on Claim XII, arguing that res judicata bars the claim and that it fails on the merits. Doc. 77; Doc. 78 at 1–2. Piper now argues that Respondents waived any procedural defense to Claim XII because Respondent's motion for summary judgment treated the claim as exhausted and addressed it on the merits. Doc. 86 at 50; Doc. 116 at 124–25.

There was no waiver here. Although Respondents' summary judgment brief focused largely on the merits of Claims XI and XII, Respondents specifically argued that res judicata bars Claim XII. Doc. 78 at 1–2; Doc. 77; see also Doc. 97 at 32–34 (Respondents' reply brief addressing procedural default of Claim XII); Doc. 68 at 2 (Respondents' answer to Piper's petition raising procedural default as a defense in general). In any case, this Court would exercise its discretion to consider the procedural default defense even if Respondents did not adequately raise it in their initial summary judgment brief. See Dansby v. Hobbs, 766 F.3d 809, 824 (8th Cir. 2014) (explaining that a "federal court has discretion to address procedural default in a habeas corpus case despite the State's failure to present the issue properly" so long as the parties have notice and an opportunity to be heard). After all, Piper knew that procedural default was a potential defense to Claim XII when he filed his petition, and this Court allowed him to respond to any "new" arguments Respondents raised in their reply brief. Docs. 100, 104.

Piper failed to raise Claim XII in state court and res judicata would bar any attempt to do so now. Piper argued in his petition that there was cause to excuse his procedural default because South Dakota law provided no mechanism by which he could have raised this claim. He asserted that the Supreme Court of South Dakota ruled in Piper IV that the trial court had no authority to consider his motion to withdraw his guilty plea, that this ruling extinguished his "life and liberty interest," and that South Dakota law provided no mechanism by which he could litigate the constitutional deprivation caused by the ruling in Piper IV. Doc. 67 at 162. At the October 25, 2023 hearing, however, Piper's attorneys admitted that they had "no arguments as to how" this Court could reach Claim XII. Doc. 116 at 120–21. If Piper is still relying on the argument in his petition, he has not met his burden to show cause. Although Piper claimed that Piper IV extinguished his liberty interest, he pointed to the Piper III decision— when the court held that the trial judge had no jurisdiction to consider Piper's motion to withdraw—as being the arbitrary denial of his statutory right to withdraw his guilty plea. Doc. 67 at 162, 165, 167. Piper was free to raise Claim XII in his second habeas case, Piper IV. He chose not to, however, and is barred from doing so now. Respondents are entitled to summary judgment on Claim XII.

### L.     Claim XIII: Cumulative Prejudice

Claim XIII alleges that Piper is entitled to habeas relief because of the cumulative prejudice of the constitutional violations in his case. He argues that he raised this claim in his reply brief in Piper IV but says that the Supreme Court of South Dakota never addressed it. Doc. 67 at 168. Piper also acknowledges, however, that the Eighth Circuit has held that neither the cumulative effect of trial errors nor the cumulative effect of attorney errors are grounds for habeas relief. Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996). Respondents have not moved for summary judgment on Claim XIII. At the October 25 hearing, Respondents' attorneys said they

did not realize Claim XIII was a free-standing claim.  Doc. 116 at 7–8.  Respondents may move

for summary judgment on Claim XIII in the next round of briefing.

## IV.    Conclusion

To recap, Respondents are entitled to summary judgment on Claims I, III.B, III.C, IV.B,

VII, VIII, IX.A–D, X, XI, and XII. Piper's remaining claims, then, are Claims III.D, III.E, IV.A,

V, VI, IX.E, and XIII.

For the reasons stated above, it his hereby

ORDERED that Respondents' Motion for Summary Judgment on Claim 1, Doc. 69, is

granted.  It is further

ORDERED that Respondents' Motion for Partial Summary Judgment on Claims 4.B, 7,

and 8, Doc. 72, is granted.  It is further

ORDERED that Respondents' Motion for Partial Summary Judgment on Claims 3, 4.A, 5,

6, 9, and 10, Doc. 74, is granted in part and denied in part as explained above.  It is further

ORDERED that Respondents' Motion for Partial Summary Judgment on Claims 11 and

12, Doc. 77, is granted.  It is further

ORDERED that Respondents file a motion for summary judgment on Piper's remaining

claims on or before May 31, 2024.  Piper will have until July 31, 2024, to respond, and

Respondents will have 21 days thereafter to file a reply.

DATED this **29ᵗʰ** day of March, 2024.

BY THE COURT:

_____

ROBERTO A. LANGE
CHIEF JUDGE

120