UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRILEY PIPER,<br><br>Petitioner,<br><br>vs.<br><br>MARTY JACKLEY, ATTORNEY GENERAL OF THE STATE OF SOUTH DAKOTA, AMBER PIRRAGLIA, INTERIM WARDEN, SOUTH DAKOTA STATE PENITENTIARY;<br><br>Respondents. | 5:20-CV-05074-RAL<br><br><br>OPINION AND ORDER GRANTING RESPONDENTS' MOTION FOR SUMMARY JUDGMENT |

State prisoners challenging their conviction and sentence in federal court must meet a high standard. The Antiterrorism and Effective Death Penalty Act, commonly known as AEDPA, bars relief on a claim adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). Petitioner Briley Piper, a state death row inmate, has been challenging his conviction and sentence in this Court since 2020. This Court has already granted summary judgment on claims that Piper procedurally defaulted, Doc. 122, and Respondents, South Dakota Attorney General Marty Jackley and Interim Warden Amber Pirraglia, now move for summary judgment on Piper's remaining claims, Doc. 126. This Court grants Respondents' motion for the reasons explained below.

1

I.      **Facts**

A.      **Background and Procedural History**

In April 2000, Chester Allan Poage's partially clothed body was found in a remote location in Lawrence County, South Dakota.  Piper v. Young (Piper IV), 936 N.W.2d 793, 799 (S.D. 2019); State v. Piper (Piper I), 709 N.W.2d 783, 792 (S.D. 2006).  Law enforcement identified Piper, Elijah Page, and Darrell Hoadley as suspects in Poage's murder and a related burglary at Poage's house.  Piper IV, 936 N.W.2d at 799.  The State of South Dakota (State) charged the three men with first-degree murder, kidnapping, first-degree robbery, first-degree burglary, and grand theft. Id.  Attorneys Patrick Duffy and Timothy Rensch were appointed to represent Piper.  Doc. 67 ¶ 3. In early 2001, Piper pleaded guilty to all five crimes, including the first-degree felony murder of Poage.  Piper IV, 936 N.W.2d at 799 & n.1.  A state court judge sentenced Piper to death after a three-day sentencing hearing.  Id. at 800.  The Supreme Court of South Dakota affirmed Piper's death sentence on direct review in 2006.  Piper I, 709 N.W.2d 783.

Piper, represented by attorneys Steve Miller and Steven Binger, then filed a habeas petition in state court.  Piper IV, 936 N.W.2d at 801–02; Doc. 67 at ¶ 6.  The Supreme Court of South Dakota granted Piper habeas relief in 2009, finding that Piper did not validly waive his right to have a jury decide whether to impose the death penalty because the state trial judge had not made clear that Piper would receive a life sentence if even one juror voted against the death penalty. Piper v. Weber (Piper II), 771 N.W.2d 352, 358–60 (S.D. 2009).  The Court remanded Piper's case for resentencing by a jury.  Id. at 360.

In August 2009, a state court judge appointed attorneys Robert Van Norman and Michael Stonefield to represent Piper in the resentencing proceeding.  Doc. 67 at ¶¶ 7, 50; Doc. 2 at 288. Both men were experienced criminal defense attorneys: Van Norman, the Federal Public Defender

for South Dakota from 1999 to 2003, had handled seven death penalty cases; Stonefield, a long-time state public defender, had worked on two death penalty cases. Doc. 90-11 at 7–8, 92, 115. The compensation vouchers Van Norman and Stonefield submitted show that they began investigating Piper's mitigation case almost immediately, including speaking with Piper's prior attorneys, researching potential mitigation specialists, gathering records, and wading through the voluminous files from Piper's prior case and the cases of Page[1] and Hoadley.[2] Doc. 121-4 at 458–473.

One of the records collected—and the one most relevant to Claim I of Piper's petition—was a February 1994 report prepared by Lyn Clark, M.D., when Piper was 13. Doc. 2 at 233–43; Doc. 66-1 at 5. Piper's mother Linda had Dr. Clark evaluate Piper because she was concerned about his impulsive behavior and wanted a second opinion. Doc. 2 at 233; Doc. 66-5 at 80–81. The "Medical History" section of Dr. Clark's report noted that Linda recalled smoking one pack of cigarettes per day while pregnant with Piper and consuming "some alcohol."[3] Doc. 2 at 235. Dr. Clark noted that Piper was born four to six weeks prematurely, developed mild neonatal jaundice, and suffered from vomiting for the first month of his life. Doc. 2 at 235; Doc. 66-1 at 5. She gave Piper a neurodevelopmental examination called the Pediatric Examination of Educational Readiness in Middle Childhood. Doc. 2 at 237. Dr. Clark concluded that attention deficit disorder (ADD)[4] was a "primary concern" for Piper but believed that ADD was "not the total explanation

---

[1]Page pleaded guilty, received a death sentence, and has been executed. Piper IV, 936 N.W.2d at 800 n.5.

[2]Hoadley had a jury trial and received a life sentence. Piper IV, 936 N.W.2d at 800 n.5.

[3]Dr. Clark's full statement on Linda's drinking was as follows: "Mrs. Piper reports that she was anemic throughout her pregnancy. She smoked one pack of cigarettes per day and consumed some alcohol." Doc. 2 at 235.

[4]"The term 'ADD' refers to 'attention deficit disorder,' while 'ADHD' refers to 'attention-deficit/hyperactivity disorder.' ADD is an older term used for what is now known as the inattentive type of ADHD. The term ADHD is now commonly used to describe both inattentive and

for [his] behavioral difficulties." Doc. 2 at 241. In Dr. Clark's view, the "extent of" Piper's aggression and the "seriousness" of his conduct were "not necessarily typical of students with primary" ADD. Id. Dr. Clark's report did not mention prenatal alcohol exposure or fetal alcohol spectrum disorders (FASD)[5] as a possible explanation for Piper's behavior. Doc. 2 at 233–43.

The compensation vouchers reflect that by September 2009, Van Norman was already researching cognitive or mental health conditions Piper potentially had and communicating with mitigation witnesses. Doc. 121-4 at 463–64, 466, 468. Van Norman and Stonefield moved to withdraw Piper's guilty pleas in October 2009, arguing among other things that he was never informed that he did not have to plead guilty to receive a court sentencing. Doc. 2 at 288, 339–49, 367–79. They filed several supplements to the motion and deposed a law enforcement officer about whether evidence had been withheld in Piper's earlier case. Doc. 2 at 381–88.

Compensation vouchers from Fall 2009 to Winter 2011 show continued work on Piper's mitigation case. Van Norman and Stonefield gathered more records, tracked down and interviewed witnesses across the country, researched mitigation specialists and potential expert witnesses, met with psychologist Dewey Ertz, and investigated Piper's potential psychiatric issues. Doc. 121-4 at 470–73; Doc. 121-5 at 301–03; Doc. 121-10 at 327–29, 335–36, 342–43, 350–52, 358, 369–71, 373–74, 381–82, 385–87, 392–93, 395–98, 406, 409, 412, 417–19, 423–24, 428–32, 439, 445–47. They had frequent contact with Piper's family and sent a health questionnaire to his mother Linda. Doc. 121-4 at 473; Doc. 121-5 at 302; Doc. 121-10 at 329, 350, 358, 369–71, 373–

---

hyperactive types." Munday v. Lees-McRae Coll., 20-cv-00105, 2022 WL 17252598, at *2 n.2 (W.D.N.C. Nov. 28, 2022).
[5]FASD "is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy." Doc. 62-3 at 2. It "affects the ability to make decisions, communicate, and control emotions." Anderson v. Kelley, 938 F.3d 949, 963 (8th Cir. 2019) (Kobes, J., concurring in part and dissenting in part).

75, 381–82, 385, 395, 397, 408–09, 412, 417–18, 421–24, 430–32, 447.  Van Norman also hired a jury consultant using his own money.  Doc. 90-11 at 17; Doc. 121-10 at 369, 428, 495.

Judge Jerome A. Eckrich III denied Piper's motion to withdraw his guilty pleas in November 2010, over a year after it was filed.  Doc. 2 at 388.  In December 2010, Piper unsuccessfully petitioned the Supreme Court of South Dakota for permission to appeal Judge Eckrich's denial.  Doc. 2 at 292, 414–29; Doc. 90-11 at 126–27.  Judge Eckrich entered a scheduling order in early January 2011 setting Piper's sentencing trial for July 5, 2011.  Doc. 121-5 at 456.  Van Norman and Stonefield filed myriad motions in mid-January 2011, successfully moving to change the venue of the trial and to have appointed to the defense team Dr. Ertz, capital mitigation specialist Jeannette Sheldon, and an investigator.  Doc. 121-5 at 461, 509, 523, 592; Doc. 121-8 at 379–85, 389–90.

Sheldon's role would be to investigate Piper's life history, flag issues that could warrant further evaluation, and prepare a narrative for her testimony in court.  Doc. 88-1 at 6–14, 16–18, 21–22.  She had over 200 hours of training in mitigation work and 70 hours of one-on-one training with forensic psychologists and psychiatrists.  Doc. 90-6 at 219.  An affidavit Sheldon submitted to the state court noted her 12 "years['] experience in assisting counsel in capital case proceedings, in determining the scope of investigation necessary for preparation and presentation of mitigation and other mental health claims, in conducting those investigations and in providing mental health experts the kind of materials they routinely rely upon in their professions in order to offer reliable expert opinions."  Doc. 121-6 at 40.  Stonefield explained at a motion hearing that Sheldon had said that while the average number of hours necessary to do a "complete mitigation investigation" was over 1,000, she could do a "competent" job in Piper's case in 150 to 200 hours.  Doc. 88-1 at 9–10.  According to Stonefield, Sheldon did not need as much time as she would in a typical case

because the defense team had already done some investigation and compiled documents and because there was less than typical life history to review given that Piper was just 19 years old when the murder occurred. Doc. 88-1 at 10–12; Doc. 66-1 at 5; see also Doc. 121-9 at 379 (affidavit from Sheldon explaining that she would need less time than in an average death penalty case because of "the age of the defendant and the amount of documentary evidence already compiled by the defense team"). At the same motions hearing, Stonefield explained that Dr. Ertz would review Piper's records for mitigation evidence. Doc. 88-1 at 20–23. Stonefield said that, like the psychologists in the Hoadley and Page trials, Dr. Ertz would testify about the mitigating factors of youth, drug use, and the group dynamic involved in the killing. Doc. 88-1 at 21–23. Judge Eckrich initially capped Sheldon's fees at $10,000 and Dr. Ertz's fees at $4,000. Doc. 2 at 430. He later granted an additional $5,000 for Sheldon's work. Doc. 2 at 432. In March 2011, Piper's parents gave his lawyers $10,000 to hire forensic neuropsychiatrist Hal Wortzel. Doc. 2 at 249–53; Doc. 90-8 at 76.

Sheldon began reviewing Piper's school, psychological, and court records in February 2011. Doc. 90-6 at 225; Doc. 121-9 at 377; Doc. 121-10 at 471. She prepared a 57-page social history for Piper that involved nearly 200 hours of work. Doc. 90-7 at 59; Doc. 66-1. As relevant here, the social history cited to Dr. Clark's evaluation and noted that Linda "smoke[d] one pack of cigarettes a day and consume[d] alcohol" while pregnant with Piper. Doc. 66-1 at 5. Sheldon also discussed a diagnostic evaluation performed by psychologist Michael Rose on Piper in January 1994. Doc. 66-1 at 32–35; Doc. 66-6. Dr. Rose's diagnostic impression of Piper was that he had conduct disorder of an undifferentiated type. Doc. 66-1 at 34; Doc. 66-6 at 7. Dr. Rose's report mentioned nothing about FASD. Doc. 66-6.

Compensation vouchers from early 2011 leading up to the July trial show that Van Norman and Stonefield continued to develop Piper's mitigation case. They gathered and reviewed records, worked with Sheldon on the social history, interviewed more witnesses, and consulted with and provided documents to Dr. Ertz and Dr. Wortzel. Doc. 121-10 at 286–94, 301–02, 304, 456–59, 461, 477–81, 484, 488–97.

Dr. Ertz met with Piper twice before the trial for a total of about five hours and interviewed him "extensive[ly]" about his background and the murder. Doc. 90-7 at 183–85, 190. He also reviewed many documents, including Sheldon's social history, the evaluations from Dr. Clark and Dr. Rose, and evidence about Hoadley and Page. Doc. 90-7 at 188–89, 201. He did not evaluate Piper, perform any tests, or write a report, however. Doc. 90-8 at 26, 32, 40. He testified at trial that "[t]here didn't seem to be a lot of purpose to evaluate Briley Piper psychologically 11 years after the murder." 90-8 at 26.

Dr. Wortzel met with Piper for about four hours and reviewed his school and psychological records as well the social history Sheldon prepared. Doc. 90-8 at 81, 85, 104. Dr. Wortzel did not prepare a written report (nor had Van Norman and Stonefield requested one) or administer any test to Piper. Doc. 90-8 at 104–05, 133–36.

## B.    Resentencing Trial

### 1.    Voir Dire

Judge Eckrich sent an eight-page questionnaire to the potential jurors in late May 2011. Doc. 121-9 at 191–204. Although the questionnaire was shorter than the one Piper had proposed, Doc. 121-8 at 506–27, it did include questions about whether the potential jurors or someone close to them had ever been the victim of a crime, what the jurors knew about Piper's case, how they would respond to certain mitigating evidence, and their thoughts on the death penalty, Doc. 121-9

at 195–201.   Among other things, the questionnaire asked whether the potential jurors felt "that the death penalty is used too often or too seldom," whether they believed in an "eye for an eye," and whether they believed that the "State should impose a death penalty on everyone who, for any reason, intentionally kills another person."  Id. at 200.

Voir dire began on July 5 and lasted more than seven court days.  Doc. 89; Doc. 89-13. Piper had moved for 10 additional peremptory strikes beyond the 20 already guaranteed by statute, Doc. 121-5 at 535–36; SDCL § 23A-20-20, but Judge Eckrich concluded that one extra peremptory strike for both sides was sufficient, Doc. 121-8 at 448–49.   Judge Eckrich split voir dire into sessions involving 15 potential jurors at a time.  Doc. 88-2 at 3.   Counsel for both sides would examine the jurors individually and exercise any challenges for cause while the remaining jurors were sequestered.   These sessions would continue until there was a panel of 57 potential jurors, after which the parties would exercise their peremptory strikes.  Doc. 89 at 34–35.

As relevant to Piper's petition, the third potential juror undergoing voir dire was Lisa Sagdalen.  Doc. 89 at 73.  Sagdalen had written in her juror questionnaire that her best friend was a deputy with the Pennington County Sheriff's Office, that she had read all the newspaper articles about the case, and that she had formed an opinion about the case: that Piper had chosen to plead guilty and "need[ed] to accept" the judge's decision.  Doc. 2-2 at 160–62.  She also indicated, however, that she did not believe the death penalty was appropriate in every case involving an intentional killing and that she would want to hear all the circumstances surrounding a killing before deciding whether to impose a death sentence.  Doc. 2-2 at 163.

Van Norman's voir dire of Sagdalen focused first on her knowledge about the case.  Doc. 89 at 75.  Sagdalen confirmed that she knew "quite a bit" about Piper's case, that she had "read all the newspaper articles," and that she had discussed the case "a lot" with her friends in the

Pennington County Sheriff's Office. Id. She also confirmed that she had already formed an opinion:

> **Van Norman:** I take it from what you're saying, and please correct me if I'm wrong, that you believe that the death sentence that was imposed by that Judge some years ago should stand.
> **Sagdalen:** I do.
> **Van Norman:** Okay. And that's a firmly held belief, I take it.
> **Sagdalen:** Yes. That's how I believe, I mean.
> **Van Norman:** No, that's fine. I take it then for me to have you sitting in that jury box, on behalf of my client from his perspective - - well, let's put it this way: if you were seated - - seated in his position with a juror with your feelings would you think it would be fair, from your perspective?
> **Sagdalen:** I don't know, I - - I know that I would try and do my best to be as fair as possible sitting there.
> **Van Norman:** Right.
> **Sagdalen:** I don't know. I don't know.
> **Van Norman:** Could you envision being a juror giving your opinions and actually imposing a life sentence on Briley as opposed to a death sentence?
> **Sagdalen:** I would do my best to take what was said in the courtroom and use that instead of what I previously read and heard and such.

Id. at 77–78. Sagdalen was ambivalent when questioned further about whether she could put her opinion aside, saying she "d[id]n't know" whether she could do so and that she could not say that "yes, I could throw everything aside." Id. at 78. Van Norman challenged Sagdalen for cause after she agreed again that she already had "a pretty firm opinion as to how the case should come out." Id. at 79.

The prosecutor, John Fitzgerald, examined Sagdalen next. Sagdalen testified that although she had formed an opinion about the case and could not guarantee she could set aside everything she had read, she "might" change her opinion if she learned something new during trial. Id. at 80. Fitzgerald said he would "defer to the Court" and did not make any argument on Piper's challenge of Sagdalen. Id. at 81.

Judge Eckrich then took a turn speaking with Sagdalen.  He used the famous example of President Truman holding a newspaper wrongly declaring that Thomas Dewey had won the 1948 presidential election to illustrate why jurors must decide cases on the evidence presented in court rather than on what they read in the media.  Id.  Judge Eckrich then asked for an "honest answer" on whether Sagdalen could be fair to both sides and decide the case based only on the evidence presented in court.  Id. at 82.  Sagdalen said she believed she could, and Judge Eckrich followed up by asking "so despite what you read about what the prior Court did or any sentence, you could give Mr. Piper a fair shake and start from square one and . . . listen to the evidence, and make your decision based on the evidence as instructed and apply it to the law as given to you?"  Id. at 83.  Sagdalen said "Yes," and Judge Eckrich denied the challenge for cause.  Id.

Van Norman resumed speaking with Sagdalen, explaining that Judge Eckrich just wanted the jurors to follow the law and that there were no right or wrong answers to the questions being posed.  Id.  Sagdalen confirmed that her best friend was a deputy with the Pennington County Sheriff's Office and said she relied on the deputy's opinions "[v]ery highly" because they had known each other for over 30 years.  Id. at 83–84.  She explained, however, that although she had probably spoken with the deputy about Piper's case in the last year or two, she could not recall a specific conversation about it.  Id. at 84–85.  Van Norman then asked Sagdalen about her comment in the juror questionnaire that she did not agree that "those convicted and sentenced should have years and years of appeals to continue on 'death row' wasting taxpayer dollars."  Id. at 85.  Sagdalen testified that this comment was a "general" one and not specific to Piper's case.  Id. at 86–87.  Van Norman then returned to Sagdalen's comment about Piper needing to accept his sentence:

> **Van Norman**: Okay, yeah. And what I was doing was taking you back to your earlier answer that, "Mr. Piper needs to accept the Judge's decision as that was his choice."
>
> **Sagdalen**: Uh-huh.
>
> **Van Norman**: And isn't that really what you're saying, that Mr. Piper should just shut up and sit down and accept the death sentence?
>
> **Sagdalen**: I guess in a sense. What my thought was on that was he chose to plead guilty, he knew that the Judge had the opportunity of two choices, and that when he pled guilty he accepted that - -
>
> **Van Norman**: Yeah.
>
> ....
>
> **Van Norman**: What concerns me about that isn't that you have an opinion, it's - - what concerns me, what worries me is whether you can set that aside. And let me put it this way, and I talked about it earlier: I don't want to start out with an extra burden. And correct me if I'm wrong, you really do have strong opinions about this case, don't you.
>
> **Sagdalen**: I have an opinion.
>
> **Van Norman**: Yes, and you said that you did have an opinion, I appreciate that, and it's what we just recited there, right?
>
> **Sagdalen**: Yes, but I guess after what the Judge had said I am - - I don't know, I guess I feel I'm intelligent enough or social enough that I can take what is given to me and what I need to do.
>
> **Van Norman**: Do you - - can you sit here and visualize yourself being on the jury, first of all, and visualize yourself coming back into this court and saying, "No, I want life without parole for Mr. Piper?"
>
> **Sagdalen**: If that's presented I can with what I hear.

Id. at 87–88. Sagdalen then agreed that she could meaningfully consider mitigating evidence. Id. at 89–91, 94–96. Van Norman renewed his challenge for cause to Sagdalen, but Judge Eckrich denied it. Id. at 97.

Dennis Anthony was the fifth potential juror questioned during voir dire. Anthony had expressed concern in his juror questionnaire about the costs of imprisoning someone for life and had commented that the appeals process lasts too long in death penalty cases. Doc. 2-2 at 150–51. He also checked "Yes" when asked "Do you believe the State should impose a death penalty on everyone who, for any reason, intentionally kills another person?" Id. at 151. Van Norman

11

questioned Anthony on all these topics, particularly on whether he would be an automatic vote for the death penalty. Doc. 89 at 126–42. Although Anthony initially seemed to affirm his response in the questionnaire that everyone who intentionally kills should get the death penalty, he went on to explain that he would want to hear the evidence before voting for a death sentence and that he could envision imposing a life sentence on someone in Piper's situation. Id. at 133–42. Van Norman passed Anthony for cause. Id. at 142.

Dan Carlin, the last potential juror relevant to Piper's petition, underwent voir dire a few days later. Carlin disclosed in his juror questionnaire that his niece had been murdered and that he was unhappy with the perpetrator's sentence. Doc. 2-2 at 133. He believed in an "eye for an eye" and that people who kill should be willing to forfeit their own lives. Doc. 2-2 at 135. Carlin initially told Stonefield that, given his experience with his niece, he would "[p]robably not" want himself on the jury were he in Piper's shoes. Doc. 89-6 at 83. Stonefield then challenged Carlin for cause, id. at 83, but Judge Eckrich denied the challenge after questioning by Fitzgerald, id. at 85. Under further questioning from Stonefield, Carlin testified that he did not think the death penalty would be appropriate in every murder case. Id. at 91. When Carlin said that mitigatory evidence of Piper's troubled childhood would not matter to him, however, Stonefield renewed the challenge for cause. Id. at 94–95. Fitzgerald then questioned Carlin and objected to the challenge after Carlin agreed that he would follow the instructions and would consider both mitigating and aggravating evidence before reaching a verdict. Id. at 96–99. Judge Eckrich spoke with Carlin next, asking Carlin how he solves problems in his job as a mechanic and whether he could follow the instructions and consider mitigatory evidence of a troubled childhood despite his personal opinions. Id. at 99–105. Carlin agreed that he could, and Judge Eckrich denied the challenge for cause. Id. at 104–05. Judge Eckrich made a record once Carlin left the courtroom, reciting the

standard for juror bias in capital cases and explaining that, after listening to the whole voir dire and considering the juror questionnaire, he did not believe that Carlin's views would substantially impair his duty to be impartial. Id. at 108–09. Piper's attorneys used peremptory strikes on Sagdalen and Carlin, but Anthony ended up on the jury. Piper IV, 936 N.W.2d at 812.

### 2.    Final Pretrial Conference and Opening Statements

The trial began on July 18, 2011. Doc. 90 at 13. Judge Eckrich held a final pretrial hearing that morning in chambers. Id. at 18–19. One of the issues discussed was Piper's sexual orientation. Id. at 24–25. Piper had filed a motion in limine in January 2011 seeking to prohibit any evidence or argument that he was bisexual or had sexual relationships with other men. Doc. 121-5 at 551–53. He claimed that the State had presented evidence of this nature in his first trial and cited to the testimony of a man named Russell Olson in support.[6] Id. Judge Eckrich entered a terse order in mid-June 2011 granting Piper's motion under the "[s]ame circumstances and ruling as Motion in Limine #6."[7] Doc. 121-9 at 316. Fitzgerald sought reconsideration of this ruling at the pretrial hearing, arguing that Piper's sexual orientation tied in with evidence that Piper had forced Poage to strip naked and asked Poage to perform fellatio on him, Hoadley, and Page. Doc. 90 at 24. Judge Eckrich said he would "stand by [his] prior ruling excluding it." Id. at 25.

The final pretrial conference also included a discussion on whether prison privileges would be admissible. Id. at 28–29. Stonefield asked that the State be prohibited from mentioning the privileges available to inmates serving life sentences. Id. at 29. Judge Eckrich questioned the

---

[6]Russell Olson testified in the first trial that he had sexual relations with Piper. Doc. 121-2 at 525.
[7]Judge Eckrich's ruling on motion in limine six stated that the State had agreed to that motion during a January 28, 2011 hearing. Doc. 121-9 at 316. This Court read the transcript from that hearing, however, and did not see where the State agreed to Piper's motion to exclude evidence that he was bisexual or had sexual relationships with men. See Doc. 88-1. Rather, the transcript reflects that Judge Eckrich said he would defer ruling on Piper's motions in limine. Doc. 88-1 at 64–65.

relevance of particular privileges like cable television or subscriptions for reading materials and directed Fitzgerald to "stay away from any kind of specifics" in his opening statement. Id. at 30–34.

In opening statements, Fitzgerald said the evidence would show that Piper had told a fellow inmate at the Lawrence County Jail that he, Page, and Hoadley had made Poage strip because they wanted him to give them "blow jobs." Id. at 96–97. Van Norman objected, and the transcript reflects that the parties had an off-the-record discussion. Id. at 97. Fitzgerald resumed his opening statement, saying that Piper had told inmate Tom Curtis that the purpose of having Poage disrobe was because the trio wanted Poage to give them oral sex. Id. Piper's counsel did not object this time. Id. Fitzgerald proceeded to tell the jury that Piper had said that Poage was forced to disrobe because Page "got some sort of a pleasure from watching men strip" and that Page threatened to "'have Russell come down here and rape [Poage's] ass.'" Id. at 104. According to Fitzgerald, Piper found Page's threat amusing. Id.

### 3.    Trial

For Piper to be eligible for the death penalty, the State needed to prove at least one of the aggravating factors listed in SDCL § 23A-27A-1. Piper I, 709 N.W.2d at 797; Doc. 90-10 at 6. If the jury found one of these factors beyond a reasonable doubt, it would then consider any mitigating circumstances[8] and whether Piper should be sentenced to death or life without parole. Doc. 90-10 at 9, 19–20; SDCL § 23A-27A-1. The State argued that three aggravating factors existed in Piper's case: (1) the killing was "outrageously or wantonly vile, horrible, or inhuman in

---

[8]The jury instructions in Piper's case defined a mitigating circumstance as "one which, while not constituting a justification or excuse for the crime, should in fairness and mercy be considered as reducing the degree of moral culpability or blame of the defendant, or otherwise offering a basis for not imposing the death penalty." Doc. 90-10 at 19.

that it involved torture, depravity of mind, or an aggravated battery;" (2) Piper had killed Poage for money or profit; and (3) Piper had killed Poage to avoid detection. Doc. 90 at 80–81.

The State presented extensive evidence on all three factors. The State's witnesses testified that Piper, Page, and Hoadley developed a plan to rob Poage while playing video games at his house on the evening of March 12, 2000. Doc. 90-3 at 64–65; Doc. 90-4 at 9–12; State v. Piper (Piper III), 842 N.W.2d 338, 345 (S.D. 2014). The three men lured Poage away from his home to a house where they had been staying. Doc. 90-3 at 65; Doc. 90-4 at 14. Inside, Page pulled a .22 caliber pistol he had stolen from Poage's home and ordered Poage to the floor. Doc. 90-3 at 65; Doc. 90-4 at 14–15; Piper III, 842 N.W.2d at 346. As Poage lay on his stomach, asking why his supposed friends were doing this, Piper kicked him in the face, knocking him unconscious. Doc. 90-3 at 26, 64–65; Doc. 90-4 at 16–17; Doc. 95 at 5–6; Piper III, 842 N.W.2d at 346. Poage's hands and feet were bound, and he was propped upright in a chair. Doc. 90-3 at 65; Doc. 90-4 at 19–22; Doc. 90-6 at 16; Piper III, 842 N.W.2d at 346. Poage, upon regaining consciousness, could overhear Piper, Page, and Hoadley discuss ways to kill him, including slitting his throat or drowning him. Doc. 90-3 at 27, 65; Doc. 90-4 at 22–23, 29–30. Piper stood on a four-way tire iron across Poage's ankles while Page and Hoadley forced Poage to drink a mixture of beer and hydrochloric acid. Doc. 90-4 at 25–28; Doc. 90-6 at 17; Doc. 90-8 at 114; Piper III, 842 N.W.2d at 346, 350. The acid hurt Poage's stomach but did not kill him. Doc. 90-4 at 26.

Piper, Page, and Hoadley decided that it would be best to kill Poage elsewhere. Doc. 90-3 at 65; 90-4 at 32–33. They put Poage in his Chevrolet Blazer and drove to a remote, wooded area in the Black Hills called Higgins Gulch. Doc. 90 at 179; Doc. 90-3 at 65; Doc. 90-4 at 31. Once there, Piper and Page forced Poage out into a foot of snow, in the below-freezing night, and made him strip to nothing but a tank-top shirt and his socks and shoes. Doc. 90 at 189–91; Doc. 90-4 at

15

35–36.  The three then tried burying Poage in the snow, Doc. 90-4 at 53; 90-8 at 55, 123; 90-6 at 19, and drowning him in a nearby creek, Doc. 90-1 at 124; Doc. 90-4 at 47; 90-6 at 22, but Poage remained alive, Piper III, 842 N.W.2d at 346.  Piper would later admit that he kicked Poage multiple times in the head and body with combat boots while out at Higgins Gulch.  Doc. 90 at 127–34, 151–53, 167–68; Doc. 90-3 at 66; Doc. 90-8 at 55–56, 121; Doc. 95 at 32, 35–36, 52; Piper III, 842 N.W.2d at 346, 350.

Poage tried to escape sometime during the attack, but according to Hoadley, Piper told Page to bring him back.  Doc. 90-4 at 43; Piper III, 842 N.W.2d at 346.  The three then each stabbed Poage once with a buck knife.  Doc. 90-4 at 46–49, 118–19; Doc. 90-7 at 194; Doc. 90-8 at 121, 125.  According to Hoadley, Piper went first, stabbing Poage in the side of the head.  Doc. 90-4 at 46–47, 118–19; Doc. 90-5 at 43.  Poage's stab wounds were potentially lethal, but he did not die immediately.  Doc. 90 at 147; Doc. 90-4 at 125.  Instead, Poage asked to get in the Blazer so that he could bleed to death where it was warm.  Doc. 90-1 at 127; Doc. 90-3 at 29; Doc. 90-4 at 54, 124; Piper III, 842 N.W.2d at 346, 350.  The three told Poage that they would grant his request if he washed the blood off his body in the creek first.  Doc. 90-4 at 54–56, 124.  Poage complied but was still not allowed in the vehicle.  Doc. 90-1 at 127; Doc. 90-4 at 54–56, 124.  Piper retreated to the Blazer after which Page and Hoadley dropped heavy rocks on Poage's head to complete the murder.  Doc. 90-3 at 66–67; Doc. 90-4 at 57–58; Piper III, 842 N.W.2d at 346.  The three left Poage's body in the creek and drove back to Spearfish where they looted Poage's home.  Doc. 90-4 at 57–59; Doc. 90-3 at 33, 67; Doc. 95 at 18; Piper III, 842 N.W.2d at 345.  They eventually pawned some of Poage's possessions and used his ATM card to steal cash from his bank account.  Doc. 90-4 at 61, 68; Doc. 90-6 at 89; Doc. 95 at 24, 95–96; Piper III, 842 N.W.2d at 345.

16

All told, the kidnapping and murder of Poage lasted about four hours. Doc. 90-4 at 44–45, 122; Doc. 95 at 49. The State presented evidence at trial that Poage had begged for his life throughout the ordeal and that Piper taunted Poage as he was brutalized. Doc. 90-1 at 126, 175; Doc. 90-3 at 26–27, 30; Doc. 90-4 at 33, 48, 51; Doc. 90-6 at 20; Doc. 95 at 40, 70; Doc. 90-8 at 122; Piper III, 842 N.W.2d at 347, 350. Hoadley admitted that he and his codefendants killed Poage to eliminate him as a witness, Doc. 90-4 at 51, and the State offered other testimony that Piper had said that "things had gotten so bad that they had to" kill Poage, Doc. 90-1 at 176. At least two witnesses testified that in the months just before the murder, Piper had said that he wanted to know what it was like to kill someone. Doc. 90-1 at 128; Doc. 90-5 at 168. Other witnesses who were housed with Piper in the Lawrence County Jail before his first trial testified that Piper had offered them money to kill two guards so that he could escape. Doc. 90-3 at 13, 15–16, 19–23; Doc. 90-6 at 12, 23–25. One of these witnesses was Tom Curtis.

Curtis met Piper at the Lawrence County Jail in 2000 and testified at Piper's first trial. Doc. 121-2 at 574, 577–78; Doc. 90-3 at 15–16. He was in custody in Utah during Piper's second trial, but the State had him returned to South Dakota via an interstate subpoena to testify. Doc. 90-3 at 15–16. A few days before Curtis took the stand, Piper made an oral motion to prohibit Curtis from testifying as he did in the first trial that Piper had disclosed that "[t]hey made [Poage] strip down, said that he was going to perform oral sex on them." Doc. 121-2 at 585; Doc. 90-1 at 2–3, 111, 187–88, 192–93. Judge Eckrich declined to exclude this testimony, finding it different from the sort of sexual orientation evidence he thought Piper had been seeking to prohibit:

> Okay. Now, that -- we had a brief discussion yesterday because it came up in the opening a little bit. I don't -- to be honest with you, I don't see that as a sexual orientation reference. It's a -- might be an aggression reference, it might be an assault reference, but it's -- I suppose it's to -- it's to sexual orientation as rape is to sex. There isn't really a connection. I don't regard it that way.

17

"They" said "he" "perform oral sex on them." To that extent, if that's the -- if that was going to be the -- if that's the objectionable material based on sort of a constitutional sexual orientation argument I would deny it.

90-1 at 193. Judge Eckrich later reaffirmed his ruling on Curtis's testimony, saying that references to oral sex out at Higgins Gulch were admissible and "part of the res gestae." Doc. 90-3 at 8–9.

Curtis thus testified about the oral sex reference at Piper's trial. He explained that Piper had said that he and his accomplices forced Poage to disrobe out at Higgins Gulch because they planned to make him give them "blow job[s]." Id. at 27–28. Curtis said that he did not know, however, whether the three men actually made Poage fellate them. Id. at 28. Van Norman objected to Curtis's testimony, but Judge Eckrich overruled the objection. Id. at 27.

Although Curtis also testified about several other topics, the one most relevant here is his criminal history. Clad in jail garb, Curtis testified on direct that he was imprisoned in Utah and was awaiting sentencing on some recent felony convictions. Id. at 11–12. Van Norman revisited Curtis's criminal history on cross:

> **Van Norman**: Okay. How many felonies have you been convicted of over the years?
> **Curtis**: How many have I been convicted of?
> **Van Norman**: Yeah.
> **Curtis**: Approximately two that I have been convicted of. I have been accused of many more but I have been convicted of I think two.
> **Van Norman**: Okay.
> **Curtis**: A burglary and a theft.
> **Van Norman**: A burglary and a theft?
> **Curtis**: Yes.
> **Van Norman**: Okay, and what have you been convicted of that you're incarcerated for now?
> **Curtis**: For possession with intent to distribute.
> **Van Norman**: What?
> **Curtis**: Cocaine.
> **Van Norman**: And that would be another conviction - -
> **Curtis**: Yeah.
> **Van Norman**: - - right? How much time are you facing?
> **Curtis**: I have no idea yet and I won't know until I go to court.

18

**Van Norman**: I thought you said you were just awaiting sentencing.
**Curtis**: I am awaiting sentencing.
**Van Norman**: You have an attorney, don't you?
**Curtis**: But it carries - - it carries a five-to-life and I don't know what the Judge is going to do on that.

. . . .

**Van Norman**: Okay. And [your lawyer] has explained to you what you might get, right?
**Curtis**: No, he has not yet. I - - when you're - - when you get your papers you know what it is. There is first, second and third degree felonies, mine was a first degree felony, which is a five-to-life.
**Van Norman**: That's the highest rated felony?
**Curtis**: Yes.
**Van Norman**: How much cocaine?
**Curtis**: I did not have any cocaine, I was accused of having cocaine.
**Van Norman**: Okay, so you're taking a false rap here, right, with regard to the cocaine?
**Curtis**: Yes, I am.
**Van Norman**: You have explained that to your attorney?
**Curtis**: My attorney is aware of that, yes.
**Van Norman**: And you have actually gone to court and pled guilty in front of a Judge even though it's a false charge.
**Curtis**: No, I did not go to court and plead guilty to it, I was found facility [sic, likely "guilty" mistranscribed].
**Van Norman**: Oh, you went to trial?
**Curtis**: Yes.
**Van Norman**: I'm sorry.
**Curtis**: That's okay.
**Van Norman**: Yeah. And how many charges were you found guilty of?
**Curtis**: There was eight charges.
**Van Norman**: Eight?
**Curtis**: Eight distributors.
**Van Norman**: And you were charged - - charged with eight distributions, right?
**Curtis**: Yeah.
**Van Norman**: And you were found guilty of eight distributions?
**Curtis**: Okay.
**Van Norman**: And all eight of the incidents are false.
**Curtis**: Yes, it is.

Doc. 90-3 at 36–39. Curtis did not testify to nor was he asked about convictions for sexual assault.

Trouble arose during the State's case in chief when Fitzgerald asked Brad Woodward, a unit manager at the Penitentiary, whether inmates were allowed to have television. Doc. 90-2 at

104, 121–22. Woodward responded "Yes," and Van Norman immediately objected. Id. at 121. Judge Eckrich sustained the objection and called a recess. Id. Van Norman then moved for a mistrial, arguing that Fitzgerald had violated Judge Eckrich's "direct order in chambers" prohibiting evidence of "television and other privileges" available to prisoners. Id. at 121–22. Judge Eckrich admonished Fitzgerald for "stepp[ing] over the line" but denied Piper's motion, finding that the brief reference to inmates having television did not justify a mistrial. Id. at 122. Judge Eckrich prohibited Fitzgerald from making any further reference to privileges in prison.[9] Id.

The State also offered testimony from psychiatrists Ulises Pesce and Ronald Franks and counselor Robert Fredrickson. Dr. Pesce saw Piper over ten times between 2001 and 2004 while working at the South Dakota State Penitentiary in Sioux Falls. Doc. 90-2 at 57. He prescribed Piper medication and assessed him as having antisocial personality disorder. Doc. 90-2 at 65–66, 69, 83. Dr. Pesce testified that conduct disorder is basically the child version of antisocial personality disorder, and that a childhood diagnosis of the former often precedes an adult diagnosis of the latter. Id. at 76, 96–98. He explained that violence, manipulation, deceitfulness, and a lack of empathy were all associated with antisocial personality disorder. Doc. 90-2 at 78. When asked about ADHD, Dr. Pesce said that the condition is linked to trouble in school and agitation, but that it does not cause violence. Id. at 72–73. He described Piper as feeling that his death sentence was a "terrible crime" the State committed against him.[10] Id. at 61.

---

[9]Neither party cites to where Judge Eckrich's order on prison privileges appears in the record. Doc. 75 at 12; Doc. 67 at 94–97. Van Norman's reference to a "direct order in chambers" appears to refer to the pretrial hearing Judge Eckrich held in chambers. Doc. 90 at 18–19.

[10]There were no objections to Dr. Pesce saying that Piper had received a death sentence in his prior trial. Doc. 90-2 at 61. That fact seemed to be part of the trial from voir dire and throughout. See, e.g., Doc. 89 at 60. The final instructions said that the jury could not consider Piper's prior death sentence. Doc. 121-10 at 194.

On cross-examination, Dr. Pesce conceded that he had only seen Piper for eight hours total and that ADHD can have very significant effects on a person's life. Id. at 80, 85. He also agreed that the brain's frontal lobes are not fully mature when a person is 20 years old, that development of the frontal lobes is directly related to impulse control and an appreciation for consequences, and that ADHD can exacerbate problems associated with underdeveloped frontal lobes. Id. at 86–87. Dr. Pesce likewise acknowledged that ADHD and antisocial personality disorder would "directly" affect a 20-year-old's ability to make good choices. Id. at 99.

Dr. Franks never met with Piper but did review his social history and psychological records from the penitentiary. Doc. 90-3 at 79, 86. He testified that ADHD makes it difficult to focus but that children with ADHD are no more likely to be violent than children without ADHD. Id. at 76–79. Dr. Franks told the jury that children with conduct disorder can still control their behavior, id. at 85–86, and identified instances in Piper's social history where he had behaved well, id. at 79–80. He testified that an enabling home environment—such as when a parent refuses to consistently punish misbehavior and hold a child accountable—can worsen conduct disorder, id. at 84–85, 101, and that Dr. Rose had diagnosed Piper with conduct disorder when he was 13 or 14, id. at 130.

According to Dr. Franks, Piper's social history and penitentiary records did not reveal any evidence that Piper had a brain disease or neurological damage. Doc. 90-3 at 87. "[I]n fact," Dr. Franks explained, "[Piper] had a very thorough neurological assessment when he was in the seventh grade and they did not find evidence of neurological deficit" or damage. Id. at 87; see also id. at 91 (stating that Dr. Clark's evaluation did not show any evidence of neurological deficits). Dr. Franks also testified that he saw little connection between frontal lobe development and the type of violence done to Poage, id. at 95, and that people with antisocial personality disorder can control their impulses but are sometimes unwilling to do so, id. at 98–99. On cross-

21

examination, Dr. Franks acknowledged that at least two authorities had recommended that Piper receive residential treatment but that such treatment never occurred. Id. at 104–05, 119.

Penitentiary counselor Robert Fredrickson saw Piper regularly between June 2008 and March 2009 while doing rounds in Piper's housing area. Doc. 90-5 at 96–97, 101, 103, 111, 121. He testified that there were times Piper exhibited antisocial traits like a lack of remorse, superficial charm, and little concern for something unless it involved himself. Id. at 103–04. He also recalled one interaction where Piper had displayed "strong traits of narcissism," id. at 106, and testified that Piper is "quite intelligent," id. at 107. Fredrickson admitted on cross-examination that Piper had never been rude or combative with him and that Piper taking college courses in prison was a positive sign. Id. at 110–11, 113.

Piper's defense focused largely on presenting mitigatory evidence. Testimony from Linda and Sheldon sought to humanize Piper, highlight his ADHD and learning disability, and explain his difficult upbringing. Doc. 90-6 at 129–207, 218–51; Doc. 90-7 at 2–121. Prison counselor Justin Falon testified about Piper's drive to educate himself by taking college correspondence courses and about his positive overall impression of Piper. Doc. 90-7 at 121–77.

A prison chaplain and a nun, Sister Gabrielle Crowley, also testified on Piper's behalf. Doc. 90-8 at 149–89. Sister Crowley testified that she met Piper about three and a half years before trial when she started giving him Spanish lessons over the phone. Id. at 151. Piper was studying to become a Catholic, Sister Crowley explained, and she served as his godmother when he was baptized in April 2008. Id. at 152. She began regular in-person visits with Piper thereafter, during which they would discuss spiritual matters, Piper's family, his close relationship with his nieces, his studies, and his desire to please his parents with good grades. Id. at 154–57. Sister Crowley testified that she had a "very deep relationship" with Piper given their "spiritual connection," and

that she felt like "family to him, like I belong to their family." Id. at 157. Fitzgerald's cross-examination of Sister Crowley focused on a letter she had written to a female inmate at Piper's request. Sister Crowley agreed with Fitzgerald that prison policy prohibited inmates from writing each other and that her letter violated this policy. Id. at 158–60. Fitzgerald closed his cross-examination by asking whether Piper had "manipulated your friendship" to get Sister Crowley to do something he could not. Id. at 160–61. Sister Crowley replied that she did not view "it that way" when she wrote the letter because she did not recall that doing so was against prison policy. Id. at 161.

Dr. Ertz testified about Piper's extensive pre-incarceration abuse of marijuana and LSD, and the negative effects these drugs have on a person's reasoning and mental health. Doc. 90-7 at 195–98. He agreed with Piper's ADHD diagnosis but questioned Dr. Rose's conclusion that Piper had conduct disorder. Id. at 199–203, 205. Among other things, Dr. Ertz believed that Dr. Rose erred by using an adult version of a test when evaluating the then 13-year-old Piper. Id. at 202. In Dr. Ertz's view, Piper's inattention and struggle to conform to societal norms was evidence of his ADHD. Id. at 205. He explained that impulsivity and failure to conform to societal norms are symptoms of both antisocial personality disorder and ADHD, and that Piper's impulsivity made it more likely that he would unthinkingly engage in antisocial behavior. Id. at 205–08; Doc. 90-8 at 3–4. Dr. Ertz told the jury that youth, substance abuse, group dynamics, and upbringing all affect a person's ability to exercise free will. Doc. 90-8 at 6, 8. He explained that the brain's frontal lobes—the area responsible for reasoning and executive function—are not fully developed until age 25, id. at 7, and that the harsh physical punishment Piper received during his youth only worsened his ADHD and prevented him from learning prosocial behavior, id. at 9–10.

Dr. Wortzel testified that youth, substance abuse, upbringing, ADHD, and group dynamics were all mitigating factors in Piper's case. Id. at 85, 97. He explained that 19-year-olds are more impulsive because their brains haven't finished maturing and that Piper's heavy LSD use in the months before Poage's murder would have compounded this impulsivity. Id. at 87–90. He said that home environment is critical to a person's development, id. at 93, and that Piper's environment was "far from ideal," id. at 91. In particular, Dr. Wortzel explained that the arbitrary beatings Piper received would not have taught him right from wrong and that Piper's parents erred by blaming others for his behavior and refusing to get him the help he needed. Id. at 91–94. Dr. Wortzel believed that Poage's murder resulted from group dynamics, with Piper, Hoadley, and Page feeding off one another and behaving in ways they would not have if they had been alone. Id. at 99–100.

Dr. Wortzel agreed on cross-examination that the three defendants stole Poage's property and murdered him to eliminate a witness against them. Id. at 120, 128. The State asked Dr. Wortzel whether he had done a brain scan of Piper and whether there was any evidence that Piper had brain damage. Id. at 135. Dr. Wortzel replied that while Piper's ADHD and antisocial tendencies had "neurological underpinnings," he was not saying that Piper had brain damage. Id. He also testified that he had not recommended a brain scan or similar test for Piper because they were "experimental in nature at this point in time and not intended for single subject use." Id. at 136.

Attorneys Van Norman and Stonefield focused on the mitigatory evidence in closing arguments, urging the jury to impose a sentence of life without parole rather than death. Doc. 90-10 at 58–94. Stonefield argued that the crime resulted from group dynamics and was not something Piper would have done by himself, that Piper had cooperated with law enforcement and

24

accepted responsibility by pleading guilty, and that Piper had been sitting in the Blazer when Hoadley and Page did the most damage to Poage. Id. at 66–67, 72–73. He contended that it would be wrong to sentence Piper to death when Hoadley—who played a significant role in Poage's murder, showed little remorse on the witness stand, and engaged in other concerning conduct like threatening his pregnant girlfriend's life and holding a knife to another girl's throat—only received a life sentence. Id. at 73–74. Van Norman's mitigation arguments focused more on Piper's upbringing and mental health. He argued that Piper "wasn't wired correctly to start with," having been born with a learning disability and ADHD. Id. at 84–85. He emphasized Linda's refusal to get Piper the therapeutic help he so clearly needed, id. at 90, as well as her penchant for corporal punishment, id. at 89.

The jury found all three aggravating factors alleged by the State and sentenced Piper to death. Doc. 2 at 333–34. Judge Eckrich entered judgment in early August 2011 and appointed attorney Steve Miller as appellate counsel. Id. at 304–05, 337; Doc. 67 ¶ 7. Piper appealed to the Supreme Court of South Dakota, arguing that Judge Eckrich erred by denying his motion to withdraw his guilty pleas and that his sentence was disproportionate to the life sentence Hoadley received.[11] Doc. 2-1 at 7–42. The Supreme Court of South Dakota affirmed in early 2014, holding that Piper's sentence was lawful and that his motions to withdraw his guilty pleas were beyond the scope of the court's limited 2009 remand. Piper III, 842 N.W.2d at 344–51.

### C.    State Habeas Case

Piper filed a pro se state habeas petition in mid-March 2014. Doc. 2 at 313; Doc. 2-1 at 44–48. He claimed that the State had presented false testimony and withheld material evidence,

---

[11]When Piper appealed his initial sentence, two justices on the Supreme Court of South Dakota agreed that his death sentence was grossly disproportionate to Hoadley's life sentence. Piper I, 709 N.W.2d at 822 (Sabers, J., dissenting).

that his 2001 guilty pleas were not knowing and intelligent, and that he received ineffective assistance of counsel. Doc. 2-1 at 44–48. Judge Randall Macy appointed attorney Matthew Kinney to represent Piper. Kinney secured an order staying Piper's execution and began work on the case. Doc. 103 at 62, 68–71, 73–74. An evidentiary hearing was set for mid-July 2015. Id. at 99. In June 2015, Kinney moved to postpone the hearing so that he could have more time to review "the voluminous amounts of documents and discovery in this matter." Id. at 102. At a hearing on the motion, Kinney explained that he planned to move to withdraw Piper's guilty pleas in the criminal case so that this issue would be exhausted for any federal habeas action Piper might bring. Id. at 530–31. He added that he was "on schedule," that he and Kim de Hueck, an attorney at his firm, had "spent some good time on this," and that de Hueck had "seen Mr. Piper at least on two or three occasions for long periods of time in the South Dakota State Pen." Id. at 532. Judge Macy granted the continuance and moved the evidentiary hearing to October 2015. Id. at 118.

Kinney moved for another continuance in September 2015. The motion explained that Judge Eckrich had yet to rule on Piper's motion to withdraw his guilty pleas and that Piper wanted to exhaust this issue before Judge Macy ruled on his habeas petition. Doc. 103 at 122–24. Judge Macy granted the motion and set a status conference for January 2016. Id. at 131. In the meantime, Judge Eckrich held a hearing on Piper's motion to withdraw his guilty pleas and both parties submitted briefs on the issue. Id. at 557–58. Piper and the State agreed to continue the habeas hearing until Judge Eckrich ruled on Piper's motion. Id. at 558–59. Judge Eckrich denied Piper's motion in February 2016. Id. at 564–65. Piper filed an immediate appeal, but the Supreme Court of South Dakota dismissed it for a lack of jurisdiction. Piper IV, 936 N.W.2d at 803. With the effort to withdraw the guilty pleas concluded, Judge Macy set the evidentiary hearing for July 2016. Doc. 103 at 134, 564. Kinney prepared a writ of habeas corpus ad testificandum directing

that Piper be brought to Lawrence County before the hearing so that he could meet with his attorneys. Id. at 143–44. Kinney also subpoenaed Van Norman and Stonefield. Id. at 138–41.

At the evidentiary hearing, Kinney presented testimony from Van Norman, Stonefield, and Steve Miller. He questioned Van Norman and Stonefield about the motion to withdraw Piper's guilty pleas, voir dire and jury selection, preparation for and cross of certain witnesses, supposedly inconsistent arguments the State made about the leadership roles of Piper and Page during Poage's murder, and which issues they believed Miller should have raised on appeal. Doc. 90-11 at 7–36, 44–82, 114–60. Kinney questioned Miller on his advice to Piper that it would be premature to challenge his guilty pleas during his initial state habeas case, the motion to withdraw Piper's guilty pleas, and Miller's decision on which arguments to raise in Piper's appeal. Id. at 196–221. Miller testified that although he could not "specifically recall" discussing with trial counsel whether he should appeal Judge Eckrich's denials of Piper's challenges for cause to potential jurors, he had read the entire record and concluded that he had no issue that was "even arguably close" to as strong as the claim that Judge Eckrich erred by denying Piper's motion to withdraw his guilty pleas.[12] Id. at 218. Kinney did not ask anyone about Piper possibly having brain damage or FASD and did not offer any evidence beyond the testimony of Piper's three previous lawyers.

Piper himself was also allowed to question his former attorneys. When Piper asked how long Sheldon had requested to prepare her report, Van Norman admitted that she had been rushed:

> I remember we jammed her up, and there were two reasons
> I think that that happened. One is that we waited quite a while for a
> couple of rulings by Judge Eckrich which were pretty important.
> One could have been dispositive of the case, and that was on the
> motion to withdraw your guilty plea. And then there was – there

---

[12]Miller testified that he had only raised the disproportionate-sentence argument because the Supreme Court of South Dakota was already going to review the issue as part of the automatic appeal in every death penalty case in South Dakota, and Miller felt like he "had" to raise it. Doc. 90-11 at 212–13, 218.

were several other pending decisions that took until February or March to get decided, of the same year we went to trial. We had started at that point looking for a mitigation specialist and even the very experienced ones we talked to, they were too expensive or unavailable because they wanted at least a year lead time to properly do their work. And there's a national organization of mitigation specialists, and I understood what their standards were.

So we ended up finding Ms. Sheldon, and then pushing her very hard to try to do what she could do. There were a couple of things about her that were a little odd. She wouldn't fly, she lived in Tuscan [sic] so she'd need to drive or take a bus or a train to get different places, and we were balancing schedules for her to even see you at the penitentiary to do very essential things.

Id. at 40–41. Van Norman acknowledged that, if Sheldon had needed more time to complete her work and he and Stonefield had not requested a continuance, he had not "protect[ed] that aspect of [Piper's] case." Id. at 42–43.

Judge Macy ordered the parties to file proposed findings of fact and conclusions of law after they received the transcript of the habeas hearing. Id. at 228–29; Doc. 103 at 145. Kinney and the State filed their proposed findings of fact and conclusions of law in early October 2016. Doc. 103 at 410–59. Piper's proposed findings of fact and conclusions of law raised these grounds for relief:

(1) that his 2001 guilty pleas were not knowing and intelligent;

(2) that Duffy, Rensch, and Piper's initial state habeas counsel (Miller) were ineffective in advising him about his guilty pleas and right to a jury trial;

(3) that Van Norman and Stonefield were ineffective during voir dire in handling potential jurors Sagdalen and Carlin, failing to thoroughly investigate State witnesses from the Penitentiary, failing to adequately investigate Tom Curtis, and failing to respond appropriately when Sister Crowley was questioned about the alleged prison policy.

(4) that Miller was ineffective in his role as appellate counsel after the jury verdict by failing to appeal Judge Eckrich's denial of the motions to strike Sagdalen and Carlin as well as the denial of

> Piper's motion for a mistrial after Fitzgerald asked whether
> inmates were allowed to have television.

Doc. 85-1 at 30–31; Doc. 2-1 at 183–85. Some of these grounds for relief overlapped with Piper's pro se habeas petition while others were new. Kinney did not claim that Van Norman and Stonefield were ineffective by failing to adequately investigate and present life history and cognitive functioning evidence. The State filed a rebuttal brief, but Kinney did not. Doc. 103 at 460–65.

Judge Macy denied Piper's habeas petition on January 13, 2017, finding that Piper's guilty pleas were knowing and intelligent and that his attorneys had not performed ineffectively or prejudiced him. Doc. 2-1 at 180–204. Judge Macy entered an order on February 13, 2017, appointing Kinney to represent Piper on appeal of his habeas case. Doc. 103 at 504. Piper wrote to the Supreme Court of South Dakota asking that a new attorney be appointed for his appeal. Id. at 835–36. The court remanded Piper's request to the trial court and Judge Macy entered an order appointing Ryan Kolbeck as substitute counsel for Piper. Id. at 834, 843–44, 847. Kolbeck obtained an amended certificate of probable cause from the trial court and appealed to the Supreme Court of South Dakota. Id. at 953–54, 962–63. Piper raised the following claims on appeal:

1. That his guilty pleas were not knowing and intelligent;

2. That the State made inconsistent arguments during the separate proceedings for Page and Piper and that the State's inconsistent arguments should have been admitted at Piper's resentencing trial;

3. That the trial judge violated his right to due process by failing to strike potential jurors Sagdalen and Carlin for cause;

4. That counsel was ineffective by (a) presenting testimony from Dr. Wortzel and Dr. Ertz essentially admitting that Piper had committed the alleged aggravating factors; (b) providing incorrect legal advice about his guilty pleas; (c) failing to object when the trial court rehabilitated potential jurors Sagdalen and

Carlin; (d) failing to adequately investigate the State's witnesses from the Penitentiary; (e) failing to adequately investigate State witness Tom Curtis; (f) failing to appropriately respond to the State's assertion that Sister Crowley violated prison policy;

5.  That the State violated his right to due process by failing to provide an updated criminal history report for Curtis; and

6.  That Miller was ineffective as appellate counsel by failing to appeal Judge Eckrich's denial of Piper's motion for a mistrial and Judge Eckrich's refusal to strike Sagdalen and Carlin for cause.

Doc. 2-1 at 72–148.  The Supreme Court of South Dakota affirmed the denial of Piper's habeas petition in late 2019, concluding that res judicata barred some claims and that others failed on the merits.  Piper IV, 936 N.W.2d 793.

**D.     Federal Habeas Case**

Piper filed his federal habeas petition in December 2020, Doc. 1, and his amended federal habeas petition in August 2022, Doc. 67.  He raised these claims:

Claim I: Van Norman and Stonefield were ineffective by failing to adequately investigate and present life history and cognitive functioning evidence.

Claim II: [This claim was withdrawn.]

Claim III: Judge Eckrich improperly denied Piper's motion to strike juror Lisa Sagdalen for cause and both trial and appellate counsel were ineffective in handling the Sagdalen issues.

Claim IV: Van Norman and Stonefield were ineffective during voir dire in handling potential juror Dan Carlin and juror Dennis Anthony.

Claim V: Van Norman and Stonefield were ineffective in preparing for and handling Sister Crowley's cross examination.

Claim VI: Miller was ineffective by failing to appeal Judge Eckrich's denial of a motion for a mistrial after the State elicited testimony about whether inmates were allowed television in prison.

30

Claim VII: Fitzerald violated Piper's rights by introducing evidence of lewd behavior at Higgins Gulch and Van Norman and Stonefield were ineffective in responding to Fitzgerald's actions.

Claim VIII: Van Norman and Stonefield were ineffective by failing to move for a mistrial based on Fitzgerald's cumulative prosecutorial misconduct.

Claim IX: The State violated Piper's due process rights by failing to disclose Tom Curtis's criminal history and Van Norman and Stonefield were ineffective by failing to adequately investigate Curtis's background.

Claim X: Judge Eckrich violated Piper's rights under the Due Process Clause and Eighth Amendment by refusing to admit allegedly inconsistent arguments Fitzgerald made in Poage's trial.

Claim XI: Piper's guilty pleas were not knowing, voluntary, and intelligent.

Claim XII: Piper had a statutory right to withdraw his guilty pleas under South Dakota law and the State violated due process by arbitrarily denying him this right.

Claim XIII: Piper was prejudiced because of the cumulative effect of the errors in his case.

Doc. 67.

Piper filed a motion for testing to support Claim I, asking that four experts be allowed to visit him in prison to evaluate him for brain damage and FASD now. Doc. 60. He argued that the results of these tests would help him both to succeed on the merits of Claim I and to demonstrate cause and prejudice to excuse his procedural default of this claim. Doc. 62 at 3–4. This Court issued a decision in June 2023 finding that 28 U.S.C. § 2254(e)(2) and the Supreme Court's decision in Shinn v. Ramirez, 596 U.S. 366 (2022), barred Piper's motion for testing. Doc. 108.

This Court structured the deadlines in this case so that it could decide whether Piper's claims were exhausted or procedurally defaulted before ruling on whether Piper was entitled to any relief on his claims. Docs. 54, 84. In March 2024, this Court issued an opinion granting

Respondents summary judgment on Claims I, III.B, III.C, IV.B, VII, VIII, IX.A–D, X, XI, and XII. Doc. 122. This Court found that Piper had procedurally defaulted these claims and had failed to show the necessary cause and prejudice to avoid that default. Id. Respondents now move for summary judgment on the remaining exhausted claims in Piper's petition: III.D, III.E, IV.A, V, VI, IX.E, and XIII. Doc. 126.

## II.    Governing Law

Piper's remaining claims allege ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984). Respondents argues that AEDPA governs all these claims, and Piper responds that AEDPA doesn't apply because it's unconstitutional. To limit repetition, this Court first describes the standards under AEDPA and Strickland and addresses Piper's constitutional argument.

### A. AEDPA's Standards

AEDPA makes succeeding on a federal habeas petition difficult, even when prisoners follow all of a state's procedural rules and properly exhaust their claims in state court. Section 2254(d) bars federal courts from granting relief on any claim "that was adjudicated on the merits in State court" unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). This "difficult to meet and highly deferential standard for evaluating state-court rulings" requires "that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (cleaned up and citations omitted).

A state court decision is contrary to federal law under AEDPA "if it (1) contradicts a rule set forth in the Supreme Court's cases or (2) confronts a set of materially indistinguishable facts and arrives at a different result." Dansby v. Payne, 47 F.4th 647, 655 (8th Cir. 2022) (cleaned up and citation omitted). And a "decision unreasonably applies federal law if the state court correctly identifies the governing legal standard but either unreasonably applies it to the facts of the particular case or unreasonably extends or refuses to extend the legal standard to a new context." Id. at 656 (cleaned up and citation omitted). Prisoners claiming an unreasonable application of federal law "must show that a state court's adjudication was not only wrong, but also objectively unreasonable, such that fairminded jurists could not disagree about the proper resolution." Id. (citation omitted). This Court evaluates "the reasonableness of the state court's ultimate conclusion, not necessarily the reasoning used to justify the decision." Zornes v. Bolin, 37 F.4th 1411, 1415 (8th Cir. 2022); see also Springs v. Payne, 95 F.4th 596, 600–01 (8th Cir. 2024) (citing Zornes and Wilson v. Sellers, 584 U.S. 122 (2018)).[13] AEDPA also demands that a state court's factual determinations "shall be presumed to be correct," and gives the petitioner the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Ineffective Assistance Under Strickland**

---

[13]One habeas treatise reads the Supreme Court's decision in Wilson, 584 U.S. 122, as saying that federal courts cannot consider theories that could have supported the state court's decision unless the state court's decision was unexplained. Brian R. Means, Federal Habeas Manual § 3:70 (June 2024 update). That is, federal habeas courts are stuck with the state court's justifications when the state court issues a reasoned decision. Id. Piper does not argue that this Court is so limited, and this Court must follow Eighth Circuit precedent in any event. See Zornes, 37 F.4th at 1415; Springs, 95 F.4th at 600–01.

Strickland requires a petitioner claiming ineffective assistance to show both that counsel's performance was constitutionally deficient and that he was prejudiced by this deficiency. Strickland, 466 U.S. at 687. To demonstrate deficient performance, Piper must show that counsel's "representation fell below an objective standard of reasonableness" given "all the circumstances." Id. at 688. This standard is "highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Piper has the burden of showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 687.

To establish prejudice, Piper must show a "reasonable probability" that, but for his attorneys' deficient performance, the outcome of his trial would have been different. Id. at 694. Since Piper is challenging his capital sentencing trial, "the question is whether there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695; see also Andrus v. Texas, 590 U.S. 806, 822 (2020) (per curiam) (explaining that, in a state where the law required a unanimous jury recommendation for a death sentence, the petitioner had to show a reasonable probability "that at least one juror would have struck a different balance" (citation omitted)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "That requires a substantial, not just conceivable, likelihood of a different result." Cullen, 563 U.S. at 189 (cleaned up and citation omitted). Petitioners must meet both Strickland prongs to succeed on an ineffectiveness claim, and courts can begin (and perhaps end) with either prong. Williams v. Norris, 576 F.3d 850, 858 (8th Cir. 2009).

These same Strickland standards apply to Piper's claims of ineffective assistance of appellate counsel. See United States v. Brown, 528 F.3d 1030, 1032–33 (8th Cir. 2008). "Because

one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be held to be ineffective for failure to raise every conceivable issue." Link v. Luebbers, 469 F.3d 1197, 1205 (8th Cir. 2006). "[A]bsent contrary evidence, [courts] assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." Brown, 528 F.3d at 1033 (cleaned up and citation omitted).

Federal habeas courts reviewing a state court's application of Strickland must layer deference upon deference, taking "a highly deferential look at counsel's performance" under Strickland "through the deferential lens of § 2254(d)." Cullen, 563 U.S. at 190 (cleaned up and citation omitted).

### C. Piper's Constitutional Challenge to AEDPA

Piper argues AEDPA's standards don't apply because the Supreme Court's decision in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024), renders AEDPA unconstitutional as violative of Article III of the Constitution. Article III made the Federal Judiciary an independent branch of government with the "'province and duty to say what the law is' in particular cases and controversies." Bank Markazi v. Peterson, 578 U.S. 212, 225 (2016) (cleaned up) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)). Piper claims that AEDPA violates Article III and the Supremacy Clause because it prohibits federal courts from making independent judgments about whether a petitioner's state court conviction is unconstitutional. Every federal appellate court to have considered these arguments before Loper Bright has rejected it.

First, these courts have held that while § 2254(d)(1) limits relief to habeas petitioners, it does not prohibit federal judges from interpreting the law independently. Cobb v. Thaler, 682 F.3d 364, 374 (5th Cir. 2012); Evans v. Thompson, 518 F.3d 1, 11 (1st Cir. 2008) ("There is a world of difference between telling a court how to decide a case given a certain set of facts and limiting the

availability of relief *after* a judge independently determines the existence of a right and the reach of Supreme Court precedent."); Crater v. Galaza, 491 F.3d 1119, 1128 (9th Cir. 2007) ("Section 2254(d)(1) does not restrict the federal courts' power to interpret the law, but only sets standards for what state court errors of law require federal habeas relief."); Green v. French, 143 F.3d 865, 874–75 (4th Cir. 1998), abrogated on other grounds by Williams v. Taylor, 529 U.S. 362 (2000); Lindh v. Murphy, 96 F.3d 856, 870 (7th Cir. 1996) (en banc) ("Federal courts acting within their jurisdiction are always entitled to interpret the law independently.  Section 2254(d)(1) as we read it does no more than regulate relief."), reversed on other grounds, 521 U.S. 320 (1997); see also Evans, 518 F.3d at 8 n.3 (rejecting argument that AEDPA violates the Supremacy Clause).  As these courts of appeals recognized, AEDPA is hardly the only rule limiting relief for constitutional violations.  Cobb, 682 F.3d at 375; Evans, 518 F.3d at 8–9; Lindh, 96 F.3d at 870–72.  Qualified immunity, for instance, can bar an award of damages even if a state official violated the Constitution.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Supreme Court's retroactivity decision in Teague v. Lane, 489 U.S. 288, 310 (1989), can likewise prohibit federal habeas courts from granting relief on new rules of constitutional law.  Evans, 518 F.3d at 9.  And the Court's rule in Stone v. Powell, 428 U.S. 465 (1976), can prohibit federal habeas relief for state prisoners convicted with evidence seized unconstitutionally.  Cobb, 682 F.3d at 375.  If the limits in Teague and Stone are constitutional, the courts of appeals reasoned, then so too are the limits on relief in § 2254(d)(1).  Lindh, 96 F.3d at 871–72; Cobb, 682 F.3d at 375; Green, 143 F.3d at 875.

Second, these courts of appeals reasoned that Congress has the authority to limit lower federal courts' power to grant habeas relief to state prisoners.  Cobb, 682 F.3d at 375–77; Evans, 518 F.3d at 8–10; Crater, 491 F.3d at 1127–29; Lindh, 96 F.3d at 871–74.  Reviewing Supreme Court precedent and the history of habeas corpus, these courts rejected the idea that once Congress

gives lower courts jurisdiction to hear certain cases, "it must not limit the discretion of judges to resolve those cases however they see fit." Evans, 518 F.3d at 8; see also Cobb, 682 F.3d at 375 (describing how the Supreme Court "has long permitted Congress to extend habeas jurisdiction to federal courts without authorizing them to reconsider the legal determinations of criminal courts"); Crater, 491 F.3d at 1127–29; Lindh, 96 F.3d at 872 ("Regulating relief is a far cry from limiting the interpretive powers of the courts, however, and Congress has ample power to adjust the circumstances under which the remedy of the writ of habeas corpus is deployed."); id. at 873–74 ("We would have to cast history to the winds to say that [§ 2254(d)(1)], which respects fully-litigated judgments unless the state court has gone seriously wrong, transgresses constitutional limitations.").

Piper argues that Loper Bright vitiates the persuasive value of these cases. The Supreme Court in Loper Bright overruled the holding in Chevron v. U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), that federal courts must defer to "permissible" agency interpretations of certain statutes. The Court began with Article III and how federal courts had traditionally treated agencies' legal interpretations. Article III, the Court explained, gives the Federal Judiciary the power to "say what the law is" free from influence by the political branches. Loper Bright, 603 U.S. at 385 (citation omitted). Consistent with this understanding that legal questions are for the judiciary to decide, federal courts had historically given "due respect" to agency interpretations of federal statutes without allowing those interpretations to "supersede" their own judgment. Id. at 385–86. The Court in Loper Bright reasoned that Congress had incorporated this understanding into the Administrative Procedures Act (APA), explaining that § 706 of the APA "codifies for agency cases the unremarkable, yet elemental proposition . . . that courts decide legal questions by applying their own judgment." 603 U.S. at 391–92; see also 5

37

U.S.C. § 706 (stating that courts reviewing agency action "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action"). The Court held that the deference required by <u>Chevron</u> "cannot not be squared" with the APA's command that a reviewing court "decide *all* relevant questions of law." <u>Loper Bright</u>, 603 U.S. at 396, 398.

     <u>Loper Bright</u> does not undermine the well-reasoned opinions from the courts of appeals that AEDPA is constitutional. First, <u>Loper Bright</u> in no way suggests that Article III requires lower federal courts to discount state court decisions on constitutional issues and review those decisions de novo. Indeed, although the <u>Loper Bright</u> majority opinion discussed Article III, it stopped short of saying deference to agency interpretations violated the Constitution and said nothing about state court decisions. Second, <u>Loper Bright</u> involved administrative law and the judicially-created <u>Chevron</u> doctrine, not habeas corpus and the congressionally-enacted limits in AEDPA. <u>Loper Bright</u> did not discuss the significant comity and finality issues raised by habeas corpus and provides no support for Piper's argument that Congress lacks the authority to limit lower federal courts' power to grant habeas relief to state prisoners. <u>See</u> <u>Felker v. Turpin</u>, 518 U.S. 651, 664 (1996) ("[J]udgments about the proper scope of [habeas corpus] are normally for Congress to make." (cleaned up and citation omitted)); <u>Teague</u>, 489 U.S. at 308 ("[I]nterests of comity and finality must . . . be considered in determining the proper scope of habeas review."); <u>Burt v. Titlow</u>, 571 U.S. 12, 19 (2013) ("AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights."); <u>Woods v. Donald</u>, 575 U.S. 312, 316 (2015) (per curiam) (explaining that AEDPA's standards "serve[] important interests of federalism and comity."). Third, <u>Loper Bright</u> does not undermine the rights/remedies distinction drawn by the courts of appeals considering AEDPA and their conclusion that AEDPA limits

habeas relief but not the judiciary's ability to independently interpret the law. Fourth, the only court to have ruled on the argument that <u>Loper Bright</u> renders AEPDA unconstitutional has disagreed with Piper. <u>Smith v. Thornell</u>, No. CV-12-00318, 2025 WL 563453, at *6 (D. Ariz. Feb. 20, 2025) ("The Court has no basis on which to decree the AEDPA unconstitutional or find that <u>Loper Bright</u> silently overruled cases . . . which have interpreted and applied § 2254(d)(1)."). <u>Loper Bright</u> does not render AEDPA unconstitutional, and thus Piper must satisfy AEDPA's standards to secure relief.

## III.    Analysis of Claims

### A. Claims III & IV

Claims III and IV of Piper's petition overlap, so this Court analyzes them together. Claim III involves potential juror Lisa Sagdalen. Doc. 67 at 67–80. Piper alleged that Judge Eckrich improperly denied his motion to strike Sagdalen for cause (Claim III.B), that this denial caused prejudice by forcing him to waste a peremptory strike on Sagdalen rather than using it on biased Juror Anthony (Claim III.C), that counsel were ineffective by not objecting to Judge Eckrich's questioning of Sagdalen (Claim III.D), and that Miller was ineffective by failing to argue on direct appeal that Judge Eckrich erred by denying the motion to strike Sagdalen for cause (Claim III.E).

This Court granted Respondents summary judgment on Claims III.B and III.C, holding that these claims were procedurally defaulted and barred by res judicata. Doc. 122 at 68–73. In rejecting Piper's attempts to avoid procedural default, this Court concluded that it could not consider Piper's argument that Juror Anthony's presence on the jury prejudiced him because Piper had not fairly presented that argument to the Supreme Court of South Dakota. <u>Id.</u> at 71–73.

Claim IV also involved voir dire. Claim IV.A alleged that Piper's attorneys were ineffective by not objecting to Judge Eckrich's questioning of potential juror Dan Carlin. Piper

asserted that Judge Eckrich would have struck Carlin for cause if counsel had only objected to the Judge's questions, that this would have saved Piper a peremptory strike, and that he could have used that strike on biased Juror Anthony. Doc. 67 at 86. Claim IV.B alleged that trial counsel performed ineffectively by not challenging Juror Anthony for cause or not requesting an additional peremptory strike to use on him. Doc. 67 at 87. This Court granted Respondents summary judgment on Claim IV.B because Piper failed to exhaust it in state court and could not overcome his procedural default. Doc. 122 at 81.

Respondents now move for summary judgment on Claims III.D, III.E, and IV.A, arguing that the Supreme Court of South Dakota's rejection of these claims was not contrary to or an unreasonable application of federal law. Piper disagrees and argues that this Court should consider the Juror Anthony evidence when analyzing Claims III.D, III.E, and IV.A.

### 1.    Juror Anthony Evidence

As Piper recognizes, the Juror Anthony evidence is "essential" to Claims III.D, III.E, and IV.A. Doc. 131 at 20. "[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45 (1980). And "[s]o long as the jury that sits is impartial," a defendant's loss of a peremptory strike to fix a court's erroneous failure to dismiss a juror for cause does not violate the Constitution. Ross v. Oklahoma, 487 U.S. 81, 88 (1988). In other words, a prisoner complaining about the loss of a peremptory strike cannot establish a constitutional violation without showing that a juror who heard the case was biased. Ramsey v. Bowersox, 149 F.3d 749, 758 (8th Cir. 1998). Since Piper relies on Anthony's presence on the jury to establish Strickland prejudice, Doc. 131 at 20, 26–27, juror bias is likewise critical to his ineffective assistance of counsel claim, see Sanders v Norris,

40

529 F.3d 787, 790–94 (8th Cir. 2008) (holding that the petitioner's ineffective assistance claim failed for lack of prejudice because he had not shown that the juror was partial); Krutilek v. Kenney, 125 F. App'x 93, 95 (8th Cir. 2005) (unpublished) (per curiam) ("[B]ecause the jurors were not biased, Krutilek cannot show his attorney's failure [during voir dire] prejudiced him."); Singleton v. Lockhart, 871 F.2d 1395, 1400 (8th Cir. 1989) (holding that petitioner could not show prejudice on his claim that counsel was ineffective during voir dire where there was no evidence that juror in question was biased); Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) ("Ybarra has not made the required showing of prejudice under Strickland, because he has not shown that any juror who harbored an actual bias was seated on the jury as a result of counsel's failure to voir dire on the insanity defense.").

Piper argues that this Court erred by holding that he failed to properly exhaust the Juror Anthony aspect of his claims. A prisoner has not properly exhausted a claim unless he "fairly presented" it to the state court. Picard v. Connor, 404 U.S. 270, 275–76 (1971). A "fair presentation," in turn, requires that the prisoner "present the same facts and legal theories to the state court that he later presents to the federal courts." Morris v. Norris, 83 F.3d 268, 270 (8th Cir. 1996) (citation omitted). Although the federal claim "cannot contain significant additional facts[,] . . . closely related claims containing an arguable factual commonality may be reviewed." Ward v. Norris, 577 F.3d 925, 935 (8th Cir. 2009) (citation omitted).

This Court's Juror Anthony ruling was correct. Piper argued in state court that the denial of counsel's motion to strike Sagdalen and Carlin for cause violated his right to a fair trial, that counsel was ineffective by not objecting to Judge Eckrich's questioning of Sagdalen and Carlin, and that Miller was ineffective by not appealing the denial of the motions to strike Sagdalen and Carlin for cause. Doc. 2-1 at 122–27. But while Piper argued generally that these alleged errors

41

prejudiced him, he never claimed that Anthony or any other juror who heard his case was impermissibly biased. See Doc. 2-1 at 119–27; Piper's Reply Brief, 2018 WL 10152750, at *16– 18. Rather, he argued that unlike the federal rule, South Dakota law did not require him to show that a member of the jury was biased to succeed on a fair trial claim. Piper's Reply Brief, 2018 WL 10152750, at *16–18. The Supreme Court of South Dakota disagreed, explaining that the loss of a peremptory challenge does not violate the Constitution absent a showing of juror bias. Piper IV, 936 N.W.2d at 812–13. Piper did not make this showing, so the court held that he could neither establish prejudice under Strickland for his voir dire claims nor succeed on his free-standing fair trial claim. Id. Since Piper's voir dire claims lacked merit, the court held that Miller was not ineffective for failing to raise them on direct appeal. Id. at 814 n.19. Claims III.D, III.E., and IV.A now rely on Anthony's supposed bias to establish prejudice. Doc. 131 at 20, 26–30. That is, these claims seek to supply the missing element of prejudice for Piper's voir dire claims and address one of the very reasons the Supreme Court of South Dakota rejected them. As this Court explained in its prior opinion, the Juror Anthony aspect of Claims III.D, III.E, and IV.A is simply too different from the claims Piper raised in state court to be considered fairly presented. Doc. 122 at 72.

Piper disagrees; he claims that the Eighth Circuit's focus in applying the fair presentation requirement has been on whether the petitioner adequately identified the constitutional basis for the claim in state court and then raised that same basis in federal court. Doc. 131 at 21. In Piper's view, raising the same general constitutional error in state and federal court is enough to fairly present a claim. Id. at 23. None of the cases Piper cites supports this interpretation of Eighth Circuit jurisprudence, however, and only one—Anderson v. Groose, 106 F.3d 242 (8th Cir. 1997)—even deserves mention. The question in Anderson was whether the petitioner's "one

vague reference" to ineffective assistance—he argued in state court that the trial judge denied him the effective assistance of counsel by precluding testimony from a belatedly-noticed alibi witness—was enough to fairly present his claim that trial counsel had been ineffective by failing to adequately pursue alibi witnesses. Id. at 245. "Giving [the petitioner] the benefit of the doubt," the Eighth Circuit concluded that "there may be an arguable factual commonality between" the petitioner's ineffective assistance claim in state court and his ineffective assistance claim in federal court. Id. (cleaned up). The Eighth Circuit then considered the claim but found it meritless. Id.

The decision in Anderson to give the petitioner "the benefit of the doubt" does not mean that Piper fairly presented the Juror Anthony aspect of his voir dire claims in state court. The Eighth Circuit requires a prisoner to "present *both* the *factual and legal* premises of his claims to the state court" to exhaust the claims properly. Dansby v. Hobbs, 766 F.3d 809, 823 (8th Cir. 2014) (cleaned up and citation omitted); see also Fairchild v. Workman, 579 F.3d 1134, 1149 (10th Cir. 2009) ("A claim is more than a mere theory on which a court could grant relief; a claim must have a factual basis, and an adjudication of that claim requires an evaluation of that factual basis." (citation omitted)). A prisoner has not properly exhausted a claim when either new facts or new arguments make it significantly different from the claim asserted in state court. See Nash v. Russell, 807 F.3d 892, 898 (8th Cir. 2015) (holding that the petitioner did not fairly present his claim where he made a facial challenge to a state evidentiary rule in state court and then an as-applied challenge in his federal habeas petition); Ward, 577 F.3d at 935–36 (finding that the petitioner was trying to "broaden impermissibly his ineffective assistance of counsel claim" when he argued in state court that counsel should have sought recusal of the trial judge after the judge exhibited bias by refusing to allow the prosecutor and defense attorney the same opportunity to approach the bench but then tried to offer additional factual bases showing the trial judge's alleged

43

bias in his federal habeas appeal); Williams, 576 F.3d at 865 (holding that the petitioner did not fairly present his claims that the state had inappropriately struck two specific African American jurors where the petitioner's direct appeal challenged "the State's use of peremptory strikes generally, but not the strikes" of the two jurors specifically); Wooten v. Norris, 578 F.3d 767, 777–78 (8th Cir. 2009) (concluding claim that trial counsel was ineffective in the penalty phase by failing to assert mental infirmities to rebut the state's arguments about a death-qualifying aggravator was procedurally defaulted because while the petitioner had argued in state court that trial counsel was generally ineffective for failing to present additional mitigation evidence, he did not identify what the mitigation evidence was or how it would have impacted the trial).

Here, the Juror Anthony aspect of Claims III.D, III.E, and IV.A alters the claims so much that the Supreme Court of South Dakota's decision no longer even addresses the substance of the claims. For the exhaustion requirement to have any meaning, Piper cannot use his federal habeas petition to supply the missing element of a claim raised in state court and to address the very reason the Supreme Court of South Dakota rejected the claim. See Picard, 404 U.S. at 276 (explaining that the exhaustion requirement "would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts"). Because Piper did not fairly present the Juror Anthony aspect of Claims III.D, III.E, and IV.A to the Supreme Court of South Dakota, this Court cannot consider that aspect when ruling on the claims.[14]

--------

[14]This Court's prior opinion also found Piper did not have a substantial claim under Martinez v. Ryan, 566 U.S. 1 (2012), that Juror Anthony was impermissibly biased in favor of the death penalty. Doc. 122 at 75–80. Piper now argues that this Court applied the wrong standard in making that finding. That is not correct. This Court's analysis of the Juror Anthony issue began by explaining that the "standard for excusing jurors for cause in a capital case is whether their views would prevent or substantially impair the performance of their duties as a juror in accordance with their instructions and their oath." Doc. 122 at 75 (cleaned up) (quoting Morgan v. Illinois, 504 U.S. 719, 728 (1992)). This is the correct standard and the same standard Piper cites in his brief. Doc. 131 at 15. A few pages after citing the correct standard, this Court wrote that Juror

2.    **Adjudication on the Merits**

Piper argues that de novo review applies to Claims III.D and IV.A because the Supreme Court of South Dakota misconstrued the claims and never actually decided them. Piper is correct that § 2254(d) only applies to claims that state courts have "adjudicated on the merits," 28 U.S.C. § 2254(d), and that review is de novo absent such an adjudication, <u>Porter v. McCollum</u>, 558 U.S. 30, 39 (2009) (per curiam). But he overlooks the presumption that applies to state court decisions. Federal courts "presume that a state court has adjudicated a federal claim on the merits if the defendant presented the claim to the state court and the court denied relief." <u>Dansby</u>, 47 F.4th at 655 (citing <u>Harrington v. Richter</u>, 562 U.S. 86, 99 (2011)). "This presumption applies even when the state court's opinion does not expressly address the claim." <u>Id.</u> (citing <u>Johnson v. Williams</u>, 568 U.S. 289, 300–01 (2013)). Though "strong," this presumption "can in some limited circumstances be rebutted." <u>Johnson</u>, 568 U.S. at 301. De novo review applies, for instance, when "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court."[15] <u>Johnson</u>, 568 U.S. at 303.

---

Anthony's "voir dire as a whole shows that he was not a juror whose views on capital punishment would have prevented him from following the law and the judge's instructions." Doc. 122 at 79. This is not, as Piper argues, a sign that this Court failed to consider whether Juror Anthony's views substantially impaired his ability to follow the law and the judge's instructions. Instead, it was merely a shorthand way of referring to the standard this Court quoted at the start of its analysis.

[15]Piper cites to several out-of-circuit cases to support his argument for de novo review of Claims III.D and IV.A. <u>See, e.g.</u>, <u>Campbell v. Bradshaw</u>, 674 F.3d 578, 596 (6th Cir. 2012) (conducting de novo review because state court did not "reach the core" of the petitioner's argument); <u>Chadwick v. Janecka</u>, 312 F.3d 597, 606 (3d Cir. 2002) ("[I]f an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply."). Since the Supreme Court issued <u>Johnson</u>, 568 U.S. 289, however, at least one of these courts of appeals has questioned the reasoning in the case on which Piper relies. <u>See</u> <u>Smith v. Cook</u>, 956 F.3d 377, 387 (6th Cir. 2020) (explaining that the approach in <u>Campbell</u>, 674 F.3d 578, "is hard to reconcile with <u>Johnson's</u> healthy presumption of merits adjudication").

But a state court opinion need not be perfect to constitute an adjudication on the merits.  In Worthington v. Roper, 631 F.3d 487 (8th Cir. 2011), for example, the Eighth Circuit rejected an argument that the state court failed to adjudicate a portion of the petitioner's claim because it did not "adequately scrutinize his allegation that counsel performed ineffectively at the penalty phase by failing to supply experts with comprehensive background information." Id. at 496.  Although the state court apparently failed to fully analyze this allegation about not supplying the experts with background information, it still discussed counsel's performance and determined that the ineffective assistance claim "as a whole lacked merit." Id. at 497.  Since AEDPA does not require that a state court's decision be "well-articulated or even . . . correct," the Eighth Circuit found that the state court's decision "plainly" sufficed as an adjudication on the merits. Id.  Other federal courts of appeals have treated the adjudication-on-the-merits requirement the same way.  See Smith v. Cook, 956 F.3d 377, 386 (6th Cir. 2020) ("We have held that Johnson's presumption prevails when a state court imperfectly discusses, rather than omits, a petitioner's federal claim."); Lee v. Comm'r, Ala. Dep't of Corrs., 726 F.3d 1172, 1211 (11th Cir. 2013) (rejecting the petitioner's argument that a state court's decision is not entitled to deference unless the "opinion on its face 'shows its work' by explicitly mentioning 'all relevant circumstances' argued by" the petitioner); Jenkins v. Bergeron, 824 F.3d 148, 152 (1st Cir. 2016) (applying AEDPA deference even though the state court "did not explicitly discuss one subsidiary argument" that the petitioner made to support his claim).

Piper now asserts that the Supreme Court of South Dakota did not adjudicate Claims III.D and IV.A on the merits.  Piper argued in state court that the denial of counsel's motions to strike Sagdalen and Carlin for cause violated his right to a fair trial and that counsel had been ineffective by not objecting to Judge Eckrich's questioning of Sagdalen and Carlin. Doc. 2-1 at 122–27.  The

Supreme Court of South Dakota concluded that res judicata barred the free-standing fair trial claim and that the claim didn't fare any better when "viewed through the lens of the Strickland analysis." Piper IV, 936 N.W.2d at 812. The court addressed Strickland's deficient performance prong first:

> As to the first prong of Strickland, Piper has not demonstrated his attorneys' efforts fell below a standard of reasonableness. Indeed, Piper's counsel challenged the two potential jurors he identifies—Sagdalen and Carlin—for cause, citing concerns about what he describes as an inclination to impose the death penalty. When the court denied the cause challenges, Piper's attorneys exercised peremptory strikes to ensure that the two jurors did not become part of the jury that considered Piper's sentence.

Id. The court addressed Strickland's prejudice prong next, holding that Piper could not establish prejudice because he failed to show that any of the jurors were impermissibly biased. Id. at 812–13. Piper argues here that the Supreme Court of South Dakota's analysis shows that it misconstrued his claim as being that trial counsel was ineffective for failing to object at all to Sagdalen and Carlin.

Piper has not rebutted the presumption that the Supreme Court of South Dakota adjudicated Claims III.D and IV.A on the merits. Like the state court in Worthington, the Supreme Court of South Dakota discussed trial counsels' performance and found that the ineffective assistance claim as a whole lacked merit. Worthington, 631 F.3d at 496–97; Piper IV, 936 N.W.2d at 812–13. And while the Supreme Court of South Dakota's analysis of the performance prong focused on the appropriate actions trial counsel took rather than on what the petitioner alleged counsel failed to do, so did the state court in Worthington. Worthington, 631 F.3d at 496–97; Piper IV, 936 N.W.2d at 812. The Supreme Court of South Dakota's analysis can be understood as concluding that trial counsel took reasonable steps to deal with Sagdalen and Carlin and that their performance did not become deficient merely by failing to object to Judge Eckrich's voir dire. Indeed, it is not surprising that the court did not specifically discuss Piper's assertion that counsel should have

47

objected to Judge Eckrich's questioning of Sagdalen and Carlin; this is not a strong argument given the sort of questions Judge Eckrich asked, and Piper did not cite a single case where a court found deficient performance by failing to object to the trial judge's voir dire. The Supreme Court of South Dakota's decision not to articulate each step of its reasoning does not show that it overlooked Piper's claim.

### 3.    Claims III.D and IV.A

The Supreme Court of South Dakota correctly stated the <u>Strickland</u> standard, and there is no contrary Supreme Court decision with materially indistinguishable facts, so the Supreme Court of South Dakota's decision was not contrary to clearly established law. Piper argues, however, that the Supreme Court of South Dakota unreasonably applied <u>Strickland</u> when deciding Claims III.D and IV.A and based its decision on an unreasonable determination of facts given the evidence presented. <u>See</u> § 2254(d)(1), (2). These arguments largely repeat Piper's assertion that the Supreme Court of South Dakota failed to adjudicate his claims on the merits.

Piper argues first that the Supreme Court of South Dakota based its prejudice ruling on an unreasonable determination of fact because it "ignored entirely the portion of the record reflecting the trial court's interference with voir dire." Doc. 131 at 28. Piper does not cite any authority to support this argument; there are, however, some cases finding an unreasonable factual determination when the state court ignored evidence that was "highly probative and central to petitioner's claim" and "sufficient to support petitioner's claim when considered in the context of the full record." <u>Taylor v. Maddox</u>, 366 F.3d 992, 1001 (9th Cir. 2004), <u>overruled on other grounds by</u> <u>Murray v. Schriro</u>, 745 F.3d 984 (9th Cir. 2014). That is not what happened here, though. As just stated, Piper's argument that counsel should have objected to Judge Eckrich's questioning of Sagdalen and Carlin after Piper challenged them for cause is weak. After all, trial judges have

"wide discretion" when conducting voir dire in "areas of inquiry that might tend to show juror bias," Mu'Min v. Virginia, 500 U.S. 415, 427 (1991), as well as a "duty to investigate colorable claims of juror bias when they arise," Fylling v. Royal Caribbean Cruises, Ltd., 91 F.4th 1371, 1375–76 (11th Cir. 2024).  Piper has never cited any cases suggesting that Judge Eckrich's questions were inappropriate or that trial counsel performs deficiently by failing to object to the sort of questions Judge Eckrich asked.  See generally Miller v. Province, 509 F. App'x 744, 747–48 (10th Cir. 2013) (denying certificate of appealability on claim that trial judge asked inappropriate questions during voir dire).  The Supreme Court of South Dakota could reasonably have determined that Piper's failure-to-object argument did not warrant discussion, especially when counsel challenged Sagdalen and Carlin for cause and then used peremptory strikes to keep them off the jury.

Piper argues next that the Supreme Court of South Dakota applied Strickland unreasonably by failing to consider "whether, *in light of all the circumstances*, the identified acts or omissions were outside the wide range of professionally competent assistance."  Doc. 131 at 28 (quoting Strickland, 466 U.S. at 690).  This argument fails too, as state courts are not required to mention every weak argument or piece of evidence to reasonably apply Strickland.  See Crockett v. Clark, 35 F.4th 231, 244 (4th Cir. 2022) (explaining that "a state court need not refer to each piece of a petitioner's evidence" for a decision under Strickland to be reasonable).

Turning to Strickland's second prong, Piper argues that the Supreme Court of South Dakota's failure to mention the Juror Anthony evidence means that its prejudice analysis was based on an unreasonable determination of fact and unreasonably applied Strickland.  This Court cannot consider the Juror Anthony aspect of Piper's claims, however, because Piper never fairly presented it to the Supreme Court of South Dakota.  Nor did the Supreme Court of South Dakota

have any reason to discuss Juror Anthony in its analysis. The State's brief on appeal pointed out that the loss of a peremptory strike to fix an erroneous failure to dismiss a juror for cause does not violate the Constitution. State's Brief, 2018 WL 10152749, at *55–56. Piper responded by arguing that the rule in South Dakota was different and that he did not have to show that a member of the jury was biased. Piper's Reply Brief, 2018 WL 10152750, at *16–18. He did not argue that Juror Anthony or any other juror was impartial.

The Supreme Court of South Dakota did not unreasonably apply Strickland by rejecting the forms of Claims III.D and IV.A that Piper raised in state court. Indeed, it was more than reasonable for the court to conclude that Piper had not shown prejudice under Strickland because he failed to offer any evidence that the jurors who heard his case were biased. See Sanders, 529 F.3d at 790–94 (holding that the petitioner's ineffective assistance claim failed for lack of prejudice because he had not shown that the juror was partial); Krutilek, 125 F. App'x at 95 ("[B]ecause the jurors were not biased, Krutilek cannot show his attorney's failure [during voir dire] prejudiced him."); Singelton, 871 F.2d at 1400 (holding that petitioner could not show prejudice on his claim that counsel was ineffective during voir dire where there was no evidence that juror in question was biased); Ybarra, 656 F.3d at 1001 ("Ybarra has not made the required showing of prejudice under Strickland, because he has not shown that any juror who harbored an actual bias was seated on the jury as a result of counsel's failure to voir dire on the insanity defense."). Respondents are entitled to summary judgment on Claims III.D. and IV.A.

### 4.    Claim III.E

Piper alleges in Claim III.E that Miller was ineffective by failing to argue on direct appeal that Judge Eckrich erred by denying the motion to strike Sagdalen for cause. He argues that de novo review should apply because it is "unclear" whether the Supreme Court of South Dakota

adjudicated Claim III.E on the merits. Doc. 131 at 29. According to Piper, the court did not address Miller "at all in the juror claims." Id. Not so. The Supreme Court of South Dakota noted Miller's testimony that he did not raise the juror selection arguments "because of their relative weakness," found that the juror selection arguments "lack[ed] merit," and concluded that Piper's ineffective assistance of appellate counsel claim was thus "similarly unsupported." Piper IV, 936 N.W.2d at 814 n.19. This constitutes an adjudication on the merits and triggers § 2254(d).

Piper argues alternatively that the Supreme Court of South Dakota's failure to consider the Juror Anthony evidence means that it unreasonably applied Strickland and based its decision on an unreasonable determination of the facts. This argument fails for reasons already explained. This Court cannot consider the Juror Anthony aspect of Claim III.E and the Supreme Court of South Dakota had no cause to address it. Since Piper failed to raise any evidence or argument that the seated jury was biased, the Supreme Court of South Dakota's holding that Claim III.E lacked merit was consistent with Ross, 487 U.S. 81, and was a reasonable application of Strickland. Respondents are entitled to summary judgment on Claim III.E.

**B. Claim V: Sister Crowley**

Claim V alleges that Van Norman and Stonefield were ineffective when Fitzgerald cross-examined Sister Crowly about writing a letter to a female inmate at Piper's urging. Piper argues that Sister Crowley's letter did not violate prison policy and that trial counsel should have objected to the cross-examination, asked for an offer of proof that such a policy existed, and requested a recess to research the issue themselves. Doc. 67 at 93; Doc. 131 at 35–36.

The State's evidence on prison policy came from corrections officer Keith Ditmanson, who testified at trial that inmates are prohibited from communicating with each other through third parties. Doc. 90-5 at 142; Doc. 133 ¶ 16; Doc. 135 ¶ 16. When Fitzgerald cross-examined Sister

Crowley, she agreed with him that prison policy prohibited inmates from writing each other.  Doc.

90-8 at 158–60.  She also agreed that, looking back, the letter she wrote violated prison policy,

although this had not occurred to her at the time.  Id. at 159–61.  The letter was received into

evidence, and Sister Crowley acknowledged that it included an explanation that she was writing

on Piper's behalf because inmates could not write each other.  Id. at 160–61; Doc. 133 ¶ 18; Doc.

135 ¶ 18.  Stonefield's brief redirect of Sister Crowley did not address the letter or prison policy.

Doc. 90-8 at 161–62.

     The prison's policy and Sister Crowley's cross-examination came up again at Piper's state

habeas hearing.  Stonefield testified that he handled Sister Crowley's cross-examination "really

badly" and that he would act differently in hindsight.  Doc. 90-11 at 146–47, 160.  Van Norman

testified that his paralegal had asked the warden after Piper's trial whether prison policy prohibited

inmate-to-inmate communication through third parties, that she had drafted an affidavit about this

discussion, and that the affidavit said "the warden was very concerned about the exchange that had

taken place" between Fitzgerald and Sister Crowley.  Id. at 77–78.  Judge Macy sustained a hearsay

objection to Van Norman's description of the affidavit.  Id. at 78.  On cross-examination, Van

Norman testified that although he did not speak with the warden, the warden had told his paralegal

that there was no policy prohibiting inmate-to-inmate communications via third parties.  Id. at 86.

     On appeal in his state habeas case, Piper argued that trial counsel responded ineffectively

when the State asserted that Sister Crowley violated prison policy.  Doc. 2-1 at 139–141.  His

appellate brief stated that because the prison's policy was never introduced at trial, "it is still

unclear as to whether this letter was, in fact, in violation of any prison policy."  Id. at 140.  The

brief added that "habeas trial counsel did not determine whether this prison policy existed or not,

and at this time, there is no policy in the record." Id. at 141.  The Supreme Court of South Dakota

rejected Piper's claim on the merits:

> Whether the letter actually violated policy is still unsettled, despite
> the fact that Sister Crowley acknowledged she had violated the
> policy.  Under the circumstances, Piper has failed to prove his
> counsel acted unreasonably.  Further, Piper fails to show how the
> alleged error prejudiced the outcome of his resentencing.

Piper IV, 936 N.W.2d at 816.

Piper now argues that the Supreme Court of South Dakota unreasonably applied both

Strickland prongs and made an unreasonable finding of fact by concluding it was "still unsettled"

whether Sister Crowley's letter violated prison policy.  Doc. 131 at 37–38.  The reasonableness of

the Supreme Court of South Dakota's factual finding depends on the "evidence presented in the

State Court proceeding."  28 U.S.C. § 2254(d)(2); see also Shoop v. Twyford, 596 U.S. 811, 819

(2022) (explaining that review under § 2254(d)(2) "is expressly limited to the evidence presented

in the State court proceeding" (cleaned up and citation omitted)).  This Court noted in a previous

opinion that it is "unclear whether [Piper] made the [paralegal's] affidavit part of the record in his

state habeas case."  Doc. 122 at 82 n.24.  Although Piper included the affidavit in the appendix of

his federal habeas case, Doc. 2-2 at 177–78, his appellate brief in his state habeas case suggested

that the affidavit was not presented in the state court proceeding, see Doc. 2-1 at 140 (stating that

it was "unclear" whether the letter violated prison policy); id. at 141 (stating that "habeas trial

counsel did not determine whether this prison policy existed or not, and at this time, there is no

policy in the record").  Piper agreed at the February 28, 2025 hearing in this case that the affidavit

was not part of the state habeas record.

The Supreme Court of South Dakota reasonably found it "unsettled" whether Sister

Crowley's letter violated prison policy.  The question under § 2254(d)(2)'s "unreasonable

determination of the facts" clause "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Donelson v. Steele, 16 F.4th 559, 568 (8th Cir. 2021) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). A state court's factual determination is not unreasonable simply "because [the federal court] would have reached a different conclusion in the first instance," Brumfield v. Cain, 576 U.S. 305, 313–14 (2015) (citation omitted), or because there is "some contrary evidence in the record," Ervin v. Bowersox, 892 F.3d 979, 985 (8th Cir. 2018) (citation omitted). Instead, federal courts may "supersede the [state court's] determination only if reasonable minds reviewing the record would not disagree about the finding in question." Donelson, 16 F.4th at 568 (cleaned up and citation omitted). The evidence before the Supreme Court of South Dakota could easily lead reasonable minds to agree that it was unsettled whether Sister Crowley's letter violated prison policy. The paralegal's affidavit was not part of "the evidence presented in the State court proceeding." § 2254(d)(2). What the Supreme Court of South Dakota had before it, then, was Ditmanson's testimony that prisoner-to-prisoner communication via third parties violated prison policy, Sister Crowley's acknowledgment that her letter violated the policy, Piper's statement in his habeas brief that it was "unclear" whether the letter violated the policy, and Van Norman's testimony at the state habeas hearing. Although Piper argues that Van Norman's testimony established that no policy existed, Judge Macy sustained a hearsay objection to Van Norman's description of the affidavit. Whatever the force of Van Norman's testimony, it is not nearly enough to render the Supreme Court of South Dakota's factual finding unreasonable.

Piper has also failed to show that the Supreme Court of South Dakota unreasonably applied Strickland's prejudice prong. Piper argues that his attorneys' alleged failure to respond

appropriately to Sister Crowley's cross-examination prejudiced him because while her testimony was key to showing that he was a changed man, the jury was left with the impression that he had manipulated her. Piper is correct that the prosecution portrayed him as manipulative; Fitzgerald asked Sister Crowley whether Piper had manipulated her into doing something he could not, Doc. 90-8 at 160–61, and then pointed to Piper's "conn[ing]" of Sister Crowley as an example of him being a "master at manipulation." Doc. 90-10 at 52. On the record before the Supreme Court of South Dakota, however, it was "unsettled" whether the letter violated prison policy. Piper's argument to that court about the potential benefits of an appropriate response from his attorneys—showing that there was no manipulation because the letter did not violate prison policy—thus relied on speculation. It was not objectively unreasonable for the Supreme Court of South Dakota to find that this speculation did not create a reasonable probability that at least one juror would have reached a different result. See Piper v. South Dakota, 5:20-CV-05074, 2024 WL 1348502, at *28 (D.S.D. Mar. 29, 2024) (collecting cases and explaining that courts "routinely hold that speculation is not enough to show a reasonable probability that the results of a petitioner's trial would have been different"); Hill v. Sec'y, Fla. Dep't of Corrs., 578 F. App'x 805, 809 (11th Cir. 2014) (per curiam) ("Because Hill has not shown what the phone records would have demonstrated, she has not proved a reasonable probability that presenting the phone records would have changed the outcome of the proceeding."); see also Williams, 576 F.3d at 859–63 (reversing district court decision that state court had unreasonably applied Strickland's prejudice prong where the state court had found no prejudice because the petitioner had failed to show what mitigating evidence could have been presented and the district court's prejudice ruling depended on evidence not offered in state court).

The Supreme Court of South Dakota's decision would be reasonable even assuming that Piper's attorneys could have shown that the letter did not violate prison policy. True, the jury heard mitigating evidence about Piper's difficult upbringing, his parents' failure to secure the help he needed, and the positive things he had done since being imprisoned. See, e.g., Doc. 90-6 at 135–206, 236–251; Doc. 90-7 at 2–59, 127–48; Doc. 90-8 at 149–58, 168–78. The jury also heard testimony and argument that Piper should be held less culpable because of the group's dynamics and Piper's youth, ADHD, and drug abuse. Doc. 90-7 at 195–98, 205–08; Doc. 90-8 at 3–10, 14–22, 85–101; Doc. 90-10 at 58–94. But the aggravating evidence was weighty. Witnesses testified that Piper had said he wanted to know what it was like to kill someone. Doc. 90-1 at 128–29, 148–49; Doc. 90-5 at 168. Along with Page and Hoadley, Piper tortured, taunted, and humiliated their supposed friend Poage for nearly four hours before killing him. That murder allowed the trio to get away for a while with robbery. The jury also heard evidence that Piper had offered fellow inmates money to kill prison guards so he could escape, that he lacked remorse for murdering Poage and even had laughed about it, and that he had antisocial personality disorder. Doc. 90-1 at 123–29, 173–74; Doc. 90-2 at 69–70; Doc. 90-3 at 18–23, 26, 30; Doc. 90-6 at 13, 23–25. Considering the entire record, a fairminded jurist could conclude that the State's evidence was so strong that Sister Crowley's testimony, free from implication that Piper had manipulated her, would not have created a reasonable probability of at least one juror voting against death.

### C. Claim VI: Ineffective Assistance by Appellate Counsel Miller

Claim VI alleges Miller was ineffective by failing to appeal the denial of Piper's motion for a mistrial made after the State elicited testimony that inmates are allowed television. Doc. 67 at 94–97; Doc. 131 at 38–42. Piper argues that Fitzgerald's question violated Judge Eckrich's

pretrial order and that there is a reasonable probability that the mistrial issue would have succeeded on appeal.

The order Piper relies on was an oral one issued during the final pretrial conference. Stonefield argued during the conference that the court should bar the State from mentioning the privileges available to inmates serving life without parole. Doc. 90 at 28–29. He relied on a South Carolina case, State v. Burkhart, 640 S.E.2d 450, 487–89 (S.C. 2007), holding that evidence of prison privileges in a death penalty case was not relevant under state law. Doc. 90 at 29. Fitzgerald replied that some discussion of prison life was necessary to show that Piper was not a model prisoner, having received 75 disciplinary write ups while in the Penitentiary. Id. at 30. He gave the example of Piper communicating with other inmates despite being in solitary confinement for much of the day. Id. Judge Eckrich agreed that certain evidence about Piper's conditions of confinement could be admissible but doubted the relevance of particular privileges like cable television or subscriptions for reading materials. Id. at 30–31. As Judge Eckrich understood it, the State would only offer evidence of prison privileges if relevant to showing that Piper violated prison rules. Id. at 30–33. Judge Eckrich said that he would reread Burkhart and directed Fitzgerald to "stay away from any kind of specifics" for "the moment." Id. at 33–34.

Judge Eckrich did not mention the prison privilege issue again until Fitzgerald asked Woodward whether inmates are allowed to have television. Doc. 90-2 at 121–22. Judge Eckrich sustained an objection to the question, told Fitzgerald that he had "stepped over the line there," and ruled that prison privileges were irrelevant under Burkhart.[16] Id. at 121–22. He denied Piper's motion for a mistrial, though, finding that the single reference to television was not "irretrievable"

---

[16] Just a few moments later, however, Judge Eckrich said that he "actually had [the prison privileges issue] as a pending motion," although he knew he "did discuss it some, just to be clear." Doc. 90-2 at 122–23.

and was unlikely to have "sunk very deep" with the jury. Id. at 122, 126. Miller did not appeal this ruling. Piper claimed that the failure to do so constituted ineffective assistance, but the Supreme Court of South Dakota disagreed. It held that Miller made a reasonable "strategic decision" not to appeal the issue based on its "relative strength" and that Piper had failed to show prejudice. Piper IV, 936 N.W.2d at 816.

Piper now argues that the Supreme Court of South Dakota unreasonably applied both Strickland prongs and made an unreasonable determination of fact when it characterized Miller as having testified that "he made a strategic decision not to appeal the [mistrial] issue based upon his assessment of its relative strength." Piper IV, 936 N.W.2d at 816. None of these arguments are convincing. First, the Supreme Court of South Dakota did not unreasonably determine the facts. Piper argues that the court got it wrong because Miller did not recall the mistrial motion when asked at the habeas hearing whether he should have appealed it. Doc. 90-11 at 220. Shortly before that, however, Miller testified that he limited the appeal to Judge Eckrich's denial of Piper's motion to withdraw his guilty plea because he had reviewed the entire record and found no issue "that was even arguably close" to as strong as that claim. Doc. 90-11 at 218; Doc. 133 ¶¶ 27–28; Doc. 135 ¶¶ 27–28; see also Doc. 90-11 at 219; Doc. 133 ¶ 26; Doc. 135 ¶ 26. A reasonable jurist could interpret Miller's testimony as showing that he made a strategic decision not to appeal the mistrial issue, despite his inability to recall the issue nearly four years later at the habeas hearing. See Donelson, 16 F.4th at 568 (explaining that federal courts may "supersede the [state court's] determination only if reasonable minds reviewing the record would not disagree about the finding in question" (cleaned up and citation omitted)).

Second, Piper has not shown that the Supreme Court of South Dakota unreasonably applied Strickland's performance prong. "Effective appellate counsel should not raise every nonfrivolous

argument on appeal, but rather only those arguments most likely to succeed." <u>Davila v. Davis</u>, 582 U.S. 521, 533 (2017). Miller's decision not to raise the mistrial issue was "not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." <u>Id.</u>; <u>see also</u> <u>Deck v. Jennings</u>, 978 F.3d 578, 584 (8th Cir. 2020) (same). Fairminded jurists could find that the mistrial claim was not plainly stronger than the guilty plea claim Miller raised. After all, courts in South Dakota will not grant a mistrial unless the conduct "in all probability[] produced some effect upon the jury's verdict and is harmful to the substantial rights of the defendant." <u>State v. Ortiz-Martinez</u>, 995 N.W.2d 239, 244–45 (S.D. 2023) (cleaned up and citation omitted); <u>see also</u> <u>State v. Mitchell</u>, 491 N.W.2d 438, 441 (S.D. 1992) (applying this same standard for a motion for a mistrial based on prosecutorial misconduct). This standard requires that the moving party establish "actual prejudice," <u>Ortiz-Martinez</u>, 995 N.W.2d at 245, a showing that would have been very difficult for Piper. Indeed, the television reference occurred just once during a ten-day trial, Judge Eckrich sustained an objection to it,[17] and the jury heard a mountain of properly admitted evidence establishing the aggravating factors and horrendous circumstances of Poage's murder. These circumstances make it unlikely that a brief reference to television in prison influenced the jury's verdict or caused it to reach a decision on an improper basis. Beyond that, the Supreme Court of South Dakota has suggested that the circumstances of prison life can be relevant in a death penalty case. <u>See</u> <u>State v. Rhines</u>, 548 N.W.2d 415, 453–54 (S.D. 1996). The petitioner in <u>Rhines</u> argued that the jury's question about whether prison conditions "might allow 'distraction from his punishment'" and whether he would be eligible for work release showed that the jury considered irrelevant or unfairly prejudicial matters. <u>Id.</u> The court rejected

---

[17]Judge Eckrich instructed the jurors at the beginning of trial that they must ignore any question to which he sustained an objection and should not try to guess what the answer might have been. Doc. 90 at 82.

this argument, explaining that "[p]rison life was an appropriate topic for discussion when weighing the alternatives of life imprisonment and the death penalty." Id. at 454; see also State v. Holden, 488 S.E.2d 514, 528 (N.C. 1997) (approving argument that the defendant would enjoy various privileges if the jury sentenced him to life in prison rather than death). This Court certainly does not read Rhines as allowing prosecutors to make a sentence of life in prison sound cushy, but there does not appear to be any prohibition per se in South Dakota on evidence about prison conditions that apply to a person serving a life sentence. Considering all the circumstances, the mistrial issue had a very low chance of succeeding. And while the guilty plea claim ultimately failed, it was a unique, thorny issue that had at least a chance of being resolved in Piper's favor. Fairminded jurists could disagree on the relative strength of the claims and the reasonableness of Miller's approach.

Third, the Supreme Court of South Dakota reasonably resolved Strickland's prejudice prong. This prong required Piper to show a reasonable probability that he would have won his appeal had Miller raised the mistrial claim. Carter v. Bowersox, 265 F.3d 705, 713–14 (8th Cir. 2001). Fairminded jurists could agree that Piper failed to make this showing given that television was referenced just once during the ten-day trial, Judge Eckrich sustained an objection to the question, the jury heard overwhelming evidence on the aggravating factors and the brutality of Poage's murder, and there does not appear to be any prohibition per se in South Dakota on evidence about prison conditions in death penalty cases. See State v. Dillon, 788 N.W.2d 360, 369 (S.D. 2010) (finding no abuse of discretion where trial court denied a mistrial motion after the prosecution's expert testified that the majority of people claiming to have been sexually abused are telling the truth); State v. Anderson, 546 N.W.2d 395, 401 (S.D. 1996) (holding that trial court did not abuse its discretion by denying a motion for mistrial after a witness testified that the

defendant was on parole; although a pretrial order precluded mention of the defendant's parole status, the evidence of guilt was overwhelming).

### D. Claim IX: Investigation of Tom Curtis's Criminal History

Claim IX.E alleges that Van Norman and Stonefield were ineffective by failing to discover and use for impeachment Curtis's recent rape convictions. Doc. 67 at 135–37; Doc. 131 at 42–51.[18] Curtis testified at Piper's resentencing trial that a jury had convicted him (wrongly, according to Curtis) of eight cocaine distribution charges. Doc. 90-3 at 36–39. At the state habeas hearing, however, Van Norman testified that his paralegal had checked Curtis's record after Piper's resentencing trial and discovered that Curtis had been convicted of several rape charges concurrent with his cocaine distribution charges.[19] Doc. 90-11 at 50, 52, 101; see also Doc. 133 ¶ 37; Doc. 135 ¶ 37. Van Norman testified that Fitzgerald had provided a criminal history for Curtis at some point before Piper's resentencing but that this history did not include the Utah convictions. Doc. 90-11 at 49, 101. Van Norman acknowledged that he could have received the criminal history before Curtis's convictions for rape and cocaine distribution occurred and that he did not request an updated criminal history for Curtis right before trial. Id. at 49–50, 54, 94.

On appeal of Piper's habeas case, Kolbeck argued that the State had violated Piper's due process rights by not providing an updated criminal history that included Curtis's rape convictions and by permitting Curtis to lie under oath about his Utah convictions. Doc. 2-1 at 135–39. He

---

[18]Piper alleged in Claims IX.A–IX.D that the State violated his due process rights by (1) failing to disclose that Curtis was awaiting sentencing on rape convictions in Utah when he testified at Piper's resentencing trial in July 2011, and (2) failing to correct Curtis's omission of the rape convictions when describing his criminal history to the jury. Doc. 67 at 128–35. This Court granted summary judgment on those claims because they were procedurally defaulted, and Piper could not show cause for the default. Doc. 122 at 97–106.

[19]A 2013 opinion from the Utah Court of Appeals, over two years after Piper's resentencing trial, shows that a jury convicted Curtis of four counts of giving a minor female victim cocaine and four counts of raping her. State v. Curtis, 317 P.3d 968, 971–72 (Utah Ct. App. 2013).

also asserted that trial counsel was ineffective by failing to adequately investigate Curtis's criminal background. Id. Although Kolbeck's appellate brief cited Van Norman's testimony about the rape convictions, it appears that Piper's state habeas attorneys never offered a judgment or other document establishing that Curtis had, in fact, been convicted of rape in Utah. The State's appellate brief argued that Piper had not identified impeaching convictions that trial counsel had failed to discover, and that Piper was simply speculating that Curtis had convictions in Utah "beyond those that were known by his counsel and used as impeachment." State's Appeal Brief, 2018 WL 10152749, at *67–69 (July 10, 2018).

The Supreme Court of South Dakota rejected Piper's ineffective assistance claim, finding no prejudice because Piper had failed to show that an investigation of Curtis would have "yielded meaningful impeachment information." Piper IV, 936 N.W.2d at 815. Although the court noted that Curtis was awaiting sentencing in Utah "on felony charges" when he testified at Piper's resentencing trial, it did not specify what those "felony charges" were. Id. Respondents argued in an earlier round of briefing in this Court that Piper failed to offer evidence of Curtis's rape conviction in his state habeas case and that he could not do so now. Doc. 75 at 14–15; Doc. 97 at 31. Respondents now seem to accept that Curtis's rape convictions were part of the record before the Supreme Court of South Dakota, however. They argue that the court reasonably found the rape convictions would not have created a reasonable probability of a different result. Doc. 127 at 11–13; Doc. 134 at 9–12. Piper disagrees, pointing to the Supreme Court of South Dakota's holding that he could not show prejudice because his claim lacked "a predicate showing that the investigation would have yielded meaningful impeachment information." Piper IV, 936 N.W.2d at 815. He argues that this constitutes an unreasonable determination of fact and an unreasonable application of Strickland because the state court record shows that an appropriate investigation

would have revealed the meaningful impeachment evidence of Curtis's rape convictions. Doc. 131 at 49–50.

Determining whether the Supreme Court of South Dakota treated Curtis's rape convictions as part of the record is difficult; although Piper discussed the convictions in his brief, the State responded that he had failed to offer evidence of the convictions, and the court never mentioned the rape convictions in its opinion. State's Appeal Brief, 2018 WL 10152749, at *67 n.7 (July 10, 2018) ("Piper has presented no evidence to establish that the state suppressed Curtis' updated criminal records, or that updated records contained impeachment material. Piper's counsel . . . produced no documentation that Curtis had been convicted of a rape charge." (cleaned up)). Not knowing how or whether Curtis's rape convictions factored into the Supreme Court of South Dakota's decision also complicates analyzing whether AEDPA should apply. See Cooper v. Sec'y, Dep't of Corrs., 646 F.3d 1328, 1353 (11th Cir. 2011) (explaining that AEDPA deference does not apply when a state court unreasonably determines the facts relevant to a claim). But federal courts need not decide whether AEPDA deference applies when the petitioner's claim would fail even under de novo review. Berghuis v. Thompkins, 560 U.S. 370, 390 (2010). That is the situation here.

Piper argues that Curtis's testimony about the escape plan and Piper's lack of remorse was devastating[20] because it suggested he posed a danger in the future and was incapable of reform. Piper contends there is a reasonable probability that at least one juror would have discounted

---

[20]Curtis also testified to things Piper had told him about Poage's murder, including that Piper had said they were going to make Poage perform oral sex, that Piper had said the murder was his idea, that Piper thought Poage begging for his life was funny, that Piper and Hoadley stood on Poage's back and head when trying to drown him in the creek, and that Piper had said he participated in throwing rocks at Poage's head. Doc. 90-3 at 25–32.

Curtis's testimony and voted for life had counsel only impeached Curtis with the rape convictions and shown that he had lied about them. Doc. 131 at 48–49.

This Court disagrees. To start, Piper's argument assumes the jury would have disregarded the escape plan and his supposed remorselessness had counsel undermined Curtis's credibility with the rape convictions. But Curtis wasn't the only witness to testify about these issues. Kenneth Tingley, who was housed with Piper in the Lawrence County Jail before his first trial, testified that Piper had offered him money to kill a female guard so Piper could escape. Doc. 90-6 at 12, 24–25. According to Tingley, Piper discussed the escape plan with fellow inmates Tobe Givens[21] and "Tom." Id. at 24.[22] Tingley did not know inmate Tom's last name, but he was presumably referring to Tom Curtis. Id. Curtis likewise testified that Piper tried to enlist Tingley and Givens in his escape plan. Doc. 90-3 at 19–20, 46. And at least two other witnesses echoed Curtis's testimony that Piper lacked remorse for murdering Poage. Doc. 90-1 at 123–29, 145; Doc. 90-6 at 13. Given the ample evidence corroborating Curtis's testimony, the rape convictions would probably not have caused even one juror to discount the prison escape plan and Piper's supposed

---

[21] Tobe Givens, a prisoner with Piper at the Lawrence County Jail, testified about the plan at Piper's first trial. Doc. 121-2 at 617–628. Givens said that Piper offered him, Tingley, and Curtis money to "take out" two prison guards and help Piper escape. Id. at 619–20. He also testified about Piper seeming to have no remorse when recounting the brutal details of Poage's murder. Id. at 627. Reporting difficulty locating Givens to testify at Piper's resentencing trial, the State sought to read his testimony from the first trial into the record. Doc. 90-5 at 11–16. Judge Eckrich excluded Givens's testimony as cumulative to Curtis's and Tingley's testimony. Doc. 90-5 at 15–16; Doc. 90-6 at 2–3.

[22] Tingley was unavailable at Piper's resentencing trial, so the State read his testimony from Piper's first trial into evidence. Doc. 90-6 at 10. Piper now argues that Curtis's testimony was more important than Tingley's because Curtis testified in person. Doc. 138 at 11. But Judge Eckrich instructed the jury to consider Tingley's testimony just as it considered testimony by live witnesses. Doc. 90-6 at 10; Doc. 121-10 at 200. And Tingley's testimony did not somehow become less corroborative just because it was read into evidence. See Strickland, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.").

lack of remorse.  See United States v. Orr, 636 F.3d 944, 953 (8th Cir. 2011) ("[I]t is very difficult to show the trial outcome would have been different had specific [impeaching] questions been asked on cross examination, particularly where other trial testimony repeatedly corroborated the challenged testimony." (cleaned up and citation omitted)); United States v. Delana, 404 F. App'x 318, 322–23 (10th Cir. 2010) (unpublished) (holding that the defendant was not prejudiced by counsel's failure to impeach witness given "the substantial amount of evidence that otherwise corroborated [the witness's] testimony").

Next, Piper's argument ignores that Van Norman damaged Curtis's credibility even without the rape convictions.  Van Norman elicited testimony from Curtis that he was a convicted burglar and thief who had spent multiple years in prison.  Doc. 90-3 at 35–36.  Incredibly, Curtis told Van Norman that he was completely innocent of his eight recent convictions for distributing cocaine.  Id. at 37–39.  Jurors could easily have inferred from this that Curtis would lie under oath. And while Piper is correct that knowing that four of these eight convictions were for rape and that Curtis had lied about them would have undermined Curtis's credibility to an even greater extent, the additional benefit would have been somewhat marginal considering the damage Van Norman did to Curtis's credibility and the other evidence corroborating the gist of Curtis's testimony.  See Lowery v. Anderson, 225 F.3d 833, 843–44 (7th Cir. 2000) (holding that the defendant was not prejudiced by his lawyer's failure to impeach a witness with additional evidence where the witness's credibility had already been undermined and his testimony was corroborated by other witnesses).

Still another problem with Piper's argument is the significance it assigns to Curtis's testimony about the escape and Piper's lack of remorse.  Although this testimony hurt Piper's case, it paled in comparison to the gruesome facts of Poage's murder.  Again, near the start of this

65

brutality, a combat-boot clad Piper kicked the defenseless Poage in the face so hard that he knocked him unconscious. Piper and his accomplices then forced Poage to drink hydrochloric acid mixed with beer and discussed in Poage's presence various ways of killing him. They drove Poage to a remote location where they made him strip in the below-freezing night and tried burying him in the snow and drowning him in an icy creek. This didn't kill Poage, so Piper stabbed him in the head with a knife and kicked him with his combat boots. Piper stood by while Page and Hoadley similarly stabbed and beat Poage. Poage pleaded for mercy throughout the attack, but Piper and his accomplices ignored and taunted him. It was these horrendous facts that damaged Piper's case the most, not Curtis's testimony about Piper's escape plan and lack of remorse.

As yet another argument, Piper points to Kyles v. Whitley, a case where the Supreme Court found that the cumulative effect of evidence suppressed by the state raised a reasonable probability that its disclosure would have led to a different result. 514 U.S. 419, 441–54 (1995). Piper argues that Kyles shows that a lack of impeachment evidence can be prejudicial even when the prosecution introduces corroborating evidence. See id. at 445 ("[T]he effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others . . . ."). Though that may be true, the critical question is still whether Piper has shown a reasonable probability that, but for Van Norman's failure to impeach Curtis with the rape convictions, at least one juror would have voted for life. Piper has not made this showing, for the reasons already explained.[23]

_____

[23]Piper's case is also far different from Kyles. The "heart" and "essence" of the prosecution's case in Kyles was testimony from four eyewitnesses identifying the petitioner as the killer. Id. at 430, 441. Yet the prosecution never disclosed statements by the two most important eyewitnesses that would have "resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." Id. at 441. The prosecution also failed to disclose statements from an informer that would have allowed the defense "to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good

Piper also cites to the Supreme Court's very recent decision in Glossip v. Oklahoma, 145 S. Ct. 612 (2025). Petitioner Glossip was convicted of paying Justin Sneed to murder Glossip's boss and received a death sentence. Id. at 618–19. As the star witness at trial, Sneed testified that Glossip had promised him thousands of dollars to commit the murder. Id. at 618. Sneed told the jury that jail personnel had given him lithium when he asked for medication for a cold and that he didn't know why this happened because he had never seen a psychiatrist. Id. at 620. The prosecution argued that Sneed "had no propensity to violence except at Glossip's direction." Id. at 621. After Glossip's conviction, the state released eight boxes of previously undisclosed documents, including:

- pretrial notes from the head prosecutor showing that Sneed had told the prosecutor that a doctor prescribed him lithium;
- medical records the prosecution had showing that the lithium was to treat Sneed's undisclosed bipolar disorder;
- pretrial letters from Sneed to his attorney asking about recanting his testimony; and
- a letter suggesting that the state had violated a sequestration order by speaking to Sneed about his testimony.

Id. at 618, 621–23.

The Supreme Court held that Glossip was entitled to a new trial under Napue v. Illinois, 360 U.S. 264 (1959),[24] because the state had failed to correct Sneed's false testimony and this failure was "material," meaning there was a "reasonable likelihood" that it "could have affected the judgment of the jury." Glossip, 145 S. Ct. at 626–28, 631 (cleaned up and citation omitted). "Evidence can be material," the Court explained, "even if it goes only to the credibility of the

---

faith of the investigation, as well." Id. at 445. The net effect of this and other suppressed evidence created a reasonable probability that disclosure would have led to a different result. Id. at 441–54. Curtis's rape convictions have nowhere near the significance of the suppressed evidence in Kyles.
[24]Napue held that prosecutors have a constitutional duty to correct testimony they know is false. Glossip, 145 S. Ct. at 626.

witness." Id. at 628 (cleaned up and citation omitted).  Since Sneed's testimony was "the only direct evidence of Glossip's guilt of capital murder," his credibility was material and indeed determinative of Glossip's case.  Id.  Correcting Sneed's false testimony, the Court found, would have significantly damaged his credibility by showing the jury that he "was willing to lie to them under oath."  Id.  This correction would also have undermined the prosecution's theory that Sneed was harmless without Glossip, as bipolar disorder can "trigger impulsive violence" when combined with Sneed's acknowledged methamphetamine use.  Id.

Piper argues that Glossip draws a qualitative distinction between general evidence of untrustworthiness and evidence that the witness lied to the jury under oath.  He contends that, like the Supreme Court in Glossip, this Court should find the evidence of lying under oath material even though there was other impeaching evidence.  But Glossip is too dissimilar to help Piper.  Most significantly, the prosecution's case in Glossip "rested centrally on Sneed's credibility."  Id. at 629.  In fact, there was no other evidence showing Glossip arranged the murder, and "the jury could convict Glossip *only* if it believed Sneed."  Id. at 628 (emphasis added).  Not so here.  Curtis's testimony helped the State but was hardly central to its case for death.  Testimony from Tingley included that Piper planned to kill a guard to escape, and testimony from Tingley and others would have allowed the jury to find that Piper lacked remorse even if the jury completely discounted Curtis's testimony.  Beyond that, Curtis's testimony that he was innocent of all eight convictions for distributing cocaine already showed the jury that he would lie under oath; raising that four of those were actually rape convictions thus would not have had the same effect as the prosecutor correcting the false testimony in Glossip.

Piper finally argues that the case for death was no "slam dunk" because another jury sentenced Hoadley to life and two justices of the Supreme Court of South Dakota agreed in Piper

I, that Piper's sentence was disproportionate to Hoadley's sentence. The Supreme Court of South Dakota has explained at length why Piper is more culpable than Hoadley. Piper I, 709 N.W.2d at 815–18; Piper III, 842 N.W.2d at 348–49. And Piper's argument again overstates the significance of Curtis's testimony and the impact the rape convictions would have had.

Considering the evidence corroborating Curtis's testimony, the somewhat marginal benefit of impeaching Curtis with the rape convictions, and the horrendous nature of Poage's murder, Piper has not shown a reasonable probability that raising in cross-examination or otherwise Curtis's rape convictions would have caused at least one juror to weigh the aggravating and mitigating circumstances differently and vote for life. Respondents are entitled to summary judgment on Claim IX.E.

### E. Claim XIII: Cumulative Prejudice

Claim XIII alleges that Piper is entitled to habeas relief because of the cumulative prejudice of the constitutional violations in his case. He argues that he raised this claim in his reply brief in Piper IV but says that the Supreme Court of South Dakota never addressed it. Doc. 67 at 168. Respondents did not move for summary judgment on Claim XIII in the last round of briefing because they did not realize it was a free-standing claim. Doc. 122 at 119–20. Respondents now move for summary judgment on the claim and summary judgment is appropriate. As Piper recognizes, the Eighth Circuit has held that neither the cumulative effect of trial errors nor the cumulative effect of attorney errors is a ground for habeas relief. Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996); see also id. ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation."); Middelton v. Roper, 455 F.3d 838, 851 (8th Cir. 2006) ("We repeatedly have recognized a habeas petitioner cannot build a showing of

prejudice on a series of errors, none of which would by itself meet the prejudice test." (cleaned up and citation omitted)).  Respondents are entitled to summary judgment on Claim XIII.[25]

## IV.     Conclusion

For the reasons stated above, it is

ORDERED that Respondents' Motion for Summary Judgment on Exhausted Claims, Doc. 126, is granted.  It is further

ORDERED that Piper's Amended Petition for Writ of Habeas Corpus, Doc. 67, is dismissed.  It is further

ORDERED that Piper's motion for a certificate of appealability and accompanying brief is due on May 1, 2025.  This Court is familiar with the standard for certificate of appealability issuance in death penalty case appeals.  Counsel may reference prior briefing or decisions of this Court in lieu of arguing about the substantiality of certain claims.  The brief shall not exceed 20 pages.  It is further

ORDERED that Respondents' reply brief is due on May 22, 2025, and shall not exceed 20 pages.  It is finally

ORDERED that any reply brief from Piper is due by June 9, 2025.

DATED this 21st day of March, 2025.

---

[25]Piper asks this Court to find that he properly exhausted this claim by raising it in his reply brief before the Supreme Court of South Dakota.  The Supreme Court of South Dakota does not consider arguments raised for the first time in a reply brief, Mach v. Connors, 979 N.W.2d 161, 173 (S.D. 2022); State v. Roedder, 923 N.W.2d 537, 545 (S.D. 2019), however, and courts have held that a petitioner procedurally defaults a claim raised for the first time in a reply brief when the state court's rules deem arguments raised in that manner waived, see Atwater v. Crosby, 451 F.3d 799, 810 (11th Cir. 2006).

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE